# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,

Plaintiffs-Appellees,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## EMERGENCY MOTION FOR A STAY PENDING APPEAL
## AND AN IMMEDIATE ADMINISTRATIVE STAY

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MICHAEL S. RAAB
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Plaintiffs-appellees are Joe Neguse, in his capacity as a Member of the U.S. House of Representatives; Adriano Espaillat, in his capacity as a Member of the U.S. House of Representatives; Bennie G. Thompson, in his capacity as a Member of the U.S. House of Representatives; Jamie Raskin, in his capacity as a Member of the U.S. House of Representatives; Robert Garcia, in his capacity as a Member of the U.S. House of Representatives; J. Luis Correa, in his capacity as a Member of the U.S. House of Representatives; Jason Crow, in his capacity as a Member of the U.S. House of Representatives; Veronica Escobar, in her capacity as a Member of the U.S. House of Representatives; Daniel S. Goldman, in his capacity as a Member of the U.S. House of Representatives; Jimmy Gomez, in his capacity as a Member of the U.S. House of Representatives; Raul Ruiz, in his capacity as a Member of the U.S. House of Representatives; Norma Torres, in her capacity as a Member of the U.S. House of Representatives; and Kelly Morrison, in her capacity as a Member of the U.S. House of Representatives. Defendants-appellants are U.S. Immigration and Customs

Enforcement; Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; the U.S. Department of Homeland Security; and Kristi Noem, in her official capacity as Secretary of the U.S. Department of Homeland Security. Lawyers Defending American Democracy participated as amicus curiae in district court.

**B. Rulings Under Review**

The ruling under review (issued by Judge Jia M. Cobb) is an order filed March 2, 2026, granting plaintiffs' motion for a stay of agency action. The accompanying memorandum opinion is available on Westlaw at 2026 WL 265647.

**C. Related Cases**

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

/s/ Steven A. Myers
STEVEN A. MYERS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

STATEMENT ............................................................................. 3

ARGUMENT .............................................................................. 9

I.   The Government Is Likely To Succeed On The Merits. ..................... 9

   A.  The Members Lack Article III Standing. ......................................... 9

   B.  The Members' APA Claims Are Precluded By Statute. ................ 18

   C.  The Advance-Notice Requirement Complies With All Applicable
   Funding Restrictions. .......................................................... 23

II.  The Remaining Factors Support A Stay. ......................................... 26

ADDENDUM

# INTRODUCTION

The Secretary of Homeland Security has determined that members of Congress must provide seven days' notice before visiting an Immigration and Customs Enforcement (ICE) detention facility. As ICE explained, this requirement is "critical to ensure the safety of ICE facilities for staff, detainees, and visitors" so that "ICE can allocate the staff and resources necessary to ensure these visits can take place safely." Add.70.

At the request of individual members of Congress suing in their capacities as such, the district court stayed the notice policy as inconsistent with an appropriations rider, Section 527, that limits ICE's ability to use certain funds to "prevent" members of Congress from entering detention facilities. *See* Add.72-144. But even after the government promulgated a new policy making clear that implementation and enforcement would be funded with money appropriated by the One Big Beautiful Bill Act (OBBBA) and therefore not subject to Section 527—and even after the appropriations bill incorporating Section 527 expired—the district court *still* prohibited the government from enforcing it. Add.244-87. Those orders are wrong at

every step, and the government respectfully requests an immediate administrative stay and a stay pending appeal.[1]

At the outset, legislators lack Article III standing when their asserted injury "is not claimed in any private capacity but solely because they are Members of Congress." *Raines v. Byrd*, 521 U.S. 811, 821 (1997); *see Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019) (explaining that "individual members lack standing to assert the institutional interests of a legislature"). An "injury to official authority or power" cannot confer Article III standing. *Raines*, 521 U.S. at 826. And plaintiffs' standing theory is especially weak now that the government has made clear that it will implement and enforce this policy using funds appropriated by the OBBBA, which grants no rights to legislators.

Even if the Court had jurisdiction, the Anti-Deficiency Act, not the Administrative Procedure Act (APA), governs claims that the Executive Branch has unlawfully expended funds. Beyond that, the operative policy is lawful because it instructs ICE to implement and enforce it

---

[1] Plaintiffs oppose. When it entered its stay order, the district court denied the government's request for a stay pending appeal. Add.286-87.

using funds *not subject to Section 527* (a provision that has since lapsed), and the district court erred in second-guessing the government's determination that it can enforce the policy using funds appropriated by the OBBBA. Finally, the district court's order disregards the government's determination that the policy is necessary to ensure the safety of members of Congress, ICE personnel, and detainees, thereby harming the government and the public interest.

## STATEMENT

1. ICE oversees civil immigration detention. To "protect staff, detainees, and the surrounding community, and to maintain order, ICE enforces strict security measures, including advance scheduling of facility tours, maintaining a secure perimeter, and screening all visitors prior to entry." Add.70.

Since June 2025, ICE has required that members of Congress and staff provide seven days' notice before visiting a detention facility. Add.69. Such notice "is necessary to ensure that ICE can allocate the staff and resources necessary to ensure these visits can take place safely." Add.70. "Visits from Members of Congress and their staff are resource intensive because ICE must ensure the safety of these high-

profile visitors and any unannounced visit is highly disruptive to ICE's immigration enforcement operations." Add.70. In particular, "Members of Congress and their staff require screening at entry to facilities, access to locked units in facilities, and escorts between locked units in facilities." Add.70.

2.    Section 527(a) of the legislation appropriating funds to ICE through September 30, 2024, provided that "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent [a member of Congress or staff] from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619 (2024). Subsection (b) provided that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight." *Id.* § 527(b), 138 Stat. at 619. And subsection (c) provided that, as to congressional staff, "the Department of Homeland Security may require that a request be made at least 24 hours in advance." *Id.*

§ 527(c), 138 Stat. at 619. This condition was incorporated into various continuing resolutions, including the bill funding ICE through February 13, 2026. *See* Pub. L. No. 119-75, div. H, § 101 (2026). Since February 13, 2026, however, that continuing resolution—and the appropriations rider, which applies to funds it appropriated—has expired.

Separately, on July 4, 2025, Congress enacted Pub. L. No. 119-21, 139 Stat. 72 (2025), commonly known as the OBBBA. That legislation appropriated more than $2 billion to the Secretary of Homeland Security, to remain available through September 30, 2029. *Id.* tit. X, subtitle A, pt. II, § 100051, 139 Stat. at 385. That funding was appropriated for "immigration and enforcement activities," including "transportation costs and related costs associated with the departure or removal of aliens" and "the assignment of Department of Homeland Security employees … to carry out immigration enforcement activities." *Id.* § 100051(1)-(3), 139 Stat. at 386. It also appropriated nearly $30 billion for ICE, to remain available through September 30, 2029. *Id.* § 100052, 139 Stat. at 387. That funding was appropriated for "[h]iring and training additional [ICE] personnel … to carry out immigration enforcement activities"; "transportation costs and related costs

associated with alien departure or removal operations"; and "facility upgrades to support enforcement and removal operations." *Id.* § 100052(1), (4), (6), 139 Stat. at 387-89.  This funding is not subject to Section 527.

**3.**     Plaintiffs initially contended that the June 2025 notice requirement violated Section 527 and impeded "their individual duties as members of Congress by denying them information that is integral to completing constituent casework, to working effectively on congressional committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in its custody."  Add.23-24.  On December 17, 2025, the district court stayed the June 2025 policy under 5 U.S.C. § 705.  Add.72-144.

The district court found that the Members had Article III standing.  It reasoned that their asserted injuries—"denial of physical access" and "inability to gather in-person information," Add.90—would suffice if they were ordinary individuals.  Add.90-99.  It then held that their injuries were "personal rather than institutional" because the

statute "provides access to ICE facilities for individual congresspeople." Add.105-06.

The district court rejected the government's argument that the Anti-Deficiency Act precluded APA review. Add.121-25. And it concluded that the June 2025 policy violated Section 527(a) because it "stops visiting Members of Congress from entering a facility unless they have provided seven days of advance notice." Add.127-28. It observed, however, that the result "might well be different" if "the Government demonstrate[d] different facts regarding the sources of funding DHS has used to promulgate and implement the challenged policies." Add.142. After finding that the remaining factors supported a stay, Add.137-43, it stayed the policy under 5 U.S.C. § 705.

**4.** Rather than appealing, Secretary Noem issued a new policy on January 8, 2026. Add.146-47. While its requirements are substantively identical to the June 2025 policy, it requires that ICE "implement[] and enforce[]" it "exclusively with money appropriated by the OBBBA." Add.147. Thus, "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding." Add.147. The

policy further directs the Chief Financial Officer to "ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." Add.147. In a declaration, ICE reiterated that it would track relevant costs to ensure that they were "properly recorded against" OBBBA appropriations. Add.150. And on February 2, 2026, when DHS's funding subject to Section 527 had lapsed, it issued a "new policy that is identical in substance to the January 8 access policy." Add.243.

On March 2, 2026, the district court stayed the new policy pursuant to 5 U.S.C. § 705. Add.244-87. On the threshold issues, it largely reincorporated its earlier analysis. Add.256-59. On the merits, it found that the revised policy was contrary to law because "Section 527-restricted funds have likely been used in" promulgating it. Add.260. In the court's view, Section 527 would be violated even if "incidental … expenditures" subject to Section 527 were incurred, Add.265, including using items like "'paper,'" Add.266. And while the court noted defendant's intentions to use exclusively OBBBA funds, it found that defendants were not permitted "to use OBBBA funds for at least some of the relevant expenditures." Add.273. Finally, the Court

rejected arguments that it should deny a stay because (1) the government had reissued the policy on February 2, while it lacked funds subject to Section 527, Add.278-81, or (2) that at the time of the district court's order, the appropriations bill extending Section 527 had lapsed, Add.281.  After determining that the remaining factors favored plaintiffs, Add.283-84, the district court again stayed the policy.

## ARGUMENT

This Court should enter a stay pending appeal because the government is likely to succeed on the merits, it will be irreparably harmed without a stay, a stay will not meaningfully injure the Members, and the public interest supports a stay.  *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.      The Government Is Likely To Succeed On The Merits.

### A.      The Members Lack Article III Standing.

A stay is warranted because the government is likely to succeed in demonstrating that the Members lack Article III standing.

**1.**      "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers."  *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (quotation omitted).  Article III constrains the types of controversies justiciable in federal courts to those "that were the

traditional concern of the courts at Westminster." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (citation omitted).

As the Supreme Court recognized in *Raines*, suits brought by individual legislators thus pose special standing problems. 521 U.S. at 820-21. In *Raines*, six representatives challenged the Line Item Veto Act, which permitted the President to cancel specific appropriations. *Id.* at 813-14. The plaintiffs argued that the act had injured them by "alter[ing] the legal and practical effect of [their] votes." *Id.* at 816 (quotation marks omitted). The Court held that any diminution of legislative powers was not cognizable; such harm arose "solely because they [we]re Members of Congress," not "in any private capacity." *Id.* at 821. And an elected Representative holds his seat "as trustee for his constituents, not as a prerogative of personal power." *Id.* at 821; *accord, e.g.*, *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). Moreover, the asserted injury attached to "the Member's seat": "If one of the Members were to retire tomorrow, he would no longer have a claim." *Raines*, 521 U.S. at 821. An "injury to official authority or power" could not confer Article III standing. *Id.* at 826.

That reasoning bars the Members from basing standing on deprivation of information to which they assert they are entitled solely because they are Members of Congress. As in *Raines*, each Member sues in his "capacity as an individual member of Congress," Add.157-58, alleging injury to an asserted right "to conduct oversight," Add.156. The Members assert no private-capacity right to inspect ICE facilities, and none exists. Indeed, Section 527 only applies where members seek entry "for the purpose of conducting oversight," Pub. L. No. 118-47, § 527(a), 138 Stat. at 619. As the district court noted, the Members "stress the importance of unannounced visits to their duties as Members of Congress, including their duties in drafting and passing legislation, timely serving constituents … , and conducting oversight of government operations." Add.85.

As in *Raines*, the Members' asserted injury arises "solely because they are Members of Congress." 521 U.S. at 821. And as in *Raines*, the injury attaches to the Member's seat: "If one of the Members were to retire tomorrow, he would no longer have a claim." *Id.* As in *Raines*, therefore, "injury to official authority or power" cannot create standing. *Id.* at 826.

**2.** The district court's principal error was to analogize this case to *Powell v. McCormack*, 395 U.S. 486 (1969), in which Congressman Powell challenged his exclusion from the House. Add.101-02, 110. As *Raines* explained, Congressman Powell asserted that he had been "singled out for specially unfavorable treatment as opposed to other Members" because he was denied something to which he was "personally" entitled—his paycheck and seat. 521 U.S. at 821 (emphasis omitted). *Raines* thus noted that Congressman Powell had sued in a "private capacity," whereas the *Raines* plaintiffs "purport[ed] to sue in their official capacities." *Id.* (quotation marks omitted). Here, the Members are suing in their capacities as members of Congress to challenge a policy applicable to every member on the grounds that it impedes them from performing their congressional duties. This case is a sequel to *Raines*, not *McCormack*.

The district court further suggested that the Members had suffered individual injuries because only they "sought … to exercise the right of access granted under Section 527 and were denied." Add.108. It is true that not every member of Congress has sought to enter ICE facilities, but analogous arguments could have been made each time

courts rejected standing for legislators. *See Raines*, 521 U.S. 811 (only certain members objected to Line Item Veto Act); *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) (same, as to executive order); *Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020) (per curiam) (same, as to receipt of purported emoluments). The question is not whether only some legislators care about an issue, but whether they challenge action that personally affects them.

The district court further suggested that this case does not involve the institutional rights of the legislature at all. Add.102-03. That contention is difficult to fathom. The implied power of oversight belongs to the legislative body, not individual members personally, and it is constrained by the legislative functions of that body. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020). Congress accordingly tied Section 527 to its oversight power, limiting it to access "for the purpose of conducting oversight." Pub. L. No. 118-47, § 527(a), 138 Stat. at 619. That is the antithesis of a private interest.

Indeed, it is telling that the district court relied on an opinion in *Maloney v. Carnahan*, 45 F.4th 215 (D.C. Cir. 2022) (Millett, J., concurring in denial of rehearing en banc), to conclude that the

Members' interests were not institutional.  Add.109.  In *Maloney*, this Court held that individual legislators had standing to demand information under 5 U.S.C. § 2954.  *See* 984 F.3d 50 (D.C. Cir. 2020). But after the government filed a certiorari petition explaining that the decision was irreconcilable with *Raines*, *see* Petition, *Carnahan v. Maloney*, No. 22-425 (U.S. Nov. 4, 2022), the Supreme Court granted certiorari, *Carnahan v. Maloney*, 143 S. Ct. 2456 (2023), plaintiffs voluntarily dismissed their suit, and the Supreme Court vacated this Court's decision, s*ee Carnahan*, 143 S. Ct. 2653 (2023).  Given those circumstances, *Maloney* is not persuasive.  And even if it had not been vacated, *Maloney* involved a statute providing members an affirmative right to request information, whereas this case merely involves a provision limiting the use of certain funds to exclude members, who lack a personalized interest in how funds are spent.

The district court also compared this case to *Committee on the Judiciary v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc), *see* Add.96-97, 105-06, but that is mistaken.  *McGahn*—which the government respectfully maintains was incorrectly decided—was brought by a congressional committee authorized by the House to sue

on its behalf. *McGahn* distinguished *Raines* as "narrowly concerned with the standing of individual Members of Congress," 968 F.3d at 775, which is precisely what this case is about. As *Virginia House of Delegates v. Bethune-Hill* explains, "individual members lack standing to assert the institutional interests of a legislature." 587 U.S. 658, 667 (2019). This Court took pains to observe in *McGahn* that, "unlike the unauthorized individual legislators in *Raines*," the plaintiff committee there "was authorized by House Resolution 430 to bring the present lawsuit." *Id.* at 776. The Members here, however, have *not* obtained authorization to sue on the House's behalf. *See Raines*, 521 U.S. at 829 (rejecting standing in part because "appellees have not been authorized to represent their respective Houses of Congress").

It may be that private citizens asserting vaguely analogous injuries could establish standing. *See* Add.90-99. But the same was true in *Raines*: private parties suffer an Article III injury when their right to vote is diluted, 521 U.S. at 837 (Stevens, J., dissenting), but the majority nonetheless held that the "dilution of institutional legislative power" could not support a claim by an individual Member of Congress.

15

521 U.S. at 826. A claim for relief in the hands of one plaintiff may not be justiciable even if it would be in the hands of another.

**3.** The lack of standing is reinforced by "history and tradition," which "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion*, 594 U.S. at 424 (quotation marks omitted). In *Raines*, the Court observed "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." 521 U.S. at 826. Similarly here, disputes about congressional demands for Executive Branch information traditionally have not ended up in court. "Instead, they have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 591 U.S. at 859. The district court rejected this contention, reasoning that Congress had already "passed legislation guaranteeing … access to individual Members." Add.114. But as set forth below, that is not what Congress did; it simply restricted the way in which ICE may spend some (but not all) of the funds appropriated to it.

**4.** Finally, even if plaintiffs had standing to enforce Section 527, that is not what this case is about now that the government has made clear its intentions to enforce and implement the policy exclusively with OBBBA funds. Even if the district court were right that Section 527 grants plaintiffs personal rights, the OBBBA unquestionably does not. And the sole remaining merits questions exclusively concern the OBBBA: whether it provides funds that the government may lawfully use for the policy and if so whether the government will in fact exclusively use such funds. Indeed, that is presumably why the district court acknowledged that plaintiffs would likely lack standing if "Defendants had established that every expenditure used to prevent Plaintiffs' entry into a given facility was funded by the OBBBA and not by appropriated funds." Add.258. The district court had no basis to question the government's representations that it would enforce and implement the policy exclusively using OBBBA funds, and plaintiffs lack standing to press an argument that the OBBBA does not authorize such expenditures.

At bottom, although "[t]here would be nothing irrational about a system that granted standing" to individual legislators over interbranch

disputes, "it is obviously not the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at 828.

**B.   The Members' APA Claims Are Precluded By Statute.**

Even if the Members had standing, their APA claims are precluded by statute. *See* 5 U.S.C. § 701(a)(1).

1.    Congress may impliedly preclude some parties from seeking APA review by enacting a detailed scheme that provides for review only by other parties.  For example, in *Block v. Community Nutrition Institute*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain orders.  467 U.S. 340, 346 (1984).  In holding that the statute precluded consumers from challenging those orders under the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id*. at 347.  As this Court has explained with respect to the Impoundment Control Act, "it does not make sense that the Congress

would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" under the APA.  *Global Health Council v. Trump*, 153 F.4th 1, 19 (D.C. Cir. 2025); *see also Department of State v. AIDS Vaccine Advocacy Coal.*, 146 S. Ct. 19 (2025) (noting government's "showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce [certain] appropriations").

In this case, the Anti-Deficiency Act precludes recourse to the APA.  The Members' theory is that the Executive Branch is spending funds without authorization, but the Anti-Deficiency Act is the statute that addresses purportedly unauthorized expenditures by Executive Branch officials—including claims that an expenditure violated an appropriations rider.  *See* U.S. Gov't Accountability Off., Principles of Federal Appropriations Law 6-82 to 6-84 (2006).

The Anti-Deficiency Act provides that the Executive Branch may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."  31 U.S.C. § 1341(a)(1)(A).  Where it is violated, the head of the agency must report the violation to the President, to Congress, and

to the Comptroller General. *Id.* § 1351. Congress further authorized the Executive Branch to pursue administrative and criminal penalties against responsible officials. *Id.* §§ 1349-1350. Yet Congress never suggested that actions taken in violation of the Anti-Deficiency Act are void, nor has it authorized judicial orders barring the expenditure of funds or providing other prospective equitable relief. *See Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) (Jackson, K.B., J.). Congress's view that the Anti-Deficiency Act is an adequate safeguard of its spending power forecloses the Members' reliance on the APA.

In this regard, it bears emphasis that Section 527 is simply a limitation on the Executive Branch spending certain funds in certain ways—precisely the subject comprehensively regulated by the Anti-Deficiency Act. As a funding statute, Section 527 does not grant Members of Congress an affirmative right to enter ICE facilities, and OBBBA does not address access by the Members at all. *See, e.g.*, *United States v. Vulte*, 233 U.S. 509, 514-15 (1914) (presumption that appropriations bills do not amend substantive law "follows naturally from the nature of appropriation bills"). The district court observed that Congress may amend substantive law in an appropriations act,

Add.78, and it is correct that a provision of an appropriations act may amend substantive law if "it does so clearly." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992); *see, e.g.*, *United States v. Will*, 449 U.S. 200, 222 (1980) (appropriations bill indicated that raises "shall not take effect" (quotation marks omitted)). But that principle does *not* mean that every funding provision automatically amends substantive law—which is why, for example, the government remained obligated to make payments under the Risk Corridor program even after Congress provided that "none of the funds made available" by the relevant act could be used to make them. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315-17 (2020) (alteration and quotation marks omitted).

Even if Section 527 were understood as creating oversight rights, and even if the OBBBA were not understood to qualify such rights, Congress has considered the circumstances under which disputes about congressional demands for information may be resolved in court. If a party fails to comply with a subpoena, Congress may refer the matter to the Executive Branch for prosecution. *See* 2 U.S.C. §§ 192, 194. Congress has also purported to authorize the Senate to bring civil

actions to enforce some subpoenas, though it has carved out most interbranch suits. *See id.* § 288d; 28 U.S.C. § 1365(b). These provisions would be superfluous if a member of Congress could file an APA action whenever he was dissatisfied with the Executive Branch's response to an oversight request. Given the provisions for enforcement of certain subpoenas and the mechanisms for enforcing appropriations, "the omission of [similar] provision[s]" for judicial enforcement of Section 527 is "sufficient reason to believe that Congress intended to foreclose" such actions. *Block*, 467 U.S. at 346-47.

**2.** The district court rejected this analysis, suggesting that *Block* "involved plaintiffs bringing claims under the very statute that precluded other avenues of judicial review." Add.124. Put differently, the theory seems to be that even if the Anti-Deficiency Act precludes APA review of claims alleging violations of the Anti-Deficiency Act, it cannot bar claims naming the appropriations acts themselves. But the fundamental point is that the Anti-Deficiency Act is the statute that provides potential consequences for unlawful expenditures by Executive Branch officials. The Members cannot avoid the preclusive force of that statute by failing to name it as a basis for their APA claims.

**C.    The Advance-Notice Requirement Complies With All Applicable Funding Restrictions.**

In all events, the January 2026 policy does not violate Section 527 because the government is not using funds subject to Section 527 to implement or enforce it.

The January 2026 policy does not implicate Section 527.  It is instead explicit: "ICE must ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA." Add.147.  "To that end, any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding."  Add.147.  The policy further directs the Department's Chief Financial Officer and General Counsel to "ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." Add.147.  In district court, the government specifically explained the process it would use to ensure that the policy would be enforced with money not subject to Section 527.  *See* Add.148-51.  And to further address any possible issue concerning promulgation, Secretary Noem promulgated it anew on February 2, 2026, when the agency lacked funding under Section 527.  Add.243.  But despite these steps—and

even though the appropriations act extending Section 527 had lapsed—the district court still stayed the policy.

The district court believed that the government would violate Section 527 if the notice policy were developed or enforced using any resources initially funded with Section 527 money. But Section 527 applies to preventing members of Congress from entering ICE facilities, not formulating policy. And even as to implementation, "an agency may initially charge common-use items to a single appropriation as long as it makes the appropriate adjustments from other benefiting appropriations before or as of the end of the fiscal year." Gov't Accountability Off., *supra*, at 7-8; *see also id.* at 6-80 (no violation "if the appropriation that should have been charged in the first place has sufficient available funds to enable the adjustment of accounts"). Finally, the OBBBA expressly provides (and at a minimum necessarily implies) authority to develop and enforce policies to implement Section 527's exclusion from the OBBBA. *See* Scalia & Garner, Reading Law 96 (statute "implicitly authorizes" a "necessary predicate").

The district court believed that defendants could not use OBBBA funds for these purposes because relevant expenditures are provided for

elsewhere.  Add.276.  But the purpose of the OBBBA was to provide funding "[i]n addition to amounts otherwise available."  Pub. L. No. 119-21, §§ 100051-52, 139 Stat. at 385-87.  And when Congress "makes an appropriation available in addition to other appropriations available for the same object," then "an agency may elect to use both appropriations for the particular expense."  GAO, *Department of the Treasury Office of Inspector General—Availability of Appropriations for Pandemic Emergency Rental Assistance Program Oversight and Recoupment*, B-336626, at 7 (Jan. 15, 2026).  The court's narrow understanding of which expenses may be charged to the OBBBA was not correct.  And if nothing else, this arcane accounting dispute underscores why this action did not belong in court in the first place; these are the kinds of questions typically addressed by the Comptroller General and the Office of Management and Budget, not federal judges.[2]

---

[2] In any event, the government is not "preventing" members from entering ICE facilities; those who provide notice have been admitted. Add.132.  Instead, ICE is regulating the terms of entry, just as it might require members to surrender dangerous weapons.  Nor is the government violating Section 527(b), since it is not suggesting that Section 527(b) is the authority for the notice requirement.  And Section 527(c)'s permissive language is best understood as a limitation on Section 527(b).

## II.    The Remaining Factors Support A Stay.

The remaining factors favor a stay because the notice requirement does not cause the Members any cognizable harm, whereas the district court's order impedes on the government's safe management of detention facilities.

Any injury that the Members suffer is their capacity as members of Congress is not cognizable—either under Article III or as irreparable harm.  In contrast, the Executive Branch officials responsible for administering ICE's detention facilities have determined that "any unannounced visit is highly disruptive" and that advance notice is "critical to ensure the safety of ICE facilities for staff, detainees, and visitors," Add.70.

Finally, the public interest favors a stay because involving the federal courts in an interbranch political dispute would "risk damaging the public confidence that is vital to the functioning of the Judicial Branch" by "embroiling the federal courts in a power contest nearly at the height of its political tension."  *Raines*, 521 U.S. at 833 (Souter, J., concurring).  "Congress and the President—the two political branches established by the Constitution—have an ongoing relationship that the

Framers intended to feature both rivalry and reciprocity," *Mazars*, 591 U.S. at 854, and "[p]lacing the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership does not do the system a favor," *United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting).  The Supreme Court granted certiorari the last time that a court sought to intervene in a dispute of this nature, *see supra* pp.13-14, and this Court should not allow the repetition of that error to take effect while appellate review is pending.

Finally, at a minimum the district court should have limited relief to the plaintiff Members.  The APA authorizes relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705; particularly in light of background principles, *Trump v. CASA Inc.*, 606 U.S. 831 (2025), it is best understood as meaning irreparable injury *to the plaintiffs*.  To the extent that *Make the Road New York v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025), reflects a different understanding, we respectfully preserve the issue.

## CONCLUSION

The Court should enter an immediate administrative stay and a stay pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
  */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*
  *Steven.A.Myers@usdoj.gov*

MARCH 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this motion satisfies the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5199 words.  This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Century Schoolbook, 14-point font, a proportionally-spaced typeface.

/s/ *Steven A. Myers*
Steven A. Myers

# ADDENDUM

# TABLE OF CONTENTS

Complaint
(July 30, 2025) (Dkt. No. 1) ............................................................... Add.1

Declaration of Sean Hackbarth
(Aug. 29, 2025) (Dkt. No. 20-1) .................................................... Add.68

Memorandum Opinion Granting First Section 705 Stay
(Dec. 17, 2025) (Dkt. No. 36) ........................................................ Add.72

Order Granting First Section 705 Stay
(Dec. 17, 2025) (Dkt. No. 37) ...................................................... Add.145

Kristi Noem, Secretary of Homeland Security, Memorandum for
Todd M. Lyons et al., *Congressional Access to Alien Detention
Facilities – Access Policy and Use of Appropriations for Enforcement*
(Jan. 8, 2026)
(Jan. 10, 2026) (Dkt. No. 39-1) .................................................... Add.146

Declaration of Holly C. Mehringer
(Jan. 13, 2026) (Dkt. No. 42-1) .................................................... Add.148

First Amended and Supplemental Complaint
(Jan. 26, 2026) (Dkt. No. 48-1) .................................................... Add.152

Kristi Noem, Secretary of Homeland Security, Memorandum for
Todd M. Lyons et al., *Congressional Access to Alien Detention
Facilities – Ratification of Access Policy and Use of Appropriations for
Enforcement* (Feb. 2, 2026)
(Feb. 9, 2026) (Dkt. No. 55-1) ..................................................... Add.242

Memorandum Opinion Granting Second Section 705 Stay
(March 2, 2026) (Dkt. No. 61) ...................................................... Add.244

Order Granting Second Section 705 Stay
(March 2, 2026) (Dkt. No. 62) ...................................................... Add.288

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOE NEGUSE, in his official capacity as a Member
of the U.S. House of Representatives,
2400 Rayburn House Office Building
Washington, D.C. 20515,

ADRIANO ESPAILLAT, in his official capacity as
a Member of the U.S. House of Representatives,
2332 Rayburn House Office Building
Washington, D.C. 20515,

BENNIE G. THOMPSON, in his official capacity
as a Member of the U.S. House of Representatives,
2466 Rayburn House Office Building
Washington, D.C. 20515,

JAMIE RASKIN, in his official capacity as a
Member of the U.S. House of Representatives,
2242 Rayburn House Office Building
Washington, D.C. 20515,

ROBERT GARCIA, in his official capacity as a
Member of the U.S. House of Representatives,
109 Cannon House Office Building
Washington, D.C. 20515,

J. LUIS CORREA, in his official capacity as a
Member of the U.S. House of Representatives,
2082 Rayburn House Office Building
Washington, D.C. 20515,

JASON CROW, in his official capacity as a
Member of the U.S. House of Representatives,
1323 Longworth House Office Building
Washington, D.C. 20515,

VERONICA ESCOBAR, in her official capacity as
a Member of the U.S. House of Representatives,
2448 Rayburn House Office Building
Washington, D.C. 20515,

DANIEL S. GOLDMAN, in his official capacity as
a Member of the U.S. House of Representatives,
245 Cannon House Office Building
Washington, D.C. 20515,

Case No. 1:25-cv-2463

Add.1

JIMMY GOMEZ, in his official capacity as a
Member of the U.S. House of Representatives,
506 Cannon House Office Building
Washington, D.C. 20515,

RAUL RUIZ, in his official capacity as a Member
of the U.S. House of Representatives,
2342 Rayburn House Office Building
Washington, D.C. 20515,

NORMA TORRES, in her official capacity as a
Member of the U.S. House of Representatives,
2227 Rayburn House Office Building
Washington, D.C. 20515,

                    *Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th St. SW
Washington, D.C. 20536,

TODD M. LYONS, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement,
500 12th St. SW
Washington, D.C. 20536,

U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

                    *Defendants*.

**COMPLAINT**

## INTRODUCTION

1.      As part of its campaign of mass deportation, the Trump-Vance administration has stretched the U.S. immigration detention system far beyond its capacity. More people are being held by the United States in immigration detention than ever before, with many facilities housing more individuals than they were built to contain. Reports of mistreatment have been widespread and have included disturbing details of overcrowding, food shortages, lack of adequate medical care, and unsanitary conditions. At least eleven people have died in immigration custody in just the first six months of this administration. And American citizens have been unlawfully detained by immigration enforcement, in some instances without access to counsel.

2.      Against this backdrop, individual members of the U.S. Congress have an essential role to play in oversight of the U.S. Department of Homeland Security (DHS) and U.S. Immigration and Customs Enforcement (ICE) detention facilities, in the course of the members' legislative work on behalf of the American people. This oversight informs potential legislation on the subject of immigration detention, ensures that administration officials are carrying out their responsibilities consistent with federal law, and ensures that funds appropriated to DHS and ICE are being used appropriately on the ground.

3.      Members of Congress have the authority and duty to "conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws." *Ways and Means Committee's Request for the Former President's Tax Returns and Related Tax Information Pursuant to 26 U.S.C. § 6103(f)(1)*, 45 Op. O.L.C. — (July 30, 2021) (quoting *Scope of Congressional Oversight and Investigative Power with Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985)).

4.      The authority of members of Congress "to secure needed information . . . is an essential and appropriate auxiliary to the legislative function." *Trump v. Mazars USA, LLP*, 591 U.S.

848, 862 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161, 174) (1927)). Indeed, "[i]t is the proper duty" of the people's representatives "to look diligently into every affair of government and to talk much about what [they] see[]," because "[u]nless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." *United States v. Rumely*, 345 U.S. 41, 43 (1953) (quoting Woodrow Wilson, *Congressional Government* 303–04 (1885)).

5.      Since 2019, Congress and the President have agreed that individual members of Congress must have the right to visit any DHS facilities that detain or house individuals. They have determined that the need to conduct real-time oversight of the true conditions of these facilities means that members must not be required to provide advance notice of their visits. Congress has passed bills to ensure this critical access, and Presidents of both parties have signed those bills into law.

6.      Each year since 2019, Congress has adopted statutory provisions providing that no funds appropriated to DHS "may be used to prevent" "[a] Member of Congress" "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." Further Consolidated Appropriations Act, 2024 ("FY2024 Appropriations Act"), div. C, title V, § 527(a), Pub. L. No. 118-47, 138 Stat. 460, 619 (Mar. 23, 2024), as incorporated by Full-Year Continuing Appropriations and Extensions Act, 2025 ("FY2025 Continuing Resolution"), Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11, 12 (Mar. 15, 2025); *see* Consolidated Appropriations Act, 2020, div. D, title V, § 532, Pub. L. No. 116-93, 133 Stat. 2317, 2530 (Dec. 20, 2019). Section 527 of the fiscal year 2024 DHS appropriations bill, as incorporated by the fiscal year 2025 Continuing Resolution, specifically provides that it may not "be construed to require a Member of Congress to provide prior notice of the intent to enter a

[DHS] facility" used to detain or otherwise house noncitizens "for the purpose of conducting oversight." FY2024 Appropriations Act, div. C, title V, § 527(b), 138 Stat. at 619.

7.      Nevertheless, since June 2025, each Plaintiff, in his or her official capacity as an individual member of Congress, has attempted to obtain information about conditions at a DHS facility used to detain or otherwise house noncitizens. Each Plaintiff has done so by visiting a facility in person, or by giving DHS notice of imminent plans to do so, for the purpose of conducting real-time oversight of that facility. Each of those attempted oversight visits has been blocked by Defendants, notwithstanding section 527.

8.      Defendants have adopted a new policy and practice (the "oversight visit policy"), without any congressional revision to the text of section 527, that purports to require notice "a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities," absent authorization by the secretary of DHS. Despite the clear statutory text requiring congressional access to *any* "facility used to detain or otherwise house aliens," Defendants' new oversight visit policy and practice also deems certain DHS facilities, including ICE field offices, off-limits for congressional oversight even when they are used for detention.

9.      Defendants' new oversight visit policy is unlawful.

10.     Plaintiffs, 12 members of the U.S. House of Representatives, bring this action against Defendants ICE and its acting director, Todd M. Lyons, and DHS and its secretary, Kristi Noem, to obtain relief from Defendants' unlawful obstruction of Plaintiffs' attempts to obtain information through visits to ICE facilities for congressional oversight purposes.

11.     By denying Plaintiffs' attempts to obtain information through in-person oversight visits to DHS facilities, Defendants have acted and are acting *ultra vires*, contrary to law, in excess of statutory authority, and in an arbitrary and capricious manner.

12.    These illegal actions have harmed each Plaintiff's right as an individual member of Congress to conduct oversight and obtain information about DHS facilities and the conditions of immigration detention. These harms are significant, irreparable, and ongoing as long as Defendants continue to block such visits pursuant to their unlawful policy.

13.    Adherence to the rule of law requires that Plaintiffs be permitted to conduct their congressionally authorized oversight activities, notwithstanding DHS's unlawful efforts to thwart scrutiny of its facilities.

## JURISDICTION AND VENUE

14.    The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 because the claims arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*

15.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

16.    Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because Defendants reside in this district.

## THE PARTIES

17.    Plaintiff Joe Neguse is a duly elected member of Congress representing the 2nd congressional district in Colorado. He sues in his official capacity as an individual member of Congress.

18.     Plaintiff Adriano Espaillat is a duly elected member of Congress representing the 13th congressional district in New York. He sues in his official capacity as an individual member of Congress.

19.     Plaintiff Bennie G. Thompson is a duly elected member of Congress representing the 2nd congressional district in Mississippi. He sues in his official capacity as an individual member of Congress.

20.     Plaintiff Jamie Raskin is a duly elected member of Congress representing the 8th congressional district in Maryland. He sues in his official capacity as an individual member of Congress.

21.     Plaintiff Robert Garcia is a duly elected member of Congress representing the 42nd congressional district in California. He sues in his official capacity as an individual member of Congress.

22.     Plaintiff J. Luis Correa is a duly elected member of Congress representing the 46th congressional district in California. He sues in his official capacity as an individual member of Congress.

23.     Plaintiff Jason Crow is a duly elected member of Congress representing the 6th congressional district in Colorado. He sues in his official capacity as an individual member of Congress.

24.     Plaintiff Veronica Escobar is a duly elected member of Congress representing the 16th congressional district in Texas. She sues in her official capacity as an individual member of Congress.

25.     Plaintiff Daniel S. Goldman is a duly elected member of Congress representing the 10th congressional district in New York. He sues in his official capacity as an individual member of Congress.

26.    Plaintiff Jimmy Gomez is a duly elected member of Congress representing the 34th congressional district in California. He sues in his official capacity as an individual member of Congress.

27.    Plaintiff Raul Ruiz is a duly elected member of Congress representing the 25th congressional district in California. He sues in his official capacity as an individual member of Congress.

28.    Plaintiff Norma Torres is a duly elected member of Congress representing the 35th congressional district in California. She sues in her official capacity as an individual member of Congress.

29.    Defendant ICE is a component of DHS, a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is headquartered in Washington, D.C.

30.    Defendant Todd M. Lyons is the acting director of ICE. He is sued in his official capacity.

31.    Defendant DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS is headquartered in Washington, D.C.

32.    Defendant Kristi Noem is the secretary of DHS. She is sued in her official capacity.

## BACKGROUND

### I.    Congressional Oversight Power

33.    "From the earliest times in its history, the Congress has assiduously performed an informing function" that permits members of Congress "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957) (quotation marks omitted). The Supreme Court has long recognized that "the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is

intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up). "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain*, 273 U.S. at 175. The power to "secure needed information" is thus firmly grounded in Congress's duty and authority to exercise "[a]ll legislative powers" under article I of the U.S. Constitution. *Id.* at 160–61.

34.    This power to investigate "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). It "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Mazars*, 591 U.S. at 862 (quoting *Watkins*, 354 U.S. at 187).

35.    Congress exercises its investigative duty and authority in various ways. Through its committees, for example, it regularly requests and, when necessary, compels documents and testimony, including from executive branch officials. Individual members of Congress play distinct oversight roles, and "each member needs accurate information from the executive branch in order to make informed decisions on all sorts of matters."[1] Those matters vary by member, according to the concerns of their constituents, their committee memberships, and their issue areas of focus. For example, pursuant to their individual oversight roles, members of Congress regularly write letters raising concerns to and requesting information from executive branch officials, and they seek information on the ground through in-person investigations.[2]

---

[1] *See, e.g.*, Press Release, Sen. Charles Grassley, Grassley on the Importance and Responsibility of Congressional Oversight (June 25, 2018), https://perma.cc/N687-4XQC.

[2] *See, e.g.*, Levin Center for Oversight and Democracy, *Portraits in Oversight: Harry Truman and the Investigation of Waste, Fraud, & Abuse in World War II*, https://perma.cc/4EJU-Z6Y4; Press Release, Sen. Charles Grassley, Grassley to Gates: Defense IG Audits Need Changes in order to Root Out Waste (Sept. 8, 2010), https://perma.cc/QH83-HUX2.

36.     Congressional oversight over DHS and ICE is particularly important because those agencies have received significant—and increasing—appropriated funds, which they use to apprehend, detain, and remove individuals from the United States.

## II.  Each Member of Congress Has a Right to Conduct Oversight Visits at DHS Facilities

### A.  Section 527 provides an individual right for members of Congress to conduct oversight visits

37.     Robust and effective congressional oversight of DHS and ICE is critical, particularly in light of the significant funds appropriated to DHS and ICE to apprehend, detain, and even remove individuals, and the attendant risk that such funds may be used to infringe the rights of both U.S. citizens and noncitizens.

38.     To that end, Republican and Democratic members alike have sought information about ICE facilities through requests for information, hearing testimony, and in-person member and staff oversight visits.[3] And they have used that information to determine the proper appropriation of funds to DHS and ICE, to craft restrictions on those funds, to draft and pass relevant legislation, to attempt to ensure that DHS and ICE officials are carrying out their duties with respect for individuals' civil rights and liberties and not in violation of federal law, and to otherwise engage with the executive branch on areas for improvement.

39.     Members of Congress have also long engaged in on-the-ground, in-person oversight to obtain relevant information.

40.     This method of oversight became especially important for many members of Congress during the first Trump administration.[4] In 2018, a humanitarian crisis created by the

---

[3] *See, e.g.*, Brian Fitzpatrick, Press Release, Fitzpatrick Leads Bipartisan Inspection of Tornillo Detention Center (June 22, 2018), https://perma.cc/M299-W4AD; Letter from Sen. Ted Cruz to President Joseph Biden (Mar. 28, 2021), https://perma.cc/ALL9-KB83.

[4] *See, e.g.*, H.R. 6256, 115th Cong. (2d Sess. 2018) (proposed bipartisan bill to "require the Secretary of Homeland Security and the Secretary of Health and Human Services to allow Members of Congress to tour detention facilities that house foreign national minors"); *They Are Not Letting Us*

8

administration rapidly unfolded at the southern border, where "children and families [were] subjected to inhumane conditions, asylum seekers [were] denied access to our nation's legal ports of entry, and thousands of children [were] separated from family members." H.R. Rep. No. 116-163, at 17 (2019). Congress became particularly concerned about "DHS'[s] poor management of this humanitarian crisis." *Id.*

41.     Members of Congress who attempted to conduct oversight to assess the detention conditions of separated families in 2018 were routinely frustrated in their attempts to assess on-the-ground conditions of immigration detention facilities without delay and often denied entry to these facilities completely.[5] This included members of Congress who are now Plaintiffs in this lawsuit.

42.     Congress recognized that obtaining real-time information in person at those facilities, including speaking directly with both DHS employees and detained individuals, played an important role in effective oversight of the administration's use of appropriated funds and its treatment of noncitizens.

43.     To ensure its members' ability to assess true facility conditions without obstruction, Congress included a provision in the fiscal year 2019 appropriations bill that codified individual members' right to exercise their oversight duties through in-person visits to DHS facilities where minors were detained. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title V, § 532, 113 Stat. 13, 42 (Feb. 15, 2019).

44.     President Trump signed that provision into law. The provision prohibited the use of appropriated funds to "prevent a Member of Congress from entering, for the purpose of conducting oversight," any DHS facility used to detain or otherwise house noncitizen minors. *Id.*

---

*In': Nelson, Wasserman Schultz Denied Entry to Kid Migrant Shelter*, CBSMiami (June 19, 2018), https://perma.cc/F6QD-FTY6.
    [5] *See, e.g.*, Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA.

45.     Emphasizing the importance of obtaining accurate information about immigration detention, the provision further prohibited the use of appropriated funds "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress, compared to what would be observed in the absence of such modification." *Id.*

46.     In enacting this provision, Congress was thus focused on the ability of its members to assess the *actual* conditions in which minor migrants are detained by DHS, without alteration or manipulation by executive branch officials.

47.     This provision was a direct response to DHS's obstruction of congressional oversight of its facilities.

48.     Many members of Congress, including several Plaintiffs, exercised their right to conduct in-person oversight at DHS detention facilities in the weeks and months following the passage of the fiscal year 2019 oversight provision.

49.     It was soon clear, however, that the need for oversight by individual members of Congress was not limited to facilities housing noncitizen minors. Indeed, members of Congress were already actively engaged in this oversight with respect to all individuals detained or housed by DHS.

50.     For example, by July 2019, Plaintiff Representative Crow had instituted weekly visits by him or his staff to the ICE detention facility in his district. Representative Crow and his office began to build a productive relationship with ICE officials that has both informed his legislative activities and allowed him to better serve his constituents through close and constructive oversight of that facility.

51.     Members on committees with jurisdiction over DHS and ICE likewise actively exercised their oversight visit rights after the provision's passage. In the summer of 2019, under Plaintiff Representative (then-Chairman) Thompson's direction, the House Committee on Homeland Security staff conducted an investigation that involved oversight visits to eight ICE

facilities across five states, to assess the conditions of confinement and adequacy of the internal

oversight tools.[6] And in August and September of 2019, the House Committee on Oversight and

Reform and its Subcommittee on Civil Rights and Civil Liberties—of which Plaintiff Representative

Raskin was then chair—sent bipartisan staff delegations to conduct oversight visits at 22 DHS

detention facilities across six states, including 12 ICE detention facilities.[7]

52.     In addition, although members were provided a right of access to DHS facilities

housing noncitizen minors for oversight purposes, staff did not have the same statutory protection

in the fiscal year 2019 oversight provision. Congressional staff occasionally encountered difficulties

accessing DHS detention facilities in the course of aiding members in their oversight duties.[8] Those

difficulties underscored for Congress the importance of allowing members' staff to aid in their

oversight work in DHS facilities where noncitizens of all ages are detained or otherwise housed.[9]

53.     As a result, the following year, in fiscal year 2020 appropriations, Congress expanded

members' right of oversight access in multiple ways.

54.     First, Congress broadened the provision to apply to DHS facilities used to detain or

otherwise house *any* noncitizens—not just minors. Consolidated Appropriations Act, 2020, div. D,

title V, § 532(a), 133 Stat. at 2530.

55.     Second, Congress added that "[n]othing" in the provision "may be construed to

require a Member of Congress to provide prior notice of the intent to enter" a DHS facility used to

detain or otherwise house noncitizens. *Id.* § 532(b).

---

[6] Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC ("*ICE Detention Facilities* Report").

[7] Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties, *The Trump Administration's Mistreatment of Detained Immigrants* 7 (2020), https://perma.cc/37NF-SFBS.

[8] *Id.*; *ICE Detention Facilities* Report, *supra* n.6, at 5–6.

[9] *See, e.g.*, Letter from Chairman Elijah E. Cummings to Acting DHS Secretary Kevin K. McAleenan (Aug. 29, 2019), https://perma.cc/5HVB-HGQ4.

56.     Finally, it "broadened the applicability" of the provision "to designated congressional staff," providing that "while Members need not provide prior notice of their visit, DHS can require at least 24 hours' notice for designated staff to visit."[10] *See id.* § 532(a), (c).

57.     This expanded provision has been carried forward with identical language in DHS appropriations every year since, including in the most recent continuing resolution signed by President Trump. *See* FY2025 Continuing Resolution, §§ 1101(a)(6), 1105.[11]

58.     Thus, since 2019, the law has provided that no funds appropriated to DHS "may be used to prevent . . . [a] member of Congress" or their designated congressional employee "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens," nor may funds be used "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification." *Id.* § 527(a).

59.     The law further provides, in no uncertain terms, that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter [such] a facility . . . for the purpose of conducting oversight." *Id.* § 527(b). The provision allows a narrow exception, however, that DHS "may require that a request be made at least 24 hours in advance of an intent to enter a facility" by a designated congressional employee—but not for the members themselves. *Id.* § 527(c).

---

[10] CRS, R46113, *Department of Homeland Security Appropriations: FY2020* (Jan. 21, 2020), https://perma.cc/C344-CDBN.

[11] *See* FY2024 Appropriations Act, div. C, title V, § 527; Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182, 1473 (Dec. 27, 2020); Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459, 4752 (Dec. 29, 2022).

**B. Congressional oversight at DHS facilities is increasingly important**

60.     As section 527 reflects, the information gained from congressional visits to facilities where migrants are detained or otherwise housed—through both scheduled and unannounced visits—is critical to effective congressional oversight of DHS and ICE. This oversight is increasingly important today.

61.     In recent years, congressional reports have expressed particular concern regarding "conditions and care provided at ICE's civil detention facilities" and "conditions and lack of adequate infrastructure at ICE's . . . field offices and sub-offices that serve migrants."[12] Congressional visits to several ICE detention facilities in 2021 "found that ICE . . . le[ft] deficiencies unidentified and uncorrected, and that ICE facilities frequently failed to meet basic standards of care."[13] Reflecting these concerns, since fiscal year 2018, Congress has mandated that ICE publicly report all deaths that occur in immigration custody within 90 days.[14]

62.     Members of Congress and their staff have continually sought timely information on the ground regarding the conditions of DHS facilities used to detain or otherwise house noncitizens.

63.     For example, the 2020 Homeland Security Committee staff oversight report highlighted the failures of internal ICE oversight of immigration detention facilities.[15] The report emphasized that when congressional staff provided advance notice of oversight visits, "ICE facilities used the advanced warning to improve the conditions within the facility."[16] Staff detected evidence of those improvements, including the smell of fresh paint, evidence of a major clean-up, the

---

[12] H.R. Rep. No. 116-180, at 34–35 (2019).
[13] H.R. Rep. No. 116-720, at 106 (2021).
[14] *Detainee Death Reporting*, ICE, https://perma.cc/3TST-Q5EX.
[15] *ICE Detention Facilities* Report, *supra* n.6, at 1–2.
[16] *Id.* at 8.

relocation of individuals from solitary cells to the general population, and the installation of new guards.[17]

64.    Congressional findings regarding the failures of internal DHS oversight underscore the critical role of direct congressional oversight on the ground, and members' and staffs' experiences demonstrate the importance of conducting that oversight in real time, without prior notice.

65.    The number of individuals detained by ICE has exploded in the last several months. In February 2025, immigration detention reached its highest level in over five years, at 43,759 individuals[18]—and that number has only continued to increase since then. In March 2025, ICE held 47,600 individuals in detention and announced that immigration detention facilities had been filled to capacity.[19] Notwithstanding this overflow, by late June 2025, that number had increased to nearly 58,000.[20]

66.    Unsurprisingly, amid this rapid increase in immigration arrests and detentions, there have been reports that the rights of noncitizens and citizens alike have been violated. Numerous U.S. citizens have reportedly been mistakenly detained, with no opportunity to prove their citizenship.[21] For example, a 25-year-old citizen and U.S. Army veteran was wrongfully detained by

---

[17] *Id.* at 5.

[18] Russell Contreras, *Immigrants in detention in Trump's early days hit new record*, Axios (Feb. 28, 2025), https://perma.cc/2ZFR-GEWQ.

[19] *US immigration detention maxed out at 47,600 detainees, ICE official says*, Reuters (Mar. 12, 2025), https://perma.cc/6ZDL-F3JH.

[20] Austin Kocher, *US Immigrant Detention System Entering a Period of Unprecedented Growth – 58,000 People Now Held in Over 200 Facilities*, Substack (July 8, 2025), https://perma.cc/P9GS-B9UE.

[21] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily J. (June 19, 2025), https://perma.cc/CNQ6-2CC4; Dani Anguiano, *US citizen arrested during Ice raid in what family describes as 'kidnapping'*, Guardian (June 26, 2025), https://perma.cc/L98U-NMA9; Judd Legum, *US Citizen Wrongly Detained by the Border Patrol Says Government's Account Is False*, Mother Jones (Apr. 23, 2025), https://perma.cc/NP4S-926K.

ICE during a raid at the farm where he works as a security guard on July 10.[22] At another raid on

June 15, multiple American citizens were detained by ICE with no due process, and a lawyer

representing one of them was not permitted to speak with his client while the client was in a

detention facility.[23] There are countless such examples from the last six months. And there is every

indication that the number of ICE arrests and detentions will only continue to grow at an

unmanageable rate, in service of the administration's stated goal of deporting more than one million

people each year.[24]

67.    Concerns regarding poor conditions in ICE facilities predate the current

administration,[25] but recent news reports suggest that detention conditions have drastically

deteriorated as the number of individuals in ICE custody has risen.[26] In some cases, detainees are

being denied medical care, forced to sleep on the floor in overcrowded cells, and severely underfed,

[22] Angelique Brenes, *Disabled veteran detained during immigration raid speaks out, alleges civil rights violations*, KTLA5 (July 15, 2025), https://perma.cc/SY64-2DX6.
[23] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://perma.cc/C5FN-KXUD.
[24] Maria Sacchetti & Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations*, Wash. Post (Apr. 12, 2025), https://perma.cc/KM4A-WJHF.
[25] *See, e.g.*, Tom Dreisbach, *Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention*, NPR (Aug. 16, 2023), https://perma.cc/2KMB-2MK9; Office of the Inspector Gen., DHS, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://perma.cc/6Y67-LR7H.
[26] Yale Law School, News, *Students Document Reports of Abuse at Immigration Detention Center* (Jan. 17, 2025), https://perma.cc/4MA4-VF6K; Jasmine Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers*, NPR (June 6, 2025), https://perma.cc/B9B6-KN2D; Tracee Wilkins & Rick Yarborough, *'Like living in a dark room': Inside overcrowded ICE detention centers*, NBC Wash. (Mar. 12, 2025), https://perma.cc/MCM8-UMZP.

with potentially deadly consequences.[27] In one instance, noncitizen women were chained for hours

on a prison bus without access to food, water, or a toilet.[28]

68.     As the number of arrested and detained individuals grows beyond the capacity of

existing ICE detention facilities, DHS has resorted to using ICE field offices to detain or otherwise

house noncitizens. The conditions of confinement at field offices are of particular concern because

field offices are not designed nor set up to be—facilities in which individuals are detained or housed.

69.     For example, members of Congress have received reports that immigrants were

being detained and held in the basement of the ICE Los Angeles Field Office—some overnight—in

inhumane conditions.[29] Recent public reporting has similarly confirmed the unacceptable conditions

of detention at the ICE New York Field Office in Manhattan. Video footage captured by an

individual detained in the facility showed significant overcrowding and a lack of safe and sanitary

conditions.[30]

70.     ICE generally does not consider field offices subject to its detention standards, thus

exempting field offices from requirements to uphold certain standards for safety, security, and care

and from attendant internal oversight.

---

[27] Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers,*
https://perma.cc/B9B6-KN2D; Wilkins and Yarborough, *'Like living in a dark room'*,
https://perma.cc/MCM8-UMZP; Allen Cone, *Acting head of ICE clashes with Democrats, says agency funding assured through fiscal 2026*, UPI (May 14, 2025), https://perma.cc/K9XG-ZKRN; Lauren
Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, USA Today (Mar. 24, 2025),
https://perma.cc/QW2W-M4XX.
[28] Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, https://perma.cc/QW2W-
M4XX.
[29] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.
[30] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan*, N.Y.
Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

71.     In the administration's rush to increase its immigration detention capacity, DHS has also begun reopening previously shuttered for-profit facilities—many of which had been closed due to poor conditions.[31] One such reopened facility, privately owned Delaney Hall in Newark, has already faced accusations of abusive conditions, including persistent food shortages and mistreatment of detainees.[32] Public reporting suggests that detainees there—many of whom have never been convicted of a crime—have been fed only two meals a day and have gone up to 20 hours without food; one woman did not receive her daily medication for three or four days; and dozens of family members were prevented from seeing their detained loved ones after traveling to visit.[33]

72.     Close congressional oversight of new and reopened facilities is critical to ensure that members of Congress are fully informed of such conditions and can address them as appropriate through legislation and appropriations.

73.     The importance of congressional oversight is compounded by the administration's gutting of three DHS oversight offices—the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services (CIS) Ombudsman's Office, and the Office of the Immigration Detention Ombudsman (OIDO). Congress tasked these three independent offices with distinct roles in receiving and investigating complaints and performing other oversight functions within DHS, to ensure lawful treatment of individuals by DHS components and to provide for the investigation and resolution of DHS activities, including immigration detention.

---

[31] Amanda Hernández, *For-profit immigration detention expands as Trump accelerates his deportation plans*, Stateline (Apr. 11, 2025), https://perma.cc/TT7N-22BM; Allison McCann, Alexandra Berzon & Hamed Aleaziz, *Trump Administration Aims to Spend $45 Billion to Expand Immigrant Detention*, N.Y. Times (Apr. 7, 2025), https://perma.cc/6JNL-S6B8.

[32] Mark Crudele et al., *4 detainees remain unaccounted for following unrest at New Jersey ICE facility: Officials*, ABC News (June 13, 2025), https://perma.cc/2MAQ-CSW8.

[33] Ricardo Kaulessar, *Before recent Delaney Hall uprising, detainees frequently complained about conditions*, NorthJersey.com (June 18, 2025), https://perma.cc/N8AP-JFXH.

74.    For example, CRCL's responsibilities include reviewing and investigating complaints of civil rights and civil liberties abuses; overseeing DHS compliance with legal requirements related to the civil rights and civil liberties of people affected by DHS programs and activities; and helping DHS develop and implement policies and procedures for that compliance. 6 U.S.C. § 345(a). OIDO is tasked with deploying individuals in the field to work independently in DHS detention facilities and to conduct unannounced inspections at DHS detention facilities, to which they are statutorily required to have unfettered access, and providing direct assistance to detained individuals. 6 U.S.C. § 205(c), (d)(2). And all three offices must provide regular reports to Congress on their investigations, case work, and recommendations. 6 U.S.C. § 345(b); 42 U.S.C. § 2000ee-1(f); 6 U.S.C. § 272(c); 6 U.S.C. § 205(e).

75.    On March 21, 2025, DHS placed essentially all employees of OIDO, CRCL, and the CIS Ombudsman's Office on administrative leave. Those three critical internal oversight offices ceased performing nearly all oversight functions. DHS then separated nearly all employees of those offices through a "reduction in force" that went into effect on May 23.

76.    The absence of statutorily required administrative oversight personnel on the ground in DHS facilities deprives Congress of important information that it would ordinarily receive from those internal DHS oversight offices. Congress's direct oversight role is therefore even more critical than before.

77.    The recently passed budget bill allocates a staggering $45 billion for ICE detention, including family detention. Pub. L. No. 119-21. This number is more than 13 times ICE's current annual detention budget, which was already at a record high.[34]

---

[34] Hayes Brown, *How ICE's massive cash infusion is poised to transform America*, MSNBC (July 7, 2025), https://perma.cc/B7DS-G7NB.

78.     Members of Congress have both a statutory right and a duty to assess how this appropriation is being used at DHS facilities that detain or otherwise house noncitizens. Such a dramatic budgetary expansion will inevitably create more opportunities for abuse and misuse of power, making robust congressional oversight more critical than ever. This is especially true as Congress is working to determine fiscal year 2026 appropriations, including any restrictions it may place on the funding provided to DHS and ICE.

## III. Defendants' Unlawful Obstruction of Plaintiffs' Oversight Activities

### A. Defendants adopted a policy and practice of obstructing congressional oversight

79.     On May 14, 2025, at a routine oversight hearing before a subcommittee of the House Appropriations Committee, Defendant Lyons testified that he and his staff were "fully supportive" of unannounced congressional oversight visits and were committed "to ensure that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ; *see also id.* ("[W]e have proper access and oversight from the men and women of your committee and Congress to oversee what Immigration and Custom Enforcement are doing in our detention centers [because] we have nothing to hide.").

80.     In mid-June, however, ICE stated on its website, for the first time, that it would prohibit members of Congress from conducting oversight visits at ICE field offices.

81.     Although it acknowledged that "Members of Congress are not required to provide advance notice for visits to ICE detention facilities," ICE issued a guidance document that contained the novel contention that field offices are not "used to detain or otherwise house aliens"

because the individuals housed there have not yet been processed for longer-term "custody determinations."[35]

82.    Pursuant to this unfounded interpretation, Defendants have prevented Plaintiffs from conducting oversight visits to DHS facilities, including ICE field offices, where individuals are being detained or otherwise housed.

83.    The guidance document and ICE's website further provided that, although advance notice is not required for oversight visits by members of Congress, "ICE asks visit requests to be submitted as early as possible and not less than 72 hours in advance."[36] It also reiterated, consistent with the statute, that staff members must provide at least 24 hours' notice.

84.    By June 23, Defendants removed the guidance document and changed the language on its website.

85.    Despite its recent acknowledgment that members of Congress "are not required to provide advance notice for visits," Defendants now "require[] requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. Any requests to shorten that time must be approved by the DHS Secretary."[37]

86.    ICE did not post a new guidance document providing details or otherwise explaining its oversight visit policy.

87.    Since June, DHS and ICE officials have denied Plaintiffs access to DHS facilities on the stated grounds that Defendants require at least seven days' notice and that some facilities, including ICE field offices, are entirely exempt from congressional oversight.

---

[35] DHS, U.S. Immigration and Customs Enforcement (ICE) Facility Visits for Members of Congress and Staff (June 2025), *archived at* https://perma.cc/UL23-J4ZM.
[36] *Id.*
[37] Office of Congressional Relations, ICE, https://perma.cc/P6XD-4HNV.

88.     Thus, pursuant to DHS's new oversight visit policy and practice, Defendants have prevented Plaintiffs from conducting oversight visits to DHS facilities where individuals are being detained or otherwise housed.

**B.  Defendants have obstructed each Plaintiff's lawful oversight activities**

89.     Each Plaintiff has a particular interest in conducting oversight visits at DHS facilities where individuals are detained or otherwise housed. The information that can be obtained only through in-person visits is critical to Plaintiffs' work in serving on committees of relevant jurisdiction; in serving diverse constituents, many of whom are personally affected by DHS and ICE activities, including immigration detention; and in drafting and proposing legislation on related topics, including DHS appropriations for the upcoming fiscal year 2026.

90.     Defendants have denied each Plaintiff crucial information needed to conduct oversight on at least one occasion—but in many instances on multiple occasions—by obstructing a requested or attempted oversight visit to a DHS facility where noncitizens are detained or otherwise housed.

91.     Defendants denied Plaintiffs' access to DHS facilities to conduct oversight visits on the basis of their oversight visit policy, requiring at least seven days' notice and prohibiting any oversight visits to certain facilities, including ICE field offices, notwithstanding the presence of detainees at those facilities.

92.     In doing so, Defendants used "funds appropriated or otherwise made available to" DHS "to prevent" each Plaintiff "Member of Congress" "from entering, for the purpose of conducting oversight, a[] facility operated by or for [DHS] used to detain or otherwise house aliens"—in direct contravention of section 527.

93.     Defendants' obstruction of Plaintiffs' efforts to conduct in-person, real-time oversight at DHS detention facilities significantly harms Plaintiffs' ability to satisfy their individual

duties as members of Congress by denying them information that is integral to completing constituent casework, to working effectively on congressional committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in its custody.

### 1.   Representative Escobar

94.     Representative Escobar represents Texas's 16th congressional district. She has been a member of Congress since 2019 and currently serves on the Appropriations Committee and its Subcommittee on Homeland Security and Subcommittee on Military Construction, Veterans Affairs, and Related Agencies.

95.     As a member of Congress representing El Paso, Texas, a vibrant city on the United States–Mexico border with a large binational population, Representative Escobar has been actively engaged in oversight of the conditions of immigration detention in her district since becoming a member of Congress, including by conducting numerous in-person oversight visits to immigration detention facilities. That includes visits to DHS facilities operated for and by U.S. Customs and Border Protection (CBP), ICE, and the Department of Health and Human Services Office of Refugee Resettlement (ORR). Additionally, as a member of Congress who has served on House committees with jurisdiction over immigration and border matters, she has been actively engaged in oversight of DHS and ICE.

96.     Representative Escobar's district currently contains two ICE facilities: an ICE detention facility known as the El Paso Service Processing Center (SPC) and the ICE El Paso Field Office. In addition, the ICE Enhanced Hardened Facility (EHF) is located just outside of her district. There is a new ICE facility under construction in her district, at the Fort Bliss military base, that is predicted to be the largest ICE facility in the country.

97.    Historically, Representative Escobar has maintained an effective and respectful working relationship with local DHS and ICE personnel who work on the ground in El Paso. This relationship is critical given the number of DHS facilities within her border district and the importance of immigration-related issues to her constituents. Over the years, in-person visits have been critical to building and maintaining these relationships, including with the field directors and other ICE personnel, with whom she can effectively communicate issues that arise during visits.

98.    Both announced and unannounced visits to DHS facilities are necessary to Representative Escobar's oversight work. Many of her visits have been scheduled at least one day in advance to allow one of her staff members to join, but some of her visits have been made without advance notice.

99.    Throughout Representative Escobar's tenure, as part of her oversight duties and as a member representing a border district in which the issue of immigration is omnipresent, she has led multiple congressional delegations to El Paso, including to the El Paso EHF in February 2024 and to the Border Patrol Central Processing Center in February 2023.

100.    In-person oversight visits allow Representative Escobar and her staff to discover issues that need to be addressed before they become larger problems. Additionally, because of their working relationship with DHS local leadership, when there have been surges in border crossings, her office has been able to closely coordinate with ICE and to connect DHS leadership with local nonprofits, border patrol, and city and county law enforcement, most recently in February 2025.

101.    Between 2021 and 2022, Representative Escobar conducted multiple oversight visits to the ORR Emergency Intake Site (EIS) at Fort Bliss, where minor children were being held because they had been separated from their parents and legal guardians under the Trump administration's family separation policy. To provide consistent oversight of this facility, she and her staff visited the EIS more than a dozen times. On oversight visits, she learned that minors were not

allowed to leave the tents in which they were kept and did not have access to social workers. She

raised these and other issues with Border Patrol and CBP, as well as the Department and Health and

Human Services. As a result of her oversight, she observed significant improvements in processes

and facility conditions at the EIS because of concerns that she raised during her visits.

102.    To take another example, in 2019, Representative Escobar learned of disturbing

reports that individuals being held in ICE custody in a facility in her district in El Paso were being

force-fed, and it was imperative that she find out what was happening on the ground through an

unannounced visit. Although she was initially denied entry to the facility, she was eventually able to

meet with the individuals who were being force-fed. She learned of horrific situations in which these

individuals were being tied down and, without their consent, had feeding tubes forced down their

throats and into their stomachs. Representative Escobar learned that a single doctor had the ability

to make the decision that an individual should be intubated and force-fed, with no formalized

process for making that determination.

103.    As a result of the visit and subsequent investigation, Representative Escobar worked

with ICE to institute a consultation process, in which multiple doctors would be required to be

involved to make a decision. As a result of this oversight visit and subsequent work, conditions for

detainees were improved. Visits like this one are also critical to her oversight work to ensure that

ICE is treating people in U.S. custody in her district with humanity and following applicable federal

laws.

104.    Oversight visits can also have practical and positive outcomes for DHS and the

public fisc. In 2019, Representative Escobar learned during oversight visits that Border Patrol had

expensive and inefficient processes at its facilities, employing highly trained and highly paid law

enforcement officers to do data entry. She worked with Acting DHS Secretary Kevin McAleenan

under the previous Trump administration to add a position for a special civilian employee to do data

entry at facilities. After making this change, nearly every Border Patrol sector chief she spoke with on subsequent visits praised the implementation of this position because it frees up their agents to focus on their jobs and is far less expensive.

105.    Representative Escobar also informs other members of Congress, her constituents, and the public when information gained from visits is cause for concern—and therefore a potential basis for legislation or further oversight. She also informs them of positive and productive information obtained through oversight and when she observes that things are going well. For example, after a June 18, 2025, visit, Representative Escobar shared with the press positive comments from women detained at the El Paso EHF.

106.    In-person visits to El Paso facilities also allow Representative Escobar to respond to and follow up on constituent casework. Immigration, including immigration detention, is a huge issue of concern within her border district. Her office receives a significant amount of constituent outreach about constituents or family members that are being held in ICE facilities, but about which they have no information. Representative Escobar uses oversight visits as an opportunity to investigate constituent complaints about access to legal information, quality of food, building conditions, access to phones, and other issues. Sometimes her office uncovers issues, and sometimes they determine that the situation is acceptable and are able to assuage her constituents' concerns. She receives necessary information through her observations, conversations with detainees, and conversations with ICE employees on the ground.

107.    The oversight visits that Representative Escobar conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities.

108.    After ICE denied Representative Escobar entry into an ICE facility in 2019 to visit with detainees being force-fed, she worked with the Appropriations Committee to include a

provision ensuring that members of Congress had the right to conduct oversight visits of DHS facilities without providing advance notice. That provision, now section 527, serves as the basis for this suit.

109.    Defendants' unlawful oversight visit policy has abruptly halted Representative Escobar's consistent oversight of the ICE detention facilities in her district.

110.    On July 9, 2025—for the first time since 2019—ICE denied Representative Escobar entry into an ICE facility.

111.    On July 8, 2025, Representative Escobar's staff notified ICE via email that she would be conducting an oversight visit of the El Paso SPC the next day, July 9, accompanied by one staff member. That facility had recently been plagued by accusations of mistreatment and inhumane conditions, including a recent Amnesty International report detailing nearly thirty pages of alleged human rights violations at that facility. This included reports of physical abuse by guards, use of solitary confinement, unsanitary and overcrowded living spaces including dysfunctional toilets, inadequate medical care, expired or poor quality food, and lack of access to legal services. Family members and legal representatives of detainees at the El Paso SPC had also raised concerns with Representative Escobar's office about detainees' access to telephones. It was important that Representative Escobar visit the facility in person to see the conditions firsthand, to inquire about the concerns raised in the Amnesty Internal report and about detainees' access to their legal representatives and communication with family, and to speak to detainees directly about their experiences.

112.    In response, ICE stated that it could not accommodate Representative Escobar's July 9 visit because ICE is "now requiring requests to be made seven (7) calendar days in advance."

113.    On July 9, Representative Escobar and two staff members traveled to the El Paso SPC to conduct the oversight visit announced the previous day. Representative Escobar identified

herself and informed ICE personnel of her intention to conduct an oversight visit of the facility

under section 527. ICE denied her entry because of the oversight visit policy.

114.    Given the disturbing allegations in the Amnesty International report about the El

Paso SPC facility, it was imperative for Representative Escobar to be able to visit the facility in

person. On July 11, her staff requested a second visit on July 18, providing seven days' notice.

However, votes at the House went into the early morning of July 18, and Representative Escobar

was unable to travel from El Paso to Washington, D.C., in time to conduct the scheduled visit to the

facility on July 18 to personally assess conditions and speak with detainees herself.

115.    Defendants' oversight visit policy and practice have significantly hindered

Representative Escobar's ability to perform her duties as the member of Congress serving Texas's

16th congressional district by depriving her of information necessary for that role. Representative

Escobar still has been unable to visit the El Paso SPC facility in person.

116.    The oversight visit policy significantly diminishes Representative Escobar's ability to

understand how funds Congress appropriates are being used at facilities in her district. Without

immediate, accurate information, she is less able to ensure that detainees at the facility are being

treated consistent with federal law. She is less able to work effectively on the Appropriations

Committee and its Subcommittee on Homeland Security and Subcommittee on Military

Construction, Veterans Affairs, and Related Agencies. And she is less able to assess the health and

safety of her constituents and to address constituent inquiries and complaints. Without in-person

visits by Representative Escobar and her staff, her only recourse is to submit inquiries to and wait

for a response from administration officials, which is likely to be received too late—if ever.

117.    Defendants' oversight visit policy and practice have created severe friction between

Representative Escobar's office and local ICE officials and undermined a largely respectful and

effective working relationship that she established and had maintained during the first Trump administration, the Biden Administration, and the first part of second Trump administration.

118.    It is important that Representative Escobar be able to conduct timely oversight. The realities on the ground often do not allow for a seven-day delay to her oversight and investigation. Her constituents frequently contact her office with pressing immigration-related issues and concerns, many of which involve the El Paso facilities. When her office receives reports that, for example, detained individuals have not been fed sufficient meals, or that individuals have not been able to shower in several days, it is important that she is able to visit that facility in person, in a timely fashion, to investigate the circumstances. If individuals lack food, showers, and basic medical care, those are situations that need to be rectified immediately to ensure that individuals in custody in facilities in Representative Escobar's district are being treated humanely and consistent with federal law.

119.    Additionally, requiring seven days' notice can present a significant and sometimes insurmountable barrier to conducting an oversight visit. As Representative Escobar's attempts to visit the facility between July 9 and 18 demonstrate, her work as a member of Congress—including unpredictable votes, scheduling, and travel between Washington, D.C., and her district—may make it impossible to schedule and attend an oversight visit with more than a couple of days' notice, if that.

120.    In light of the importance of this on-the-ground, immediate oversight at the El Paso facilities, Representative Escobar intends to continue conducting oversight visits to DHS facilities that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit her to do so thwarts her ability to perform her duties.

2.    **Representative Crow**

121.    Representative Crow represents Colorado's 6th congressional district, where the ICE Denver Contract Detention Facility in Aurora ("Aurora Facility"), and a field office, the Denver Field Office in Centennial, are located. The Aurora Facility is operated by a private contractor, the GEO Group, on behalf of ICE. Representative Crow has been deeply and consistently engaged in oversight of the conditions of immigration detention in his district since he became a member of Congress more than six years ago.

122.    In response to concerning reports regarding the Aurora Facility, including reports of disease outbreaks, Representative Crow attempted his first in-person visit to the facility, without prior notice, in February 2019. He was denied entry. That same day, he sent a letter to the secretary of DHS raising his concerns about conditions at the facility, particularly with respect to medical care and public health.

123.    Representative Crow requested to tour the Aurora Facility three more times before his request was granted, and he finally conducted an oversight visit on March 15, 2019.

124.    Nearly four months after sending a letter to ICE raising concerns regarding medical conditions at the Aurora Facility, in June 2019, Representative Crow received a response in which ICE denied responsibility for developing policies and protocols for managing infectious and communicable diseases at the facility.

125.    Representative Crow recognized the need for increased oversight over the Aurora Facility. He instituted regular visits to the facility, conducted by him or his staff, generally scheduled one to seven days in advance, and sometimes without prior notice. On January 6, 2020, for example, he conducted an oversight visit without prior notice and was able to tour the facility as usual.

126.    These regular visits have allowed Representative Crow and his staff to track conditions closely, including, for example, the number of detainees, their medical care, and their

access to counsel. To keep his constituents and the public informed, he regularly posts accountability reports to his website with the information gained through both in-person visits and regular communication with ICE officials.

127.    These visits have also demonstrated to ICE and GEO Group personnel that Representative Crow will hold the Aurora Facility accountable for maintaining adequate public health conditions within the facility whenever concerning circumstances arise, such as a potential tuberculosis exposure that occurred in April 2025 that led to detainees being quarantined as a precautionary measure. In this way, his oversight allows him to monitor the medical care of detainees, protect the broader community, and ensure that federal law is being followed.

128.    Representative Crow's and his staff's regular visits—sometimes with notice and sometimes without—have also shown him that advance notice can sometimes result in the member or staff getting a curated view of the facility. This hinders his ability to assess the true conditions of detention and thereby engage in real oversight with accurate information to inform his legislative functions.

129.    Representative Crow's on-the-ground oversight has also allowed him and his staff to build a productive relationship with the ICE and GEO Group personnel and to discover issues that need to be addressed before they become larger problems. For example, after raising specific concerns, Representative Crow has seen improvements to detainees' telephone access, to the number of medical staff at the facility, and to access to counsel for detainees in quarantine.

130.    In addition, Representative Crow and his staff are better able to respond to and follow up on constituent casework through on-the-ground oversight. Immigration, including immigration detention, is the most frequent topic of concern raised to his district office, and he uses the oversight visits as an opportunity to investigate constituent complaints. He can get the needed

information through observations, conversations with detainees, and conversations with ICE employees on the ground.

131.    The oversight visits that Representative Crow regularly conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities. For example, he introduced legislation in 2020 and 2021 that sought to protect his constituents and other Americans by decreasing the risk of COVID-19 transmission in ICE detention facilities and, by extension, in the surrounding communities.

132.    Defendants' unlawful oversight visit policy and practice have hindered Representative Crow's ability to conduct comprehensive oversight of the Aurora Facility.

133.    On July 20, 2025—for the first time since he began conducting oversight visits in February 2019—Representative Crow was denied in his attempt to visit the Aurora Facility. He traveled there in person and identified himself, his oversight purpose, and his right to conduct that oversight under section 527. After waiting some time, he was told that ICE had denied his request, and he was not permitted to enter.

134.    ICE OCR later confirmed by email to Representative Crow's staff that his request was denied because "DHS requires requests be made a minimum of seven calendar days in advance for scheduling."

135.    Defendants' oversight visit policy and practice that resulted in this obstruction of Representative Crow's lawful oversight significantly hinder his ability to perform his duties as the member of Congress serving Colorado's 6th congressional district. He is less able to understand how appropriated funds are being used at the facility. He is less able to ensure that detainees at the facility are being treated consistent with federal law. And he is less able to ensure the health and safety of his constituents and to address constituent complaints. Without in-person visits by him or

his staff, his only recourse is to submit inquiries to and wait on a response from administration officials, which is likely to be received too late—if ever.

136.     In light of the importance of this on-the-ground, immediate oversight at ICE facilities in his district, Representative Crow intends to continue conducting oversight visits of DHS facilities that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit him to do so thwarts his ability to perform his duties.

### 3.     Representative Goldman

137.     Representative Goldman represents New York's 10th congressional district. He currently serves as a member of both the Homeland Security Committee and the House Judiciary Committee. As a member of these committees, he has been actively engaged in oversight of DHS and ICE.

138.     The ICE New York Field Office, located at 26 Federal Plaza in Manhattan, is located in his district. The Metropolitan Detention Center (MDC) in Brooklyn, which has an agreement to house immigration detainees, is also located in his district. Both the New York Field Office and MDC are used to detain or otherwise house immigrants.

139.     Representative Goldman has engaged in oversight related to immigration detention at both facilities through in-person visits and letters to executive branch officials.

140.     Representative Goldman's previous oversight activities include regularly leading and signing oversight letters to DHS and ICE on a variety of immigration and border security issues. For example, on June 5, 2025, he led a letter joined by 85 House colleagues to DHS Secretary Kristi Noem seeking information regarding the rise of masked, plainclothes ICE officers involved in detaining individuals without criminal records in connection with their immigration court proceedings. Representative Goldman has also led letters to the chair and ranking member of the

Appropriations Committee regarding immigration and border security issues that have been informed by his oversight work.

141.    Representative Goldman has also introduced legislation to address issues that have arisen in the course of his oversight of DHS. For example, after observing ICE agents conducting operations at the immigration courts at 290 Broadway in May 2025 and experiencing obstruction during an attempted visit to ICE's New York Field Office at 26 Federal Plaza in June 2025, he introduced the No Secret Police Act, which would require DHS agents who are engaged in civil immigration enforcement to display certain identifying insignia and to provide proper identification, and would prohibit them from wearing masks or face coverings.

142.    On June 9, 2025, Representative Goldman's staff emailed ICE personnel on his behalf to request a scheduled tour of the 10th floor of the ICE New York Field Office (the "10th Floor Facility"), where individuals were reportedly being detained. On June 10, ICE personnel responded to the email indicating that the tour request was being reviewed.

143.    On June 16, Representative Goldman's staff again emailed ICE personnel to notify the agency of Representative Goldman's intended visit on June 18, pursuant to his statutory oversight authority under section 527.

144.    On June 17, ICE personnel responded by email to the June 16 email, claiming that Representative Goldman's statutory oversight authority did not apply to the 10th Floor Facility at the New York Field Office because it was not a "detention facility."

145.    On June 18 at 10:00 a.m., as noticed in the June 16 email, Representative Goldman, along with Representative Jerry Nadler, arrived at 26 Federal Plaza and attempted to gain entry to the 10th Floor Facility for the purpose of conducting oversight, consistent with their authority under section 527.

146.     Representative Goldman was not allowed to enter and observe the 10th Floor Facility, and was instead met in the lobby by the deputy director of the New York Field Office. The deputy director refused Representative Goldman entry into the 10th Floor Facility. The deputy director stated that the reason for the denial of the visit was because, according to directions the deputy director received from his supervisors, the 10th Floor Facility is not a "detention facility" under the statute and is instead a "holding and processing center."

147.     The deputy director told Representative Goldman that the 10th Floor Facility did not have beds or showers; that individuals were being held overnight, some for at least two nights; and that they were being fed. Representative Goldman asked the deputy director how a facility that was holding and housing individuals for two nights or more was not being "used to detain or otherwise house" those individuals. The deputy director responded that Representative Goldman should ask the DHS Office of Legislative Affairs.

148.     Representatives Goldman and Nadler were unable to conduct oversight of the ICE facility at 26 Federal Plaza, based on Defendants' oversight visit policy and practice of prohibiting oversight visits at ICE field offices.

149.     They were entitled to conduct such oversight under section 527.

150.     Both announced and unannounced oversight visits by Representative Goldman provide necessary information on how appropriated funds are being used in real time on the ground in immigration detention, in order to ensure the physical safety of his constituents and to ensure that DHS immigration detention activities are being conducted in accordance with the requirements of federal law. It is also vital to his work on legislation and his ability to actively and effectively participate on his assigned committees, both of which have jurisdiction over DHS.

151.    Without the ability to conduct oversight of ICE facilities—particularly those located in his district, where his constituents may be detained—he is unable to ensure his constituents are being treated humanely and have access to legal counsel.

152.    Representative Goldman's ability to conduct unannounced visits at ICE facilities where individuals are being detained or otherwise housed is imperative for him to assess the actual conditions of these facilities and to ensure that DHS and ICE do not have time to hide unacceptable conditions prior to his visit.

153.    Representative Goldman intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and serve his constituents.

154.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 4.    Representative Espaillat

155.    Representative Espaillat represents New York's 13th congressional district. From 2021 to the present, he has served on the Appropriations Committee. Since 2023, he has served as the ranking member of the Subcommittee on the Legislative Branch. He is also the chairman of the Congressional Hispanic Caucus (CHC), a group of more than 40 members of Congress of Hispanic and Latino descent. As part of his role as a member of Congress and his committee assignments, he has been actively engaged in oversight of DHS and ICE since he was elected to Congress.

156.    The 10th Floor Facility at the New York Field Office, 26 Federal Plaza, is located near his district. This facility is used to detain or otherwise house immigrants.

157.    Representative Espaillat's office does regular and significant case work for constituents involving ICE activities and detention, including for individuals detained at the New

York Field Office's 10th Floor Facility. In the course of conducting oversight of DHS and ICE, Representative Espaillat has performed multiple in-person visits to ICE facilities in New York, New Jersey, and Georgia.

158.    For example, in May 2025, Representative Espaillat visited the Elizabeth Contract Detention Facility in New Jersey, where he met with noncitizens who had been detained despite having attended all their required appointments.

159.    In September 2020, he visited the Irwin County Detention Center in Ocilla, Georgia, after a whistleblower complaint alleged that the medical staff there had performed invasive and unnecessary medical procedures, including hysterectomies, on detained women. Following that visit, he wrote a letter to the then-acting director of ICE detailing his concerns about those practices and requesting an investigation at other facilities.

160.    Those on-the-ground oversight visits are integral to other activities Representative Espaillat has undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

161.    On June 8, 2025, Representative Espaillat and his colleague Representative Nydia Velázquez traveled to the 10th Floor Facility. Their purpose was to conduct an unannounced oversight visit.

162.    They had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility had deteriorated due to surging arrests. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the 10th Floor Facility.

163.    Upon arrival, Representatives Espaillat and Velázquez were greeted outside of the building around 3:00 p.m. by a DHS officer. Representative Espaillat and his colleague said that they were members of Congress, and that they were interested in visiting the 10th floor at 26 Federal Plaza, pursuant to their authority under section 527, because they had heard from constituents that detainees were being held there overnight.

164.    At first, the DHS officer denied them entry to the building entirely, but after 15 minutes, they were allowed to enter alone, without their staff members. Once they were inside the lobby of 26 Federal Plaza, the DHS officer said that he was going to check with the acting deputy field office director (deputy FOD).

165.    Representative Espaillat spoke with the deputy FOD on the phone and told her that he had a right to gain access to the facility on the 10th floor. The deputy FOD told Representative Espaillat that he and his colleague could not enter the 10th Floor Facility, because it was a "sensitive facility."

166.    Representative Espaillat and his colleague left the building without being able to conduct oversight to which they are entitled under section 527.

167.    The following month, on July 14, 2025, Representative Espaillat returned with Representative Velázquez to the 10th Floor Facility to conduct an oversight visit. He did not provide advance notice of his visit. He conducted this visit because he had continued to hear reports from constituents and advocates of the inhumane conditions of the facility.

168.    Representatives Espaillat and Velázquez arrived at 26 Federal Plaza and told a DHS officer that they wanted to go to the 10th floor to conduct an oversight visit, consistent with their authority under section 527. They stated that they understood individuals were being held there overnight. They were instructed to wait but were not met by any DHS official.

169.    Representative Espaillat and Representative Velázquez proceeded on their own volition to the 10th floor to conduct the oversight visit. Once on the 10th floor, Representatives Espaillat and Velázquez were denied access to the area where DHS was detaining the individuals.

170.    Representatives Espaillat and Velázquez waited approximately 45 minutes. Multiple DHS staff informed them that someone would speak to them shortly. DHS staff also told the representatives that the deputy FOD was informed of their presence but that the deputy FOD would not speak with them herself. DHS staff informed them that they could not enter because the 10th Floor Facility was a "sensitive facility."

171.    One of the security officials told Representatives Espaillat and Velázquez to contact a public affairs representative. The same security official denied them access to the 10th Floor Facility to conduct oversight.

172.    Representative Espaillat's oversight visits to ICE facilities, including the 10th Floor Facility at 26 Federal Plaza in Manhattan, are critical to his legislative work, including his work on the Appropriations Committee. The information that can be obtained only through in-person oversight is also essential to his ability to serve his constituents, because many of them are detained in or impacted by these and other DHS and ICE facilities.

173.    Defendants' oversight visit policy and practice, which bar Representative Espaillat from conducting oversight visits at the 10th Floor Facility at the New York Field Office, hinder his ability to perform his duties as a member of Congress.

174.    Representative Espaillat intends to conduct both announced and unannounced visits to DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight and to address the concerns of his constituents.

175.    Without obtaining necessary information through this oversight, Representative Espaillat is less able to serve his constituents, to ensure that DHS and ICE are acting consistently

with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 5.     Representative Correa

176.     Representative Correa represents the California's 46th congressional district. He is a member of the Judiciary Committee and the Homeland Security Committee. In 2023, he was named ranking member of the Homeland Security Committee's Subcommittee on Border Security and Enforcement. As part of that role, he has been actively engaged in oversight of DHS and ICE.

177.     The ICE Santa Ana Field Office at 34 Civic Center Plaza in Santa Ana, California, is located in his district. This facility is used to detain or otherwise house immigrants.

178.     Representative Correa's previous oversight activities include numerous in-person oversight visits to DHS facilities where noncitizens were detained or otherwise housed over the last several years. These on-the-ground oversight visits are integral to other activities he has undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. He has sent oversight letters to DHS, ICE, and the Government Accountability Office, calling for greater transparency regarding ICE arrests, the conditions of detention facilities and processing facilities at ports of entry, and the processing of asylum claims, and expressing concern regarding the denial of entry by members of Congress into detention facilities for oversight purposes.

179.     On June 7, 2025, Representative Correa, along with Representatives Gomez, Rivas, and Torres traveled to the ICE Enforcement and Removal Operations Field Office at the Roybal Federal Building ("LA Field Office") in downtown Los Angeles to conduct an oversight visit, consistent with their authority under section 527. The LA Field Office is used to detain or otherwise house immigrants.

180.     After they arrived, Representative Torres contacted an ICE liaison officer and informed the officer that members of Congress were requesting a briefing on the previous day's ICE

operations. After numerous attempts to communicate with ICE officials in the facility, the representatives were told they would not be granted access to the LA Field Office and would not receive the requested briefing.

181.    The representatives remained within the vicinity and were later told by ICE officials they needed to return during regular business hours and that they were being denied access because of "unsafe conditions" related to a protest that had started outside the facility. A short time later, while they were still in the vicinity, someone inside the building deployed a chemical agent that caused irritation to their throats and lungs, making them cough. They did not see who sprayed the chemical agent and remain uncertain as to what it was.

182.    Beginning on June 8, 2025, Representative Correa began visiting the Santa Ana Field Office in his district on a daily basis to ensure there was no overcrowding and to locate specific individuals based on requests from his constituents. Representative Correa often conducted these visits with one day's notice, and sometimes, with no notice at all. Over the course of his visits, he witnessed a surge in the number of detainees at the field office, from fewer than 10 to approximately 77 individuals, housed in about eight holding cells.

183.    After conducting these visits without issue for about 12 days, Representative Correa was denied entry to the Santa Ana Field Office on June 21, 2025. When he arrived that morning, ICE officials informed him of a new rule requiring his office to provide written notice at least seven days in advance in order to visit the facility. He was therefore unable to obtain immediate, reliable information regarding the conditions of confinement.

184.    Representative Correa left the Santa Ana Field Office without being able to conduct oversight of the facility. He was also told that he could no longer use his regular contacts to schedule visits to the Santa Ana Field Office but had to submit requests to a centralized email address.

185.    Representative Correa's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. It is also directly relevant to his role as ranking member of the Subcommittee on Border Security and Enforcement, which requires close oversight to inform him on the topic of immigration detention and to ensure that funds are being adequately appropriated to immigration agencies.

186.    Representative Correa therefore intends to continue conducting in-person oversight at DHS facilities that detain or otherwise house immigrants, including both planned and unannounced visits.

187.    Defendants' refusal to permit Representative Correa to conduct oversight visits at the Santa Ana Field Office without seven days' notice hinders his ability to perform his duties as a member of Congress.

188.    Without the information that can be obtained through timely, in-person oversight, Representative Correa is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations—including limits on such appropriations—going forward.

**6.    Representative Gomez**

189.    Representative Gomez represents California's 34th congressional district. He previously served as the vice chair of the House Committee on Oversight and Government Reform.

190.    The LA Field Office is located in Representative Gomez's district.

191.    Representative Gomez has conducted in-person oversight visits to the United States–Mexico border to monitor CBP interactions with asylum seekers in 2020 and twice to CBP facilities in 2018 and 2020. In June 2025, his staff, at his direction, aided his oversight duties by visiting the LA Field Office following reports that attorneys and family members were being denied

access to the individuals detained in the basement of the building. He has issued statements and written letters to DHS and ICE leadership raising a number of concerns, including claims of mistreatment by detainees in CBP custody and the illegal rejection of asylum seekers at official ports of entry.

192.    On June 7, 2025, Representative Gomez, along with Representatives Torres, Rivas, and Correa, traveled to the LA Field Office to conduct an oversight visit, consistent with their authority under section 527. As alleged above, they requested a briefing and access to the facility. Their requests were denied. *See supra* ¶¶ 179–81.

193.    Over the following several weeks, Representative Gomez and his staff attempted to conduct oversight visits at the LA Field Office and were repeatedly denied access.

194.    On June 9, Representative Gomez and his staff returned to the LA Field Office. They identified themselves and requested access for Representative Gomez for the purpose of conducting oversight consistent with section 527. He was again denied entry and given the same reason that it was "unsafe."

195.    On June 17, Representative Gomez and his staff returned to the LA Field Office. Representative Gomez presented himself to officials on site and requested access. While he was waiting, an ICE official contacted by phone told his staff that she did not have authority to speak to them. A second ICE official contacted by phone told them that they needed to provide 72 hours' notice to conduct a visit and that ICE had previously emailed this information to his team. Representative Gomez's staff informed the ICE official that the representative had the legal authority under section 527 to conduct a site visit for oversight purposes. The ICE official told Representative Gomez and his staff that the LA Field Office is not a "detention facility," but rather a field office, and that ICE does not detain immigrants in field offices. They denied him entry on that basis.

196.     On June 19, Representative Gomez's staff contacted an ICE official via email to follow up on a request to schedule an oversight visit to the LA Field Office. ICE denied this request and cited the new DHS oversight visit policy. ICE stated that the new policy requires seven days' notice for congressional oversight visits. ICE further stated that because the LA Field Office is not a "detention facility," there was no legal basis for Representative Gomez's oversight request. Representative Gomez's staff had observed vans transporting detainees earlier in the month, while they had been on site seeking access to the LA Field Office.

197.     On July 7, after receiving repeated reports of poor facility conditions, Representative Gomez's staff once again attempted to schedule a visit to the LA Field Office for the purposes of conducting oversight. ICE again responded that the field office was not a "detention facility" and denied their request on that basis.

198.     Oversight visits by Representative Gomez and his staff provide necessary information on how to serve his constituents impacted by ICE raids and detention. His district is especially diverse; he represents temporary protected status (TPS) recipients, asylum seekers, undocumented immigrants, and their families. The reported inhumane treatment and conditions of those detained in the LA Field Office directly affects the wellbeing of his constituents. The uptick in the number of those detained has already begun to take an emotional and economic toll on the communities he represents.

199.     Defendants' refusal to permit Representative Gomez to conduct immediate oversight visits at the LA Field Office therefore significantly harms his ability to perform his duties as a member of Congress.

200.     Representative Gomez intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and

accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

201.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation that would require ICE to be transparent and accountable for resolving poor facility conditions.

### 7.    Representative Garcia

202.    Representative Garcia represents California's 42nd congressional district. He has been a member of Congress since 2023, and as of June 2025 he is the ranking member of the Oversight and Government Reform Committee. Prior to serving in that role, he served on both the Oversight Committee and the Homeland Security Committee. As part of his roles, he has been actively engaged in oversight of DHS and ICE.

203.    The LA Field Office is located near Representative Garcia's district. This facility is being used to detain or otherwise house immigrants.

204.    In-person oversight visits to this and other facilities, both announced and unannounced, are essential to Representative Garcia's ability to conduct oversight of DHS and ICE. These visits permit him to directly observe conditions with his own eyes and speak directly with impacted individuals in these environments.

205.    On-the-ground oversight visits and activities are also interconnected with activities Representative Garcia has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent various oversight letters to DHS and ICE officials, as well as to private contractors, regarding issues related to immigration detention and enforcement operations, as well as recent obstruction of oversight by the Trump administration. He has also introduced legislation to address issues he has observed and identified through his oversight of DHS.

206.    On July 23, 2025, Representative Garcia's staff provided ICE with written notice of his intent to travel to the LA Field Office to conduct an oversight visit.

207.    He had received information that individuals were being detained in that facility and that the conditions in the facility were bleak, with many individuals crammed in a small concrete room without basic necessities. He had also seen reports that many individuals have been held overnight at the LA Field Office without beds or general medical care.

208.    An in-person oversight visit was necessary for Representative Garcia to obtain timely, reliable information regarding the conditions of confinement at the LA Field Office.

209.    The written notice specifically stated that Representative Garcia was "authorized by Sec. 527 of PL 118-47" to visit the facility and conduct oversight.

210.    The facility's assistant field office director (AFOD) responded to the written notice by email the same day, referencing Defendants' new oversight visit policy, stating "the Department requires requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. . . . Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate." The AFOD did not schedule or confirm a visit for Representative Garcia.

211.    On July 24, 2025, Representative Garcia traveled to the LA Field Office. His purpose in doing so was to conduct oversight. Upon arrival, Representative Garcia presented himself at the intercom controlling access to a locked door that visitors are known to use. After identifying himself as a member of Congress, he stated his intent to conduct an oversight walk-through, consistent with section 527. However, he was not permitted to enter. A voice on the intercom told Representative Garcia that they had asked their "management" and stated, "We're not considered a facility. You will have to go to the Adelanto Detention Facility," a facility located about 85 miles from downtown Los Angeles.

212.    Representative Garcia responded that he was taking that as a denial from ICE of his request to conduct oversight at a detention facility. Representative Garcia reiterated that members of Congress have the right to conduct such oversight and ended the conversation. Representative Garcia left the facility without being able to conduct the oversight he is entitled by statute to perform.

213.    Oversight visits by Representative Garcia and his staff provide necessary information on how to best craft legislation, understand how appropriated funds are being used for immigration detention, and ensure humane and legal treatment of detainees within the facilities. These visits also inform him on how to best serve his constituents when he hears about issues or concerns about immigration detention and enforcement actions. The information obtained through in-person oversight is also directly relevant to his work as ranking member of the Oversight and Government Reform Committee.

214.    Representative Garcia intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

215.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

**8.    Representative Ruiz**

216.    Representative Ruiz represents California's 25th congressional district. He has a medical degree from Harvard Medical School and a Master of Public Heath from the Harvard School of Public Health.

217.    Representative Ruiz's previous oversight activities include in-person oversight visits to an ICE field office in 2014 and to multiple border patrol facilities in 2018, 2019, and 2023. As a physician trained in humanitarian aid, he has focused his oversight on ensuring that those in ICE and CBP custody have access to adequate healthcare. He has issued statements and written letters to DHS and ICE leadership raising these concerns, among others.

218.    In-person oversight visits to DHS facilities are integral to Representative Ruiz's legislative work. He has used the information obtained from those visits in drafting legislation, including the Humanitarian Standards for Individuals in Customs and Border Protection Custody Act, which calls on CBP to conduct health assessments, provide emergency medical care and humane living conditions, and ensure access to adequate water and nutrition.

219.    On July 11, 2025, Representative Ruiz, along with Representative Torres, traveled to the ICE Adelanto Processing Center in Adelanto, California, to conduct an oversight visit. An in-person oversight visit was necessary to obtain immediate, reliable information regarding the conditions of confinement at the Adelanto Processing Center.

220.    Upon arrival, Representative Ruiz and Representative Torres identified themselves and were greeted by a guard at the fence surrounding the facility. While they explained that they were authorized to tour the facility under section 527, an individual whom they believe to be an employee of the GEO Group (the private prison company that contracts with ICE to manage the Adelanto facility) met them at the gate. He told them that it was his understanding that they had been given notice that they were not approved for a visit that day.

221.    Representative Torres explained that she had made prior arrangements and provided ICE with notice of the visit the previous week. The individual then handed the representatives a piece of paper with DHS contact information and suggested they contact DHS. Representative Ruiz reiterated that it was their legal right to conduct an unannounced oversight visit, and he asked to

speak to an ICE agent. The individual told them he would let the ICE officials in the facility know and then walked back to the building. No one from the facility came out to speak with the representatives.

222.    Because of Defendants' oversight visit policy and practice, Representatives Ruiz and Torres left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

223.    Representative Ruiz's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. Defendants' refusal to permit Representative Ruiz to conduct immediate oversight visits at the Adelanto Processing Center, and other ICE facilities, therefore significantly harms his ability to perform his duties as a member of Congress.

224.    He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both scheduled and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Ruiz is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation.

### 9.    Representative Torres

225.    Representative Torres represents California's 35th congressional district. She is a member of the Appropriations Committee and Administration Committee. She also previously served on the Homeland Security Committee.

226.    The LA Field Office is located near Representatives Torres's district, as is the Adelanto ICE Processing Center in Adelanto, California. The LA Field Office is being used to detain or otherwise house noncitizens.

227. In the course of conducting oversight of DHS, Representative Torres has performed previous in-person visits to immigration detention facilities in California, New Mexico, and Texas. Representative Torres conducted oversight visits of these facilities to assess conditions of minors and families being held at CBP and ICE facilities based on reports of inhumane treatment of minors and families.

228. For example, while at the ICE Otay Mesa Detention Center in San Diego, California, in June 2018, Representative Torres observed toddlers huddled under aluminum blankets in freezing cold cells as they waited to be processed. In June 2019, she conducted oversight visits, along with colleagues from the Congressional Hispanic Caucus, of El Paso Border Patrol Station 1 and Clint Border Patrol Station, both located in Texas and operated by CBP, to investigate reports of inhumane conditions faced by children and families. During this visit she observed appalling conditions in which children were being held in groups of 10 to 15 in cells with no furniture and without access to basic necessities. She has conducted numerous visits to ensure that DHS and ICE adhere to the law and provide a safe environment for detained individuals.

229. For example, on February 19, 2025, Representative Torres visited the LA Field Office following reports that unidentified federal agents had removed her constituents from their homes and detained them in the facility. During her visit, Representative Torres was able to have a conversation with ICE officials about how to safely execute their duties without endangering local communities.

230. Representative Torres's on-the-ground visits and activities are integral to her other legislative duties. For example, these visits have informed relevant legislation she has crafted, including the Fairness to Freedom Act, introduced in April 2025, which seeks to establish a universal right to legal representation for individuals facing deportation.

231. On June 7, 2025, Representative Torres joined Representatives Gomez, Rivas, and Correa in an unannounced oversight visit at the LA Field Office. Representative Torres had seen reports of violent ICE operations taking place in the Los Angeles area, and information from constituents suggested that individuals detained in the operations were being held in the LA Field Office. She was also aware of credible reports that individuals were being detained in the LA Field Office under inhumane conditions. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the LA Field Office.

232. As alleged above, the representatives were denied access to the LA Field Office. *See supra* ¶¶ 179–81. While the representatives stood in the vicinity of the field office, someone from inside the building deployed a chemical agent that caused irritation to the representatives' throats and lungs. Representative Torres's exposure to the chemical agent required her to visit the hospital emergency room for respiratory treatment.

233. Representatives Torres, Gomez, Rivas, and Correa left the LA Field Office without being able to conduct the oversight which they are entitled to perform under section 527.

234. On June 18, Representative Torres again attempted to conduct an oversight visit at the LA Field Office. She identified herself as member of Congress at an entrance to the building and requested access to tour the facility pursuant to her authority under section 527. Representative Torres was denied access to the LA Field Office. In later correspondence, an ICE representative asserted that she was denied entry because the LA Field Office did not "house aliens." This information was directly contrary to the reports she had received regarding the detention of individuals at that location.

235. Representatives Torres again left the LA Field Office without being able to conduct the oversight which she is entitled by statute to perform.

236. On July 11, Representative Torres traveled to the Adelanto Processing Center to conduct an oversight visit with Representative Ruiz, as described above. *See supra* ¶¶ 219–21.

237. Representatives Torres and Ruiz were denied entry and left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

238. On July 11, after Representative Torres was denied entry to the Adelanto Processing Center, her staff emailed ICE requesting an oversight visit on a future date.

239. On July 16, Representative Torres received a communication from ICE informing her that she was "approved" for a 90-minute tour of the Adelanto Processing Center to take place on July 18 at 10:00 a.m. PT. Due to travel delays, Representative Torres was unable to arrive at the Adelanto Processing Center until approximately 11:00 a.m. PT, whereupon she was informed that the length of the tour could not be extended. She was given a tour of the Processing Center's health unit, kitchen, and processing area, but she was unable to see other parts of the facility, including where detained individuals are housed.

240. Representative Torres's tour of the Adelanto Processing Center ended before she was able to see all parts of the facility necessary to conduct the oversight that she is entitled by statute to perform.

241. Representative Torres's staff immediately placed another request for a full visit of the facility, which ICE scheduled for July 28, 2025—10 days after the request was made. The visit took place as scheduled at 10:00 a.m. PT on July 28. Representative Torres and her staff reviewed the East Wing and West Wing facilities, the latter of which holds female detainees. They also observed the female health clinic and an ongoing immigration court proceeding, which was taking place virtually. Representative Torres was told that she was not allowed to speak with detainees, and that neither she nor her staff could have access to detained constituents unless names were sent in

advance along with a privacy release form with the detainee's own signature. The staff located at the facility indicated that the number of detainees was well below capacity. Representative Torres observed low-risk and medium-risk detainees, but not high-risk detainees.

242.     Representative Torres's ability to observe operations and conditions in DHS facilities firsthand without delay is crucial to her ability to serve her constituents, who are directly affected by the presence of ICE facilities near her district. The information obtained through in-person oversight is also directly relevant to her work on the Appropriations Committee.

243.     Representative Torres intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities that detain or otherwise house individuals, including both planned and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Torres is less able to serve her constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 10.    Representative Thompson

244.     Representative Thompson represents Mississippi's 2nd congressional district and is the ranking member of the Homeland Security Committee. From 2007 to 2011 and 2019 to 2023, he served as chair of the committee; during all other times since 2005, he has served as the ranking member. As part of that role, he has been actively engaged in oversight of DHS and ICE since Congress created those agencies.

245.     An ICE detention facility, the Adams County Correctional Center, is located in his district, and an ICE field office is located just outside of his district in Mississippi. His office does regular and significant case work for constituents involving ICE activities and detention, at the Adams County Correctional Center facility in particular.

246.     In the course of conducting oversight of DHS, Representative Thompson has performed many in-person visits to immigration detention facilities, including ICE facilities and many CBP facilities.

247.     For example, in April 2025, Representative Thompson visited the Central Louisiana ICE Processing Center and South Louisiana ICE Processing Center, where he received tours of the facilities and spoke with detained individuals about their medical care and other concerns. In addition, at his direction as then-chair of the Homeland Security Committee, committee staff visited eight ICE detention facilities in Louisiana, Mississippi, California, New Mexico, and Maryland, leading to the 2020 committee staff report on the conditions of confinement and the inadequacy of DHS's internal oversight tools.[38]

248.     Those on-the-ground oversight visits and activities are integral to other activities Representative Thompson has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

249.     On July 21, 2025, Representative Thompson, along with Representatives Raskin and Neguse, traveled to the ICE Washington Field Office in Chantilly, Virginia, to conduct an unannounced oversight visit. They had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility were unknown. They were also aware of reports regarding poor conditions and overcrowding at ICE field offices across the country. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the Washington Field Office.

---

[38] *ICE Detention Facilities* Report, *supra* n.6.

250.    Upon arrival, Representative Thompson and the others identified themselves and were greeted at the door around 10:00 a.m. by a guard, who asked them to wait outside while he conferred with officials inside. An ICE official offered to show them only the public lobby. After the representatives explained that they intended to and were authorized under section 527 to tour entire facility, the ICE official returned inside to confer with management. Eventually, the deputy field office director and assistant field office director informed them that their latest guidance was that field offices are not subject to section 527. On that basis, ICE denied Representatives Thompson, Neguse, and Raskin entry to conduct an oversight visit.

251.    In answer to questions from the representatives, the ICE officials confirmed that the Washington Field Office was currently holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. The Washington Field Office is being used to detain or otherwise house noncitizens.

252.    Representatives Thompson, Neguse, and Raskin left the facility without being able to conduct the oversight which they are entitled by statute to perform.

253.    Representative Thompson's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Homeland Security Committee and to his ability to serve his constituents, who are directly affected by the presence of ICE facilities in and nearby his district. He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both planned and unannounced visits.

254.    Without the information that can be obtained only in those circumstances, Representative Thompson is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

11.     **Representative Neguse**

255.     Representative Neguse represents Colorado's 2nd Congressional district. He has served as the Assistant Democratic Leader in the House since 2024 and is a member of the Judiciary Committee. He also previously served on the Immigration Subcommittee of the Judiciary Committee. As a member of the Judiciary Committee, he has been actively engaged in oversight of DHS and ICE.

256.     Representative Neguse's previous oversight activities include in-person oversight visits to ICE facilities where noncitizens were detained or otherwise housed in 2019 and 2020, and his staff has, at his direction, aided his oversight duties by visiting ICE facilities in 2019, 2023, and 2024. As a member of the Colorado delegation, he has focused his concerns in particular on the use of private contractor facilities to detain noncitizens, including at the ICE detention facility in Aurora, Colorado. He has issued statements and written letters to DHS and ICE leadership raising those concerns.

257.     On July 21, 2025, Representative Neguse joined Representatives Thompson and Raskin in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Neguse based on Defendants' oversight visit policy and practice of prohibiting oversight visits at ICE field offices. *See supra* ¶¶ 249–52.

258.     Oversight visits by Representative Neguse and his staff provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.

259.     Representative Neguse intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and

accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

260.     Without obtaining necessary information through this oversight, Representative Neguse is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 12.     Representative Raskin

261.     Representative Raskin represents Maryland's 8th congressional district. He currently serves as the ranking member of the Judiciary Committee. From 2023 to 2025 he served as ranking member of the House Oversight Committee. Before 2023, he was a member of both the Judiciary and Oversight Committees; he also served as chair of the Subcommittee on Civil Rights and Civil Liberties of the Oversight Committee.

262.     Oversight of immigration matters is particularly important to Representative Raskin's service on the Judiciary Committee. The Judiciary Committee has jurisdiction over civil rights issues and civil liberties issues, as well as jurisdiction over all immigration policy and non-border enforcement, including ICE. The committee has authorized tens of billions of dollars for ICE, including for detention facilities. Because Representative Raskin is the ranking member of the Judiciary Committee, it is very important for him to have an accurate and detailed understanding of ICE's detention operations, including the processes under which ICE detains individuals and the conditions in which they are detained. In-person oversight visits, both announced and unannounced, are critical to this understanding of ICE detention facilities.

263.     Immigration enforcement and detention are important issues to Representative Raskin's constituents, who often reach out to his office about these matters. Some of these constituents have family members in ICE detention, and they are desperate for information about

their relatives. Recently, his office was contacted by a Maryland resident whose mother is in immigration detention and is facing removal despite the fact that she fled her country of origin because of persecution on the basis of her religion and political opinions. Another of his constituents was unexpectedly detained by ICE in front of his home on his way to work, despite having no criminal record or any removal order; he was transferred to a facility in Texas for no apparent reason. Constituents have also told Representative Raskin's office that ICE refuses to provide their detained relatives with a privacy waiver form, which is necessary to allow family members to learn about their case.

264.    Representative Raskin also engaged in oversight of DHS and ICE in his prior capacity as member and subcommittee chair of the House Oversight Committee. In August and September 2019, the Oversight Committee sent bipartisan staff delegations across the country to conduct oversight inspections of DHS immigration detention facilities. Committee staff inspected 22 DHS facilities in six states, including 12 detention centers run by ICE and for-profit contractors, seven Border Patrol stations, and three ports of entry operated by CBP. DHS cancelled staff inspections of 11 CBP facilities a day before they were to occur.[39]

265.    A 2019 investigation by the Oversight Committee, in which Representative Raskin participated, led to issuance of a staff report in 2020 on the poor treatment of detainees in detention facilities operated by private contractors, focusing especially on deaths in custody and deficient medical care. That report followed staff visits to 12 detention facilities, 10 of which were operated by contractors and two by ICE. The report concluded that the detention system needs fundamental reform, including greater internal and external oversight, and that privately run facilities are particularly problematic. It also concluded that DHS and ICE had refused to release full investigative reports into detainee deaths, as required by law.

---

[39] *ICE Detention Facilities* Report, *supra* n.6.

266.     Representative Raskin's oversight visits have also led to oversight actions during his service in Congress. In July 2019, he chaired a hearing on inhumane treatment of children in detention facilities. In August 2020, he requested that the Government Accountability Office (GAO) prepare a report on the care of pregnant women in DHS facilities, which it did. In March 2020, Representative Raskin requested that ICE and CBP provide documents on procedures in detention facilities to protect detainees from the virus that causes COVID-19.

267.     In September 2020, the Oversight Committee, along with the Homeland Security Committee, opened an investigation into a medical whistleblower complaint from an ICE detainee and requested that ICE produce documents. In May 2024, Representative Raskin, along with other members of the Oversight Committee, requested that GAO conduct a review of medically necessary procedures for detainees in ICE and CBP facilities.

268.     More recently, during the current Trump administration, Representative Raskin has sent several letters to DHS and ICE leadership, raising issues such as the detention of U.S. citizens, DHS plans for detention of families, and the detention of individuals whose student visas have been revoked.

269.     On July 21, 2025, Representative Raskin joined Representatives Thompson and Neguse in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Raskin based on Defendants' oversight visit policy and practice of prohibiting oversight visits at ICE field offices. *See supra* ¶¶ 249–52.

270.     Representative Raskin's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Judiciary Committee and to his ability to serve his constituents. These visits provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the

appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.

271.    Representative Raskin intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation, serve on relevant committees, and otherwise serve his constituents.

272.    Without obtaining necessary information through this oversight, Representative Raskin is less able to serve his constituents, ensure that DHS and ICE are acting consistently with the law, and craft relevant legislation and appropriations, including limits on such appropriations.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA—Contrary to Law and in Excess of Statutory Authority

273.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

274.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

275.    Defendants' oversight visit policy, which requires individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and prohibits members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, is final agency action.

276.    Defendants' oversight visit policy is "not in accordance with law" under 5 U.S.C. § 706(2)(A) because it is contrary to the requirements of section 527.

277.    Defendants' oversight visit policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C) because no statute or other source of law provides Defendants with the authority to prohibit unannounced oversight visits by individual members of Congress to any DHS facilities that detain or otherwise house noncitizens.

### COUNT II

**Violation of the APA—Arbitrary, Capricious, and an Abuse of Agency Discretion**

278.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

279.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

280.    Defendants' oversight visit policy, which requires individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and prohibits members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, is final agency action.

281.    Defendants' oversight visit policy is arbitrary and capricious because it lacks a lawful basis and because Defendants have not articulated an adequate, reasoned, or lawful basis for requiring seven days' notice for individual members of Congress to inspect DHS facilities or for denying members of Congress access to ICE field offices, where noncitizens are detained or otherwise housed, for the purpose of conducting oversight.

### COUNT III

**Violation of the APA—Unlawfully Withheld or Unreasonably Delayed**

282.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

283.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

284.    Section 527 imposes a mandatory duty on Defendants to admit individual members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purpose of conducting oversight.

285.    Defendants have not complied with their nondiscretionary duties to admit individual members of Congress without advance notice to DHS facilities, including ICE field offices, used to detain or otherwise house noncitizens for the purpose of conducting oversight.

286.    This court should compel Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purposes of conducting oversight.

## COUNT IV

### *Ultra Vires* / Violation of Section 527

287.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

288.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a federal officer has acted "beyond th[e] limitations" set by federal statute, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

289.    Plaintiffs have a nonstatutory right of action to ask a court to enjoin and declare unlawful official action that is *ultra vires*. Section 527 establishes a nondiscretionary duty on the part of Defendants to admit members of Congress to DHS facilities used to detain or house noncitizens.

290.    Each Plaintiff, in his or her official capacity as an individual member of Congress, has attempted to obtain information about conditions at a DHS facility used to detain or otherwise

house noncitizens. Each Plaintiff has done so by visiting a facility in person, or by giving DHS notice of imminent plans to do so, for the purpose of conducting real-time oversight of that facility. Each of those attempted oversight visits has been blocked by Defendants, notwithstanding section 527.

291.    Defendants' oversight visit policy, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, violates section 527.

292.    Plaintiffs are entitled to equitable relief to remedy Defendants' ongoing violation of federal law.

## COUNT V

## Mandamus Act and All Writs Act

293.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

294.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

295.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

296.    Section 527 imposes a mandatory duty on Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens.

297.    Defendants' oversight visit policy, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house

noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, is contrary to section 527.

298.    Defendants have not complied with their nondiscretionary duty under section 527 to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

299.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 to compel Defendants' nondiscretionary legal duty to admit members of Congress, without advance notice, to DHS facilities used to detain or otherwise house noncitizens.

## COUNT VI

### Declaratory Judgment Act

300.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

301.    Defendants' refusal to admit individual members of Congress to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, to conduct oversight activities without advance notice violates Plaintiffs' rights under section 527.

302.    The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such a declaration," in addition to any injunctive or other available relief.

303.    Plaintiffs are entitled to a declaratory judgment awarding them declaratory and injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**PRAYER FOR RELIEF**

Plaintiffs request that the Court enter the following relief:

A.     Declare unlawful, vacate, and set aside Defendants' oversight visit policy, requiring members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or otherwise house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, as contrary to law, in excess of statutory authority, arbitrary and capricious, and *ultra vires*.

B.     Declare unlawful, vacate, and set aside Defendants' withholding and unreasonable delays of performing their mandatory duties to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

C.     Grant preliminary and permanent injunctive relief to enjoin Defendants from enforcing, implementing, maintaining, or giving effect to the oversight visit policy, including through denying individual members of Congress entry to conduct oversight visits, without prior notice, at any DHS facilities that detain or otherwise house noncitizens.

D.     Exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate relief pending review, barring Defendants from enforcing or otherwise giving effect to the oversight visit policy.

E.     Enter an order in exercise of the Court's equitable powers that directs Defendants to take all steps necessary to ensure that individual members of Congress may conduct oversight visits, without advance notice, at all DHS facilities that detain or otherwise house noncitizens.

F.     Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate.

G.     Grant such other relief as the Court deems just, equitable, and proper.

July 30, 2025                                Respectfully submitted,

                                             */s/ Christine L. Coogle*
                                             Christine L. Coogle (D.C. Bar No. 1738913)
                                             Lisa Newman (TX Bar No. 24107878)
                                             Paul R.Q. Wolfson (D.C. Bar No. 414759)
                                             Brian D. Netter (D.C. Bar No. 979362)
                                             Josephine T. Morse (D.C. Bar No. 1531317)
                                             Skye L. Perryman (D.C. Bar No. 984573)

                                             DEMOCRACY FORWARD FOUNDATION
                                             P.O. Box 34553
                                             Washington, D.C. 20043
                                             (202) 448-9090
                                             ccoogle@democracyforward.org

                                             Daniel Martinez
                                             D.C. Bar No. 90025922
                                             Ronald A. Fein
                                             D.C. Bar No. 90026641
                                             Katherine M. Anthony
                                             D.C. Bar No. 1630524
                                             Jessica Jensen
                                             D.C. Bar No. 1048305

                                             AMERICAN OVERSIGHT
                                             1030 15th Street NW, B255
                                             Washington, DC 20005
                                             (202) 897-2465
                                             danny.martinez@americanoversight.org

                                             *Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Joe Neguse, et al.,

       Plaintiffs,

 v.

U.S. Immigration and Customs Enforcement, et al.,

       Defendants.

Civil Action No. 1:25-cv-02463-JMC

## DECLARATION OF SEAN HACKBARTH

     I, Sean Hackbarth, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. I am the Acting Assistant Director and Deputy Assistant Director for the Office of Congressional Relations ("OCR"), U.S. Immigration and Customs Enforcement ("ICE"), Department of Homeland Security ("DHS").

2. In my role as Acting Assistant Director and Deputy Assistant Director, I serve as the primary liaison to Congress for ICE providing Members and their staff with timely, relevant, and accurate information regarding ICE missions, priorities, and programs; I support effective engagement by ICE leadership with Member offices and staff; I evaluate potential legislative impacts to ICE; and I defend ICE resources and authorities.

3. I provide this declaration based on my personal knowledge and information obtained in my official capacity.

4.  I am aware of the lawsuit *Neguse v. U.S. Immigr. and Customs Enf't*, No. 25-2463 (D.D.C. filed July 30, 2025).

5.  On or about the week of June 16, 2025, ICE published on the ICE OCR website an update to its Facility Visit Request Process, which states:

> Please note the Department [of Homeland Security] requires requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. Any requests to shorten that time must be approved by the DHS Secretary. Visit requests should be submitted during normal business hours to OCR at CongressToICE@ice.dhs.gov. Visit requests are not considered actionable until OCR acknowledges receipt of the request to the requestor. Requests received after hours or on weekends/holidays will be confirmed on the next business day. OCR will work with the appropriate ICE Field Office to coordinate the visit request and will confirm details as soon as practicable.

> Visit requests should include the date of the proposed visit, the visit location, the duration of the visit, and the names and titles of all participants. Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate.

*See* Office of Congressional Relations | ICE, available at: https://www.ice.gov/leadership/ocr.

6.  Members of Congress and their staff can request to visit ICE detention facilities, field offices, or holding rooms, provided the request is submitted a minimum of seven (7) days in advance for scheduling purposes.

7.  Members of Congress and their staff must request visits to ICE facilities a minimum of seven (7) days in advance to ensure that the appropriate Field Office can support and accommodate

the visit. OCR will work with the appropriate Field Office to schedule the visit, then confirm

the visit with the requesting Member office or committee staff. If the Field Office is unable to

support the visit, OCR will propose alternate dates or times until a mutually agreed time is

available. As long as the visit request is made seven (7) days in advance for scheduling and the

relevant Field Office can support the visit, Members of Congress and their staff are able to visit

ICE Field Offices with temporary holding facilities.

8. Visits from Members of Congress and their staff are resource intensive because ICE must

ensure the safety of these high-profile visitors and any unannounced visit is highly disruptive

to ICE's immigration enforcement operations. Members of Congress and their staff require

screening at entry to facilities, access to locked units in facilities, and escorts between locked

units in facilities. The required advance notice for visits is necessary to ensure that ICE can

allocate the staff and resources necessary to ensure these visits can take place safely.

9. The seven (7) days' advance request for scheduling is critical to ensure the safety of ICE

facilities for staff, detainees, and visitors. To protect staff, detainees, and the surrounding

community, and to maintain order, ICE enforces strict security measures, including advance

scheduling of facility tours, maintaining a secure perimeter, and screening all visitors prior to

entry in accordance with ICE detention standards. Visitors must comply with identity

verification and security screening requirements before being granted access. In some cases,

entry may be delayed due to exigent circumstances, such as security concerns during protests

or the time required to vet visit requests.

10. Recent events confirm why it is important for DHS to require visit requests for access to ICE

facilities be made seven (7) days in advance to ensure that sufficient ICE staff is available to

facilitate a safe and secure visit.  In some recent visits from Members of Congress, those

Members and their staff have refused to comply with facility visitation requirements, including limitations on recording devices.  These visits required additional staff attention and resources both to ensure safe visits and to protect the privacy interests of detained individuals and ICE employees.

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, as of the time of signature.

Executed this 29th day of August 2025.

SEAN M HACKBARTH

Digitally signed by
SEAN M HACKBARTH
Date: 2025.08.29
16:15:37 -04'00'

Sean Hackbarth
Office of Congressional Relations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOE NEGUSE, in his official capacity as a Member of the U.S. House of Representatives, *et al.*, | |
| Plaintiffs, | Case No. 25-cv-2463 (JMC) |
| v. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Every year since 2020, Congress has passed and the President has signed an appropriations

bill that prohibits the Department of Homeland Security (DHS) from using appropriated funds "to

prevent" Members of Congress "from entering, for the purpose of conducting oversight," any DHS

facility "used to detain or otherwise house aliens." *See, e.g.*, Further Consolidated Appropriations

Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619.[1] This appropriations

rider, colloquially referred to in its current form as Section 527, also prohibits DHS from using

funds provided through the appropriations process to "make any temporary modification at any

such facility that in any way alters what is observed by a visiting Member of Congress" or their

staffs, "compared to what would be observed in the absence of such modification." *Id.* The rider

also addresses the subject of notice requirements for entry to covered facilities. For congressional

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

staff members seeking to visit covered facilities, DHS "may require that a request be made at least 24 hours in advance of an intent to enter" the facility. *Id.* § 527(c). However, with respect to the Members of Congress themselves, the rider states that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility . . . for the purpose of conducting oversight." *Id.* § 527(b).

In June 2025, U.S. Immigration and Customs Enforcement (ICE) announced two policies regarding access of Members of Congress to ICE facilities. First, ICE posted a guidance document to its website regarding rules and procedures for congressional visits to ICE facilities covered by Section 527. *U.S. Immigration and Customs Enforcement (ICE) Facility Visit and Engagement Protocol for Members of Congress and Staff* (June 2025) [hereinafter June 2025 Visit Protocol], *archived at* https://perma.cc/UL23-J4ZM. This document, which was subsequently removed from the website without explanation, specifically noted that "ICE Field Offices" were not detention facilities that fell within the scope of Section 527's requirements because those offices did not house or detain noncitizens, and instead merely "process[ed them] to make custody determinations." *Id.* at 4. Second, later in June, ICE instituted a requirement that all Members of Congress who seek to visit ICE facilities must make the request seven calendar days in advance of the visit in order to gain access. *See, e.g.*, *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV. That requirement remains on ICE's website to this day.

Plaintiffs are twelve Members of Congress who have attempted to visit various ICE facilities, including field offices, without providing advance notice. All claim to have been denied entry to the facilities under one of the policies described above. Plaintiffs now bring this suit to challenge these policies, referred to collectively in this opinion as the Oversight Visit Policies. *See* ECF 1 ¶ 8. They allege that Defendants have acted unlawfully in creating and enforcing the

2

Oversight Visit Policies because the policies prevent Members of Congress from conducting unannounced, in-person oversight at ICE facilities in violation of Section 527. Plaintiffs allege that the policies are contrary to law, in excess of DHS's statutory authority, and arbitrary and capricious under the Administrative Procedure Act (APA), and that they represent an *ultra vires* violation of Section 527. *Id.* ¶¶ 273–81, 287–92. Plaintiffs also argue that Defendants have violated the APA by unlawfully withholding and unreasonably delaying access to covered facilities, *id.* at ¶¶ 282–86, and that if APA or *ultra vires* challenges are not available, they are entitled to mandamus relief, *id.* ¶¶ 293–99.

After filing suit, Plaintiffs moved to preliminarily stay the Oversight Visit Policies under 5 U.S.C. § 705 pending judicial review. ECF 17. In the alternative, they request a preliminary injunction. *Id.* Defendants—DHS, ICE, and several agency officials—oppose the motion on various grounds, including that Plaintiffs lack both standing and a cause of action to bring the suit, and that Plaintiffs' claims fail on the merits. For the reasons stated below, the Court concludes that Plaintiffs have shown a likelihood of success on the merits of their claim that the challenged Oversight Visit Policies are contrary to law and in excess of DHS's statutory authority. Further, the remaining factors governing issuance of preliminary relief support a stay of the challenged policies. As such, the Court will **GRANT** Plaintiffs' motion for preliminary relief in the form of a stay under Section 705 of the APA.

## I. BACKGROUND

### A. Statutory and Regulatory Background

This case involves the application of statutes that fund Defendant Department of Homeland Security and its various sub-agencies. One of those sub-agencies is U.S Immigration and Customs Enforcement, commonly known as ICE. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005)

(describing ICE, previously named the "Bureau of Immigration and Customs Enforcement," as one of the "divisions" of DHS). DHS is tasked with carrying out the nation's "detention and removal program." 6 U.S.C. § 251(2); *see N.S. v. Dixon*, 141 F.4th 279, 282 n.1 (D.C. Cir. 2025). Under the immigration laws, certain classes of noncitizens may be detained during removal proceedings or pending their removal from the United States. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1226(c), 1231(a)(2)(A).[2] Responsibilities assigned to the Secretary of Homeland Security and delegated to ICE include "arrang[ing] for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1)[3]; *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 186, 196 (D.D.C. 2020) (noting that ICE "oversees the departure of removable immigrants from the United States," including by "oversee[ing] the civil detention of immigrants").

To effectuate that statutory duty, ICE's Enforcement and Removal Operations (ERO) oversees more than 100 civil immigration detention facilities across the country, and hundreds of thousands of adult immigrants are detained in those facilities in a given year. *See, e.g.*, *Annual Report: Fiscal Year 2024*, ICE 22–23, 23 fig. 13 (Dec. 19, 2024) [hereinafter ICE FY 2024 Report], https://perma.cc/M72B-NZLA (noting 277,913 "book-ins" to 129 detention facilities over the course of the fiscal year, with approximately 37,684 noncitizens detained as of the end of the

---

[2] The statutes in question in this case typically use the term "aliens" rather than "noncitizens." However, as this Court has previously explained, *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *3 n.3 (D.D.C. Aug. 1, 2025), it will use the term "noncitizen" unless quoting from a statute, regulation, or case that uses "alien."

[3] These, and certain other statutory authorities relating to detention of noncitizens pending removal, were originally "exercised by the Attorney General and the Immigration and Naturalization Service (INS)." *Clark*, 543 U.S. at 374 n.1. Following the Homeland Security Act of 2002, various responsibilities related to the "detention and removal program" were transferred to the Secretary of Homeland Security, *Dixon*, 141 F.4th at 282 n.1; *see Clark*, 543 U.S. at 374 n.1, and the Court treats statutory references to the Attorney General in the relevant portions of the Immigration and Nationality Act as references to the Secretary of Homeland Security, *see Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 n.6 (D.D.C. 2017).

4

fiscal year); *Detention Facilities*, ICE, https://perma.cc/BU8Q-LDGZ (listing 129 detention facilities as of September 30, 2025). ICE states that detention facilities are used to "house aliens to secure their presence for immigration proceedings or removal from the U.S." *Detention Facilities*, ICE, https://perma.cc/BU8Q-LDGZ.

In addition to these detention facilities, ICE also operates field offices and associated "sub-locations" of those field offices. *See* ICE FY 2024 Report at 9 (listing "25 domestic field offices and 182 sub-locations nationwide"). Field offices play a role in directing and managing immigration enforcement efforts: "ERO manages all aspects of the immigration enforcement process through the operation of 25 field offices nationwide that report to ERO headquarters." *Field Offices*, ICE, https://perma.cc/3NCM-RS2H. These offices host ICE officials and employees who oversee regional enforcement efforts. *See* Fatma Marouf, *Regional Immigration Enforcement*, 99 Wash. U. L. Rev. 1593, 1595 (2022). They also are home to administrative staff that manage individual noncitizens' immigration cases. *ICE Field Office Check-Ins*, ICE, https://portal.ice.gov/immigration-guide/check-ins (last visited Dec. 12, 2025). While these field offices are not classified as detention facilities in ICE's public materials, ICE's regulations nevertheless permit the operation of "holding facilities located within . . . field offices." *Policy Number 11087.2: Operations of ERO Holding Facilities*, ICE, Office of Enforcement and Removal Operations, § 1.1 (Jan. 31, 2024) [hereinafter ICE Policy Number 11087.2], https://perma.cc/9UD2-B9WX. The regulations state that a "holding facility" in a field office is to be "primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency" with "short-term confinement" being defined as "a period not to exceed 12 hours, absent exceptional circumstances." *Id.* § 3.2 & n.3.

Of course, operating such an extensive network of facilities requires money. DHS, like many agencies, is funded in large part through annual congressional appropriations. *See, e.g.*, Gov't Accountability Off., Principles of Federal Appropriations Law 2-17 (4th ed. 2016). In our constitutional scheme, "Congress's control over federal expenditures is absolute." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.). The Constitution provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "Congress'[s] power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use." *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991). Accordingly, it is "emphatically . . . the exclusive province of the Congress not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

One way Congress establishes the relative priority of programs and projects is through appropriations riders. These riders are "provisions in appropriations legislation that limit (or occasionally require) the use of funds for purposes or activities an agency is authorized to undertake." Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1093 (2021). Limitations riders are often "aimed at changing governmental policy: Their prime use is to forestall the executive branch from proceeding with or developing particular agency initiatives." *Id.*; *see also* Neal E. Devins, *Regulation of Government Agencies Through Limitation Riders*, 1987 Duke L.J. 456, 464 (1987) ("Appropriations-based restrictions on agency action may also be the only realistic way to stop the Executive from launching administrative initiatives that Congress disfavors."). These riders are often successful in that goal because, without appropriated funds, which pays the salaries of agency employees and keeps the lights on at agency facilities, "the

executive branch cannot act." Metzger, *supra*, at 1077. Such riders, in addition to conditioning funds and setting policy priorities, may also involve the modification of substantive law. *See, e.g.*, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992) ("Congress . . . may amend substantive law in an appropriations statute, as long as it does so clearly."); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 183 (D.D.C. 2002) ("[T]he power of Congress to legislate substantive law through riders attached to appropriations bills and thereby bypass the usual process of development of law is established."), *aff'd*, 333 F.3d 228 (D.C. Cir. 2003).

This case concerns one specific rider regarding annual DHS appropriations and ICE's operation of detention facilities. The rider, colloquially known as Section 527, reads as follows:

> SEC. 527. (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
>
> > (1) A Member of Congress.
> >
> > (2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
>
> (b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.
>
> (c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

Further Consolidated Appropriations Act, 2024 ("FY2024 Appropriations Act"), Pub. L. No. 118-47, div. C, tit. V, § 527, 138 Stat. 460, 619.

The language of what is now known as Section 527 first appeared in the fiscal year 2020 appropriations bill, and has been carried forward to every subsequent DHS yearly appropriations bill since, either through direct inclusion in the appropriations package, or incorporation by reference to prior years' bills and the limitations on funding contained therein.[4] The text of the rider was most recently enacted as Section 527 of the FY2024 Appropriations Act. *See* FY2024 Appropriations Act, div. C. tit. V, § 527, 138 Stat. at 619. Section 527 was then carried forward into the fiscal year 2025 appropriations statutes, which incorporated by reference both the funding levels and applicable limitations for DHS from the FY2024 Appropriations Act. *See* Full-Year Continuing Appropriations and Extensions Act, 2025 ("FY2025 Continuing Appropriations Act"), Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11–12. Next, those funding levels and funding limitations, including the terms of Section 527, were most recently extended until January 30, 2026, in an appropriations bill passed by Congress and signed by President Trump. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 ("FY2026 Continuing Appropriations Act"), Pub. L. No. 119-37, §§ 101, 103, 139 Stat. 495, 496–97 (2025).

While the parties dispute the various legal impacts of Section 527, the parties agree that the provision prohibits DHS from using funds appropriated under DHS's regular appropriations acts to engage in any of the activities prohibited in the rider, such as "prevent[ing]" Members of Congress or their staff members "from entering, for the purpose of conducting oversight," ICE facilities that are "used to detain or otherwise house aliens," or making "temporary modification[s]" at such facilities that "in any way alter[] what is observed by" a visiting Member

---

[4] *See, e.g.*, Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. D, tit. V, § 532, 133 Stat. 2317, 2530 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. F, tit. V, § 532, 134 Stat. 1182, 1473 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. F, tit. V, § 530, 136 Stat. 49, 340–41; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. F, tit. V, § 529, 136 Stat. 4459, 4752–53 (2022).

of Congress or designated member of their staff. FY2024 Appropriations Act, div. C. tit. V, § 527, 138 Stat. at 619; *see* ECF 20 at 28 ("[Section] 527 prohibits the use of certain appropriated funds to prevent Members from visiting certain facilities."); ECF 17-1 at 41 ("ICE may not prevent Plaintiffs from accessing [Section 527-funded facilities] for the purpose of oversight.").

However, not all of DHS's current funding comes from the FY2026 Continuing Appropriations Act. An additional source of DHS funding is the reconciliation bill passed in July 2025, which provides additional funds for DHS, including $29 billion given to ICE to "hir[e] and train[] additional [ICE] personnel, . . . to carry out immigration enforcement activities," to cover "transportation costs and related costs associated with alien departure or removal operations," and to provide "[f]unding for facility upgrades to support enforcement and removal operations." One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, tit. X, § 100052, 139 Stat. 72, 388–89 (2025). These funds are not subject to Section 527's limitations.

## B. Factual Background

### 1. ICE's Changing Guidance Regarding Congressional Visits to Detention Facilities and Field Offices

This case involves a challenge to ICE's policies concerning visits by Members of Congress and their staffs to ICE facilities. ICE has implemented various policies regarding visits to its detention facilities. First, ICE's National Detention Standards "permit authorized persons to visit detainees within security and operational constraints." ICE, *National Detention Standards* § 5.5(I) (2025) [hereinafter ICE National Detention Standards], https://perma.cc/7QXS-CEA6. ICE's standards also allow the agency to "temporarily restrict visiting when necessary to ensure the security and good order of the facility." *Id.* § 5.5(II)(A). However, the National Detention Standards do not establish specific "[g]uidance regarding congressional visits to facilities." ICE

National Detention Standards, § 5.5(I). Instead, the National Detention Standards direct the reader to ICE's website. *Id.*

ICE's policies on its website regarding congressional visits have shifted considerably in the last few months. First, in mid-June 2025, ICE posted a guidance document to its website regarding ICE's protocols for visits by Members of Congress and their staff. *See* June 2025 Visit Protocol; ECF 1 ¶ 80. The document stated that Members of Congress are "not required to provide advance notice for visits to ICE detention facilities," but that ICE "require[d] a minimum of 24-hours' notice for visits by congressional staff." *Id.* at 2. The document expressly acknowledged the existence of Section 527 and reprinted the appropriations rider's text in full. *Id.* at 1. The June 2025 Visit Protocol also distinguished requests to visit ICE field offices from ICE detention facilities. The protocol stated that "ICE Field Offices are not detention facilities and fall outside of the Sec. 527 requirements." *Id.* The rationale provided was that "ICE does not house aliens at field offices, rather these are working offices where Enforcement and Removal Operations (ERO) personnel process aliens to make custody determinations based on the specific circumstances of each case." *Id.* at 4.

Later that month, ICE's guidance again shifted. Around the week of June 16, 2025, ICE updated its "Office of Congressional Relations" webpage, to state the new requirement that requests to visit "DHS detention facilities" "be made a minimum of seven (7) calendar days in advance," and that "[a]ny requests to shorten that time must be approved by the DHS Secretary." *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV; ECF 20-1, Hackbarth Decl. ¶ 5. The seven-day notice requirement remains in effect to this day. ECF 20-1, Hackbarth

Decl. ¶¶ 5–6.[5] The status of the field office policy is less clear. ICE removed the document containing the June 2025 Visit Protocol from its website in mid-June, without expressly stating whether the policies in that document were rescinded. Neither ICE nor DHS has posted any new version of the Visit Protocol since June 2025.

Finally, the parties do not dispute that at the time these policies were first adopted, DHS and ICE were operating pursuant to Section 527-restricted funds, meaning that the promulgation of these policies was carried out by officials whose salaries were paid for by Section 527-appropriated funds and implemented at facilities operated with Section 527-restricted funds. *See, e.g.*, Hr'g Tr. 47:11–22 (Sept. 25, 2025); ECF 34 (stating that Section 527-restricted funds were used for "the adoption and implementation of the visitation protocols at issue in this action"); *see also infra* Section III.A.4.a.

## 2. The Trump Administration's Expanded Immigration Enforcement and Plaintiffs' Attempts to Conduct In-Person Visits to ICE Facilities

These changes in ICE's congressional oversight visit policies have occurred during a period of heightened immigration enforcement in the United States. DHS officials have claimed that in the past eight months, DHS has "turbocharg[ed] the arrest[] and deportation[] of illegal aliens." *New Milestone: Over 2 Million Illegal Aliens Out of the United States in Less than 250 Days*, Dep't of Homeland Sec. (Sept. 23, 2025), https://perma.cc/8UYV-5PF4 (noting DHS's intent to "arrest[,] detain[,] and deport[] illegal aliens"); *100 days of record-breaking immigration enforcement in the US interior*, ICE (last revised Jun. 13, 2025), https://perma.cc/ALN3-VAHJ (noting that ICE had "significantly ramped up arrests and removals" in the first 100 days of the

---

[5] The policy appears to have undergone minor revisions between June 2025 and the date of this opinion, in that the original policy stated that the notice requirement was for visits to "DHS detention facilities," but the current policy now states that the requirement applies to "DHS facilities." *Office of Congressional Relations*, ICE (last viewed Dec. 12, 2025), https://www.ice.gov/leadership/ocr.

second Trump Administration). Expanding the detention of noncitizens arrested pending deportation or the outcome of removal proceedings has been a priority of the current Administration since day one. *See* Exec. Order. No. 14,159, 90 Fed. Reg. 8443, 8445 (Jan. 20, 2025) (directing the Secretary of Homeland Security in an executive order signed on January 20, 2025 to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law").

Plaintiffs are twelve Members of Congress who all claim an interest in the Administration's immigration enforcement and detention practices.[6] *See* ECF 1 ¶¶ 17–28; ECF 17-1 at 25–28. Some are leaders or members of committees with jurisdiction over DHS and ICE, or issues of immigration, appropriations, and civil rights and civil liberties. *See* ECF 17-2, Escobar Decl. ¶¶ 1, 4; ECF 17-4, Goldman Decl. ¶ 2; ECF 17-5, Espaillat Decl. ¶ 2; ECF 17-6, Correa Decl. ¶ 2; ECF 17-8, Garcia Decl. ¶ 2; ECF 17-10, Torres Decl. ¶ 2; ECF 17-11, Thompson Decl. ¶ 4; ECF 17-12, Neguse Decl. ¶ 2; ECF 17-13, Raskin Decl. ¶¶ 2, 4. Others have DHS detention facilities either in or near the districts that they represent, or represent districts where immigrants were detained and later sent to an ICE detention facility. *See, e.g.*, ECF 17-2, Escobar Decl. ¶ 3; ECF 17-3, Crow Decl. ¶ 3; ECF 17-7, Gomez Decl. ¶¶ 7, 23; ECF 17-9, Ruiz Decl. ¶ 8.

Plaintiffs allege that the Administration's expanded immigration enforcement has "stretched the U.S. immigration detention system far beyond its capacity" and has led to "[m]ore people . . . being held by the United States in immigration detention than ever before." ECF 1 ¶ 1. Various Plaintiffs state their concerns—based on news reports, constituent outreach, and rumors— about poor conditions and mistreatment of detainees. *See, e.g.*, ECF 17-2, Escobar Decl. ¶ 10;

---

[6] The Plaintiffs are Representatives Joe Neguse, Adriano Espaillat, Bennie G. Thompson, Jamie Raskin, Robert Garcia, J. Luis Correa, Jason Crow, Veronica Escobar, Daniel S. Goldman, Jimmy Gomez, Raul Ruiz, and Norma Torres.

ECF 17-3, Crow Decl. ¶ 24; ECF 17-4, Goldman Decl. ¶¶ 39–40; ECF 17-5, Espaillat Decl. ¶ 18; ECF 17-6, Correa Decl. ¶¶ 7–8. Consistent with these concerns, all Plaintiffs have attempted to visit various ICE facilities and been denied entry under one of ICE's visitor policies. First, multiple Plaintiffs state that they have sought to conduct in-person oversight at ICE detention facilities, but were denied entry at the requested dates and times because they failed to comply with ICE's seven-day notice requirement. These attempted visits all occurred following the publication of the notice requirement on ICE's website in mid-June 2025. *See* ECF 17-2, Escobar Decl. ¶¶ 10–18; ECF 17-3, Crow Decl. ¶¶ 20–21; ECF 17-6, Correa Decl. ¶¶ 9–11; ECF 17-9, Ruiz Decl. ¶¶ 9–14; ECF 17-10, Torres Decl. ¶¶ 16–18. For example, Representative Escobar sought to visit the El Paso Service Processing Center, a detention facility in her district, based on concerns about the conditions there, including concerns about physical abuse by guards, inadequate medical care, and lack of access to legal services. ECF 17-2, Escobar Decl. ¶¶ 3, 10. On July 8, 2025, her staff emailed ICE to request a visit for the next day. *Id.* ¶ 10. In response, ICE stated that it could not accommodate the next-day visit because ICE was "now requiring requests to be made seven (7) calendar days in advance." *Id.* ¶ 11. Representative Escobar nevertheless went to the facility the next day, where she was denied access on the grounds that she failed to provide the required seven-day notice. *Id.* ¶ 12. Other Plaintiffs have had similar experiences.

Second, various Plaintiffs have also requested in-person visits to ICE facilities that they believed were housing detained immigrants, but were denied by ICE staff on the grounds that the facility that they sought to enter was a field office that was not subject to Section 527, consistent with the policy announced in the June 2025 Visit Protocol. *See* ECF 17-7, Gomez Decl. ¶¶ 15, 17–18; ECF 17-8, Garcia Decl. ¶¶ 20–23; ECF 17-10, Torres Decl. ¶ 14; ECF 17-11, Thompson Decl. ¶¶ 13–18; ECF 17-12, Neguse Decl. ¶¶ 9–14; ECF 17-13, Raskin Decl. ¶¶ 11–16; ECF 17-4,

13

Add.84

Goldman Decl. ¶¶ 22–31; *see also* ECF 17-5, Espaillat Decl. ¶¶ 22–28 (being denied access to the same facility as Representative Goldman, but because staff described it as a "sensitive facility"). For example, Representative Gomez sought to schedule a visit to ICE's Los Angeles Field Office and was told that the office was not a "detention facilit[y]" and thus fell outside of the scope of Section 527. ECF 17-7, Gomez Decl. ¶ 17. He was told that ICE did "not house aliens at field offices," and that field offices were "working offices where [ICE] process[es] aliens to make custody determinations based on the specific circumstances of each case." *Id.* ¶ 18. However, ICE officials also told Representative Gomez's staff that immigrants could be held up to 72 hours at the "book-in facility until administrative processing is complete." *Id.* ¶ 20; *see also* ECF 17-7, Gomez Decl. Ex. A., at 12–14 (containing this exchange). Representatives Raskin, Neguse, and Thompson arrived at the ICE Washington Field Office in Chantilly, Virginia to conduct an unannounced oversight visit. ECF 17-11, Thompson Decl. ¶ 13. They arrived and requested a tour of the facility but were denied on the grounds that "field offices are not subject to [S]ection 527." *Id.* ¶ 15. However, officials confirmed to them that the Washington Field Office has a 12-hour holding area where "people are detained and not allowed to leave." *Id.* ¶ 16.

Despite these stymied attempts at in-person oversight, Plaintiffs have stated their intent to continue to visit ICE facilities without prior notice. *See, e.g.*, ECF 17-2, Escobar Decl. ¶ 37; ECF 17-3, Crow Decl. ¶ 27; ECF 17-6, Correa Decl. ¶ 12; ECF 17-7, Gomez Decl. ¶ 22; ECF 17-9, Ruiz Decl. ¶ 17; ECF 17-10, Torres Decl. ¶ 26; ECF 17-11, Thompson Decl. ¶ 25; ECF 17-12 Neguse Decl. ¶ 18; ECF 17-13, Raskin Decl. ¶ 18. Plaintiffs stress the importance of unannounced visits to their duties as Members of Congress, including their duties in drafting and passing legislation, timely serving constituents impacted by the Administration's enforcement policies, and conducting oversight of government operations. *See, e.g.*, ECF 17-9, Ruiz Decl. ¶ 20; ECF 17-

10, Torres Decl. ¶ 22; ECF 17-11, Thomspon Decl. ¶ 25. Plaintiffs also emphasize their concerns that the notice requirement provides ICE time to obscure the true conditions at a given facility, thereby diminishing the value of visits as a mechanism to determine how ICE is conducting detention operations. *See, e.g.*, ECF 17-4, Goldman Decl. ¶ 46; ECF 17-6, Correa Decl. ¶ 13; ECF 17-7, Gomez Decl. ¶ 25.

### 3. Plaintiffs' Lawsuit

Plaintiffs filed a complaint in this Court on July 30, 2025. ECF 1. They sue in their official capacities as Members of the House of Representatives, and name DHS, ICE, Secretary of Homeland Security Kristi Noem, and Acting Director of ICE Todd M. Lyons as Defendants. *See generally id.* Plaintiffs challenge as unlawful (1) ICE's seven-day advance notice requirement and (2) ICE's policy that field offices are not subject to Section 527. Plaintiffs argue that ICE's promulgation and enforcement of these policies prevents them from accessing ICE facilities in violation of the appropriations limitations in Section 527. Plaintiffs claim that the Oversight Visit Policies are contrary to Section 527 and in excess of DHS's statutory authority under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A)–(C), represent arbitrary and capricious actions in violation of the APA, *id.* § 706(2)(A), and are *ultra vires* in violation of Section 527. ECF 1 ¶¶ 273–81, 287–92. Plaintiffs also claim that the denial of access to DHS facilities, including field offices, without advance notice, represents agency action unlawfully withheld or unreasonably delayed under the APA. *See* 5 U.S.C. § 706(1); ECF 1 ¶¶ 282–86. Finally, Plaintiffs also seek mandamus and declaratory relief. ECF 1 ¶¶ 293–303.

On August 8, 2025, Plaintiffs filed a motion to stay agency action under 5 U.S.C. § 705, or in the alternative, for a preliminary injunction, to temporarily enjoin the Oversight Visit Policies pending conclusion of this litigation. ECF 17; ECF 17-1 at 54. Defendants opposed the motion,

raising myriad arguments as to why relief is improper in this case, including that Plaintiffs lack

Article III standing to bring this lawsuit. *See generally* ECF 20. Plaintiffs filed a reply in support

of their motion on September 12, 2025, ECF 29, and the Court held a hearing on the motion on

September 25, 2025, *see* Sept. 25, 2025 Min. Entry. Then, on October 1, 2025, the Federal

Government shut down due to a lapse in regular appropriations. *See* ECF 32. As a result, and

following the Government's unopposed request, this Court stayed proceedings given the uncertain

status of Section 527 during the lapse of appropriations. *See* Oct. 29, 2025 Min. Order. The

Government shutdown ended following passage of the FY2026 Continuing Appropriations Act,

which again provides appropriations funding for DHS subject to the terms of Section 527. *See*

§§ 101, 103, 139 Stat. at 496–97. The Court lifted the stay, *see* Nov. 24, 2025 Min. Order, and

now proceeds to resolve Plaintiffs' motion.

## II.    LEGAL STANDARD

Plaintiffs seek a stay under Section 705 of the APA, and, in the case that relief is not

available, request a preliminary injunction.

Section 705 of the APA authorizes a "reviewing court" to "issue all necessary and

appropriate process to postpone the effective date of an agency action or to preserve status or rights

pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such

conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

The same factors governing the issuance of relief under Section 705 also govern the

issuance of a preliminary injunction. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp.

3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972,

974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial

likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not

granted, (3) that a[ ] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

Turning to the application of those factors, the Court holds that each favors a stay under 5 U.S.C. § 705. Plaintiffs have shown a substantial likelihood of success on their claim that the challenged Oversight Visit Policies are contrary to law and in excess of DHS's statutory authority. The Court also finds that Plaintiffs demonstrate irreparable injury from the challenged policies and that the equitable factors weigh in their favor. Because the Court finds that a stay is warranted under 5 U.S.C. § 705, the Court does not address whether Plaintiffs are also entitled to a preliminary injunction or other miscellaneous relief. The Court addresses the scope of the remedy at the close of this section.

### A.  Plaintiffs are Substantially Likely to Succeed on the Merits.

In determining whether Plaintiffs are substantially likely to succeed on the merits of their claims, the Court must not only address Plaintiffs' "substantive theories," but also threshold issues such as the "establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Defendants present various reasons why Plaintiffs fail to succeed on this prong. First, they argue that the Court likely lacks subject matter jurisdiction because Plaintiffs do not have Article III standing to bring this lawsuit. ECF 20 at 20–21. Second, Defendants contend that even if Plaintiffs could demonstrate Article III standing, the Court should decline to hear this case under principles of equitable discretion that disfavor the judiciary resolving disputes between the

17

Add.88

political branches. *Id.* at 35. Third, Defendants argue that Plaintiffs likely lack a cause of action to bring their claims. *Id.* at 36. Fourth, Defendants argue that Plaintiffs' claims likely fail on the merits because ICE's Oversight Visit Policies comport with Section 527 and other laws governing DHS and ICE. *Id.* at 45–49.

The Court disagrees. Plaintiffs have shown a substantial likelihood of success on the issues of jurisdiction, equitable discretion, the availability of a cause of action under the APA, and the merits of at least one of their claims. The Court addresses each of these issues in turn.

### 1. Standing

The first threshold issue in this case is whether Plaintiffs, as individual Members of Congress suing in their official capacities, have standing to sue Defendants regarding the Oversight Visit Policies.

The doctrine of standing derives from Article III of the Constitution, which extends the judicial power of the United States only to "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2. "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). The standing inquiry asks whether the "plaintiff is a proper party to bring a particular lawsuit." *Id.* (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799 (2015)). "When determining whether a plaintiff has Article III standing, the court must assume that the [plaintiff] will prevail on the merits." *Id.*

To establish Article III standing, a plaintiff must allege "(1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019). At issue

in this case is "injury in fact," the "first and foremost of standing's three elements." *Spokeo, Inc.*

*v. Robins*, 578 U.S. 330, 338 (2016). Injuries cognizable by Article III courts must be: "concrete,

meaning . . . real and not abstract" and "particularized," meaning that the injury "must affect the

plaintiff in a personal and individual way and not be a generalized grievance." *FDA v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury must also be "actual or imminent, not

speculative." *Id.*

The standing inquiry is "especially rigorous" when "reaching the merits of the dispute

would force [a court] to decide whether an action taken by one of the other two branches of the

Federal Government was" unlawful. *McGahn*, 968 F.3d at 763. Further, this lawsuit, one brought

by Members of Congress against officials and agencies of the Executive Branch, "implicates

considerations not always present in a standing dispute," *id.* at 768, such as the correct application

of the D.C. Circuit and Supreme Court's precedents on questions of "legislative standing," and the

separation of powers concerns raised by such cases, *Raines v. Byrd*, 521 U.S. 811, 820 (1997). The

Court therefore addresses the standing inquiry as follows: It evaluates Plaintiffs' alleged injuries

under "general principles of standing, before turning to the special considerations presented by the

interbranch nature of this litigation," *McGahn*, 968 F.3d at 763, including the fact that Plaintiffs

are "individual members of the Congress seek[ing] judicial remedies," *Blumenthal v. Trump*,

949 F.3d 14, 19 (D.C. Cir. 2020).

### a. Plaintiffs' Theories of Injury

Plaintiffs allege two theories of injury purportedly caused by Defendants' Oversight Visit

Policies: the denial of physical access to facilities covered by Section 527, and the inability to

gather in-person information regarding the on-the-ground conditions at those facilities. In this

section, the Court finds that both would qualify as sufficiently concrete harms under typical Article

III injury-in-fact principles. In the following sections, the Court will address whether Plaintiffs' status as legislators justifies departing from this conclusion.

i. Denial of Physical Access to Facilities

Plaintiffs first argue that Defendants' Oversight Visit Policies have led to ICE personnel barring Plaintiffs from entering facilities covered by Section 527, and claim that such a "restriction on physical access is a classic 'tangible harm.'" ECF 17-1 at 34 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). Plaintiffs claim that they are entitled to this physical access under the terms of Section 527, which in their view was designed to prohibit DHS from taking action to stop them from entering and observing the conditions at Section 527-covered facilities in real time. Per Plaintiffs, Section 527's prohibition on using funds appropriated "to prevent" Members of Congress "from entering" covered ICE facilities "for the purpose of conducting oversight," and its instruction that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice" of their intent to enter such a facility, add up to an entitlement to enter those facilities under Section 527 at the time of their request. § 527, 138 Stat. at 619; ECF 17-1 at 35; ECF 29 at 16, 18 (characterizing Plaintiffs' injury as an unlawful "restriction on physical access" to which Plaintiffs are "entitled").

As a threshold objection, Defendants dispute that Section 527 creates a right of unimpeded in-person access to ICE facilities operated with Section 527 funds. *See* ECF 20 at 13 ("Plaintiffs attempt to transform an appropriations bar known as § 527 . . . into a statutory entitlement for unfettered access to those facilities."). Defendants argue that the text of Section 527 does not expressly "grant Members a legal 'right' to conduct" oversight visits. *Id.* at 28. That argument does not bear on Plaintiffs' standing. "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of" the plaintiff's legal claim. *Parker v. District*

*of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). "Whether a plaintiff has a legally protected interest that supports standing does not require that" a plaintiff show "succe[ss] on the merits; if it did, every merits loss would amount to a lack of standing." *Est. of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019). Thus a Court evaluating a standing dispute can conclude that a plaintiff "ha[s] a cognizable interest" in a certain activity which is allegedly harmed by a defendant's actions "without considering whether the plaintiff[] ha[s] a legal right" to engage in that activity. *Parker*, 478 F.3d at 377. However, the Court also acknowledges that the analysis in the legislative standing cases discussed below often considers the nature of the alleged right at issue, and will thus "peek ahead into the merits" of Plaintiffs' arguments about the legal effect of Section 527 for the purpose of definitively resolving the legislative standing issue. *Conway Corp. v. Fed. Power Comm'n*, 510 F.2d 1264, 1269 (D.C. Cir. 1975), *aff'd*, 426 U.S. 271 (1976); *see McGahn*, 968 F.3d at 765 (discussing, in the context of evaluating legislator standing, whether the House of Representatives had a "long-recognized right, based in the Constitution" of entitlement to specific information); *Raines*, 521 U.S. at 820–830 (asking whether the plaintiff legislators' injury derived from a harm to "something to which they *personally* are entitled").

The Court's understanding of the statute supports Plaintiffs' standing. Defendants read too much into Congress's use of an appropriations bar to implement its chosen policy and ignore the practical implications of Section 527. An "appropriations law denying funding for certain activities generally amounts to a substantive ban on those activities, regardless of the amount of funding involved." *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (Tatel, J., concurring in part and dissenting in part); *see also id.* at 232 (per curiam) (stating that the "use of any government resources—whether salaries, employees, paper, or buildings—to accomplish" a given activity "would entail government expenditure," and "therefore would run afoul of [a] statutory

moratorium on spending for" that activity (quoting *Env't Def. Ctr. v. Babbit*, 73 F.3d 867, 871–72 (9th Cir. 1995)). In Section 527, Congress prohibited DHS and ICE from using appropriated funds to "prevent" a Member of Congress from entering a covered facility for the purpose of conducting oversight. § 527(a), 138 Stat. at 619. Given that ICE cannot act other than through appropriated funds, the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member. *See, e.g.*, *United States v. Will*, 449 U.S. 200, 222 (1980) ("There can be no doubt that [Congress] could accomplish its purpose by an amendment to an appropriation bill, or otherwise." (quoting *United States v. Dickerson*, 310 U.S. 554, 555 (1940)). The statute's restriction on using funds "to make any temporary modification at any such facility that in any way alters what is observed" by the visiting Member "compared to what would be observed in the absence of such modification," and the additional explanatory provision noting that nothing in Section 527 "may be construed to require a Member of Congress to provide prior notice of the intent to enter" a covered facility, § 527(a), (b), 138 Stat. at 619, clearly mean that the Member must be admitted without delay—let alone delay that would lead to modifications of conditions in the facility compared to when the visit was requested. That the Member's admission must occur upon request is also evidenced by a further provision of Section 527, which provides that DHS "may require" a notice period of 24 hours for visits by a congressperson's staff, but says nothing about such a requirement for the Members themselves. § 527(c), 138 Stat. at 619. The result of this provision, when read along with the other parts of Section 527, is that a 24-hour notice period can be acceptable for Members' staffs, but not permissible for the Members themselves. Contrary to Defendants' suggestion, then, Section 527 does entitle Members of Congress to access ICE facilities without being subject to a notice requirement.

The Court must therefore decide whether denial of access to a location to which Plaintiffs claim a right of entry upon request counts as a "cognizable injury" for the purposes of Article III. *Sierra Club v. Jewell*, 764 F.3d 1, 6 (D.C. Cir. 2014). With little trouble, the Court finds that it does. Denial of access to property is a "tangible harm," which can qualify as a "concrete injury in fact." *See TransUnion*, 594 U.S. at 425. The federal courts have historically exercised jurisdiction over disputes involving the denial of access to federal property based on various claims of right, without questioning whether the parties involved had standing to bring the suit. *See Greer v. Spock*, 424 U.S. 828, 831–34 (1976) (prohibition on accessing grounds of military reservation for political speech); *Sherrill v. Knight*, 569 F.2d 124, 128 (D.C. Cir. 1977) (addressing decision to bar reporter from White House press events); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 139, 143 (D.D.C. 2025) (addressing challenge to order that restricted firm's employees from accessing government buildings); ECF 20 at 30 (Defendants acknowledging that these cases "address[] . . . access restrictions," although emphasizing that the restrictions in those cases were "targeted—and thus particularized—access restrictions"). Further, the Supreme Court has instructed that when evaluating certain types of harms, a court should consider whether there exists any "close historical or common-law analogue" to such an injury. *TransUnion*, 594 U.S. at 424. And suits about rights of entry to property—such as those over a contractually-granted license—are the kinds of disputes that are "traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425.

Further, the denial of physical access to each Plaintiff, *see supra* Section I.B.2, is not only concrete but also "particularized," *TransUnion*, 594 U.S. at 423. While Defendants' Oversight Visit Policies prohibit any Member of Congress from entering a facility without seven days' prior notice, Defendants' actions in implementing the policies have nevertheless "affect[ed]" each of

"the [P]laintiff[s] in a personal and individual way." *Spokeo, Inc.*, 578 U.S. at 339. Each Plaintiff has sought to visit different facilities, at different times, for different reasons. *See supra* Section I.B.2. The alleged injuries are thus "neither abstract nor widely dispersed." *McGahn*, 968 F.3d at 776. Nor does the fact that multiple Plaintiffs allege harms arising from the Oversight Visit Policies undermine the notion that Plaintiffs' harms are particularized. "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc.*, 578 U.S. at 339 n.7.

Finally, and although it does not seem to be in serious dispute in this case, the Court finds that Plaintiffs' physical access injury also satisfies the Article III requirements of causation and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (requiring that there be a "causal connection between the injury and the conduct complained of" and that "the injury will be redressed by a favorable decision"). On various occasions, Defendants have justified their denial of Plaintiffs' access to ICE facilities by citing either the seven-day notice requirement or the claim that ICE field offices are not subject to Section 527. *See supra* Section I.B.2. Plaintiffs' harms are "fairly traceable" to Defendants' promulgation and implementation of those policies, and a "favorable decision" that those policies are unlawful is likely to redress the harm imposed by future denials. *Bethune-Hill*, 587 U.S. at 662.

### ii. Denial of Information Regarding Conditions at ICE Facilities

In the alternative, Plaintiffs also ask the Court to view their injury as an informational injury: the denial of "on-the-ground information regarding the . . . conditions at" ICE facilities covered by Section 527. ECF 17-1 at 35. Plaintiffs again claim that they are entitled to this information under Section 527. In addition to the language prohibiting ICE from using funds to prevent Members of Congress "from entering" ICE facilities, Plaintiffs also point to the language

in Section 527 which prohibits ICE from "mak[ing] any temporary modification at any [covered facility] that in any way alters what is observed by a visiting Member of Congress . . . compared to what would be observed in the absence of such modification." § 527(a), 138 Stat. at 619.

Plaintiffs are correct that certain types of informational injuries are cognizable under Article III. The Supreme Court and the D.C. Circuit have "held that when a person seeks to obtain information the government is required to disclose, the denial of the information is a concrete injury for standing purposes." *McGahn*, 968 F.3d at 766 (citing *FEC v. Akins*, 524 U.S. 11 (1998), and *Pub. Citizen v. DOJ*, 491 U.S. 440 (1989)). In such cases, a plaintiff must (1) have "been deprived of information that, on [the plaintiff's] interpretation, a statute requires the government or a third party to disclose to it, and (2) . . . suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). The Supreme Court in *TransUnion* reaffirmed the viability of informational injuries of this kind, albeit while introducing the requirement that the "informational injury . . . cause[]" either "adverse effects" or "downstream consequences" in order for the injury to be cognizable under Article III. *TransUnion*, 594 U.S. at 442 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)); *see also, e.g.*, *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1229 (D.C. Cir. 2024) (concluding informational injury was concrete where the denial of information "hinder[ed]" consumer's ability to make "an informed purchasing decision").[7]

---

[7] The D.C. Circuit has noted that *TransUnion*'s statement that a plaintiff alleging an informational injury must show a downstream adverse effect of the denial appears to be in tension with the Supreme Court's own decisions regarding information-disclosure statutes like the Freedom of Information Act which hold that a plaintiff need not show "more than that they sought and were denied specific agency records" to have standing to sue. *Pub. Citizen*, 491 U.S. at 449; *see Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) (noting that "*TransUnion* does not expressly overrule *Public Citizen*" and that the lower courts are "charged with following case law that directly controls a particular issue, 'leaving to the Supreme Court the prerogative of overruling its own decisions'" (quoting *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023))). For the purposes of this opinion, the Court assumes without deciding that such a downstream effect is required in this case, given that Plaintiffs easily meet this requirement.

Defendants again contest that Section 527 creates any entitlement to information or requires the government to "'disclose' any type of 'information'" to Plaintiffs, thus making the informational injury line of cases inapplicable. ECF 20 at 30 (citing *Elec. Priv. Info. Ctr.*, 878 F.3d at 378). Again, the scope of 527 and what it secures to Plaintiffs here is intertwined with the merits of the case and is a question on which Plaintiffs need not necessarily show success in order to prevail on the standing analysis. *See Est. of Boyland*, 913 F.3d at 123; *Elec. Priv. Info. Ctr.*, 878 F.3d at 378 (framing the standing inquiry as asking whether the party was "deprived of information that, on [the plaintiff's] interpretation, a statute requires the government . . . to disclose to it"). Nevertheless, in evaluating statutorily-grounded informational injuries, the Supreme Court's analysis in *TransUnion* indicates that it is proper at the standing analysis stage to ask whether the statute in question functions similarly to a "public-disclosure or sunshine law[] that entitle[s] . . . the public to certain information." *TransUnion*, 594 U.S. at 441; *see also McGahn*, 968 F.3d at 765–66 (evaluating, in a case regarding the purported denial of information, whether the plaintiff had been deprived of something "to which it is legally entitled").

The Court concludes that Section 527 creates an entitlement to information sufficiently analogous to the statutes featured in the informational injury cases to make those cases instructive here. Defendants are correct that Section 527 does not operate in exactly the same way as other information disclosure statutes such as the Freedom of Information Act (FOIA), given that Section 527 imposes a prohibition on the use of appropriated funds rather than a mandatory command requiring the disclosure of information upon request. *See, e.g.*, 5 U.S.C. § 552(a)(3)(A) (provision of FOIA requiring that the government "shall make . . . records promptly available to any person" following a request). But Defendants' objection that Section 527 insufficiently resembles FOIA and other disclosure provisions because it has no "mandatory direction to supply information,"

ECF 20 at 34, ignores that the type of information access contemplated by the statute is not records or documents created by the agency, but access to a specific ICE facility to permit the "observ[ation]" of the facility "by a visiting Member of Congress or such designated employee," § 527(a), 138 Stat. at 619. And as discussed above, Defendants overstate the implications of Congress's choice to use an appropriations limitation to facilitate Members' observations of the conditions in certain ICE facilities. Again, Congress not only prohibited DHS and ICE from preventing Members of Congress from entering covered ICE facilities upon request, but also from making temporary modifications that would alter what a visiting Member sees when they visit. The effect of Section 527 is that the facility must (1) admit the Member upon request, and, (2) thanks to the language prohibiting any "temporary modification," permit the Member to view the facilities in their current condition. Because of Section 527, the government cannot act otherwise. *See Env't Def. Ctr.*, 73 F.3d at 872. ("The government cannot make expenditures, and therefore cannot act, other than by appropriation.").

This case is therefore analogous to those cases recognizing a sufficiently "concrete and particularized" informational injury. *Jewell*, 828 F.3d at 992. Here, each Plaintiff has alleged that they have "been deprived of information" about conditions at ICE facilities "that, on [their] interpretation, a statute require[d] the government" to make available to them. *Id.* That harm is "the type of harm Congress sought to prevent by" passing the disclosure-oriented statute. *Id.* Section 527 focuses on access to specific ICE facilities and allowing visiting Members of Congress to view those facilities with the goal of preserving what may be "observed by a visiting Member of Congress." § 527(a), 138 Stat. at 619. Further, these requests for access to ICE facilities, even when construed as requests for information, occurred at different facilities, different times, and

with different motivations by each Plaintiff, and are particularized for the reasons discussed above. *See supra* Section III.A.1.a.i.

Finally, to the degree required, Plaintiffs have identified "downstream" or "adverse" effects of the denial of that information. *TransUnion*, 594 U.S. at 442. The Supreme Court has found standing when the denial of information harmed the requestors' ability to engage in the political and policymaking process. *See Pub. Citizen*, 491 U.S. at 449; *Akins*, 524 U.S. at 21. Plaintiffs are Members of Congress who seek information that will aid them in their roles of assisting constituents, conducting oversight, and drafting and proposing legislation. They "desire[] information with which" to make "informed . . . decision[s], and the 'information deficit' created by" Defendants' Oversight Visit Policies "'hinder[s] [their] ability' to do so." *Animal Legal Def. Fund, Inc.*, 111 F.4th at 1229. And as with the denial of physical access, the inability of Plaintiffs to view the on-the-ground conditions of covered ICE facilities at the times they request is caused by Defendants' Oversight Visit Policies and would be redressed by a decision that these policies should be stayed or vacated.

### b. *Raines* and Legislator Standing Principles

Plaintiffs have demonstrated the requisite injury-in-fact under "general principles of standing," but the question remains whether the Court should nevertheless depart from that conclusion because Plaintiffs are "individual members of the Congress seek[ing] judicial remedies" against the Executive Branch. *McGahn*, 968 F.3d at 763; *Blumenthal*, 949 F.3d at 19. The D.C. Circuit has instructed that the "question [of] whether [Members of Congress] have standing in federal court to challenge the lawfulness of" Executive Branch actions "was answered, at least in large part, in the Supreme Court's . . . decision in *Raines v. Byrd*," and in resolving this dispute, the Court must apply the guidance set out in *Raines* and related cases. *Campbell v. Clinton*,

203 F.3d 19, 20 (D.C. Cir. 2000); *see Blumenthal*, 949 F.3d at 19 ("*Raines* is our starting point when individual members of the Congress seek judicial remedies.").

In *Raines*, six Members of Congress challenged the constitutionality of the Line Item Veto Act. *See* 521 U.S. at 814. The Act authorized the President to "cancel" certain spending and tax benefit measures after they have been signed into law, unless the cancellation was subsequently overridden by Congress by joint resolution. *Id.* at 814–15. Plaintiffs challenged the constitutionality of the law on the grounds that it "unconstitutionally expand[ed] the President's power, and violate[d] the requirements of bicameral passage and presentment by granting to the President, acting alone, the authority to 'cancel' and thus repeal provisions of federal law." *Id.* at 816. Plaintiffs claimed that the Act "directly and concretely" injured them in their official capacities by "alter[ing] the legal and practical effects of all votes they may cast on bills containing such separately vetoable items," which "divest[ed] [them] of their constitutional role in the repeal of legislation," and "alter[ed] the constitutional balance of powers between the Legislative and Executive Branches." *Id.*

The Supreme Court found that the six Members of Congress lacked standing. *Raines*, 521 U.S. at 830. In coming to this conclusion, the Court in *Raines* emphasized that the alleged injury— "the diminution of legislative power"—was an "institutional injury," which "necessarily damage[d] all Members of Congress . . . equally," and was therefore "wholly abstract and widely dispersed." *Id.* at 821, 829. As a result, the Court found that the Members lacked a "sufficient 'personal stake' in th[e] dispute" and did not have a "sufficiently concrete injury" for Article III standing. *Id.* at 830; *see also Clinton v. City of New York*, 524 U.S. 417, 430 (1998) (distinguishing the "abstract and widely dispersed" injury in *Raines* from cases where the parties have "alleged a 'personal stake' in having an actual injury redressed").

29

In *Raines*, the Court addressed and distinguished *Coleman v. Miller*, 307 U.S. 433 (1939), a prior case where the Court found standing for individual "legislators . . . claiming" what the Court described as "an institutional injury." *Raines*, 521 U.S. at 821. In *Coleman*, 20 of Kansas's 40 state senators voted against ratifying a proposed amendment to the U.S. Constitution, resulting in a deadlock that would have ordinarily defeated ratification. *Raines*, 521 U.S. at 822. However, the Kansas Lieutenant Governor broke the tie by voting in favor of the amendment. *Id.* The losing state senators brought suit, and the Court held that the legislators had standing because their votes "against ratification [had] been overridden and virtually held for naught although . . . their votes would have been sufficient to defeat ratification." *Coleman*, 307 U.S. at 438. On review, the Supreme Court found the state senators to have a "plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* The Supreme Court in *Raines* reaffirmed a legislator's standing to sue on the basis of this kind of injury, but read *Coleman* narrowly, stating that "our holding in *Coleman* stands (at most) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (citation omitted); *see also Campbell*, 203 F.3d at 22–23 (noting that *Coleman* represents a "very narrow possible . . . exception" to the "*Raines* rule").

The Court in *Raines* contrasted both the alleged institutional injuries in *Raines* (which failed to establish standing) and the vote-nullification injury in *Coleman* (which did establish standing), with the injury that the Court had found judicially cognizable in *Powell v. McCormack*, 395 U.S. 486 (1969). *See Raines*, 521 U.S. at 820–21, 829. In *Powell*, the House of Representatives refused to seat Congressman Adam Clayton Powell due to alleged misconduct. *Powell*, 395 U.S.

at 490. Congressman Powell brought a suit challenging "his exclusion from the House of Representatives (and his consequent loss of salary)." *Raines*, 521 U.S. at 821. In *Raines*, the Supreme Court emphasized that Powell's injury differed from the *Raines* plaintiffs in two key regards. First, the *Raines* plaintiffs were not "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies." *Id.* at 821. Second, the plaintiffs did not claim to have been "deprived of something to which they *personally* are entitled." *Id.* The Supreme Court thus read *Powell* to bless standing in cases where the plaintiffs alleged an "injury to themselves as individuals." *Raines*, 521 U.S. at 829.

*Raines*, as further elaborated by subsequent Supreme Court and D.C. Circuit decisions, thus provides the framework for an inquiry into "whether [Members of Congress] have standing in federal court to challenge the lawfulness of actions of the executive." *Campbell*, 203 F.3d at 20. Most critically, a court must consider whether the legislator seeks to "assert the institutional interests of a legislature," in which case the Member will generally lack standing, *Blumenthal*, 949 F.3d at 19, or an injury that is personal to the legislators "as individuals," and is thus particularized and concrete, *Raines*, 521 U.S. at 829. As the Supreme Court clarified in *Arizona Independent Redistricting Commission*, an "institutional injury" is one that is "'widely dispersed'" and does not "zero[] in on any individual Member," but "'necessarily impact[s] . . . equally'" the members of the relevant legislative body. 576 U.S. at 802 (quoting *Raines*, 521 U.S. at 821, 829). Therefore, notwithstanding the narrow potential exception recognized in *Coleman*, "unauthorized legislators" will generally "lack standing to sue the [Executive Branch] to vindicate injuries to the legislative bodies of which they are a part," *McGahn*, 968 F.3d at 775, because of a "mismatch between the [party] seeking to litigate and the body to which the" injury accrues, *Bethune-Hill*, 587 U.S. at 667. "[T]he [Supreme] Court's focus on 'mismatch' is [thus] an inquiry into whether

the claimed injury is personal to the plaintiff or else shared by a larger group of which the plaintiff is only a component—in other words, whether the injury is particularized." *McGahn*, 968 F.3d at 767. "*Raines* stands for the proposition that whereas a legislative institution may properly assert an institutional injury, an individual member of that institution generally may not." *Id.* at 775.[8]

The case is different for personal "injurie[s] to [Members of Congress] as individuals," such as ones that "deprive[] [them] of something to which they personally are entitled." *Raines*, 521 U.S. at 821, 829. Personal injuries of this kind—such as the denial of Representative Powell's ability to sit in Congress after his constituents had "duly elected" him, *Powell*, 395 U.S. at 493— are sufficiently particularized and concrete, *Raines*, 521 U.S. at 821. More broadly, the personal-versus-institutional inquiry helps to ensure that there is no "mismatch" between the interests of the plaintiff seeking to litigate and the legislative locus to which the injury attaches, whether that is the individual legislator, their committee, or the body as a whole. *McGahn*, 968 F.3d at 767. Where the injury is not one simply to the "larger group of which the plaintiff is only a component" but one to the plaintiff Member of Congress themselves, the injury is sufficiently particularized under *Raines* and its progeny. *Id.*

In addition to considering (1) whether the plaintiffs had alleged an institutional injury that was abstract and widely dispersed rather than a personal injury that is concrete and particularized,

---

[8] The Supreme Court's discussion of institutional injury in *Arizona Independent Redistricting Commission* is in some tension with *Raines*'s characterization of the legislators' vote-nullification injuries in *Coleman* as an "institutional injury." *Raines*, 521 U.S. at 821; *see Kerr v. Hickenlooper*, 824 F.3d 1207, 1214 (10th Cir. 2016) ("Describing the injury in *Coleman* as 'institutional' is difficult to square with the definition of an institutional injury provided in *Arizona*."). This is because the injury in *Coleman* was arguably not one that "necessarily impacted all Members" of a legislative body equally, *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 802 (cleaned up), but one accruing to the specific twenty Senators whose votes "would have been decisive in defeating" the resolution, *Raines*, 521 U.S. at 823 (quoting *Coleman*, 307 U.S. at 446). Thus, *Coleman* did not necessarily "concern injury to the power of the legislature as a whole," at least as contemplated in *Arizona Independent Redistricting Commission*. *Kerr*, 824 F.3d at 1215. The Court understands the discussion of institutional injury in *Arizona Independent Redistricting Commission* to be the main approach to institutional injury, and that the injury contemplated in *Coleman* and endorsed in *Raines* represents a separate, narrow species of institutional injury. *See Campbell*, 203 F.3d at 23 (describing *Coleman* as "the very narrow possible . . . exception to *Raines*").

*Raines* also considered additional factors relevant to the standing analysis, such as that: "(2) [the] plaintiffs' attempt to litigate their dispute . . . was contrary to historical experience; (3) the plaintiffs had not been authorized to represent their respective Houses of Congress, and indeed both Houses actively opposed their suit; and (4) dismissing the lawsuit neither deprived Members of Congress of an adequate remedy nor foreclosed the Act from constitutional challenge." *McGahn*, 968 F.3d at 775–76 (cleaned up) (quoting *Raines*, 521 U.S. at 829).

### c. Plaintiffs' Injuries are Not Barred by *Raines* Because They are Personal and Particularized, Rather than Institutional.

Defendants argue that this case starts and ends with *Raines*. They argue that even if Section 527 provides a right to Members of Congress to access ICE facilities and view the conditions therein, this is a right that is "held by Congress as a whole," and its infringement "necessarily damages all Members . . . and both Houses of Congress equally," making it an "institutional injury" that is insufficiently particularized under *Raines*.[9] ECF 20 at 27 (citing *Raines*, 521 U.S. at 821). Defendants also appear to argue that even if the right to access ICE facilities accrues to the Members of Congress as individuals, a lawsuit is still barred under *Raines*, because, in Defendants' reading, Members of Congress may only bring lawsuits for harms experienced in their "personal capacities." ECF 20 at 23. Per Defendants, "any deprivation of information or access" harms Plaintiffs only as "Members of Congress (or staffers) attempting to engage in legislative oversight," which is tied to Congress's legislative power, and thus their injuries represent "a diminution of legislative power" not cognizable under *Raines*. *Id.* To the extent the right to visit

---

[9] It is Defendants' view that Section 527 does not guarantee such rights to Plaintiffs, and as a result, the only injury that they could complain of is "a violation of [a] restriction on funding," which "falls upon Congress as a whole," and "at most harms the Congress that enacted that prohibition, not any particular Member." ECF 20 at 26. Because the Court disagrees with Defendants' characterization of Plaintiffs' injury, it does not address whether this framing of the injury would qualify as a sufficient injury in fact to permit standing.

ICE facilities without notice is individualized to Members, Defendants portray it as "a political benefit that attaches to the seat that [the] member holds," and cannot be considered a "personal right" that can be vindicated in a lawsuit in an Article III court. *Id.* at 24.

Plaintiffs argue that Defendants greatly overread *Raines* and subsequent cases. They contend that under *Raines*'s personal-versus-institutional dichotomy, their alleged injuries are personal and thus not barred by *Raines*. ECF 29 at 11. They also argue that for a legislator to have standing under *Raines*, the legislator need not allege an injury purely in the legislator's private capacity—personal injuries under *Raines* and its progeny can arise from injuries that the Member incurs because they are a congressperson. *Id.* at 11–12. For Plaintiffs, the proper inquiry under *Raines* is to ask whether Plaintiffs sue based on harms to their "*individual* entitlements (whether in a private or official capacity)" or based on "a right that belongs only to the collective institution of which they are members." *Id.* at 11.

The Court agrees with Plaintiffs that *Raines* does not bar this lawsuit. As discussed above, the key inquiry under *Raines* and the subsequent cases is whether the alleged injury is "personal" or "institutional." *Campbell*, 203 F.3d at 20, 21 n.2. This is because "individual members" generally "lack standing to assert the institutional interests of a legislature." *Bethune-Hill*, 587 U.S. at 667; *but see Coleman*, 307 U.S. at 438; *Raines*, 521 U.S. at 821–23 (allowing for suit by individual legislators to remedy institutional injury in limited circumstances). The key point is that there should be no "mismatch" between the party "seeking to litigate" and the party—whether it is an individual Member of Congress, congressional committee, or house of Congress as a whole—that has been harmed. *See McGahn*, 968 F.3d at 767.

Under *Raines*, Plaintiffs' injuries are personal rather than institutional. Look first to the language of Section 527: It provides access to ICE facilities for individual congresspeople or their

designated staff members. *See* § 527(a), 138 Stat. at 619. Plaintiffs are individual Members of Congress who have been denied access to Section 527-funded facilities. Thus impacted, individual Members of Congress are the appropriate parties to bring suit and there is no "mismatch." *McGahn*, 968 F.3d at 767. This is different from cases involving institutional injuries, where the right or interest harmed belonged to a committee or to the legislature as a whole, such that individual Members of Congress would not be proper plaintiffs. *See id.* (finding that the House of Representatives' constitutional right to subpoena testimony had been delegated to the plaintiff committee, which was proper plaintiff to bring suit); *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 799–800 (finding standing where state legislature sued alleging harm to its legislative "prerogative to initiate redistricting"); *Bethune-Hill*, 587 U.S. at 671 (rejecting attempt by one branch of state legislature to vindicate interests in redistricting when that power had been assigned to both branches jointly). A clear mismatch between the plaintiff and the institution injured also occurred in *Raines*, where the plaintiffs alleged abstract harms that accrued to Congress as an institution. The *Raines* plaintiffs alleged harms to the "legal and practical effect" of their votes, the loss of their "constitutional role in the repeal of legislation," and the upset of "the constitutional balance of powers between the Legislative and Executive Branches." *Raines*, 521 U.S. at 816. But as the Supreme Court noted, when taken together, these injuries qualified only as an alleged "diminution of legislative power." *Raines*, 521 U.S. at 821. That "legislative power" which had been allegedly diminished belonged to Congress as a body, which is why the Supreme Court found that the Line Item Veto Act "necessarily damage[d] all Members of Congress and both Houses of Congress equally." *Id.*

The injury was also found to be institutional in *Blumenthal v. Trump*, where 215 Members of Congress sued the Executive Branch on the ground that President Trump had failed to seek

Congress's consent to accept foreign emoluments. *See* 949 F.3d at 16–17. Like the injuries in *Raines*, the *Blumenthal* plaintiffs' inability to cast votes to "approve or disapprove [the President's] acceptance of foreign emoluments," was a "loss of political power" that impacted Congress as a whole and could not be the basis for a suit by individual legislators. *Id.* at 17, 19. This was likewise the case in *Chenoweth v. Clinton*, where legislators sued President Clinton on the ground that an executive order had "deprived the plaintiffs of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" regarding the subjects of the executive order. 181 F.3d 112, 113 (D.C. Cir. 1999). The D.C. Circuit found that this injury was properly characterized as a "dilution of their authority as legislators" and thus harmed Congress's institutional interests. *Id.* at 115; *see also id.* at 116 (noting that the plaintiffs had alleged that President Clinton had "usurp[ed] Congressional authority by implementing a program . . . in a manner contrary to the Constitution"). The same was true in *Campbell v. Clinton*, where 31 Members of Congress sued President Clinton on the grounds that he had violated the War Powers Clause and War Powers Resolution. 203 F.3d at 20. This claim was also institutional, and harmed Congress as a whole, as plaintiffs' claim boiled down to an allegation that President Clinton had acted in violation of Congress's authority by "wag[ing] war . . . without a congressional delegation." *Id.* at 22. Because the injuries in *Raines*, *Blumenthal*, *Chenoweth*, and *Campbell* were to interests of Congress as a whole, they were injuries shared not only by the plaintiffs, but also the "members of the Congress who did not join the lawsuit[s]" and therefore could not be asserted by individual legislators. *Blumenthal*, 949 F.3d at 19.

The facts here differ significantly from those in the institutional injury cases. Defendants are correct that under Plaintiffs' reading, the access granted by Section 527—access to covered ICE facilities—is not granted to a particular subset of legislators alone, and that the entitlement,

let alone the injury, would not exist were Plaintiffs not Members of Congress. *See* ECF 20 at 23. But the fact that an individual Member of Congress can claim the right to access under Section 527 does not automatically alchemize the interests at stake into institutional interests and turn Plaintiffs' individual injuries into institutional harms. As noted above, Section 527 is specifically focused on granting access to ICE facilities to individual Members of Congress and their designated staff members. § 527(a), 138 Stat. at 619. This is something they are entitled to "as individuals," rather than a right assigned to a committee or to Congress as a whole. *Raines*, 521 U.S. at 829. Further, even if the right to access is shared by all Members of Congress, Defendants' oversight policies do not "damage[] all Members of Congress . . . equally." *Id.* at 821. Not all Members of Congress could bring this suit. Plaintiffs are injured because they sought (and continue to seek) to exercise the right of access granted under Section 527 and were denied. They made requests for access for different purposes, at different facilities, at different times and were all rebuffed. Consider the analogous position of an individual requesting information under a disclosure statute such as FOIA. While all members of the public have the right to make such a request, only those who actually *do* make the request and are denied have the right to sue in federal court. *See McDonnell v. United States*, 4 F.3d 1227, 1238 (3d Cir. 1993) ("The filing of a request, and its denial, is the factor that distinguishes the harm suffered by the plaintiff in a[] FOIA case from the harm incurred by the general public."). Here, while any Member of Congress may have the ability to seek access under Section 527, they only become injured for Article III purposes when those rights have been stymied.

Defendants also argue that even if individual Members of Congress are provided the right to access facilities under Section 527, the injury worked by a denial of those rights is still an institutional injury because "any legislator who seeks information for purposes of legislative

oversight necessarily does so as an agent for the entire legislative body." ECF 20 at 27. But Defendants provide no support for that novel proposition. One way to construe Defendants' argument is to say that the inherent "constitutional power" to conduct oversight, *see, e.g.*, *McGahn*, 968 F.3d at 764, is granted to Congress (or perhaps each house of Congress) alone, and thus any injury to that oversight power is one that harms the institution, rather than any particular Member carrying out the oversight. But this ignores that Congress can, and often does, delegate its oversight responsibilities to individual committees, which then may be the proper plaintiff in an Article III lawsuit seeking to vindicate harms to that oversight power. *See generally id.* Plaintiffs argue that Congress has in fact "delegated [such] authority to individual members with respect to DHS facilities" through the operation of Section 527. ECF 29 at 11. However, the Court need not adopt Plaintiffs' stance to reject Defendants' argument on this point. It is true that Section 527 is structured such that Plaintiffs are only entitled to access if they seek to enter the covered facility "for the purpose of conducting *oversight*." § 527(a), 138 Stat. at 619 (emphasis added). But Plaintiffs' injury is not institutional in the way Defendants claim because the source of their right is not "Congress's inherent power to obtain information in aid of legislation," but "[r]ather, it is the express provision of a federal law" that is the "outcome of bicameralism and presentment," *Maloney v. Carnahan*, 45 F.4th 215, 216 (D.C. Cir. 2022) (Millett, J., concurring in denial of rehearing en banc), and the result of Congress's decision to provide specific entitlements to access through an appropriations bill.

The Court also rejects Defendants' claim that to be a personal and particularized injury under *Raines*, the injury must be one that only occurs in Plaintiffs' "personal capacities," and cannot extend to a legislator "in their official capacity asserting injury to . . . the prerogatives of their office." ECF 20 at 13, 23; *see also* Hr'g Tr. 27:17–25 (stating that *Raines* "drew a distinction

between individual legislators bringing claims in their official capacity, whether alleging official or institutional harm," and "individual legislat[ors] bringing claims in their personal capacity"). This is undermined by the text of *Raines* and its acknowledgment of the justiciability of the injury alleged in *Powell*. Congressman Adam Clayton Powell's sufficiently personal and particularized injury arose from rights he was entitled to as a congressperson—in his case, entitlement to sit in Congress and exercise the authority that attached to that seat, as well as a salary. *See Raines*, 521 U.S. at 821. While the Court in *Raines* noted that the plaintiffs had sued "in their official capacities," and acknowledged that the "loss of a[] private right" would have made the injuries in that case "more concrete," *id.*, that is far from saying that the only harms that can justify standing in the case of a Member of Congress are those which are divorced from their official roles and responsibilities. *Raines* itself noted that a legislator would be likely to have standing if the legislator had "been singled out for specially unfavorable treatment as opposed to other Members," without distinguishing whether that treatment was to the legislator's personal or official prerogatives. *Id.* Further, *Raines* implied that a Member of Congress would be injured for Article III purposes if their vote was "denied its full validity in relation to the votes of their colleagues," a harm that could only ever occur in the legislator's official capacity, and one that would be clearly personalized to the legislator, rather than to the institution of Congress as a whole. *Id.* at 824 n.7 (raising the "hypothetical law in which first-term Members were not allowed to vote on appropriations bills"). And following this discussion in *Raines*, courts have acknowledged that personal injuries to legislators may arise when they seek to exercise their official duties. For example, the Tenth Circuit has stated that a "personal injury" accruing to an "individual legislator" would include a claim that a "particular subset of legislators was barred from exercising their right to vote on bills." *Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016).

The question is thus whether the legislator is deprived of something to which they "personally are entitled." *Raines*, 521 U.S. at 821. The access granted by Section 527 and the denial of that access falls within this category, even though Plaintiffs would not experience this injury were they not Members of Congress. What makes the injury "personal" in these cases is not that the injury is to some entitlement outside of the Member's official duties, but that the injury "zeroes in on the individual and is thus concrete and particularized." *Kerr*, 824 F.3d at 1216. While it is true that if Plaintiffs resigned tomorrow, they would "no longer have a claim," the injury does not "run[] . . . with the Member's seat" in the same way as did the purported injuries in *Raines*. 521 U.S. at 821. The right to request and receive access to a Section 527 facility is secured by a Plaintiff's status as a Member of Congress, but the injury arises from the particular Member's request for access and subsequent denial by the Executive Branch. This injury would not "be possessed by [the Member's] successor" in the same way as the alleged injuries in *Raines*. *Id.* The injuries in *Raines* were so "abstract" and "institutional"—based as they were in harms to Congress's legislative power and place in the constitutional scheme—that any successor congressperson would have the exact same claim of injury as the *Raines* plaintiffs. *Id.* at 829. That is not the case here. Plaintiffs' injuries are sufficiently personalized under *Raines*, and Plaintiffs are not barred from bringing suit simply because they sue as legislators in their official capacities.

> **d. The Additional Separation-of-Powers Concerns in *Raines* and Related Cases do not Prohibit Finding Standing Here.**

While the personal-versus-institutional inquiry is the key one, the D.C. Circuit has identified additional factors that militated against finding Article III standing in *Raines*. *See McGahn*, 968 F.3d at 775–76 (citing *Raines*, 521 U.S. at 829–30). The Court finds that none of those considerations bar Plaintiffs' suit.

40

Add.111

First, the Court does not find that "plaintiffs' attempt to litigate their dispute at this time [is] contrary to historical experience." *McGahn*, 968 F.3d at 775 (citing *Raines*, 521 U.S. at 829). *Raines* itself acknowledged historical precedent for individual legislator suits that were premised on "injur[ies] to themselves as individuals." *Raines*, 521 U.S. at 829 (citing *Powell*, 395 U.S. 486). "[H]istorical practice is constitutionally significant even when it does not extend as far back into the past as the Founding." *McGahn*, 968 F.3d at 777. This dispute is not the kind of "confrontation[] between one or both Houses of Congress" (i.e., institutional plaintiffs with institutional grievances) "and the Executive Branch . . . brought on the basis of claimed injury to official authority or power" that *Raines* viewed as unsuitable for judicial intervention. *Raines*, 521 U.S. at 826. It is more analogous to disputes over an individual's entitlement to information based on a congressionally passed and presidentially-signed statute, which courts have long held provide grounds for standing. *See, e.g.*, *Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617–18 (D.C. Cir. 2006); *Akins*, 524 U.S. at 21; *Pub. Citizen*, 491 U.S. at 449.

Second, the fact that Plaintiffs "have not been authorized to represent their respective Houses of Congress" in this lawsuit does not weigh the same way as it did in *Raines*. 521 U.S. at 829. In *Raines*, the plaintiffs sought to vindicate injuries to the institution of Congress as a whole. Here, the Court has found that the injuries are not institutional but personal to Plaintiffs, and thus authorization to sue by the House of Representatives is not relevant to the analysis.

Third, unlike in *Raines*, a finding that Plaintiffs would lack standing would "deprive[] Members of Congress of an adequate remedy" and "foreclose[] the [Oversight Visit Policies] from . . . challenge (by someone who suffers judicially cognizable injury as a result of the [Policies])." *Raines*, 521 U.S. at 829. Defendants resist this conclusion. They argue that this case should be remedied through "political mechanisms" rather than judicial intervention. ECF 20 at

41

25. In *Raines*, similar self-help mechanisms included legislative action by Congress as a whole to "repeal[] the [Line Item Veto] Act or exempt appropriations bills from its reach." 521 U.S. at 829. In *Chenoweth* and *Campbell*, the prospect of passing additional legislation also served as an adequate remedy. In *Chenoweth*, it was "uncontested that the Congress could terminate [the President's actions] were a sufficient number in each House so inclined." 181 F.3d at 116. And in *Campbell*, "Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign." 203 F.3d at 23.

Defendants also analogize this case to a type of information dispute between Congress and the Executive Branch—such as those regarding the proper scope of a response to a subpoena of presidential or agency documents—which are often resolved through the "process of accommodation." *Trump v. Thompson*, 20 F.4th 10, 37 (D.C. Cir. 2021); *see* ECF 20 at 27. Accommodation is a "flexible, dynamic process that could involve interlocking and contingent negotiations over multiple different requests for information," with Congress exercising pressure on a recalcitrant Executive Branch through its ability to influence or stymie "the President's legislative priorities, nominations and confirmations." *Thompson*, 20 F.4th at 37. The Supreme Court has emphasized that information disputes "have been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020).

But Defendants' citation to *Mazars* and the like ignore that here, the "hurly-burly's done": "the battle's lost and won." William Shakespeare, Macbeth act 1, sc. 1, l. 3–4. Section 527 is a result of the very "self-help" mechanisms and political rough-and-tumble that Defendants espouse. ECF 20 at 25. The text of Section 527 reflects a congressional concern with access to, and information about, conditions within ICE facilities. In order to remedy that concern, Congress

Add.113

undertook the most classic of political remedies: both the House and the Senate have repeatedly passed legislation guaranteeing that access to individual Members. If the Executive Branch thought that Section 527 was bad policy, it could have employed its own political tools—including the bully pulpit and the veto—to ensure that Section 527 was not included in the various appropriations acts. Instead, President Trump assented to Section 527 as recently as November 12, 2025. *See* FY2026 Continuing Appropriations Act, §§ 101, 103–04, 105, 139 Stat. at 496–97. Accepting Defendants' characterization of this action—in reality, a lawsuit alleging violation of a duly enacted law—as instead a political dispute to be resolved solely with "political mechanisms," ECF 20 at 25, would extend the logic of accommodation to a context where it is totally inapposite. Assuming that Plaintiffs are right on the merits, Defendants are violating the law. To address that violation, Defendants suggest that Members of Congress must essentially start over: despite having already passed a statute to secure its Members' access to ICE facilities, Defendants argue that Plaintiffs should convince their colleagues in Congress to go back to the well and do the same thing again, either through further appropriations legislation or other full-House action. ECF 20 at 25 (citing with approval the "political tools" mentioned in *Raines*); *see also id.* at 35 (suggesting that Plaintiffs would be able to secure substantial relief by "convinc[ing] a majority of their House colleagues that Congress should act to enforce" Section 527). Defendants cite with approval *Campbell*, which found that the plaintiff Members of Congress had alternative remedies because they "retain[ed] appropriations authority and could have cut off funds for" the allegedly illegal actions. 203 F.3d at 23.

With Section 527, Congress has done just that, and the dispute before the Court regards ICE's alleged failure to comply with that funding limitation. In light of the injury alleged by Plaintiffs, it cannot be the case that Congress's power to implement further appropriations

limitations or legislate other obligations on the Executive Branch is plausibly an adequate remedy. As Plaintiffs aptly put it, "Congress does not have to act twice for its statutes to be enforceable." ECF 29 at 20. "Without the possibility of enforcement" of an appropriations rider like Section 527, "the Executive Branch faces little incentive," *McGahn*, 968 F.3d at 771, to adhere to other of Congress's decisions regarding "legislative policies[,] . . . programs[,] and projects" as laid out in appropriations bills, *Tenn. Valley Auth.*, 437 U.S. at 194. Finding this case justiciable "preserve[s]," rather than disrupt[s]," the longstanding practice of bicameralism and presentment. *McGahn*, 968 F.3d at 771.

Defendants' arguments regarding alternative remedies and Congress's political tools are misguided for a broader reason: They again assume that this case presents an institutional injury to Congress as a whole. But the injuries here are to individual Members of Congress. As a result, the analogy to the information dispute cases does not work. Those cases involve two, co-equal branches pitted against each other and the balancing of constitutionally-derived interests— Congress's in "obtaining information through appropriate inquiries," and the Executive Branch's in confidentiality. *Mazars*, 591 U.S. at 870; *see, e.g.*, *United States v. Nixon*, 418 U.S. 683, 706 (1974). In such cases, Congress is exercising an inherent power to conduct oversight that belongs to the institution, and has the stamp of approval from the institution, whether through delegation or direct authorization. *See McGahn*, 968 F.3d at 767, 776 (finding standing to enforce congressional subpoena where the committee that had issued the subpoena was authorized to do so by the House rules). Here, individual Members of Congress are exercising a right given to them by statute to access ICE facilities. It is difficult to see how requiring an individual Member of the House to seek action of the entire body to vindicate an individual entitlement of access can qualify as an "adequate remedy." *Raines*, 521 U.S. at 829. That the twelve Plaintiffs here would have to

mobilize majorities of Congress to act on their individual injuries further demonstrates why the injuries are personal, rather than institutional, under *Raines*.

*      *      *

In sum, the Court finds that Plaintiffs have shown the "substantial likelihood of standing" required to maintain a request for preliminary relief. *Food & Water Watch, Inc.*, 808 F.3d at 913. Section 527 provides an entitlement to individual Members of Congress to enter facilities funded with Section 527 funds and observe the conditions within. And whether construed as the denial of physical access to those facilities, or the denial of information about the conditions therein, Plaintiffs have sufficiently alleged "concrete and particularized" injuries that are "fairly traceable to the challenged conduct" of Defendants and are "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338–39. Plaintiffs' status as legislators, which requires that the Court's standing inquiry be "especially rigorous," does not change this conclusion. *Raines*, 521 U.S. at 819. Defendants make much out of the fact that this case involves political actors and figures from both the Legislative and Executive Branches, but the "Judiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). An Article III court cannot decline to hear a case "merely because the issues have political implications." *Id.* at 196 (citing *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

## 2.  Equitable Discretion

Notwithstanding the judiciary's "virtually unflagging" "obligation" to hear cases that are properly before it, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013), Defendants argue that this Court should nevertheless decline to hear this case. Defendants ground this request in the D.C. Circuit's "equitable discretion" doctrine. ECF 20 at 35–36. This doctrine states that "[w]here a congressional plaintiff could obtain substantial relief from . . . fellow legislators through the

enactment, repeal, or amendment of a statute, [a] court should exercise its equitable discretion to dismiss the legislator's action." *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981). While the D.C. Circuit has never overruled *Riegle*'s "creat[ion] [of this] doctrine of 'circumscribed equitable discretion,'" it has questioned its viability and suggested that the work done by this doctrine has been to a certain extent superseded by, and is properly considered as part of, the jurisdictional analysis in *Raines*. *Chenoweth*, 181 F.3d at 114, 116; *see also Melcher v. Fed. Open Mkt. Comm.*, 836 F.2d 561, 565 n.4 (D.C. Cir. 1987) (questioning whether *Riegle*'s "court-fashioned doctrine of equitable discretion" is "viable").

Even assuming the continued viability of this doctrine after *Raines*, the Court finds no grounds to exercise this discretion. Defendants' arguments on this point overlap significantly with their arguments regarding historical practice and adequate alternative remedies for legislator plaintiffs under *Raines*, *see* ECF 20 at 24–25, 27–28, and the Court rejects them for similar reasons. Defendants argue that the Court should refrain from exercising its jurisdiction pending the resolution of "all possibilities for settlement" between the "Legislative and Executive Branches." ECF 20 at 35 (citing *United States v. House of Representatives*, 556 F. Supp. 150, 152 (D.D.C. 1983)). But as the Court has explained, this is not the kind of case to which the process of accommodation applies, and if it was, that process has been settled by Congress's passage of Section 527. *See supra* Section III.A.1.d. Defendants also suggest, as discussed above, that Plaintiffs ought to "convince a majority of their House colleagues that Congress should act to enforce" Section 527. ECF 20 at 35. But it is Defendants, not Congress, who are tasked with enforcing the laws enacted by Congress and signed by the President. U.S. Const. art. II, § 3 ("[The President] shall take Care that the Laws be faithfully executed."); *see Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202 (1928). Where the issue of access to ICE facilities has

already been the subject of negotiation between the political branches and resolved through the passage of a presidentially-signed appropriations bill, one which Plaintiffs allege is now being ignored, the Court does not find that this dispute is "fully susceptible to political resolution," as Defendants claim. *Chenoweth*, 181 F.3d at 116. The Court will not decline to exercise jurisdiction on the basis of equitable discretion.

### 3. Cause of Action Under the Administrative Procedure Act

In addition to establishing a likelihood of jurisdiction, which gets Plaintiffs "through the courthouse door," Plaintiffs must also show a substantial likelihood that they have a "cause of action to prosecute" their case. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 631 (D.C. Cir. 2020). Plaintiffs invoke the judicial review provision of the APA, which "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 130 (2014). Defendants argue that Plaintiffs cannot show a likelihood of a cause of action under the APA because they are (a) not "adversely affected or aggrieved" "persons" who may seek APA review, (b) APA review is precluded by statute, and (c) the challenged Oversight Visit Policies are not reviewable agency action. ECF 20 at 36 (citing 5 U.S.C. § 702). The Court addresses these objections in turn.

#### a. Plaintiffs are Adversely Affected or Aggrieved Within the Meaning of the APA.

A "person . . . adversely affected or aggrieved" by "agency action within the meaning of a relevant statute" is entitled to invoke the APA's judicial review provision. 5 U.S.C. § 702. The APA further defines a "person" to include "an individual." *Id.* §§ 701(b)(2), 551(2).

The Court has no difficulty finding that Plaintiffs satisfy this provision. The requirement that a "person" be "adversely affected or aggrieved" under the APA is "not especially demanding,"

47

*FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 232–33 (2025). This requirement is interpreted "broadly as covering anyone even '*arguably* within the zone of interests to be protected or regulated by the statute in question.'" *Id.* at 233 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

Plaintiffs' APA challenge to the Oversight Visit Policies is based on violations of the terms of Section 527. ECF 17-1 at 37. Again, Section 527 prohibits DHS from using appropriated funds to "prevent" any "Member of Congress" from "entering" specific DHS facilities, or to "make any temporary modification" to alter conditions at that facility that would be observed by those Members. § 527(a), 138 Stat. at 619. While DHS "may require that a request" to visit a facility by congressional staff members "be made at least 24 hours in advance of an intent to enter" the facility, *id.* § 527(c), "[n]othing in [Section 527] may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility . . . for the purpose of conducting oversight," *id.* § 527(b).

Plaintiffs are Members of Congress whose requests to enter covered facilities have been denied. They are plainly within the zone of interests protected by Section 527, which "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Further, while this test does not require any "indication of congressional purpose to benefit the would-be-plaintiff," *id.*, such purpose is clearly evident here, where the language of Section 527 expressly protects the access rights of Members of Congress and their staffs.

Defendants' two arguments to the contrary are unavailing. First, Defendants appear to argue that a "person" or "individual" under the APA cannot include "Congress or its Members in

their official capacity." ECF 20 at 38. But the definition of "individual," whether prior to the APA's enactment or in the present day, plainly covers a Member of Congress. *See, e.g.*, *Individual*, Black's Law Dictionary (3d ed. 1933) ("[A] single person as distinguished from a group or class, and also . . . a private or natural person."); *Individual*, Black's Law Dictionary (12th ed. 2024) ("Of, relating to, or involving a single person or thing, as opposed to a group.").

Second, Defendants argue that the logic of the Supreme Court's decision in *Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.* ("*Newport News*"), 514 U.S. 122 (1995), supports the proposition that Members of Congress suing over matters relating to their official capacity could not be persons adversely affected or aggrieved under the APA. In *Newport News*, the Supreme Court interpreted a provision of the Longshore and Harbor Workers' Compensation Act (LHWCA) which allowed for judicial review of decisions by a Benefits Review Board within the Department of Labor. *Id.* at 125–26. Like the APA, that statute provided for judicial review at the request of "any person adversely affected or aggrieved by" the Board's order. *Id.* at 126. The Court held that a "person" "adversely affected or aggrieved" did not include the Director of the Office of Workers' Compensation Programs—an office within the Department of Labor—who had sought review of a Board decision denying a specific worker's compensation claim. *Id.* at 126–29. Defendants seize on the Court's statement that it had found no historical examples of "an agency" invoking the APA "in its regulatory or policy-making capacity" as a person "adversely affected or aggrieved." *Id.* at 127. They argue that the lack of similar historical examples of Members of Congress bringing APA suits in their official capacities points against finding the Plaintiffs here to be "adversely affected or aggrieved." ECF 20 at 37.

*Newport News* does not stand for the broad proposition that Defendants claim. *Newport News* was decided, first and foremost, on the textual ground that agencies are expressly excluded

under the APA from invoking the judicial review provision, and that throughout the U.S. Code, "when an agency in its governmental capacity" is meant to be able to sue under a statute's judicial review provision, "Congress says so." *Newport News*, 514 U.S. at 129. The Supreme Court considered the history of similar suits only in determining whether to depart from that basic textual assumption when interpreting the LHWCA. *Id.* at 127. Here the situation is reversed: Members of Congress—whether in their personal or official capacities—have not been expressly excluded from the APA's scope and, moreover, squarely fit within the plain definition of a "person . . . adversely affected or aggrieved." 5 U.S.C. § 702. And *Newport News* even acknowledged that the "Government" could invoke "administrative and judicial protection" if it were occupying a status similar to a "statutory beneficiary." 514 U.S. at 128. Plaintiffs are the statutory beneficiaries of Section 527 in their official capacities as "Member[s] of Congress." § 527(a)(1), 138 Stat. at 619. If anything, *Newport News* supports Plaintiffs' cause of action argument.

### b. APA Review is Not Precluded by Statute.

Even if a plaintiff is "adversely affected or aggrieved by agency action within the meaning of a relevant statute," the APA's cause of action will not be available "to the extent the relevant statute 'preclude[s] judicial review.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. §§ 701(a)(1), 702). Defendants argue that the existence of the Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), along with other methods through which Congress may seek information from the Executive Branch, indicates that Congress has intended to preclude review of the appropriations-related claims at issue here.

Defendants wage an uphill battle from the start. "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," and courts therefore apply a "'strong

presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). That presumption is, of course, just a presumption, which may be rebutted when a "statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Id.* But even so, an agency bears a "'heavy burden' in attempting to show that Congress 'prohibited all judicial review' of the agency's compliance with a legislative mandate." *Id.* (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975)). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block*, 467 U.S. at 345. Here, those factors all indicate a lack of preclusion.

Start with Section 527, the text of which says nothing about the preclusion of judicial review. Nor do Defendants point to anything in Section 527's legislative history that undermines the "strong presumption" that violations of its provisions are judicially reviewable. *Mach Mining, LLC*, 575 U.S. at 486. Section 527's text indicates that Congress was concerned with DHS actions that were inhibiting individual Members' access to ICE facilities and was skeptical of the Executive Branch's voluntary compliance with its requests. Thus, this is not a situation where the statutory text and context demonstrate that "Congress wanted an agency to police its own conduct." *Id.* And the "nature of the administrative action" challenged—in this case, the promulgation of polices that impact the access granted in the statute to the parties contemplated by the statute— indicates that a suit by these particular Plaintiffs is not impliedly precluded. *Block*, 467 U.S. at 345.

Defendants urge the Court to look beyond Section 527 to the Anti-Deficiency Act (ADA), which they claim is the "exclusive remedial scheme for alleged violations of appropriations bars, such as § 527." ECF 20 at 39. Among other prohibitions, the ADA states that any "officer or employee of the United States Government" may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). If an officer or employee has violated this provision, the ADA provides that they "shall be subject to appropriate administrative discipline," and a knowing and willful violation subjects that person to criminal penalties. *Id.* §§ 1349(a), 1350. In the case of a violation of the Act by "an officer or employee of an executive agency," the "head of the agency" is obligated to report the violation to the President and Congress. *Id.* § 1351.

The ADA does not preclude Plaintiffs' ability to bring an APA claim alleging that Defendants have violated the terms of Section 527. This kind of preclusion is inferred when, for example, a statute creates a "complex and delicate administrative scheme" that would be disrupted by letting specific parties seek judicial review under the APA. *Glob. Health Council v. Trump*, 153 F.4th 1, 18 (D.C. Cir. 2025) (quoting *Block*, 467 U.S. at 348). Defendants analogize to the Impoundment Control Act (ICA), which the D.C. Circuit recently found precluded an APA cause of action for a contrary-to-law claim to enforce the ICA's limitations on the Executive Branch's ability to decline to spend appropriated funds.[10] *Id.* at 19; ECF 20 at 14. Similar to the ADA, which prohibits the Executive Branch from spending money not appropriated, the ICA imposes limits on the Executive Branch's ability to delay or withhold the spending of appropriated funds. *See Glob.*

---

[10] In *Global Health Council*, foreign aid grantees and associations sued to challenge the Executive Branch's decision to freeze foreign aid spending by the State Department and the U.S. Agency for International Development. 153 F.4th at 7. Plaintiffs brought contrary to law claims based on multiple statutes, including (1) the ICA, on the grounds that the defendants had violated the ICA's limitations on the Executive Branch's ability to decline to spend appropriated funds, as well as (2) the 2024 Appropriations Act, on the grounds that defendants had violated its specific provisions *Id.* at 18, 20 n.17.

*Health Council*, 153 F.4th at 8. But this is unpersuasive for multiple reasons, the first being that

*Global Health Council* addressed whether plaintiffs had an APA cause of action to enforce the

Impoundment Control Act itself. *Id.* at 17 (addressing whether the "ICA precludes the grantees

from bringing suit under the APA to enforce its provisions"). But as *Global Health Council*

acknowledged, this holding did not extend to the question of whether the existence of the

Impoundment Control Act also precluded "contrary-to-law claims . . . based on" other "substantive

provisions," such as appropriations acts. *Id.* at 20 n.17 ("[W]e need not and do not decide whether

the ICA precludes suits under the APA to enforce appropriations acts."). And the other cases that

Defendants cite similarly involved plaintiffs bringing claims under the very statute that precluded

other avenues of judicial review. *See Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers

Ass'n*, 453 U.S. 1, 14 (1981); *Block*, 467 U.S. at 345–48. Here, Plaintiffs seek not to enforce the

ADA's provisions for administrative discipline and criminal prosecution, but to invoke the terms

of Section 527 in their APA contrary to law claim. Defendants' citations are inapposite.

The mere existence of the scheme established by the ADA does not indicate a

congressional intent to preclude Plaintiffs' suit. As the Office of Legal Counsel has noted in an

opinion cited by Defendants, the ADA is only "one of *several means* by which Congress has sought

to enforce" its appropriations instructions. *Applicability of the Antideficiency Act to a Violation of

a Condition or Internal Cap Within an Appropriation*, 25 Op. O.L.C. 33, 33 (2001) (emphasis

added); ECF 20 at 39 (citing this opinion, erroneously, for the proposition that the ADA is the

"exclusive remedial scheme for alleged violations of appropriations bars"). The text of the ADA's

remedial provisions indicate that it is a limited scheme that empowers Executive Branch officials

to enforce internal compliance with appropriations laws, but not one meant to preclude the kind of

dispute presented here. The ADA creates penalties imposed by superior Executive Branch actors

Add.124

against subordinate Executive Branch actors. *See* 31 U.S.C. § 1349(a). True, the remedial scheme created by the ADA implicates Congress in that the "head of the agency" whose "officer or employee" violated the statute must notify Congress upon any violation of the ADA. 31 U.S.C. § 1351. But the notice provision, along with the other provisions of the statute, all assume that the enforcing officials in the Executive Branch have decided that a violation of the ADA exists. The ADA provides no avenue for relief when an Executive Branch agency has decided as a matter of policy, as is the alleged case here, that its actions do not represent a violation of an appropriations bar. This distinguishes the ADA from the Impoundment Control Act, which created a "complex scheme of interbranch dialogue," which included Congress's right to sue, exercised by "a specified legislative branch official if the executive branch violates its statutory expenditure obligations." *Glob. Health Council*, 153 F.4th at 18–19 (citing 2 U.S.C. § 682 *et seq.*). Holding that the ADA precludes Plaintiffs' suit under these circumstances would "threaten [the] realization of the fundamental objectives" of Section 527. *Block*, 467 U.S. at 352.[11]

Setting aside the ADA, Defendants venture even further afield when they suggest that Plaintiffs' suit is precluded because other statutory mechanisms exist for Congress to obtain information from the Executive Branch, such as the statutory causes of action granted to the Senate to bring civil lawsuits to enforce congressional subpoenas. *See* ECF 20 at 41 (citing 2 U.S.C. § 288d and 28 U.S.C. § 1365(b)). These mechanisms are irrelevant to this analysis as they concern requests for documents and testimony by committees. Plaintiffs' case is about the access to ICE facilities by individual Members of Congress under the terms of Section 527 and the ability to observe the conditions within. The existence of statutory causes of action to vindicate Congress's

---

[11] The specific question before the Court is whether the existence of the ADA precludes the Plaintiff Members of Congress from bringing an APA claim based on a separate "substantive provision[]," that is, Section 527. *Glob. Health Council*, 153 F.4th at 20 n.17. As a result, the Court need not and does not determine whether the scheme set up by the ADA would preclude an APA claim that Defendants' conduct was contrary to the ADA itself.

general powers of inquiry are not sufficient to overcome the presumption that APA review is available in this case.

### c. Plaintiffs Challenge Final Agency Action.

Defendants also claim that the APA claims are barred because Plaintiffs do not challenge "final agency action" under 5 U.S.C. § 704. ECF 20 at 42–43. Final agency action under the APA is action that "mark[s] the consummation of the agency's decisionmaking process," and one "by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The Oversight Visit Policies are final agency action. The seven-day notice requirement for detention facilities has been posted on ICE's Office of Congressional Relations webpage since June 2025 with no indication that it was tentative, interlocutory, or undergoing revision. The policy has been cited by DHS and ICE officials when denying Plaintiffs' access to ICE facilities on various occasions. The same website previously displayed the field office policy which, while no longer publicly posted, Plaintiffs attest also continues to be enforced to prevent their entry into specific facilities. Both policies are final because they "mark the consummation" of DHS's "decisionmaking process" regarding Members' visits to ICE facilities and have had an impact on the Members' "rights," the agency's "obligations," and led to the "legal consequence[]" of the denial of access to Section 527-funded facilities. *Bennett*, 520 U.S. at 178.

Defendants' only argument to the contrary is to construe the actions challenged by Plaintiffs as the "provision or denial of information to Congress," which Defendants claim are unreviewable under the APA. ECF 20 at 42. The Court rejects Defendants' attempt to mischaracterize the gravamen of Plaintiffs' challenge. Plaintiffs clearly challenge the Oversight Visit Policies, which are final agency action under the APA.

### 4. Plaintiffs Are Likely to Succeed on the Merits of their APA Contrary-to-Law and Statutory Authority Claim.

Having satisfied itself of likely jurisdiction and rejected Defendants' threshold objections regarding equitable discretion and the availability of a cause of action under the APA, the Court proceeds to the merits of Plaintiffs' claim that the Oversight Visit Policies are contrary to law and in excess of statutory authority. Section 706 of the APA requires the Court to "hold unlawful and set aside agency action" that is "not in accordance with law," or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Plaintiffs challenge Defendants' seven-day notice requirement to enter ICE facilities and the purported policy excluding ICE field offices from the scope of Section 527. The Court finds Plaintiffs likely to succeed the merits of both.[12]

### a. The Seven-Day Notice Requirement Violates Section 527.

Section 527(a) prohibits the Department of Homeland Security from using any appropriated funds in the relevant appropriations acts "to prevent" a "Member of Congress" or that Member's designated staff "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619. Defendants deny that their notice policy prevents Members of Congress from entering a facility because Members were in a number of cases later allowed to enter the facilities. In their view, a delayed entry is not a "prevent[ed]" entry. *See* ECF 20 at 45. That is not a plausible interpretation of "prevent" as used in the statute. To "prevent," means to "keep from happening," or "to hold or keep back: hinder, stop." *See Prevent*, Merriam-Webster Dictionary, https://perma.cc/GF9Y-L2J4. The notice requirement as implemented by ICE officials does just

---

[12] Because the Court finds Plaintiffs substantially likely to prevail on the merits of this claim and that this claim merits granting a stay of the Oversight Visit Policies, the Court declines to address the merits of Plaintiffs' remaining APA claims and their mandamus claim at this preliminary juncture.

that: it stops visiting Members of Congress from entering a facility unless they have provided seven days of advance notice. Plaintiffs have identified numerous examples where their requests to enter facilities at a given date and time were rebuffed by ICE for failure to provide that notice and they were not allowed access to the facility. *See, e.g.*, ECF 17-2, Escobar Decl. ¶¶ 12–13; ECF 17-3, Crow Decl. ¶ 20; ECF 17-6, Correa Decl. ¶ 9; ECF 17-9, Ruiz Decl. ¶¶ 9–12; ECF 17-10, Torres Decl. ¶¶ 17–18.

Any indication that a seven-day advance notice policy is permissible under the definition of "prevent" as used in Section 527(a) is dispelled by Section 527(b), which states that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter" a covered facility. § 527(b), 138 Stat. at 619. The final subsection of the statute also points against the permissibility of a notice requirement. That subsection provides specifically that for "individuals described in subsection (a)(2)"—the designated employees of Members of Congress—DHS "may require that a request be made at least 24 hours in advance of an intent to enter" a covered facility. *Id.* § 527(c), 138 Stat. at 619. That the statute appears to carve out the permissibility of an advance notice requirement for congressional employees while saying nothing about Members of Congress further supports Plaintiffs' reading of the statute that such advance notice requirements are not permissible for Members of Congress. To adopt Defendants' interpretation of Section 527 to allow a seven-day notice requirement would also render subsection (c)'s grant of license to issue a one-day notice requirement to congressional employees superfluous, which counsels against the interpretation. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (rejecting statutory reading when the reading would "render[] an entire subparagraph meaningless").

Defendants argue that other statutory authorities allow for the promulgation and enforcement of the notice requirement, such as the assignment to the DHS Secretary of the responsibility for "arrang[ing] for appropriate places of detention" of detained noncitizens, 8 U.S.C. § 1231(g), on the theory that this responsibility includes "prescribing standards for detention such as visitation protocols," ECF 20 at 46 (also citing 6 U.S.C. § 122(b)). But these highly general, prior-in-time statutes cannot reasonably be construed to overcome the prohibition in the highly-specific, later-passed Section 527. *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("[A] statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere."). "[A]n agency" like DHS "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). What Congress giveth, Congress may taketh away. Even if statutory authority had previously been provided to DHS to implement a notice requirement, Section 527 has now limited that authority with respect to Members of Congress and their designated staffs.

Nor can Defendants justify the notice requirement under the President's Article II responsibility to take care that the immigration laws are "faithfully executed." U.S. Const. art. II, § 3. That argument ignores that Section 527 is itself one of the "[l]aws" that must be "faithfully executed." *Id.*; *see Glob. Health Council*, 153 F.4th at 8 ("[T]he Take Care Clause 'charges the Executive Branch with enforcing federal law,' including spending-power laws." (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025)); *see also City of Los Angeles v. Adams*, 556 F.2d 40, 49 (D.C. Cir. 1977) ("[W]e are bound to follow Congress's last word . . . even in an appropriations law.").

Finally, although they do not press this as a reason that Plaintiffs' claims fail on the merits, Defendants note in their briefing that DHS and ICE have access to funds that are not subject to

Section 527. They observe that DHS currently receives funding from not only the FY2026 Continuing Appropriations Act, but also from the additional spending bill passed in July 2025, which does not include the Section 527 rider. *See* OBBBA, § 100052, 139 Stat. at 388–89; ECF 20 at 18. There is no present dispute that the Oversight Visit Policies were created and first implemented before the passage of that bill. Further, days before the recent Government shutdown, Defendants conceded that OBBBA funds had not been used for "the operation of detention facilities and access to detention facilities,"—meaning that the only funds being used were Section 527-restricted funds—and promised to inform the Court if that fact had changed. Hr'g Tr. 47:11–24. And Defendants' declaration regarding ICE's funding during the shutdown indicated that OBBBA funding alone was insufficient to cover the costs of ICE's continuing operations during the shutdown, including detention operations, with ICE funding itself in part by "incur[ring] obligations in advance of FY2026 appropriations." ECF 32-1, Ferguson Decl. ¶¶ 5–7. Finally, in a joint status report, Defendants appear to concede that following the conclusion of the lapse in appropriations and the passage of the FY2026 Continuing Appropriations Act, Section 527-restricted funds are currently being used for "detention operations, including the adoption and implementation of the visitation protocols at issue in this action." ECF 34 at 2.

The Court thus finds that Plaintiffs are likely to succeed on their claim that Section 527 funds are being used to implement a seven-day notice requirement for Members of Congress seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in excess of DHS's statutory authority.

### b. The Policy of Categorically Excluding ICE Field Offices from the Requirements of Section 527 is Also Contrary to Section 527.

Plaintiffs also challenge ICE's policy of categorically excluding ICE field offices from the scope of Section 527. The Court finds on this record that Defendants' policy exists, and it rests on

59

an incorrect understanding of Section 527, which requires ICE to permit access to "any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619.

Recall that the June 2025 Visit Protocol briefly posted to ICE's Office of Congressional Relations website stated that "ICE Field Offices are not detention facilities and fall outside of the Sec. 527 requirements" because "ICE [did] not house aliens at field offices[;] rather these are working offices where Enforcement and Removal Operations (ERO) personnel process aliens to make custody determinations based on the specific circumstances of each case." June 2025 Visit Protocol at 4. While the June 2025 Visit Protocol was removed from ICE's website sometime in June 2025, Plaintiffs claim that this aspect of the Protocol continues to be ICE's official policy. *See* ECF 17-1 at 39. They present evidence showing that ICE officials have rebuffed visits to specific field offices following June 2025 on the grounds stated in the June 2025 Visit Protocol. *See* ECF 17-7, Gomez Decl. Ex. A at 13 (rejecting request to visit field office on July 7, 2025, because, among other reasons, "ICE Field Offices are not detention facilities" covered by Section 527 because "ICE does not house aliens at field offices"); ECF 17-8, Garcia Decl. ¶¶ 20–23 (denying access to Los Angeles field office on the grounds that it was "not considered a facility"); ECF 17-11, Thompson Decl. ¶¶ 13–16 (denying access on July 21, 2025, to full Washington Field Office facility, including "12-hour holding area," on the grounds that the "'latest guidance' was that field offices are not subject to" Section 527). Plaintiffs also direct the Court to a letter from August 2025 from DHS Secretary Kristi Noem to Plaintiff Representative Garcia in which Secretary Noem states that "ICE Field Offices are not detention facilities and fall outside of Section 527 requirements. ICE does not house aliens at field offices, rather these are working offices where

[ERO] administratively processes aliens." Letter from DHS Sec'y Noem to Rep. Garcia (Aug. 22, 2025) [hereinafter August 2025 Noem Letter], https://perma.cc/5J7N-EGLH.

It is telling that Defendants do not substantively contest that certain ICE field offices are facilities "operated by or for the Department of Homeland Security used to detain or otherwise house aliens." § 527(a), 138 Stat. at 619. Instead, Defendants simply deny the existence of "any visitation protocol that prevents Members of Congress and their staff from visiting ICE field offices, including those containing ERO temporary holding facilities." ECF 20 at 46. At oral argument, counsel for Defendants answered affirmatively to the Court's question about whether Members of Congress are "being permitted access to those facilities," and represented that "[s]ubject to the same seven days' advance notice requirement for any detention facilities, [Members of Congress] can access field offices." Hr'g Tr. at 46:17–25. But Defendants' answers subtly shift the terrain. The question is whether ICE has a policy that "ICE field offices are not subject to [S]ection 527." ECF 17-1 at 39. Defendants' admission that ICE is currently allowing Members of Congress into certain field offices is not necessarily a concession that ICE considers field offices to be covered by Section 527. To put it another way, ICE's allowing of congressional visits to certain field offices could be completely consistent with a policy that "entirely excludes ICE field offices from the reach of section 527." *Id.* at 37. If a facility is covered by Section 527, Defendants are *required* to let Members of Congress visit. A departmental policy that field offices are exempt from Section 527 would still allow ICE officials to *voluntarily* admit Members of Congress to field offices; but such a policy would also allow ICE to deny access when it chooses. Defendants' assertion that Members of Congress are currently being allowed to visit field offices thus does not disprove the existence of a policy categorically excluding field offices from the scope of Section 527. And again, the evidence submitted by Plaintiffs indicates that Defendants have

61

indeed adopted a policy that ICE field offices "fall outside of Section 527 requirements" and are relying on that policy, even if inconsistently, to deny access to ICE field offices. August 2025 Noem Letter.

Defendants' failure to substantively respond to the merits of Plaintiffs' argument that certain ICE field offices are in fact covered by the terms of Section 527 is grounds to treat the argument as conceded under Local Civil Rule 7(b) of this Court. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("The rule is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."); *Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (declining to "resolve the merits of [an] issue because [plaintiff] conceded it" by failing to "respond in any way to defendant's argument"). But even if Defendants had not conceded the point, the Court would find that a policy categorically excluding field offices from the scope of Section 527 is contrary to the terms of the statute.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004). Section 527 applies to "any" "facility," which indicates breadth. "Read naturally, the word 'any' has an expansive meaning, that is one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). To "use" means to "employ for the accomplishment of a purpose." *Use*, Black's Law Dictionary (12th ed. 2024); *Smith v. United States*, 508 U.S. 223, 228–29 (1993) (noting the "everyday meaning" of "use" is "to employ"). The definition of a covered facility is thus not governed by its labelling by DHS but by how it is employed in practice.

Next, Section 527 applies to any facility used to "detain or otherwise house" noncitizens. "Detain" is the verb form of "detention," which means the "act or an instance of holding a person in custody; confinement or compulsory delay." *Detention*, Black's Law Dictionary (12th ed. 2024); *Jennings v. Rodriguez*, 583 U.S. 281, 307–08 (2018) (collecting this, and other definitions of "detain," which include "to hold or keep in or as if in custody," "to keep in confinement or under restraint; to keep prisoner" (citations and emphasis omitted)). Plaintiffs argue that the custody or confinement contemplated by Section 527 extends to "any circumstance[s] where an individual's freedom of movement is restrained, even temporarily." ECF 17-1 at 40. The Court agrees that the plain meaning of "detain" lacks any clear temporal element as to the length of the detention—it focuses on whether the individual is subject to legal confinement or restraint, regardless of the time spent in that condition. And in various other places in the law, the language of detention is frequently used to describe types of restraint and confinement that are for a brief duration. *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (describing the brief investigative police stops discussed in *Terry v. Ohio*, 392 U.S. 1 (1968), as "detain[ing] the individuals"); *see Terry*, 392 U.S. at 10 (discussing whether the "police should be allowed to 'stop' a person and detain him briefly for questioning").

However, Section 527 also uses "detain" as part of the full phrase "detain or otherwise house" noncitizens. "Otherwise" means "[i]n a different way; in another manner," or "[i]n other conditions or circumstances." *Otherwise*, Black's Law Dictionary (12th ed. 2024). "House" means "to provide with living quarters or shelter," or "serve as a shelter or container for." *House*, Merriam-Webster Dictionary, https://perma.cc/7WCY-CERA; *see also House*, Oxford English Dictionary, https://perma.cc/Q4AY-V4T9 (meaning "[t]o shelter, contain, or accommodate as a house; to be a house for"). Plaintiffs argue that "otherwise" serves as a "catch-all" provision that

63

expands the scope of the statute through the addition of the term "house," meaning that Section 527 applies to a "DHS facility, of whatever kind, functioning as a place where individuals are held in confinement in any manner." ECF 17-1 at 41. Plaintiffs' interpretation, while plausible, gives short shrift to the statute's use of "house," a verb which implies an association with living quarters, and ignores the way that "otherwise" links the two verbs together. Based on the definitions for "otherwise" above, the statute is best read to mean "detain or [in a different way] house," or "detain or [in another manner] house," which indicates that the detentions contemplated by the statute are similar in nature to the act of housing. *See Otherwise*, Merriam-Webster Dictionary, https://perma.cc/WTP4-HHCD (providing the example of "[a]ll of the books had been burned or *otherwise* destroyed," a sentence in which the word "destroyed" makes clear that burning of the books resulted in their destruction, rather than cosmetic or other minor damage). As a result, the Court finds that the detentions contemplated by the statute likely have a prolonged or residential aspect, more akin to an overnight stay at a jail rather than an hour-long interrogation at a police office.

The present record demonstrates that ICE field offices featuring ERO holding facilities appear to be "used to detain or otherwise house" noncitizens as contemplated by Section 527. § 527(a), 138 Stat. at 619. As noted above, ICE's own internal guidance permits "holding facilities" within field offices, and states that such holding facilities are used for the "short-term confinement of individuals who have recently been *detained*." *ICE Policy Number 11087.2*, §§ 1.1, 3.2 (emphasis added). The policies regarding those holding facilities indicate that they are generally supposed to be used for detentions shorter than 12 hours—already a lengthy period of time—but the policies also acknowledge that individuals may in fact be held for longer. *See id.* § 3.2 n.3 (noting that detainees may be held at the holding facility for longer than 12 hours in

"exceptional circumstances"). And the evidence in the record indicates that detainees are indeed in practice being held in ERO holding facilities for far longer than 12 hours. Take the Los Angeles field office, which multiple Plaintiffs have sought to enter for the purpose of conducting oversight. Plaintiffs have been told by ICE officials that ICE holds noncitizens "in custody" in that office "until administrative processing is complete," and that in some cases, processing "may take up to 72 hours." ECF 17-7, Gomez Decl. ¶¶ 19–20; *id.* Ex. A. at 12; *see also id.* at 12–14 (noting also that Plaintiff Gomez's requests to visit the Los Angeles field office were denied, in part, because "ICE Field Offices are not detention facilities and fall outside of [Section 527]"). Plaintiff Garcia sought to enter the same facility after receiving reports that individuals were being held overnight there, but was denied on July 24, 2025, on the ground that the field office was "not considered a facility," and was instead directed to the "Adelanto Detention Facility." ECF 17-8, Garcia Decl. ¶¶ 15, 20–23. Plaintiff Goldman's request to visit the 10th floor of the ICE New York Field Office was denied by ICE on June 17, 2025, on the ground that the facility was not a "detention facility" and it "fell outside the Sec. 527 requirements." ECF 17-4, Goldman Decl. ¶ 24. However, Goldman states that he spoke with an individual who was detained in the 10th floor facility for four days. *Id.* ¶ 39 ("I have spoken to two individuals who were detained in the 10th Floor Facility—one of whom was detained for four days.").

ICE's own policies also indicate that the field office holding facilities have the indicia of detention as contemplated by the statute. The policy document governing the operation of those facilities uses the language of not only detention but also "hous[ing]," when it states that "[a]bsent exceptional circumstances, no detainee should be *housed* in a holding facility for longer than 12 hours." *ICE Policy Number 11087.2*, § 5.1 (emphasis added). And depending on the amount of time the detainee is held in the facility, staff operating the facility are supposed to provide other

residential-type functions, like meals every six hours. *See id.* § 4.4.1(2) (requiring that detainees be "provided a meal at least every six hours"); *see also id.* § 5.2(1) (requiring that minors and pregnant women be provided with "regular access to meals, snacks, milk, and juice").

The Court need not at this preliminary juncture determine the full scope of which ICE facilities fall under the terms of Section 527—such as field offices without the types of holding facilities described above—because the current record demonstrates that at minimum, ICE field offices with ERO holding facilities are currently being "used to detain or otherwise house" noncitizens as contemplated by the statute. Defendants' purported exemption of field offices from Section 527 as a categorical matter is therefore contrary to the statute. Based on the evidence before the Court at this stage and the plain text of Section 527, the Court finds that Plaintiffs are substantially likely to succeed on the merits of their claim that the field office policy exists, and that it is contrary to Section 527.

### B. Plaintiffs Have Demonstrated Irreparable Harm.

Success on the merits of Plaintiffs' APA claim will not alone justify preliminary relief. Plaintiffs must also establish that they face irreparable injury absent the requested preliminary relief. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297).

Plaintiffs claim that the Oversight Visit Policies cause "irreparable harm to their ability to conduct congressionally authorized oversight." ECF 29 at 35. Their argument is that "access to DHS facilities and real-time, on-the-ground information" about those facilities is required for

Add.137

Plaintiffs to carry out their responsibilities, which include serving "members' constituents and their loved ones," "hold[ing] hearings, craft[ing] legislation, and determin[ing] fiscal year 2026 appropriations." ECF 17-1 at 50. According to Plaintiffs, the "information gained from in-person oversight is unique information that cannot be learned or recreated in the future," and that conditions in "detention facilities can change rapidly, rendering a week too long to wait" for that information. *Id.* In response, Defendants argue that this case is analogous to FOIA cases which have required a showing that information denied be "time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which the utility of the records would 'be lessened or lost.'" ECF 20 at 51 (quoting *N.Y. Times Co. v. DHA*, No. 21-cv-566, 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021)). In Defendants' view, Plaintiffs have not shown that any "imminent event" lessens the utility of site visits after seven days. *Id*. Defendants also challenge as speculative Plaintiffs' concern that conditions in ICE facilities change in the seven days between a Member's request to visit and their visit. *Id.* at 52. Defendants argue that to the extent that conditions improve at a given facility between a Member's notice of intent to visit and their arrival at the facility, this cannot qualify as a harm—if anything, Defendants argue, this shows that oversight visits are working as intended. *See* Hr'g Tr. 51:9–18 ("[I]f the facilities are being changed for the better, that seems like something Plaintiffs would be okay with. . . . [I]f the conditions are being improved, I think that goes some way to . . . resolving Plaintiffs' irreparable injury assertion.").

The Court finds Plaintiffs' argument more persuasive. First, while this case is analogous to those involving FOIA and the release of agency records, the analogy only goes so far. Plaintiffs are not requesting agency records, which the agency is obligated to preserve in accordance with the Federal Records Act, *see Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 555

(D.C. Cir. 1996), so will therefore be available "at some later date," *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C.), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017). Here, Section 527 concerns the ability of Members of Congress to review on-the-ground conditions at a covered facility at the time of their request. Plaintiffs have an interest in facts about whether facilities are overcrowded or unsanitary, whether the staff is engaging in abuse, or the location of constituents or their family members. *See, e.g.*, ECF 17-4, Goldman Decl. ¶ 40; ECF 17-2, Escobar Decl. ¶ 10. This kind of information is not static like an agency record, but can vary widely based on ICE's pace of arrests and decisions regarding housing of detainees. Nor is it speculative that these conditions could change over the course of seven days. For example, before Defendants initiated the Oversight Visit Policies, Representative Correa conducted daily visits during which he personally observed that an ICE facility went from holding fewer than ten detainees to 77 detainees over the course of several days. ECF 17-6, Correa Decl. ¶ 8 ("I was told that the increase was due to the Los Angeles facilities being temporarily closed."). The better analogy is to the cases involving the potential disposal or destruction of agency records. *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 565 F. Supp. 2d 23, 30 (D.D.C. 2008) ("[Plaintiffs] would have absolutely no recourse in the event that records potentially responsive to its FOIA requests were destroyed."). The changing conditions within ICE facilities means that it is likely impossible for a Member of Congress to reconstruct the conditions at a facility on the day that they initially sought to enter. This issue is even more pronounced to the extent that Defendants' policies—such as the field office policy—prohibit Plaintiffs from entering certain facilities at all. Such information about the on-the-ground conditions is "lost forever to history," and cannot be retroactively provided to Plaintiffs following

68

resolution of the merits of this litigation. *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 29 (D.D.C. 2025).

But even under the logic of the FOIA cases cited by Defendants, Plaintiffs demonstrate irreparable harm. The information that Plaintiffs seek about ICE facility conditions is "time-sensitive and highly probative" to the Members' ongoing duties, which include "imminent event[s], after which . . . the utility of the [information will] be lessened." *N.Y. Times Co.*, 2021 WL 1614817, at *8. Plaintiffs identify upcoming legislative deadlines to which updated and accurate knowledge of the conditions in ICE facilities will be critical, such as Congress's upcoming deadline to pass full-year 2026 appropriations for DHS and ICE. ECF 17-1 at 25. For those impending deadlines, "stale information is of little value." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). Further, Plaintiffs note that they use their visits to ICE facilities to engage in constituent casework, including to locate or check on the status of detained constituents or their constituents' detained family members. *See, e.g.*, ECF 17-2, Escobar Decl. ¶¶ 26, 34; ECF 17-4, Goldman Decl. ¶ 42; ECF 17-5, Espaillat Decl. ¶ 32; ECF 17-6, Correa Decl. ¶ 8. But given ICE's representations to Plaintiffs that certain facilities only hold detainees for periods of time shorter than seven days before transferring them elsewhere, Defendants' notice requirement necessarily "lessen[s]" the "utility of" such an oversight visit. *N.Y. Times Co.*, 2021 WL 1614817, at *8; ECF 17-7, Gomez Decl. ¶ 20 (noting that custody in field office holding area was "not to exceed 72 hours absent exceptional circumstances"); ECF 17-11, Thompson Decl. ¶ 16 (Representative Thompson noting he was told that field office had a "12-hour holding area"). When "time is necessarily of the essence, the harm in agency delay is more likely to be irreparable." *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019).

Accordingly, Plaintiffs have shown that they suffer irreparable harm due to the Oversight Visit Policies.

### C. The Equitable Factors Support Preliminary Relief.

The public interest and the balance of equitable considerations weigh strongly in favor of granting Plaintiffs their requested relief. *See Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (noting that these factors "merge when, as here, the Government is the opposing party"). There is little "public interest in the perpetuation of unlawful agency action," and the "public interest therefore favors [Plaintiffs]," given that the Court has found that the Government's actions are likely unlawful. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102–03 (D.C. Cir. 2021) (finding Plaintiffs likely to succeed on a claim that the Secretary of the Treasury was "distributing congressionally appropriated funds in violation of the authorizing statute"). Further, this case involves the Government's violation of an appropriations statute passed by Congress and signed by the President. The public has an interest in ensuring that "statutes enacted by their representatives are not imperiled by executive fiat." *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019); *see U.S. Dep't of Navy*, 665 F.3d at 1347 (noting the importance of the government appropriations process "as a restraint on Executive Branch officers").

In response to these weighty concerns, Defendants point to the same kinds of separation-of-powers concerns raised in *Raines* and discussed previously in this opinion. *See* ECF 20 at 53 (arguing that "separation-of-powers considerations carry even greater weight in the context of a preliminary injunction"); *see supra* Section III.A.1.c., d; *supra* Section III.A.2. But the Court has previously rejected Defendants' claim that this case is one that must be resolved through the

process of negotiation and accommodation between the political branches rather than through the judicial system and finds it again unpersuasive at this stage of the analysis.

Finally, the Court rejects the Government's argument that this Court should not grant preliminary relief because doing so would be tantamount to granting full relief on the merits. ECF 20 at 54. Preliminary relief of the kind requested by Plaintiffs is designed to reestablish the status quo, or "the last *uncontested* status which preceded the pending controversy." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). In this case, that is the status before Defendants began enforcing the Oversight Visit Policies. Based on the record before the Court, between the first enactment of Section 527 in 2020 and June 2025, DHS did not impose notice requirements for Members of Congress seeking entry into covered facilities or take the stance that field offices were categorically exempt from Section 527. *See* June 2025 Visit Protocol, at 2 ("Member[s] of Congress are not required to provide advance notice for visits to ICE detention facilities."); ECF 17-7, Gomez Decl. ¶¶ 7, 15 (noting staff members' visit to ICE field office was permitted on June 6, 2025, but a visit to the same office was prohibited on June 17, 2025, on the grounds that the "LA Field Office is a field office[,] not a 'detention facility'"). And victory on this motion is far from a total victory for Plaintiffs. "[W]hile the record establishes that preliminary relief is warranted, this decision in no way prejudges the Government's ability going forward to defend its policy on the merits." *Singh*, 56 F.4th at 109. Here, the Court has found Plaintiffs substantially likely to succeed on the merits of their APA contrary to law claims based on the present record. Should that record change—for example, should the Government demonstrate different facts regarding the sources of funding DHS has used to promulgate and implement the challenged policies, *see supra* Section III.A.4.a—the Court's conclusions on the merits might well be different. Plaintiffs will receive relief sufficient to reestablish the status quo, not "full

relief . . . on the merits," as Defendants claim. *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (per curiam).

**D. The Court Stays the Oversight Visit Policies Under Section 705 of the APA.**

All the relevant factors support a grant of preliminary relief. Both DHS's seven-day notice requirement, and its policy of excluding ICE field offices from the scope of Section 527 are stayed under Section 705 of the APA. Such a stay is consistent with Defendants' request that "any relief awarded must be limited to enforcing" the "limitation on the use of funding contained in" Section 527. ECF 20 at 56. The challenged Oversight Visit Policies violate the APA and are contrary to the terms of Section 527 because the evidence currently before the Court demonstrates that the Policies were promulgated with Section 527 funds, and they continue to be implemented and enforced through the use of Section 527 funds. Unless and until Defendants show that no Section 527 funds are being used for these purposes, a stay of the policies is consistent with the scope of Defendants' violation and Plaintiffs' requested relief.

Defendants ask that if this Court grants relief, it limit the stay to these Plaintiffs. But as the D.C. Circuit has repeatedly held, vacatur of the agency action is the normal remedy under APA section 706. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). This Court and courts in this and other circuits have applied that same rule to section 705 stays. *See Make the Rd. N.Y. v. Noem*, No. 25-cv-190, 2025 WL 2494908, at *22 (D.D.C. Aug. 29, 2025); *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, 2025 WL 2192986, at *37–38 (D.D.C. Aug. 1, 2025); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48 (D.D.C. 2020); *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (collecting cases). The Court also rejects Defendants' claim that Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), prohibits a stay of the challenged Oversight Visit Policies. As this Court

has held and the D.C. Circuit has also concluded, "CASA is *not* a case about the scope of relief for agency review authorized by the APA." *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J. and Childs, J.) ("The Department . . . does next to nothing to advance the ball by pointing to CASA as the source of its purported limitation on the scope of stay relief under the APA."). Finally, the Court rejects Defendants' request that Plaintiffs put forward a bond pursuant to Federal Rule of Civil Procedure 65(c). That rule requires the Court when issuing a preliminary injunction or temporary restraining order to order the movant to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A stay under APA section 705 is neither a preliminary injunction nor a temporary restraining order, and Rule 65(c) therefore does not apply. *Coal. for Humane Immigrant Rts.*, 2025 WL 2192986, at *38; *Make the Rd. N.Y.*, 2025 WL 2494908, at *23.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for a stay of agency action, ECF 17, is **GRANTED**. The challenged Oversight Visit Policies are **STAYED** pending conclusion of these review proceedings.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: December 17, 2025

73

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOE NEGUSE, in his official capacity as a
Member of the U.S. House of Representatives,
*et al.*,

                 Plaintiffs,

    v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

                 Defendants.

Case No. 25-cv-2463 (JMC)

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Plaintiffs' motion for a stay of agency action under 5 U.S.C. § 705, ECF 17, is **GRANTED**.

It is further **ORDERED** that, to preserve status or rights pending conclusion of the review proceedings, the effective dates of implementation and enforcement of the challenged Oversight Visit Policies, as identified in the accompanying memorandum opinion, are immediately postponed and stayed.

    **SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: December 17, 2025

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



January 8, 2026

MEMORANDUM FOR:    Todd M. Lyons
                   Acting Director for U.S. Immigration and Customs Enforcement

                   Holly C. Mehringer
                   Senior Officer Performing the Duties of the Chief Financial Officer

FROM:              Kristi Noem
                   Secretary of Homeland Security

SUBJECT:           **Congressional Access to Alien Detention Facilities – Access
                   Policy and Use of Appropriations for Enforcement**

In June 2025, following significant and sometimes violent incidents at ICE facilities, I directed that requests by Members of Congress to visit an ICE facility be submitted at least seven days in advance of the visit. DHS also determined that because ICE field offices, including holding facilities, are not detention facilities, they are not subject to the same requirements as detention facilities. On December 17, 2025, in *Neguse v. ICE*, the U.S. District Court for the District of Columbia stayed this guidance, concluding that DHS's policy is inconsistent with Section 527(b) of the Department's appropriation.[1] That appropriation states, among other things, that "[n]one of the funds appropriated or otherwise made available to [DHS] . . . may be used to prevent" Members of Congress or certain congressional employees "from entering, for the purpose of conducting oversight," any DHS facility "used to detain or otherwise house aliens."[2] The district court also found that covered facilities for purposes of Section 527(b) include field offices and holding facilities.[3]

I disagree with this decision, but as even the district court explicitly acknowledged, funds deriving from the One Big Beautiful Bill Act (OBBBA)[4] "are not subject to Section 527's limitations."[5] Accordingly, effective immediately, and to ensure compliance with this court order, I am issuing this new policy.

---

[1] *Neguse v. ICE*, No. 25-2463, Memorandum Op. at 72 (D.D.C. Dec. 17, 2025).
[2] Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619; *as extended by* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(6), 1105, 139 Stat. 9, 11–12; *as extended by* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, §§ 101, 103, 139 Stat. 495, 496–97 (2025).
[3] *Neguse v. ICE*, No. 25-2463, Memorandum Op. at 66 (D.D.C. Dec. 17, 2025).
[4] Pub. L. No. 119-21, tit. X, § 100052, 139 Stat. 72, 388–89 (2025).
[5] *Neguse v. ICE*, No. 25-2463, Memorandum Op. at 9 (D.D.C. Dec. 17, 2025).

Facility visit requests must be made a minimum of seven (7) calendar days in advance. Any requests to shorten that time must be approved by me. Visit requests should be submitted during normal business hours to the Office of Congressional Relations (OCR) at CongressToICE@ice.dhs.gov. Visit requests are not considered actionable until OCR acknowledges receipt of the request to the requestor. Requests received after hours or on weekends/holidays will be confirmed on the next business day. OCR will work with the appropriate ICE Field Office to coordinate the visit request and will confirm details as soon as practicable. Visit requests should include the date of the proposed visit, the visit location, the duration of the visit, and the names and titles of all participants. Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate.

ICE must ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA. To that end, any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding. Given the extent of the funding made available to ICE through the OBBBA, I anticipate that there is more than sufficient funding available for the limited expenses associated with implementing and enforcing these policies.

The basis for this policy is that advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike. Unannounced visits require pulling ICE officers away from their normal duties. Moreover, there is an increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions.

This policy is consistent with and effectuates the clear intent of Congress to not subject OBBBA funding to Section 527's limitations. In an abundance of caution, however, the Chief Financial Officer, in consultation with the General Counsel, shall ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Joe Neguse, et al.,

      Plaintiffs,

 v.

U.S. Immigration and Customs Enforcement, et al.,

      Defendants.

Civil Action No. 1:25-cv-02463-JMC

## DECLARATION OF HOLLY C. MEHRINGER

I, Holly C. Mehringer, based upon my personal knowledge and information made known to me in the course of my official employment hereby declare, to the best of my knowledge, information, and belief, as follows relating to the above-captioned matter:

    1.  I am the Senior Official Performing the Duties of the Chief Financial Officer at the U.S. Department of Homeland Security (DHS).  As the Senior Official Performing the Duties of the Chief Financial Officer, I oversee the Budget Division within the Office of the Chief Financial Officer.  The Budget Division oversees the administration of the Department's total budgetary resources to ensure the efficient and effective use of funds.  The Budget Division's responsibilities include the formulation of the Department's budget submissions to the White House Office of Management and Budget (OMB), and other work related to the formulation of the President's annual budget submission for DHS.  The Budget Division is also responsible for execution, control, and monitoring of appropriations for the Department that Congress has enacted.  I have

personal knowledge regarding the budget process, including the execution of the Department's appropriated funding.

2.    On July 4, 2025, Congress passed, and the President signed into law H.R. 1, otherwise known as the One Big Beautiful Bill Act or the Reconciliation Act.  H.R. 1 provided more than $191 billion in appropriations to DHS.  The appropriations provided by H.R. 1 are available in addition to the Department's regular, annual appropriations and fund a variety of activities related to homeland security, including costs related to immigration enforcement and immigration detention.  Congress provided much of the H.R.1 funding in the form of multi-year appropriations, meaning they are available for the Department's obligation and use for a period of years.  Many of the H.R. 1 appropriations are available for five years through September 30, 2029, and are currently available for obligation and expenditure.

3.    Among the appropriations provided by H.R. 1 for purposes related to immigration enforcement and detention are the following:

- Section 90003 provides ICE with $45 billion for detention capacity;

- Section 90007 provides DHS with $10 billion for activities "in support of the Department of Homeland Security's mission to safeguard the borders of the United States."; and

- Section 100052 provides ICE with $29.8 billion for, among other listed purposes, hiring and training additional personnel, including officers and agents, to carry out immigration enforcement activities.

These H.R. 1 funds have been apportioned by the Office of Management and Budget, and they are currently available for the Department to obligate and expend and were available on January 8, 2026.

4.  For fiscal year 2026, DHS also received funding through a short-term continuing resolution.   The continuing resolution provides annual funding to the Department, including ICE, at the same funding levels as the fiscal year 2025 annual appropriation.  The current short-term continuing resolution expires on January 30, 2026.

5.  On January 8, 2026, the Secretary of Homeland Security issued a new policy related to congressional access to alien detention facilities.  The Secretary's policy directed that it be implemented and enforced using only funds appropriated to the Department by H.R. 1 and that the Department's annual appropriations not be used for that purpose.

6.  From an accounting perspective, the Department has determined that it is possible to track the costs incurred to issue and enforce the January 8 policy.  Once those costs are captured, the Department can adjust its accounting ledgers to ensure that these costs are properly recorded against an available, and appropriate, H.R. 1 appropriation and not one of the Department's annual appropriations accounts.  To the extent that the obligations for these costs would ordinarily be recorded against the Department's annual appropriations, the Department can adjust its accounting ledgers so that they are properly recorded against H.R. 1 appropriations.

7.  Going forward, to ensure that ICE complies with the Secretary's direction and to ensure that the appropriate H.R. 1 funding source is used to enforce the January 8 policy, the Department will track the costs incurred enforcing the policy.

8.  For instance, ICE will track the time spent by ICE employees responding to requests by Members of Congress to visit ICE facilities, including time spent planning such visits.  The Department will accordingly track the costs associated with those time records.

9.  The Department will reconcile its accounts to ensure that the tracked costs related to the access policy are charged to and recorded against the appropriate H.R. 1 accounts.  To the

extent it is necessary for the H.R. 1 appropriations to reimburse annual appropriations so that all of these expenses are properly recorded and accounted for against an H.R. 1 appropriation, the Department will establish interagency agreements to effectuate any transfers that are necessary to reimburse annual appropriations for payroll and other expenses.

10. Any transfers that are necessary to ensure payroll and other tracked charges are obligated against appropriate H.R. 1 accounts related to enforcement of the access policy will be processed on a monthly basis. A consolidated report will be compiled by the DHS Budget Director for audit purposes.

11. Using this process to reconcile its accounts, the Department will ensure that all charges related to enforcement of the January 8 access policy are properly recorded against H.R. 1 accounts no later than the end of the fiscal year, when the Department's annual appropriations accounts expire.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 13th day of January, 2026.

HOLLY C MEHRINGER
Digitally signed by HOLLY C MEHRINGER
Date: 2026.01.13 20:33:13 -05'00'

/s/_____
Holly C. Mehringer
Senior Official Performing the Duties of the
Chief Financial Officer
Office of the Chief Financial Officer
U.S. Department of Homeland Security

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOE NEGUSE, in his capacity as a Member of the
U.S. House of Representatives,
2400 Rayburn House Office Building
Washington, D.C. 20515,

ADRIANO ESPAILLAT, in his capacity as a
Member of the U.S. House of Representatives,
2332 Rayburn House Office Building
Washington, D.C. 20515,

BENNIE G. THOMPSON, in his capacity as a
Member of the U.S. House of Representatives,
2466 Rayburn House Office Building
Washington, D.C. 20515,

JAMIE RASKIN, in his capacity as a Member of
the U.S. House of Representatives,
2242 Rayburn House Office Building
Washington, D.C. 20515,

ROBERT GARCIA, in his capacity as a Member
of the U.S. House of Representatives,
109 Cannon House Office Building
Washington, D.C. 20515,

J. LUIS CORREA, in his capacity as a Member of
the U.S. House of Representatives,
2082 Rayburn House Office Building
Washington, D.C. 20515,

JASON CROW, in his capacity as a Member of the
U.S. House of Representatives,
1323 Longworth House Office Building
Washington, D.C. 20515,

VERONICA ESCOBAR, in her capacity as a
Member of the U.S. House of Representatives,
2448 Rayburn House Office Building
Washington, D.C. 20515,

DANIEL S. GOLDMAN, in his capacity as a
Member of the U.S. House of Representatives,
245 Cannon House Office Building
Washington, D.C. 20515,

Case No. 25-cv-2463-JMC

JIMMY GOMEZ, in his capacity as a Member of
the U.S. House of Representatives,
506 Cannon House Office Building
Washington, D.C. 20515,

RAUL RUIZ, in his capacity as a Member of the
U.S. House of Representatives,
2342 Rayburn House Office Building
Washington, D.C. 20515,

NORMA TORRES, in her capacity as a Member of
the U.S. House of Representatives,
2227 Rayburn House Office Building
Washington, D.C. 20515,

KELLY MORRISON, in her capacity as Member
of the U.S. House of Representatives, 1205
Longworth House Office Building Washington,
D.C. 20515,

　　　　　*Plaintiffs*,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th St. SW
Washington, D.C. 20536,

TODD M. LYONS, in his official capacity as
Acting Director of U.S. Immigration and Customs
Enforcement,
500 12th St. SW
Washington, D.C. 20536,

U.S. DEPARTMENT OF HOMELAND
SECURITY,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security,
2707 Martin Luther King Jr. Ave SE
Washington, D.C. 20528,

　　　　　*Defendants*.

**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**

Add.153

**INTRODUCTION**

1.        As part of its campaign of mass deportation, the Trump-Vance administration has stretched the U.S. immigration detention system far beyond its capacity and created a humanitarian crisis in detention facilities across the country.

2.        Over the past year, the Department of Homeland Security (DHS) and its component Immigration and Customs Enforcement (ICE) have moved from one city to the next, conducting violent crackdowns targeting perceived immigrants and arresting huge numbers of individuals. Through increasingly violent and indiscriminate tactics by the agencies, the number of individuals detained by ICE has exploded. The number of individuals in ICE custody is at an all-time high. And there is every indication that the number of ICE arrests and detentions will only continue to grow at a dangerous rate, in service of the administration's stated goal of deporting more than one million people each year.

3.        DHS and ICE's immigration enforcement operations and resulting detention conditions have had deadly consequences.

4.        In the last few weeks, DHS officials shot and killed two U.S. citizens in Minneapolis in the course of a massive, brutal DHS operation targeting that city.

5.        At least 31 people died in ICE custody in 2025, a two-decade high and nearly triple the number of deaths in ICE custody in 2024. At least five people have died in ICE custody in just the first few weeks of 2026, one of which was classified by a medical examiner as a homicide. Firsthand accounts from detainees, extensive reporting, federal court orders, and congressional visits to ICE facilities have revealed a pattern of horrifying detention conditions and calculated cruelty towards those in the custody of the U.S. government.

6.        These numbers are staggering and shameful. Congressional oversight of immigration detention facilities is urgently important at this moment in time. And yet, over the past year, DHS

1

has assiduously worked to avoid oversight of any kind and has made every effort to ensure that members of Congress have little or no visibility into its operations or detention facilities by attempting to sidestep a law that codifies legislators' right to conduct that oversight.

7.    Individual members of Congress have an essential role to play in oversight of immigration detention facilities. And they have a clear legal right to conduct that oversight.

8.    This oversight informs potential legislation on the subject of immigration detention, ensures that funds appropriated to DHS and ICE are being used lawfully on the ground, ensures that administration officials are carrying out their responsibilities consistent with federal law, and—critically—exposes when they are not.

9.    Congress and the President have historically agreed that individual members of Congress have the right to visit any DHS facilities that detain or house individuals. They have determined that the need to conduct real-time oversight of the true conditions of these facilities means that members must not be required to provide advance notice of their visits. Congress has passed bills to ensure this critical access, and Presidents of both parties have signed those bills into law.

10.    In June 2025, Defendants adopted a new policy and practice that, in part, required members of Congress to provide notice "a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities," absent authorization by the secretary of DHS.

11.    Plaintiffs immediately challenged DHS's new oversight visit policy as unlawful. This Court agreed and, in December 2025, stayed the policy. ECF No. 36.

12.    On January 8, 2026, DHS secretly reimposed the same requirement that members of Congress give at least seven days' notice and receive approval for oversight visits to ICE facilities. DHS subsequently blocked at least four members of Congress from conducting oversight visits to ICE facilities under this new oversight visit policy. The first such denial occurred when three

members of the Minnesota delegation attempted to conduct an unannounced oversight visit to the Whipple Federal Building outside of Minneapolis, in the wake of the deadly shooting of Renee Good and reports of unacceptable conditions at that facility.

13.    It is no coincidence that DHS is, once again, attempting to prevent congressional oversight of ICE detention facilities at the height of its violent "immigration enforcement" surge in Minneapolis.

14.    The January 8 oversight visit policy is DHS's latest attempt to subvert Congress's will and shroud its facilities in secrecy. But make no mistake: Defendants' policy is unlawful.

15.    Plaintiffs, 13 members of the U.S. House of Representatives, file this amended and supplemental complaint against Defendants ICE and its acting director, Todd M. Lyons, and DHS and its secretary, Kristi Noem, to obtain relief from Defendants' unlawful obstruction of Plaintiffs' attempts to obtain information through visits to ICE facilities for congressional oversight purposes.

16.    Defendants' illegal actions harm each Plaintiff's right as an individual member of Congress to conduct oversight and obtain information about DHS facilities and the conditions of immigration detention. These harms are significant, irreparable, and ongoing as long as Defendants continue to block such visits pursuant to their unlawful policy.

17.    Adherence to the rule of law requires that Plaintiffs be permitted to conduct their statutorily authorized oversight activities, notwithstanding DHS's unlawful and repeated efforts to thwart scrutiny of its facilities.

## JURISDICTION AND VENUE

18.    The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361 because the claims arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*

19.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

20.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because Defendants reside in this district.

## THE PARTIES

21.     Plaintiff Joe Neguse is a duly elected member of Congress representing the 2nd congressional district in Colorado. He sues in his capacity as an individual member of Congress.

22.     Plaintiff Adriano Espaillat is a duly elected member of Congress representing the 13th congressional district in New York. He sues in his capacity as an individual member of Congress.

23.     Plaintiff Bennie G. Thompson is a duly elected member of Congress representing the 2nd congressional district in Mississippi. He sues in his capacity as an individual member of Congress.

24.     Plaintiff Jamie Raskin is a duly elected member of Congress representing the 8th congressional district in Maryland. He sues in his capacity as an individual member of Congress.

25.     Plaintiff Robert Garcia is a duly elected member of Congress representing the 42nd congressional district in California. He sues in his capacity as an individual member of Congress.

26.     Plaintiff J. Luis Correa is a duly elected member of Congress representing the 46th congressional district in California. He sues in his capacity as an individual member of Congress.

27.     Plaintiff Jason Crow is a duly elected member of Congress representing the 6th congressional district in Colorado. He sues in his capacity as an individual member of Congress.

4

28.     Plaintiff Veronica Escobar is a duly elected member of Congress representing the 16th congressional district in Texas. She sues in her capacity as an individual member of Congress.

29.     Plaintiff Daniel S. Goldman is a duly elected member of Congress representing the 10th congressional district in New York. He sues in his capacity as an individual member of Congress.

30.     Plaintiff Jimmy Gomez is a duly elected member of Congress representing the 34th congressional district in California. He sues in his capacity as an individual member of Congress.

31.     Plaintiff Raul Ruiz is a duly elected member of Congress representing the 25th congressional district in California. He sues in his capacity as an individual member of Congress.

32.     Plaintiff Norma Torres is a duly elected member of Congress representing the 35th congressional district in California. She sues in her capacity as an individual member of Congress.

33.     Plaintiff Kelly Morrison is a duly elected member of Congress representing the 3rd congressional district in Minnesota. She sues in her capacity as an individual member of Congress.

34.     Defendant ICE is a component of DHS, a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). ICE is headquartered in Washington, D.C.

35.     Defendant Todd M. Lyons is the acting director of ICE. He is sued in his official capacity.

36.     Defendant DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1). DHS is headquartered in Washington, D.C.

37.     Defendant Kristi Noem is the secretary of DHS. She is sued in her official capacity.

## BACKGROUND

### I.     Congressional Authority to Appropriate Money and Conduct Oversight

38.     There can be no dispute that Congress may, through the exercise of its constitutional authority over public funds, prevent DHS from denying members of Congress immediate access to

ICE detention facilities. The Appropriations Clause of the Constitution, art. I, § 9, cl. 7, provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." That clause grants Congress sweeping control, not just to decide how much money may be spent by federal agencies, but also to dictate for what purposes those funds may be expended, and under what conditions. As the Supreme Court explained, "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of Congressional control over funds in the Treasury." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 425 (1990); *see Knote v. United States*, 95 U.S. 149, 154 (1877) (even the President's pardon power "cannot touch moneys in the treasury of the United States, except as expressly authorized by act of Congress"); *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion.").

39.     Under the Appropriations Clause, Congress has plenary power to limit not just how much money may be spent by the executive, but also when the funds may be spent, and for what purposes. "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government. It is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213–14 (1833)); *see also* The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed. 1961).[1] In *Department of*

---

[1] *See also U.S. House of Representatives v. Mnuchin*, 978 F.3d 1, 8 (D.C. Cir. 2020) (The Appropriations Clause is "a core structural protection of the Constitution—a wall, so to speak, between the branches of government that prevents encroachment of the House's and Senate's

*the Navy v. Federal Labor Relations Authority*, for example, the D.C. Circuit concluded that the Appropriations Clause and federal appropriations statutes, including the purpose statute, 31 U.S.C § 1301(a), barred the Navy from providing free bottled water to its employees when safe drinking water was otherwise available for free. Because Congress had made no provision that authorized the purchase of bottled water, the court concluded that that purchase would exceed the limited and specific purposes for which Congress had appropriated funds to the Navy. 665 F.3d at 1348–49.

40.    It is *a fortiori* the case when Congress *prohibits* appropriated funds from being used for any purpose, the executive branch has no discretion—none—to spend one dollar of those funds for that purpose. The Appropriations Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress." *Richmond*, 496 U.S. at 428; Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343, 1353 (1988) ("All appropriations thus may be conceived of as lump-sum grants with 'strings' attached. These strings, or conditions of expenditure, constitute legislative prescriptions that bind the operating arm of government."). As the Department of Justice's Office of Legal Counsel has recognized, "Congress's spending power is undoubtedly broad, and, as a general matter, Congress may decline to appropriate money altogether for a particular function, or place binding conditions on the appropriations it does make." *Constitutionality of Section 7054 of the Fiscal Year 2009 Foreign Appropriations Act*, 33 Op. O.L.C. 221, 235–36 (2009), https://perma.cc/K7F2-VG9G; *see also Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233, 1955 WL 3675 (1955) ("It is recognized that Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted."). Unless an appropriations rider violates some independent constitutional provisions—and Defendants have never argued in this case that

---

power of the purse."), *judgment vacated as moot sub nom. Yellen v. U.S. House of Representatives*, 142 S. Ct. 332 (2021).

the oversight rider does—it lies within Congress's plenary authority to dictate the terms on which appropriated funds may, and may not, be used.

41.    "[A]s penetrating and far-reaching as the potential power to enact and appropriate under the Constitution" is Congress's power to investigate. *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).

42.    "From the earliest times in its history, the Congress has assiduously performed an informing function" that permits members of Congress "to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957) (quotation marks omitted). The Supreme Court has long recognized that "the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up). "[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1924). The power to "secure needed information" is thus firmly grounded in Congress's duty and authority to exercise "[a]ll legislative powers" under article I of the U.S. Constitution. *Id.* at 160–61. It "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Trump v. Mazars*, 591 U.S. 848, 862 (2020) (quoting *Watkins*, 354 U.S. at 187).

43.    Congress exercises its investigative duty and authority in various ways. Through its committees, for example, it regularly requests and, when necessary, compels documents and testimony, including from executive branch officials. Individual members of Congress play distinct oversight roles, and "each member needs accurate information from the executive branch in order

to make informed decisions on all sorts of matters."[2] Those matters vary by member, according to the concerns of their constituents, their committee memberships, and their issue areas of focus. For example, pursuant to their individual oversight roles, members of Congress regularly write letters raising concerns to and requesting information from executive branch officials, and they seek information on the ground through in-person investigations.[3]

44.    Congressional oversight over DHS and ICE is particularly important because those agencies have received significant—and increasing—appropriated funds, which they use to apprehend, detain, and remove individuals from the United States.

## II.  Each Member of Congress Has a Right to Conduct Oversight Visits at DHS Facilities

### A.  The oversight rider provides an individual right for members of Congress to conduct oversight visits

45.    Robust and effective congressional oversight of DHS and ICE is critical, particularly in light of the significant funds appropriated to DHS and ICE to apprehend, detain, and remove individuals, and the attendant risk that such funds may be used to infringe the rights of both U.S. citizens and noncitizens.

46.    To that end, Republican and Democratic members alike have sought information about ICE facilities through requests for information, hearing testimony, and in-person member and staff oversight visits.[4] And they have used that information to determine the proper appropriation of funds to DHS and ICE, to craft restrictions on those funds, to draft and pass relevant legislation, to

---

[2] *See, e.g.*, Press Release, Sen. Charles Grassley, Grassley on the Importance and Responsibility of Congressional Oversight (June 25, 2018), https://perma.cc/N687-4XQC.

[3] *See, e.g.*, Levin Center for Oversight and Democracy, *Portraits in Oversight: Harry Truman and the Investigation of Waste, Fraud, & Abuse in World War II*, https://perma.cc/4EJU-Z6Y4; Press Release, Sen. Charles Grassley, Grassley to Gates: Defense IG Audits Need Changes in order to Root Out Waste (Sept. 8, 2010), https://perma.cc/QH83-HUX2.

[4] *See, e.g.*, Brian Fitzpatrick, Press Release, Fitzpatrick Leads Bipartisan Inspection of Tornillo Detention Center (June 22, 2018), https://perma.cc/M299-W4AD; Letter from Sen. Ted Cruz to President Joseph Biden (Mar. 28, 2021), https://perma.cc/ALL9-KB83.

attempt to ensure that DHS and ICE officials are carrying out their duties with respect for individuals' civil rights and liberties and not in violation of federal law, and to otherwise engage with the executive branch on areas for improvement.

47.     Members of Congress have also long engaged in on-the-ground, in-person oversight to obtain relevant information.

48.     This method of oversight became especially important for many members of Congress during the first Trump administration.[5] In 2018, a humanitarian crisis created by the administration rapidly unfolded at the southern border, where "children and families [were] subjected to inhumane conditions, asylum seekers [were] denied access to our nation's legal ports of entry, and thousands of children [were] separated from family members." H.R. Rep. No. 116-163, at 17 (2019). Congress became particularly concerned about "DHS'[s] poor management of this humanitarian crisis." *Id.*

49.     Members of Congress who attempted to conduct oversight to assess the detention conditions of separated families in 2018 were routinely frustrated in their attempts to assess on-the-ground conditions of immigration detention facilities without delay and often denied entry to these facilities completely.[6] This included members of Congress who are now Plaintiffs in this lawsuit.

50.     Congress recognized that obtaining real-time information in person at those facilities, including speaking directly with both DHS employees and detained individuals, played an important role in effective oversight of the administration's use of appropriated funds and its treatment of noncitizens.

---

[5] *See, e.g.*, H.R. 6256, 115th Cong. (2d Sess. 2018) (proposed bipartisan bill to "require the Secretary of Homeland Security and the Secretary of Health and Human Services to allow Members of Congress to tour detention facilities that house foreign national minors"); *They Are Not Letting Us In': Nelson, Wasserman Schultz Denied Entry to Kid Migrant Shelter*, CBSMiami (June 19, 2018), https://perma.cc/F6QD-FTY6.

[6] *See, e.g.*, Brett Samuels, *Dem lawmakers make surprise visit to ICE detention center*, The Hill (June 17, 2018), https://perma.cc/DPE8-9PZA.

51.    To ensure its members' ability to assess true facility conditions without obstruction, Congress included a provision in the fiscal year 2019 appropriations bill that codified individual members' right to exercise their oversight duties through in-person visits to DHS facilities where minors were detained. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title V, § 532, 113 Stat. 13, 42 (Feb. 15, 2019).

52.    President Trump signed that provision into law. The provision prohibited the use of appropriated funds to "prevent a Member of Congress from entering, for the purpose of conducting oversight," any DHS facility used to detain or otherwise house noncitizen minors. *Id.*

53.    Emphasizing the importance of obtaining accurate information about immigration detention, the provision further prohibited the use of appropriated funds "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress, compared to what would be observed in the absence of such modification." *Id.*

54.    In enacting this provision, Congress was thus focused on the ability of its members to assess the *actual* conditions in which minor migrants are detained by DHS, without alteration or manipulation by executive branch officials.

55.    This provision was a direct response to DHS's obstruction of congressional oversight of its facilities.

56.    Many members of Congress, including several Plaintiffs, exercised their right to conduct in-person oversight at DHS detention facilities in the weeks and months following the passage of the fiscal year 2019 oversight provision.

57.    It was soon clear, however, that the need for oversight by individual members of Congress was not limited to facilities housing noncitizen minors. Indeed, members of Congress were already actively engaged in this oversight with respect to all individuals detained or housed by DHS.

58.     For example, by July 2019, Plaintiff Representative Crow had instituted weekly visits by him or his staff to the ICE detention facility in his district. Representative Crow and his office began to build a productive relationship with ICE officials that has both informed his legislative activities and allowed him to better serve his constituents through close and constructive oversight of that facility.

59.     Members on committees with jurisdiction over DHS and ICE likewise actively exercised their oversight visit rights after the provision's passage. In the summer of 2019, under Plaintiff Representative (then-Chairman) Thompson's direction, the House Committee on Homeland Security staff conducted an investigation that involved oversight visits to eight ICE facilities across five states, to assess the conditions of confinement and adequacy of the internal oversight tools.[7] And in August and September of 2019, the House Committee on Oversight and Reform and its Subcommittee on Civil Rights and Civil Liberties—of which Plaintiff Representative Raskin was then chair—sent bipartisan staff delegations to conduct oversight visits at 22 DHS detention facilities across six states, including 12 ICE detention facilities.[8]

60.     In addition, although members were provided a right of access to DHS facilities housing noncitizen minors for oversight purposes, staff did not have the same statutory protection in the fiscal year 2019 oversight provision. Congressional staff occasionally encountered difficulties accessing DHS detention facilities in the course of aiding members in their oversight duties.[9] Those difficulties underscored for Congress the importance of allowing members' staff to aid in their oversight work in DHS facilities where noncitizens of all ages are detained or otherwise housed.[10]

---

[7] Majority Staff Report, H. Comm. on Homeland Sec., *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC ("*ICE Detention Facilities* Report").

[8] Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties, *The Trump Administration's Mistreatment of Detained Immigrants* (2020), https://perma.cc/37NF-SFBS.

[9] *Id.*; *ICE Detention Facilities* Report, *supra* n.7, at 5–6.

[10] *See, e.g.*, Letter from Chairman Elijah E. Cummings to Acting DHS Secretary Kevin K. McAleenan (Aug. 29, 2019), https://perma.cc/5HVB-HGQ4.

61.    As a result, the following year, in fiscal year 2020 appropriations, Congress expanded members' right of oversight access in multiple ways.

62.    First, Congress broadened the provision to apply to DHS facilities used to detain or otherwise house *any* noncitizens—not just minors. Consolidated Appropriations Act, 2020, div. D, title V, § 532(a), 133 Stat. at 2530.

63.    Second, Congress added that "[n]othing" in the provision "may be construed to require a Member of Congress to provide prior notice of the intent to enter" a DHS facility used to detain or otherwise house noncitizens. *Id.* § 532(b).

64.    Finally, it "broadened the applicability" of the provision "to designated congressional staff," providing that "while Members need not provide prior notice of their visit, DHS can require at least 24 hours' notice for designated staff to visit."[11] *See id.* § 532(a), (c).

65.    This expanded provision has been carried forward with identical language in DHS appropriations every year since, including in the most recent continuing resolution signed by President Trump. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, §§ 101, 103, 139 Stat. 495, 496–97, 504 (2025).[12]

66.    On January 22, 2026, the House passed a bill providing fiscal year 2026 appropriations for DHS and ICE. H.R. 7147, 119th Cong. (2026). The House bill maintains the oversight rider, unchanged, at section 547. *Id.* § 547. The bill is currently under consideration in the Senate.

_____

[11] CRS, R46113, *Department of Homeland Security Appropriations: FY2020* (Jan. 21, 2020), https://perma.cc/C344-CDBN.

[12] *See* FY2024 Appropriations Act, div. C, title V, § 527; Consolidated Appropriations Act, 2021, div. F, title V, § 532, Pub. L. No. 116-260, 134 Stat. 1182, 1473 (Dec. 27, 2020); Consolidated Appropriations Act, 2022, div. F, title V, § 530, Pub. L. No. 117-103, 136 Stat. 49, 340 (Mar. 15, 2022); Consolidated Appropriations Act, 2023, div. F, title V, § 529, Pub. L. No. 117-328, 136 Stat. 4459, 4752 (Dec. 29, 2022); FY2025 Continuing Resolution, §§ 1101(a)(6), 1105.

67.     Thus, since 2019, the law has provided that no funds appropriated to DHS "may be used to prevent . . . [a] member of Congress" or their designated congressional employee "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens," nor may funds be used "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification." *Id.* § 527(a).

68.     The law further provides, in no uncertain terms, that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter [such] a facility . . . for the purpose of conducting oversight." *Id.* § 527(b). The provision allows a narrow exception, however, that DHS "may require that a request be made at least 24 hours in advance of an intent to enter a facility" by a designated congressional employee—but not for the members themselves. *Id.* § 527(c).

69.     Lest there be any doubt, in November 2025, and again in January 2026, Congress reaffirmed its intention to continue the ban on preventing congressional oversight of immigration detention facilities through the passage of the continuing resolution that currently funds the agency's operations. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (Nov. 12, 2025).

**B.  Congressional oversight at DHS facilities is critical**

70.     As the oversight rider currently in section 527 reflects, the information gained from congressional visits to facilities where individuals are detained or otherwise housed—through both scheduled and unannounced visits—is essential to effective congressional oversight of DHS and ICE. This oversight is critical today.

71.    In recent years, congressional reports have expressed particular concern regarding "conditions and care provided at ICE's civil detention facilities" and "conditions and lack of adequate infrastructure at ICE's . . . field offices and sub-offices that serve migrants."[13] Congressional visits to several ICE detention facilities in 2021 "found that ICE . . . le[ft] deficiencies unidentified and uncorrected, and that ICE facilities frequently failed to meet basic standards of care."[14] Reflecting these concerns, since fiscal year 2018, Congress has mandated that ICE publicly report all deaths that occur in immigration custody within 90 days.[15]

72.    Members of Congress and their staff have continually sought timely information on the ground regarding the conditions of DHS facilities used to detain or otherwise house noncitizens.

73.    For example, the 2020 Homeland Security Committee staff oversight report highlighted the failures of internal ICE oversight of immigration detention facilities.[16] The report emphasized that when congressional staff provided advance notice of oversight visits, "ICE facilities used the advanced warning to improve the conditions within the facility."[17] Staff detected evidence of those improvements, including the smell of fresh paint, evidence of a major clean-up, the relocation of individuals from solitary cells to the general population, and the installation of new guards.[18]

74.    Congressional findings regarding the failures of internal DHS oversight underscore the critical role of direct congressional oversight on the ground, and members' and staff's experiences demonstrate the importance of conducting that oversight in real time, without prior notice.

---

[13] H.R. Rep. No. 116-180, at 34–35 (2019).
[14] H.R. Rep. No. 116-720, at 106 (2021).
[15] *Detainee Death Reporting*, ICE, https://perma.cc/3TST-Q5EX.
[16] *ICE Detention Facilities* Report, *supra* n.7, at 1–2.
[17] *Id.* at 8.
[18] *Id.* at 5.

75. The need for congressional oversight over immigration detention facilities has never been more dire.

76. The number of individuals detained by ICE has exploded in the past year. In February 2025, immigration detention reached its highest level in over five years, at 43,759 individuals[19]—and that number has only continued to increase since then. In March 2025, ICE held 47,600 individuals in detention and announced that immigration detention facilities had been filled to capacity.[20] In January 2026, the number of individuals detained in ICE custody hit an all-time high: as many as 73,000 individuals were detained in ICE custody.[21] There is every indication that the number of ICE arrests and detentions will only continue to grow at an unmanageable rate, in service of the administration's stated goal of deporting more than one million people each year.[22]

77. Unsurprisingly, multiple federal judges have concluded that ICE has repeatedly violated the rights of noncitizens and citizens under the guise of immigration enforcement operations that have become increasingly violent. Numerous U.S. citizens have been mistakenly detained, with no opportunity to prove their citizenship.[23] For example, a 25-year-old citizen and U.S. Army veteran was wrongfully detained by ICE during a raid at the farm where he works as a

---

[19] Russell Contreras, *Immigrants in detention in Trump's early days hit new record*, Axios (Feb. 28, 2025), https://perma.cc/2ZFR-GEWQ.

[20] *US immigration detention maxed out at 47,600 detainees, ICE official says*, Reuters (Mar. 12, 2025), https://perma.cc/6ZDL-F3JH.

[21] Camilo Montoya-Galvez, *ICE's detainee population reaches new record high of 73,000, as crackdown widens*, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/ices-detainee-population-record-high-of-73000/

[22] Maria Sacchetti & Jacob Bogage, *'One million.' The private goal driving Trump's push for mass deportations*, Wash. Post (Apr. 12, 2025), https://perma.cc/KM4A-WJHF.

[23] Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily J. (June 19, 2025), https://perma.cc/CNQ6-2CC4; Dani Anguiano, *US citizen arrested during Ice raid in what family describes as 'kidnapping'*, Guardian (June 26, 2025), https://perma.cc/L98U-NMA9; Judd Legum, *US Citizen Wrongly Detained by the Border Patrol Says Government's Account Is False*, Mother Jones (Apr. 23, 2025), https://perma.cc/NP4S-926K.

security guard.[24] At another raid, multiple American citizens were detained by ICE with no due process, and a lawyer representing one of them was not permitted to speak with his client while the client was in a detention facility.[25] In December 2025, a 22-year-old Maryland woman spent 25 days in ICE custody despite her attorneys providing documentation that showed she was born in the United States.[26]

78.     Over the past year, DHS has moved from one city to the next, conducting crackdowns targeting perceived immigrants. During these chaotic operations, federal agents indiscriminately arrest huge numbers of individuals—a mix of citizens and noncitizens, with a variety of immigration statuses. They are arrested for alleged immigration and non-immigration-related offenses through targeted operations, random dragnet-style stops, and while protesting ICE operations.

79.     As the number of arrested and detained individuals has grown far beyond the capacity of existing ICE detention facilities, DHS has resorted to using ICE field offices and other federal buildings to detain or otherwise house individuals. Defendants transport these individuals to overcrowded, under-resourced facilities that are not suited to hold large numbers of individuals for extended periods of time.

80.     The conditions of confinement at field offices are of particular concern because field offices are not designed or set up to be facilities in which individuals are detained or housed, nor are field offices subjected to the same audits and inspections as larger ICE detention centers. ICE generally does not consider field offices subject to its detention standards and exempts field offices

---

[24] Angelique Brenes, *Disabled veteran detained during immigration raid speaks out, alleges civil rights violations*, KTLA5 (July 15, 2025), https://perma.cc/SY64-2DX6.

[25] Jennifer Medina, *'I'm an American, Bro!': Latinos Report Raids in Which U.S. Citizenship Is Questioned*, N.Y. Times (June 15, 2025), https://perma.cc/C5FN-KXUD.

[26] Marina Dunbar, *Maryland woman who says she is US citizen finally released from ICE custody*, The Guardian (Jan. 9, 2026), https://www.theguardian.com/us-news/2026/jan/09/maryland-woman-us-citizen-released-ice-custody.

from requirements to uphold certain standards for safety, security, and care and from attendant internal oversight.

81.    As DHS's enforcement operations have moved around the country, they have led to unequivocal judicial orders from federal courts in California, New York, Illinois, and Maryland finding that the DHS and ICE have violated the law.[27] Multiple federal courts have confirmed that detention conditions at challenged facilities drastically deteriorated as the number of individuals in ICE custody rose.[28] Multiple federal courts have also determined that detainees in ICE facilities are unlawfully being denied medical care, forced to sleep on the floor in overcrowded cells, severely underfed, and denied access to counsel. *See, e.g.*, Temporary Restraining Order, *Moreno Gonzalez v. Noem*, No. 1:25-cv-13323 (N.D. Ill. Oct. 30, 2025), ECF No. 49; Preliminary Injunction, *Sergio Alberto Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97.[29]

82.    These shocking and unlawful detention conditions have directly affected facilities where Plaintiffs and other members of Congress have attempted to conduct oversight. In June 2025, for example, members of Congress received reports that immigrants were being detained and held

---

[27] *See, e.g.*, Order, *Abrego Garcia v. Noem*, No. 8:25-cv-951 (D. Md. Apr. 11, 2025), ECF No. 61; *Moreno Gonzalez v. Noem*, No. 1:25-cv-13323 (N.D. Ill. Oct. 30, 2025), ECF Nos. 49 (Temporary Restraining Order, Nov. 5, 2025), 87 (Memorandum Opinion, Nov. 17, 2025); Preliminary Injunction, *Sergio Alberto Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97; Order Granting Motion for Preliminary Injunction, *Pedro Vasquez Perdomo v. Noem*, No. 2:25-cv-5605 (C.D. Cal. Nov. 13, 2025), ECF No. 256.

[28] Yale Law School, News, *Students Document Reports of Abuse at Immigration Detention Center* (Jan. 17, 2025), https://perma.cc/4MA4-VF6K; Jasmine Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers*, NPR (June 6, 2025), https://perma.cc/B9B6-KN2D; Tracee Wilkins & Rick Yarborough, *'Like living in a dark room': Inside overcrowded ICE detention centers*, NBC Wash. (Mar. 12, 2025), https://perma.cc/MCM8-UMZP.

[29] Garsd, *In recorded calls, reports of overcrowding and lack of food at ICE detention centers,* https://perma.cc/B9B6-KN2D; Wilkins and Yarborough, *'Like living in a dark room'*, https://perma.cc/MCM8-UMZP; Allen Cone, *Acting head of ICE clashes with Democrats, says agency funding assured through fiscal 2026*, UPI (May 14, 2025), https://perma.cc/K9XG-ZKRN; Lauren Villagran, *Immigrant women describe 'hell on earth' in ICE detention*, USA Today (Mar. 24, 2025), https://perma.cc/QW2W-M4XX.

overnight in the basement of the ICE Los Angeles Field Office in inhumane conditions. News reporting corroborated the stories they were hearing from constituents.[30]

83.     In July 2025, video footage captured by an individual detained at the ICE New York Field Office in Manhattan showed significant overcrowding and a lack of safe and sanitary conditions.[31] After a lawsuit was filed challenging the conditions in this field office, ICE transported "most of the people" detained at the facility in a matter of hours, reducing the number of detainees from an estimated 90 to 26. *See also Barco Mercado*, No. 1:25-cv-6568, ECF No. 81. However, a 62-year-old man was reportedly held inside the New York Field Office for two and a half months.[32]

84.     The conditions at the ICE New York Field Office—which Representative Goldman and Espaillat were prevented from visiting between June and December 2025—led to the issuance of a preliminary injunction requiring ICE to supply adequate space, hygienic products, clean sleeping mats, and access to counsel. *See* Preliminary Injunction, *Barco Mercado*, No. 1:25-cv-6568, ECF No. 97.

85.     In September 2025, reporting suggested that the number of individuals detained at the ICE Washington Field Office—where three Plaintiffs were prevented from conducting oversight visits prior to this Court's December stay order—drastically increased with the surge of ICE agents

---

[30] Nidia Cavazos, *Immigrants at ICE check-ins detained, held in basement of federal building in Los Angeles, some overnight*, CBS News (June 7, 2025), https://www.cbsnews.com/news/immigrants-at-ice-check-ins-detained-and-held-in-basement-of-federal-building-in-los-angeles/.

[31] Luis Ferré-Sadurní, *Video Taken by Migrant Shows Overcrowded ICE Holding Cell in Manhattan*, N.Y. Times (July 22, 2025), https://www.nytimes.com/2025/07/22/nyregion/video-immigration-holding-cells-overcrowded-unsanitary.html.

[32] José Olivares & Will Craft, *Revealed: ICE violates its own policy by holding people in secretive rooms for days or weeks*, The Guardian (Oct. 30, 2025), https://www.theguardian.com/us-news/2025/oct/30/ice-hidden-detention-sites.

Add.172

and checkpoints in Washington, D.C.[33] This included allegations that 80 to 90 individuals were detained for days in rooms designed to hold a handful of individuals.[34]

86.     In November 2025, a federal judge in Chicago issued a temporary restraining order related to the ICE facility in Broadview because of "deplorable conditions," which included "[l]ack of adequate food," "[l]ack of sufficient clean water," "[l]ack of personal hygiene products," "[e]xtremely overcrowded holding cells," "[n]o access to sufficient bedding or space to sleep," "dirty holding cells that are rarely or never cleaned," "[i]nsufficient and dirty toilet facilities," "[l]ack of access to medication, including those that detainees arrived with on their person or that were provided by family members," "[n]o access to showers or other bathing facilities," and "systemic lack of access to counsel." Mem. Op. at 2–3, *Moreno Gonzalez*, No. 1:25-cv-13323, ECF No. 87. The conditions prompted the judge to take the extraordinary step of assessing the conditions of the Broadview facility in person. Minute Entry, *id.*, ECF No. 59.

87.     In Louisiana and Georgia, there are allegations that pregnant women were detained in ICE custody, in violation of agency guidance, and mistreated while there.[35] These women reported disturbing accounts, including the shackling and use of restraints when women were being transported to the hospital while profusely bleeding from a miscarriage, placement in solitary confinement, denial of prenatal vitamins, inadequate food, delayed or substandard medical care, and lack of interpretation during medical visits leading to multiple invasive procedures without their consent. One woman experienced a dangerous infection after a miscarriage due to the lack of care she received in ICE custody.

---

[33] *E.g.*, Teo Armus et al., *ICE holding facilities overcrowded amid surge in immigration arrests*, Wash. Post (Sept. 12, 2025), https://perma.cc/KA3D-73MF.

[34] Letter from ACLU Va. & Nat'l Immigr. Project to Sec'y Kristi Noem et al. (Sept. 4, 2025), https://perma.cc/ST2Z-X9EA.

[35] Letter from ACLU et al. to Acting ICE Director Lyons et al. (Oct. 22, 2025), https://perma.cc/W2XP-CFJC.

88.     ICE's detention practices have had deadly consequences. At least 31 people died in ICE custody in 2025, a two-decade high and nearly triple the number of deaths in ICE custody in 2024.[36] At least five people have reportedly died in ICE custody in just the first few weeks of 2026, including two individuals who died while detained at the Camp East Montana Detention Facility in El Paso, Texas.[37] One of the two deaths in El Paso involved a detainee who reportedly was choked to death by guards, and whose death was classified by the medical examiner as a homicide.[38]

89.     In the Trump-Vance administration's latest attempt to weaponize ICE and terrorize communities, ICE has been engaged in a brutal crackdown in Minneapolis, Minnesota, following much the same playbook as it did in Portland, California, New York, Chicago, and Washington, D.C.

90.     Beginning in December 2025, DHS launched what they describe as "the largest DHS operation ever," called "Operation Metro Surge," sending thousands of federal law enforcement agents to Minnesota, with the primary focus on the Twin Cities metro area.[39]

91.     In this surge, Secretary Noem claims to have arrested thousands of individuals in a matter of weeks.[40]

92.     ICE has engaged in brutal and increasingly violent arrest tactics in Minneapolis. ICE has arrested U.S. citizens in the Twin Cities for observing law enforcement operations or otherwise

---

[36] Maanvi Singh et al., *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, Guardian (Jan. 4, 2026), https://www.theguardian.com/us-news/ng-interactive/2026/jan/04/ice-2025-deaths-timeline.

[37] Victoria Bekiempis, *Second man dies at Texas ICE detention facility in two weeks*, The Guardian (Jan. 19, 2026), https://www.theguardian.com/us-news/2026/jan/19/second-death-ice-facility-texas.

[38] Douglas MacMillan, *Medical examiner likely to classify death of ICE detainee as homicide, recorded call says*, Wash. Post (Jan. 15, 2026), https://www.washingtonpost.com/immigration/2026/01/15/ice-detention-death-homicide/.

[39] Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever,'* AP (Jan. 6, 2026), https://perma.cc/KA2E-DW7X.

[40] Sec. Kristy Noem (@Sec_Noem), X (Jan. 19, 2026, 9:40 AM CT), https://perma.cc/D74M-VJFR.

engaging in lawful protest, *see*, *e.g.*, *Tincher v. Noem*, No. 25-cv-4669, 2026 WL 125375, at *2–14 (D. Minn. Jan. 16, 2026). DHS has arrested parents dropping their children off at school, and high school children at school.[41] DHS detained a five-year-old boy after using him as bait to locate other family members,[42] and arrested a father holding his two-year-old daughter in his arms.[43]

93.      In just the past few weeks, DHS officers in Minneapolis have shot and killed two Americans under the guise of immigration enforcement.

94.      On January 7, DHS shot and killed Renee Good while she was in her vehicle. On January 24, DHS shot and killed Alex Jeffrey Pretti as he was protesting ICE's activities.

95.      It is no coincidence that DHS is, once again, attempting to prevent congressional oversight of ICE detention facilities at the height of its violent "immigration enforcement" surge in Minneapolis.

96.      Because of this surge in immigration detention around the country, close congressional oversight of DHS facilities is critical to ensure that members of Congress are fully informed about the conditions in these facilities and can address them as appropriate through legislation and appropriations.

97.      The consequences of congressmembers' inability to personally conduct oversight on the ground are compounded by the administration's gutting of three DHS oversight offices—the Office for Civil Rights and Civil Liberties (CRCL), the Citizenship and Immigration Services (CIS) Ombudsman's Office, and the Office of the Immigration Detention Ombudsman (OIDO).

---

[41] Beth Hawkins, *As ICE targets Twin Cities schools & bus stops even citizens keep kids home*, MinnPost (Jan. 22, 2026), https://www.minnpost.com/education/2026/01/as-ice-targets-twin-cities-schools-bus-stops-even-citizens-keep-kids-home/.
[42] Andrew Jeong, *ICE detains four children from Minnesota school district, including 5-year-old*, Wash. Post (Jan. 22, 2026)**,** https://www.washingtonpost.com/immigration/2026/01/22/minnesota-ice-columbia-heights-school/.
[43] Emma Tucker, *Minnesota toddler taken into ICE custody with father and flown to Texas is returned to mother next day, lawyer says*, CNN (Jan. 25, 2026), https://www.cnn.com/2026/01/24/us/elvis-tipan-echeverria-toddler-ice-arrest-minnesota.

Congress tasked these three independent offices with distinct roles in receiving and investigating complaints and performing other oversight functions within DHS, to ensure lawful treatment of individuals by DHS components and to provide for the investigation and resolution of DHS activities, including immigration detention.

98.     For example, CRCL's responsibilities include reviewing and investigating complaints of civil rights and civil liberties abuses; overseeing DHS compliance with legal requirements related to the civil rights and civil liberties of people affected by DHS programs and activities; and helping DHS develop and implement policies and procedures for that compliance. 6 U.S.C. § 345(a). OIDO is tasked with deploying individuals in the field to work independently in DHS detention facilities and to conduct unannounced inspections at DHS detention facilities, to which they are statutorily required to have unfettered access, and providing direct assistance to detained individuals. 6 U.S.C. § 205(c), (d)(2). And all three offices must provide regular reports to Congress on their investigations, case work, and recommendations. 6 U.S.C. § 345(b); 42 U.S.C. § 2000ee-1(f); 6 U.S.C. § 272(c); 6 U.S.C. § 205(e).

99.     In March 2025, DHS placed essentially all employees of OIDO, CRCL, and the CIS Ombudsman's Office on administrative leave. Those three critical internal oversight offices ceased performing nearly all oversight functions. DHS then separated nearly all employees of those offices through a "reduction in force" that went into effect in May.

100.    As a result of these reductions of staff in these offices, OIDO conducted only two-thirds the number of detention facility inspections in 2025 as it had the prior year—102 facility inspections in 2025, compared to 160 in 2024.[44]

---

[44] *See ODO ICE Facility Inspections*, U.S. Customs & Immigration Enforcement, https://www.ice.gov/foia/odo-facility-inspections (last accessed Jan. 21, 2026).

101.    The absence of statutorily required administrative oversight personnel on the ground in DHS facilities deprives Congress of important information that it would ordinarily receive from those internal DHS oversight offices. Congress's direct oversight role is therefore even more critical than ever.

102.    Members of Congress have both a statutory right and a duty to assess how federal appropriations are being used at DHS facilities that detain or otherwise house noncitizens. Such a dramatic expansion of detention within ICE facilities has created more opportunities for abuse and misuse of power, making robust congressional oversight more important than ever.

## III. Defendants' Repeated, Unlawful Obstruction of Plaintiffs' Oversight Visits to DHS Facilities

### A. Defendants adopt and enforce a policy and practice of obstructing congressional oversight

103.    On May 14, 2025, at a routine oversight hearing before a subcommittee of the House Appropriations Committee, Defendant Lyons testified that he and his staff were "fully supportive" of unannounced congressional oversight visits and were committed "to ensure that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations (May 14, 2025), https://perma.cc/F3ZB-HVVQ; *see also id.* ("[W]e have proper access and oversight from the men and women of your committee and Congress to oversee what Immigration and Custom Enforcement are doing in our detention centers [because] we have nothing to hide.").

104.    In mid-June, however, ICE stated on its website, for the first time, that it would prohibit members of Congress from conducting oversight visits at ICE field offices.

105.    Although it acknowledged that "Members of Congress are not required to provide advance notice for visits to ICE detention facilities," ICE issued a guidance document that contained the novel contention that field offices are not "used to detain or otherwise house aliens"

because the individuals housed there have not yet been processed for longer-term "custody determinations."[45]

106.    Pursuant to this unfounded interpretation, Defendants prevented Plaintiffs from conducting oversight visits to DHS facilities, including ICE field offices, where individuals are being detained or otherwise housed.

107.    The guidance document and ICE's website further provided that, although advance notice is not required for oversight visits by members of Congress, "ICE asks visit requests to be submitted at least 72 hours in advance."[46] It also reiterated, consistent with the statute, that staff members must provide at least 24 hours' notice.

108.    By June 23, Defendants removed the guidance document and changed the language on its website.

109.    Despite ICE's acknowledgment that members of Congress "are not required to provide advance notice for visits" by law, under their policy, Defendants "require[] requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. Any requests to shorten that time must be approved by the DHS Secretary."[47]

110.    ICE did not post a new guidance document providing details or otherwise explaining its oversight visit policies.

111.    In June, DHS and ICE officials began denying Plaintiffs access to DHS facilities on the stated grounds that Defendants require at least seven days' notice and that some facilities, including ICE field offices, are entirely exempt from congressional oversight.

---

[45] DHS, U.S. Immigration and Customs Enforcement (ICE) Facility Visits and Engagement Protocol for Members of Congress and Staff (June 2025), https://perma.cc/UL23-J4ZM.
[46] *Id.*
[47] *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV.

**B.  Recent Congressional Appropriations to DHS and ICE**

112.    Congress enacted the Reconciliation Act in July 2025. Pub. L. No. 119-21, 139 Stat. 72 (2025). In relevant part, the act provided additional funding to DHS and ICE for specific purposes. For example, the act provided $45 billion to ICE "for single adult alien detention capacity and family residential center capacity,", *id.*, tit. X, § 90003, 139 Stat. at 358, and $10 billion to DHS "for reimbursement of costs incurred in undertaking activities in support of the Department of Homeland Security's mission to safeguard the borders of the United States," *id.*, tit. X, § 90007, 139 Stat. at 361. The act further provided $2.055 billion to DHS for such purposes as the hiring and training of certain CBP and DHS personnel, transportation costs related to deportation or return of certain migrants, and "[i]nformation technology investments to support immigration purposes." *Id.*, tit. X, § 100051, 139 Stat. at 385–87. Finally, the act provided an additional $29.850 billion to ICE for such purposes as "[h]iring and training" certain ICE personnel; "[p]roviding performance, retention, and signing bonuses for qualified [ICE] personnel"; "[f]acilitating the recruitment, hiring, and onboarding of additional [ICE] personnel"; transportation and "related costs associated with" migrant departure and removal; information technology investments, facility upgrades, fleet modernization; and "[p]romoting family unity." *Id.*, tit. X, § 100052, 139 Stat. at 387–89.

113.    The reconciliation act provided funds for these purposes in addition to the annually appropriated funds provided as the initial and principal source of funds for operating DHS and its components.

114.    The act did not provide that any of the additional funds it made available could be used to prevent members of Congress from entering DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight. Nor did the act provide authority for DHS or its components to use the additional funds to ignore restrictions on their operations otherwise imposed through the annual appropriations laws.

115.     Four months after the passage of the reconciliation act, Congress unequivocally reaffirmed its intention to continue the ban on preventing congressional oversight in immigration detention facilities through the passage of the continuing resolution that is currently intended to fund the agency's operations. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, 139 Stat. 495, 496 (Nov. 12, 2025). That funding expires on January 30, 2026.

116.     On January 22, 2026, the House passed a bill providing fiscal year 2026 appropriations for DHS and ICE. H.R. 7147, 119th Cong. (2026). The House bill maintains the oversight rider, unchanged, at section 547. *Id.* § 547. The bill is currently under consideration in the Senate.

### C.  This Court's Section 705 Stay

117.     In Plaintiffs' original complaint in this action, twelve individual members of Congress challenged the oversight visit policies as unlawful and in excess of Defendants' authority. They moved for a stay of that policy under section 705 or, in the alternative, for a preliminary injunction, to ensure that members of Congress could continue to conduct critical oversight visits during the pendency of this litigation.

118.     This Court granted Plaintiffs' motion and stayed Defendants' policy on December 17, 2025. The Court concluded that "Plaintiffs are likely to succeed on their claim that Section 527 funds are being used to implement a seven-day notice requirement for Members of Congress seeking to enter ICE detention facilities, and that the notice requirement is contrary to law and in excess of DHS's statutory authority." Op. at 59.

119.     In particular, the Court determined that "a seven day notice policy is [not] permissible under" the oversight rider and is not otherwise authorized by law. Op. at 56–58. The Court further held that Plaintiffs had "shown that they suffer irreparable harm" due to the oversight

policy and that the "public interest and the balance of equitable considerations weigh[ed] strongly in favor of granting Plaintiffs their requested relief." Op. at 70. The Court thus stayed the oversight visit policy under section 705 pending the conclusion of this litigation. Op. at 73.

120.    Defendants have not appealed the Court's order staying the policy.

121.    Defendants' answer to Plaintiffs' original complaint was due on January 16, 2026. *See* Minute Order (Aug. 15, 2025). Defendants failed to file any response to the complaint by that date.

### D. Plaintiffs conduct oversight visits without issue between December 17 and January 8

122.    After the Court issued its order staying Defendants' unlawful oversight visit policies, Plaintiffs and other members of Congress immediately recommenced their oversight duties at ICE facilities across the country, including field offices.[48]

123.    Those visits occurred without incident, *contra* Mem. from Secretary Noem, *Congressional Access to Alien Detention Facilities – Access Policy and Use of Appropriations for Enforcement*, ECF No. 39-1 ("Jan. 8 Memo") (asserting, without support, a need for advance notice to "protect[]" persons during oversight visits).

124.    These visits provided valuable information to members who have identified serious deficiencies in detention conditions and obtained timely information that aided Members' determinations of laws and appropriations relating to DHS and ICE.

125.    For example, Representatives Goldman and Espaillat visited the 10th floor detention facility at 26 Federal Plaza in New York City on December 19, 2025, at 9:00 am. A member of

---

[48] *See, e.g.*, Luis Ferré-Sadurní and Olivia Bensimon, *ICE Allows Democratic Lawmakers Inside Migrant Cells in New York City*, N.Y. Times (Dec. 19, 2025), https://www.nytimes.com/2025/12/19/nyregion/ice-congress-detention-nyc.html; Matt Materson, *'Accountability Is Not Optional': Illinois Congressional Reps Tour Broadview Ice Facility Monday*, WTTW (Dec. 22, 2025), https://news.wttw.com/2025/12/22/accountability-not-optional-illinois-congressional reps-tour-broadview-ice-facility; Jordan Rynning, *Rep. Jimmy Gomez inspects ICE facility in LA during unannounced visit*, LAist (Dec. 19, 2025), https://laist.com/news/politics/rep-jimmy-gomez-inspects ice-facility-in-la-during-unannounced-visit.

Representative Goldman's staff provided one day's notice of the representatives' intent to visit the facility.

126.    The visit occurred at the planned time. Representatives Goldman and Espaillat observed detainees sleeping on the floor on thin mats and blankets and with toilets in the same areas where they sat, waited, and slept. They also saw that there were no showers in the facility.

127.    Representatives Goldman and Espaillat also observed multiple staff members mopping and cleaning the detention space, and Representative Goldman noted that conditions were generally clean and orderly, in contrast to conditions shown in videos of the facility during the summer of 2025, when his oversight access had been obstructed.

128.    An ICE official told Representative Espaillat that some detainees could stay in the facility as long as 72 hours before they were transferred to other facilities.

129.    Representative Goldman made an unannounced visit to the same facility on January 5, 2026. He was admitted without incident and again observed individuals sleeping without beds, on the same thin mats with thin foil blankets. He noted that the conditions were again clean.

130.    Representative Crow's office conducted an oversight visit of the Aurora facility and observed that due to the increased number of individuals detained there, special management units, including segregated housing and units for vulnerable populations, are now being used for general housing to accommodate additional detainees.

131.    During one visit, Representative Escobar learned from female detainees that ICE had been cleaning up the facility in the days leading up to the oversight visit that had been scheduled in advance. They shared that, in light of the unusual cleaning, the detainees anticipated a visit.

132.    Representative Gomez learned that the ICE field office at the Roybal Federal Building ("LA Field Office") that he visited did not have a kitchen, did not have medical personnel on site, and stocked only some nonrefrigerated medications.  He also learned that, although the LA

facility is not designed to hold people for longer than 12 hours, some people had been in custody for longer than 12 hours, some for up to 72 hours.

133.    Plaintiff Representatives Correa, Escobar, Espaillat, Goldman, and Gomez conducted oversight visits at ICE detention facilities without incident during the time in which this Court's stay was in place.

### E.  Defendants again impose a policy to obstruct congressional oversight

134.    On January 8, 2026, Secretary of Homeland Security Kristi Noem issued a memorandum to Todd Lyons, the acting director of ICE, and Holly Mehringer, a senior officer performing the duties of the chief financial officer, setting out a purported "new policy," "effective immediately." Jan. 8 Memo at 1.

135.    The memorandum reimposes an identical seven-day-notice requirement and states that congressional oversight "[f]acility visit requests must be made a minimum of seven (7) calendar days in advance." *Id.* at 2. Such requests must be made "during normal business hours" and "are not considered actionable until [ICE Office of Congressional Relations (OCR)] acknowledges receipt of the request." *Id.*

136.    In an attempt to circumvent both the oversight rider and this Court's stay order, the secretary instructed ICE to "ensure that this policy is implemented and enforced exclusively with money appropriated by" the reconciliation act, and she stated that she "anticipate[s]" that the reconciliation act provides adequate funding. *Id.* She further instructed that "the Chief Financial Officer, in consultation with the General Counsel, shall ensure appropriate funding for the promulgation of this policy, including use of [reconciliation act] funding where appropriate." *Id.*

137.    DHS's stated "basis" for the duplicate policy "is that advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE

employees alike," and that "[u]nannounced visits require pulling ICE officers away from their normal duties." *Id.*

138.    Despite the fact that there had been no issues with congressional visits between the time of the stay and the reimposition of a notice requirement, ICE stated that "there is an increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions." *Id.*

139.    Additionally, even once a member of Congress is granted access to an ICE facility, Defendants now restrict Plaintiffs' ability to speak with or visit with specific detainees once inside a facility.

140.    Previously, ICE had permitted members to identify individuals with whom they wanted to visit and then complete privacy releases in real time, during their visit.

141.    ICE now states that members cannot "have any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters." This includes a prohibition on "meetings with detainees in detention facilities without valid, signed privacy releases."

142.    If a member or staff "would like to meet with a specific detainee or set of detainees," they must "provide names, alien registration numbers, and valid, signed privacy releases with [the] request," which must be made seven days in advance. In other words, an individual in ICE's custody must somehow send a completed privacy release to a member outside the facility so that the member may be permitted to visit the facility, erecting a catch-22-inspired barrier to oversight.

### F. Defendants used funds subject to the oversight rider to prevent members of Congress from conducting oversight of ICE facilities

143.    Within two days, Defendants began enforcing the January 8 memorandum.

144.    Defendants have continued to prevent members of Congress from conducting oversight at ICE facilities pursuant to the reimposed notice requirement.

145.     The January 8 memorandum, and the notice requirement it repromulgates, has been enforced both by physically denying members of Congress from entering ICE facilities and also by approving or denying visit requests submitted by email to ICE OCR.

146.     The development and promulgation of the memo, and the implementation and enforcement actions that followed, required the use of funds appropriated through DHS's annual appropriations and funds otherwise subject to the oversight rider.

147.     Defendants have therefore used funds subject to the oversight rider to create, promulgate, implement, and enforce the January 8 oversight visit policy.

**G.  Defendants are once again obstructing Plaintiffs' lawful oversight activities using funds subject to the oversight rider**

148.     Each Plaintiff has a particular interest in conducting oversight visits at DHS facilities where individuals are detained or otherwise housed. The information that can be obtained only through in-person visits is critical to Plaintiffs' work in serving on committees of relevant jurisdiction; in serving diverse constituents, many of whom are personally affected by DHS and ICE activities, including immigration detention; and in drafting and proposing legislation on related topics, including DHS appropriations for the upcoming fiscal year 2026.

149.     Defendants have denied each Plaintiff crucial information needed to conduct oversight on at least one occasion—but in many instances on multiple occasions—by obstructing a requested or attempted oversight visit to a DHS facility where noncitizens are detained or otherwise housed.

150.     Defendants denied Plaintiffs access to DHS facilities to conduct oversight visits on the basis of their oversight visit policies, requiring at least seven days' notice and prohibiting any oversight visits to certain facilities, including ICE field offices, notwithstanding the presence of detainees at those facilities.

151.    In practice, ICE has arbitrarily rescheduled members' visits without reason, even when members have attempted to schedule visits more than seven days in advance. For example, on December 11, 2025, Representative McClain Delaney attempted to schedule a visit to a Baltimore ICE facility. ICE waited 6 days to confirm receipt of her email; offered her dates more than one month later; and then, days before the scheduled visit, cancelled her visit without providing a reason. She is scheduled to visit on January 27, 47 days after her office originally made the request. ICE also, again, maintained that field offices were exempt.

152.    In repromulgating and implementing their notice and approval policy, Defendants used "funds appropriated or otherwise made available to" DHS "to prevent" each Plaintiff "Member of Congress" "from entering, for the purpose of conducting oversight, a[] facility operated by or for [DHS] used to detain or otherwise house aliens"—in direct contravention of the oversight rider.

153.    Defendants' obstruction of Plaintiffs' efforts to conduct in-person, real-time oversight at DHS detention facilities significantly harms Plaintiffs' ability to satisfy their individual duties as members of Congress by denying them information that is integral to completing constituent casework, to working effectively on congressional committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in its custody.

### 1.    Representative Escobar

154.    Representative Escobar represents Texas's 16th congressional district. She has been a member of Congress since 2019 and currently serves on the Appropriations Committee and its Subcommittee on Homeland Security and Subcommittee on Military Construction, Veterans Affairs, and Related Agencies.

155.    As a member of Congress representing El Paso, Texas, a vibrant city on the United States–Mexico border with a large binational population, Representative Escobar has been actively engaged in oversight of the conditions of immigration detention in her district since becoming a member of Congress, including by conducting numerous in-person oversight visits to immigration detention facilities. That includes visits to DHS facilities operated for and by U.S. Customs and Border Protection (CBP), ICE, and the Department of Health and Human Services Office of Refugee Resettlement (ORR). Additionally, as a member of Congress who has served on House committees with jurisdiction over immigration and border matters, she has been actively engaged in oversight of DHS and ICE.

156.    Representative Escobar's district currently contains two ICE facilities: an ICE detention facility known as the El Paso Service Processing Center (SPC) and the ICE El Paso Field Office. In addition, the ICE Enhanced Hardened Facility (EHF) was located just outside her district until its closure in August 2025. There is also a new ICE facility in Representative Escobar's district called Camp East Montana, which is located at the Fort Bliss military base in El Paso. It is currently the largest ICE facility in the country.

157.    Historically, Representative Escobar has maintained an effective and respectful working relationship with local DHS and ICE personnel who work on the ground in El Paso. This relationship is critical given the number of DHS facilities within her border district and the importance of immigration-related issues to her constituents. Over the years, in-person visits have been critical to building and maintaining these relationships, including with the field directors and other ICE personnel, with whom she can effectively communicate issues that arise during visits.

158.    Both announced and unannounced visits to DHS facilities are necessary to Representative Escobar's oversight work. Many of her visits have been scheduled at least one day in

advance to allow one of her staff members to join, but some of her visits have been made without advance notice.

159.    In-person oversight visits allow Representative Escobar and her staff to discover issues that need to be addressed before they become larger problems. Additionally, because of their working relationship with DHS local leadership, when there have been surges in border crossings, her office has been able to closely coordinate with ICE and to connect DHS leadership with local nonprofits, Border Patrol, and city and county law enforcement, most recently in February 2025.

160.    Between 2021 and 2022, Representative Escobar conducted multiple oversight visits to the ORR Emergency Intake Site (EIS) at Fort Bliss, where minor children were being held because they had been separated from their parents and legal guardians under the Trump administration's family separation policy. To provide consistent oversight of this facility, she and her staff visited the EIS more than a dozen times. On oversight visits, she learned that minors were not allowed to leave the tents in which they were kept and did not have access to social workers. She raised these and other issues with Border Patrol and CBP, as well as the Department and Health and Human Services. As a result of her oversight, she observed significant improvements in processes and facility conditions at the EIS because of concerns that she raised during her visits.

161.    Representative Escobar also informs other members of Congress, her constituents, and the public when information gained from visits is cause for concern—and therefore a potential basis for legislation or further oversight. She also informs them of positive and productive information obtained through oversight and when she observes that things are going well. For example, after a June 18, 2025, visit, Representative Escobar shared with the press positive comments from women detained at the El Paso EHF.

162.    In-person visits to El Paso facilities also allow Representative Escobar to respond to and follow up on constituent casework. Immigration, including immigration detention, is a huge

issue of concern within her border district. Her office receives a significant amount of constituent outreach about constituents or family members that are being held in ICE facilities, but about which they have no information. Representative Escobar uses oversight visits as an opportunity to investigate constituent complaints about access to legal information, quality of food, building conditions, access to phones, and other issues. Sometimes her office uncovers issues, and sometimes they determine that the situation is acceptable and are able to assuage her constituents' concerns. She receives necessary information through her observations, conversations with detainees, and conversations with ICE employees on the ground.

163.    The oversight visits that Representative Escobar conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities.

164.    After ICE denied Representative Escobar entry into an ICE facility in 2019 to visit with detainees being force-fed, she worked with the Appropriations Committee to include a provision ensuring that members of Congress had the right to conduct oversight visits of DHS facilities without providing advance notice. That provision, the oversight rider at section 527 in the fiscal year 2024 DHS appropriations act, serves as the basis for this suit.

165.    Defendants' unlawful oversight visit policies abruptly halted Representative Escobar's consistent oversight of the ICE detention facilities in her district.

166.    On July 9, 2025—for the first time since 2019—ICE denied Representative Escobar entry into an ICE facility.

167.    On July 8, 2025, Representative Escobar's staff notified ICE via email that she would be conducting an oversight visit of the El Paso SPC the next day, July 9, accompanied by one staff member. That facility had recently been plagued by accusations of mistreatment and inhumane conditions, including a recent Amnesty International report detailing nearly thirty pages of alleged

human rights violations at that facility. This included reports of physical abuse by guards, use of solitary confinement, unsanitary and overcrowded living spaces including dysfunctional toilets, inadequate medical care, expired or poor quality food, and lack of access to legal services. Family members and legal representatives of detainees at the El Paso SPC had also raised concerns with Representative Escobar's office about detainees' access to telephones. It was important that Representative Escobar visit the facility in person to see the conditions firsthand, to inquire about the concerns raised in the Amnesty Internal report and about detainees' access to their legal representatives and communication with family, and to speak to detainees directly about their experiences.

168.     In response, ICE stated that it could not accommodate Representative Escobar's July 9 visit because ICE is "now requiring requests to be made seven (7) calendar days in advance."

169.     On July 9, Representative Escobar and two staff members traveled to the El Paso SPC to conduct the oversight visit announced the previous day. Representative Escobar identified herself and informed ICE personnel of her intention to conduct an oversight visit of the facility under the oversight rider. ICE denied her entry because of the oversight visit policies.

170.     Given the disturbing allegations in the Amnesty International report about the El Paso SPC facility, it was imperative for Representative Escobar to be able to visit the facility in person. On July 11, her staff requested a second visit on July 18, providing seven days' notice. However, votes at the House went into the early morning of July 18, and Representative Escobar was unable to travel to El Paso from Washington, D.C., in time to conduct the scheduled visit to the facility on July 18 to personally assess conditions and speak with detainees herself.

171.     Given the importance of in-person oversight, however, Representative Escobar and her staff persisted in conducting oversight in compliance with Defendants' unlawful policy.

172.    That oversight revealed that Defendants have used the notice as an opportunity to alter conditions of detention in advance of a visit, also in violation of the oversight rider. During an oversight visit in November 2025, for example, Representative Escobar spoke with a group of women detainees. Every woman she interacted with shared that ICE had been cleaning up the facility in the days leading up to the oversight visit. They shared that, in light of the unusual cleaning, they anticipated the visit.

173.    After the Court's December 17 order staying Defendants' seven-day-notice requirement, Representative Escobar resumed conducting oversight at immigration detention facilities without issue.

174.    On December 19, Representative Escobar conducted an oversight visit with a member of her staff, without prior notice at Camp East Montana. They were able to enter the facility and conduct oversight without incident. During that visit, Representative Escobar spoke with a group of women in one detention pod, who expressed concerns with the food quality and quantity, lack of consistent cleaning, deportation delays even after individuals signed a voluntary departure form, and a general lack of information on their own cases.

175.    Representative Escobar also spoke with an ICE staff member in the medical unit at the facility. She had heard concerning reports regarding a high number of 911 calls coming from the facility, many related to suicide attempts. Representative Escobar expressed concern to the ICE staff member regarding recent reports of suicide attempts. The staff member initially denied that this was a concern. When pressed, he conceded that calls to emergency medical services had been made in response to additional Representative Escobar attempted suicides in the facility but asserted that this was usually an attempt to "get attention."

176.    Representative Escobar then spoke with the behavioral health professional within the medical unit, who answered questions and informed her that the facility sent some detainees to

behavioral health hospitals when they exhibited more than suicidal ideation. They were unable to provide the number of individuals who had been sent to behavioral hospitals.

177. On Monday, January 12, 2026, Representative Escobar's office emailed ICE OCR requesting to conduct an oversight visit with her and two members of her staff on the afternoon of Friday, January 16. She did not receive a reply until Thursday, January 15. OCR did not respond to her specific request but instead informed her that, on January 8, Secretary Noem had "issued a directive mandating that any request for a Congressional visit to ICE detention facilities must be made seven (7) days in advance." OCR did not offer any alternative dates for an oversight visit.

178. Recent public reporting and reports from Representative Escobar's constituents regarding conditions in DHS detention facilities and concerning incidents underscore the importance of Representative Escobar's ability to engage in in-person oversight, to observe the conditions in these facilities and speak to the individuals there in person. Three deaths have been reported at Camp Montana. The death of a detainee at Camp Montana on January 3 was determined by the El Paso County Medical Examiner to be a homicide. ICE reported another detainee death at the facility on January 14 as a suicide.[49]

179. Defendants' oversight visit policies and practices have significantly hindered Representative Escobar's ability to perform her duties as the member of Congress serving Texas's 16th congressional district by depriving her of information necessary for that role.

180. The oversight visit policies significantly diminish Representative Escobar's ability to understand how funds Congress appropriates are being used at facilities in her district. Without immediate, accurate information, she is less able to ensure that detainees at the facility are being treated consistent with federal law. She is less able to work effectively on the Appropriations

---

[49] ICE reports death of illegal alien in custody in El Paso, ICE (Jan. 18, 2026), https://www.ice.gov/news/releases/ice-reports-death-illegal-alien-custody-el-paso.

Committee and its Subcommittee on Homeland Security and Subcommittee on Military Construction, Veterans Affairs, and Related Agencies. And she is less able to assess the health and safety of her constituents and to address constituent inquiries and complaints. Without in-person visits by Representative Escobar and her staff, her only recourse is to submit inquiries to and wait for a response from administration officials, which is likely to be received too late—if ever.

181.    It is important that Representative Escobar be able to conduct timely oversight. The realities on the ground often do not allow for a seven-day delay to her oversight and investigation. Her constituents frequently contact her office with pressing immigration-related issues and concerns, many of which involve the El Paso facilities. When her office receives reports that, for example, detained individuals have not been fed sufficient meals, or that individuals have not been able to shower in several days, it is important that she is able to visit that facility in person, in a timely fashion, to investigate the circumstances. If individuals lack food, showers, and basic medical care, those are situations that need to be rectified immediately to ensure that individuals in custody in facilities in Representative Escobar's district are being treated humanely and consistent with federal law.

182.    Additionally, requiring seven days' notice and approval can present a significant and sometimes insurmountable barrier to conducting an oversight visit. As Representative Escobar's attempts to visit the facility between July 9 and 18 demonstrate, her work as a member of Congress—including unpredictable votes, scheduling, and travel between Washington, D.C., and her district—may make it impossible to schedule and attend an oversight visit with more than a couple of days' notice, if that.

183.    In light of the importance of this on-the-ground, immediate oversight at the El Paso facilities, Representative Escobar intends to continue conducting oversight visits to DHS facilities

that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit her to do so thwarts her ability to perform her duties.

### 2. Representative Crow

184.    Representative Crow represents Colorado's 6th congressional district, where the ICE Denver Contract Detention Facility in Aurora ("Aurora Facility"), and a field office, the Denver Field Office in Centennial, are located. The Aurora Facility is operated by a private contractor, the GEO Group, on behalf of ICE. Representative Crow has been deeply and consistently engaged in oversight of the conditions of immigration detention in his district since he became a member of Congress more than six years ago.

185.    In response to concerning reports regarding the Aurora Facility, including reports of disease outbreaks, Representative Crow attempted his first in-person visit to the facility, without prior notice, in February 2019. He was denied entry. That same day, he sent a letter to the secretary of DHS raising his concerns about conditions at the facility, particularly with respect to medical care and public health.

186.    Representative Crow requested to tour the Aurora Facility three more times before his request was granted, and he finally conducted an oversight visit on March 15, 2019.

187.    Nearly four months after sending a letter to ICE raising concerns regarding medical conditions at the Aurora Facility, in June 2019, Representative Crow received a response in which ICE denied responsibility for developing policies and protocols for managing infectious and communicable diseases at the facility.

188.    Representative Crow recognized the need for increased oversight over the Aurora Facility. He instituted regular visits to the facility, conducted by him or his staff, generally scheduled one to seven days in advance, and sometimes without prior notice. On January 6, 2020, for example, he conducted an oversight visit without prior notice and was able to tour the facility as usual.

189.    These regular visits have allowed Representative Crow and his staff to track conditions closely, including, for example, the number of detainees, their medical care, and their access to counsel. To keep his constituents and the public informed, he regularly posts accountability reports to his website with the information gained through both in-person visits and regular communication with ICE officials.

190.    These visits have also demonstrated to ICE and GEO Group personnel that Representative Crow will hold the Aurora Facility accountable for maintaining adequate public health conditions within the facility whenever concerning circumstances arise, such as a potential tuberculosis exposure that occurred in April 2025 that led to detainees being quarantined as a precautionary measure. In this way, his oversight allows him to monitor the medical care of detainees, protect the broader community, and ensure that federal law is being followed.

191.    Representative Crow's and his staff's regular visits—sometimes with notice and sometimes without—have also shown him that advance notice can sometimes result in the member or staff getting a curated view of the facility. This hinders his ability to assess the true conditions of detention and thereby engage in real oversight with accurate information to inform his legislative functions.

192.    Representative Crow's on-the-ground oversight has also allowed him and his staff to build a productive relationship with the ICE and GEO Group personnel and to discover issues that need to be addressed before they become larger problems. For example, after raising specific concerns, Representative Crow has seen improvements to detainees' telephone access, to the number of medical staff at the facility, and to access to counsel for detainees in quarantine.

193.    In addition, Representative Crow and his staff are better able to respond to and follow up on constituent casework through on-the-ground oversight. Immigration, including immigration detention, is the most frequent topic of concern raised to his district office, and he uses

the oversight visits as an opportunity to investigate constituent complaints. He can get the needed information through observations, conversations with detainees, and conversations with ICE employees on the ground.

194.     The oversight visits that Representative Crow regularly conducts have led not only to further oversight activities, such as seeking relevant additional information from cabinet officials, but also directly to legislative activities. For example, he introduced legislation in 2020 and 2021 that sought to protect his constituents and other Americans by decreasing the risk of COVID-19 transmission in ICE detention facilities and, by extension, in the surrounding communities.

195.     Defendants' unlawful oversight visit policies and practices have hindered Representative Crow's ability to conduct comprehensive oversight of the Aurora Facility.

196.     On July 20, 2025—for the first time since he began conducting oversight visits in February 2019—Representative Crow was denied in his attempt to visit the Aurora Facility. He traveled there in person and identified himself, his oversight purpose, and his right to conduct that oversight under the oversight rider. After waiting some time, he was told that ICE had denied his request, and he was not permitted to enter.

197.     ICE OCR later confirmed by email to Representative Crow's staff that his request was denied because "DHS requires requests be made a minimum of seven calendar days in advance for scheduling."

198.     On August 22, 2025, in another attempt to obtain some information about conditions at the Aurora Facility, Representative Crow sent ICE a letter following an August 11, 2025, congressional oversight visit seeking information regarding conditions of detention and facility operations. Over 150 days later, he still has not received a response.

199.     The need for oversight into conditions at the Aurora Facility has only increased since this Court stayed Defendants' notice requirement on December 17, 2025. Since that time,

Representative Crow and members of his staff have heard significant concerns from the community about conditions at the Aurora Facility. Among these concerns were those impacting public health, in particular reports of detainees suffering from gastrointestinal illnesses and other ailments for which they may not have been receiving timely medical treatment.

200.    Representative Crow and members of his staff also heard concerns about an increase in the total number of detainees held at the Aurora Facility. His office observed that due to the increased number of individuals detained at the Aurora Facility, Special Management Units, including segregated housing and units for vulnerable populations, are now being used for general housing to accommodate additional detainees. These concerns make it imperative that Representative Crow and his staff be able to conduct timely in-person visits to obtain an accurate assessment of conditions and to ensure that the Aurora Facility is adhering to the Performance-Based National Detention Standards that govern ICE detention at that facility.

201.    Representative Crow's staff made several visits to the Aurora facility between December 17, 2025, and January 8, 2026, without incident.

202.    Before Representative Crow became aware of the January 8 memorandum, he intended to make another unannounced visit to the Aurora facility on January 16, 2026, a date that was specifically selected to avoid conflict with any congressional duties requiring him to be in Washington.

203.    On January 13, Representative Crow's office sent a notice to ICE OCR, informing ICE that on January 16, Representative Crow and members of his staff intended to conduct an oversight visit at the Aurora Facility. OCR informed Representative Crow that his request was denied because he had not provided seven days' advance notice, as the January 8 policy purports to require.

204.    Defendants' oversight visit policies and practices that resulted in this obstruction of Representative Crow's lawful oversight significantly hinder his ability to perform his duties as the member of Congress serving Colorado's 6th congressional district. He is less able to understand how appropriated funds are being used at the facility. He is less able to ensure that detainees at the facility are being treated consistent with federal law. And he is less able to ensure the health and safety of his constituents and to address constituent complaints. Without in-person visits by him or his staff, his only recourse is to submit inquiries to and wait on a response from administration officials, which is likely to be received too late—if ever.

205.    In light of the importance of this on-the-ground, immediate oversight at ICE facilities in his district, Representative Crow intends to continue conducting oversight visits of DHS facilities that detain or otherwise house individuals, with little or no prior notice. Defendants' refusal to permit him to do so thwarts his ability to perform his duties.

### 3.    Representative Goldman

206.    Representative Goldman represents New York's 10th congressional district. He currently serves as a member of both the Homeland Security Committee and the House Judiciary Committee. As a member of these committees, he has been actively engaged in oversight of DHS and ICE.

207.    The ICE New York Field Office, located at 26 Federal Plaza in Manhattan, is located in his district. The Metropolitan Detention Center (MDC) in Brooklyn, which has an agreement to house immigration detainees, is also located in his district. Both the New York Field Office and MDC are used to detain or otherwise house immigrants.

208.    Representative Goldman has engaged in oversight related to immigration detention at both facilities through in-person visits and letters to executive branch officials.

209.    Representative Goldman's previous oversight activities include regularly leading and signing oversight letters to DHS and ICE on a variety of immigration and border security issues. For example, on June 5, 2025, he led a letter joined by 85 House colleagues to DHS Secretary Kristi Noem seeking information regarding the rise of masked, plainclothes ICE officers involved in detaining individuals without criminal records in connection with their immigration court proceedings. Representative Goldman has also led letters to the chair and ranking member of the Appropriations Committee regarding immigration and border security issues that have been informed by his oversight work.

210.    Representative Goldman has also introduced legislation to address issues that have arisen in the course of his oversight of DHS. For example, after observing ICE agents conducting operations at the immigration courts at 290 Broadway in May 2025 and experiencing obstruction during an attempted visit to ICE's New York Field Office at 26 Federal Plaza in June 2025, he introduced the No Secret Police Act, which would require DHS agents who are engaged in civil immigration enforcement to display certain identifying insignia and to provide proper identification, and would prohibit them from wearing masks or face coverings.

211.    On June 9, 2025, Representative Goldman's staff emailed ICE personnel on his behalf to request a scheduled tour of the 10th floor of the ICE New York Field Office (the "10th Floor Facility"), where individuals were reportedly being detained. On June 10, ICE personnel responded to the email indicating that the tour request was being reviewed.

212.    On June 16, Representative Goldman's staff again emailed ICE personnel to notify the agency of Representative Goldman's intended visit on June 18, pursuant to his statutory oversight authority under the oversight rider.

213.    On June 17, ICE personnel responded by email to the June 16 email, claiming that Representative Goldman's statutory oversight authority did not apply to the 10th Floor Facility at the New York Field Office because it was not a "detention facility."

214.    On June 18 at 10:00 a.m., as noticed in the June 16 email, Representative Goldman, along with Representative Jerry Nadler, arrived at 26 Federal Plaza and attempted to gain entry to the 10th Floor Facility for the purpose of conducting oversight, consistent with their authority under the oversight rider.

215.    Representative Goldman was not allowed to enter and observe the 10th Floor Facility and was instead met in the lobby by the deputy director of the New York Field Office. The deputy director refused Representative Goldman entry into the 10th Floor Facility. The deputy director stated that the reason for the denial of the visit was because, according to directions the deputy director received from his supervisors, the 10th Floor Facility is not a "detention facility" under the statute and is instead a "holding and processing center."

216.    The deputy director told Representative Goldman that the 10th Floor Facility did not have beds or showers; that individuals were being held overnight, some for at least two nights; and that they were being fed. Representative Goldman asked the deputy director how a facility that was holding and housing individuals for two nights or more was not being "used to detain or otherwise house" those individuals. The deputy director responded that Representative Goldman should ask the DHS Office of Legislative Affairs.

217.    Representatives Goldman and Nadler were unable to conduct oversight of the ICE facility at 26 Federal Plaza, based on Defendants' oversight visit policies and practice of prohibiting oversight visits at ICE field offices.

218.    They were entitled to conduct such oversight under the oversight rider.

219.    As described above, Representative Goldman made two visits to the 10th Floor Facility between December 17, 2025, and January 8, 2026, without incident.

220.    During one of those visits, on December 19, Representative Goldman spoke with a Pakistani father of four U.S. citizens who had no criminal convictions, had lived in the country since 1995, and was arrested at his annual check-in with ICE.

221.    On January 5, Representative Goldman's office notified ICE that three of his staff intended to visit the facility on January 7, providing the requisite 24-hours' notice. ICE did not respond until January 8, informing the office they could visit on January 9.

222.    However, by the time Representative Goldman's office confirmed a visit for January 12, the new policy requiring seven days' notice had gone into effect.

223.    On January 13, 2026, Representative Goldman attempted to make an unannounced visit to the 26 Federal Plaza facility. He was denied entry.

224.    The director met him outside the detention facility and stated that because of the new policy, Representative Goldman was required to make a request through the ICE Office for Congressional Relations seven days in advance.

225.    Subsequently, on January 13, Representative Goldman provided notice to ICE that he intended to visit the next week, on January 20, with two staffers.

226.    ICE informed him they could not accommodate Representative Goldman at the time he requested to visit on January 20.

227.    The alternative dates and times ICE offered, many of which were while the House was in session, did not work, and so he was not able to conduct a visit.

228.    Both announced and unannounced oversight visits by Representative Goldman provide necessary information on how appropriated funds are being used in real time on the ground in immigration detention, in order to ensure the physical safety of his constituents and to ensure that

DHS immigration detention activities are being conducted in accordance with the requirements of federal law. It is also vital to his work on legislation and his ability to actively and effectively participate on his assigned committees, both of which have jurisdiction over DHS.

229.    Without the ability to conduct oversight of ICE facilities—particularly those located in his district, where his constituents may be detained—he is unable to ensure his constituents are being treated humanely and have access to legal counsel.

230.    Representative Goldman's ability to conduct unannounced visits at ICE facilities where individuals are being detained or otherwise housed is imperative for him to assess the actual conditions of these facilities and to ensure that DHS and ICE do not have time to hide unacceptable conditions prior to his visit.

231.    His observations of staff cleaning the detention facility during his December 2025 visit confirmed the importance of his oversight, as the conditions were dramatically better than in videos of the facility that were circulating during the summer of 2025.

232.    Representative Goldman intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and serve his constituents.

233.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 4.    Representative Espaillat

234.    Representative Espaillat represents New York's 13th congressional district. From 2021 to the present, he has served on the Appropriations Committee. Since 2023, he has served as the ranking member of the Subcommittee on the Legislative Branch. He is also the chairman of the Congressional Hispanic Caucus (CHC), a group of more than 40 members of Congress of Hispanic

and Latino descent. As part of his role as a member of Congress and his committee assignments, he has been actively engaged in oversight of DHS and ICE since he was elected to Congress.

235.    The 10th Floor Facility at the New York Field Office, 26 Federal Plaza, is located near his district. This facility is used to detain or otherwise house immigrants.

236.    Representative Espaillat's office does regular and significant case work for constituents involving ICE activities and detention, including for individuals detained at the New York Field Office's 10th Floor Facility. In the course of conducting oversight of DHS and ICE, Representative Espaillat has performed multiple in-person visits to ICE facilities in New York, New Jersey, and Georgia.

237.    For example, in May 2025, Representative Espaillat visited the Elizabeth Contract Detention Facility in New Jersey, where he met with noncitizens who had been detained despite having attended all their required appointments.

238.    In September 2020, he visited the Irwin County Detention Center in Ocilla, Georgia, after a whistleblower complaint alleged that the medical staff there had performed invasive and unnecessary medical procedures, including hysterectomies, on detained women. Following that visit, he wrote a letter to the then-acting director of ICE detailing his concerns about those practices and requesting an investigation at other facilities.

239.    Those on-the-ground oversight visits are integral to other activities Representative Espaillat has undertaken to investigate immigration detention and to craft relevant legislation, including DHS appropriations. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

240.     On June 8, 2025, Representative Espaillat and his colleague Representative Nydia

Velázquez traveled to the 10th Floor Facility. Their purpose was to conduct an unannounced

oversight visit.

241.     They had received information from multiple organizations that individuals were

being detained in that facility, even though it is a field office, and that the conditions in the facility

had deteriorated due to surging arrests. An in-person oversight visit was necessary to obtain prompt,

reliable information regarding the conditions of confinement at the 10th Floor Facility.

242.     Upon arrival, Representatives Espaillat and Velázquez were greeted outside of the

building around 3:00 p.m. by a DHS officer. Representative Espaillat and his colleague said that they

were members of Congress, and that they were interested in visiting the 10th floor at 26 Federal

Plaza, pursuant to their authority under the oversight rider, because they had heard from

constituents that detainees were being held there overnight.

243.     At first, the DHS officer denied them entry to the building entirely, but after 15

minutes, they were allowed to enter alone, without their staff members. Once they were inside the

lobby of 26 Federal Plaza, the DHS officer said that he was going to check with the acting deputy

field office director (deputy FOD).

244.     Representative Espaillat spoke with the deputy FOD on the phone and told her that

he had a right to gain access to the facility on the 10th floor. The deputy FOD told Representative

Espaillat that he and his colleague could not enter the 10th Floor Facility, because it was a "sensitive

facility."

245.     Representative Espaillat and his colleague left the building without being able to

conduct oversight to which they are entitled under the oversight rider.

246.     The following month, on July 14, 2025, Representative Espaillat returned with

Representative Velázquez to the 10th Floor Facility to conduct an oversight visit. He did not

provide advance notice of his visit. He conducted this visit because he had continued to hear reports from constituents and advocates of the inhumane conditions of the facility.

247.    Representatives Espaillat and Velázquez arrived at 26 Federal Plaza and told a DHS officer that they wanted to go to the 10th floor to conduct an oversight visit, consistent with their authority under the oversight rider. They stated that they understood individuals were being held there overnight. They were instructed to wait but were not met by any DHS official.

248.    Representative Espaillat and Representative Velázquez proceeded on their own volition to the 10th floor to conduct the oversight visit. Once on the 10th floor, Representatives Espaillat and Velázquez were denied access to the area where DHS was detaining the individuals.

249.    Representatives Espaillat and Velázquez waited approximately 45 minutes. Multiple DHS staff informed them that someone would speak to them shortly. DHS staff also told the representatives that the deputy FOD was informed of their presence but that the deputy FOD would not speak with them herself. DHS staff informed them that they could not enter because the 10th Floor Facility was a "sensitive facility."

250.    One of the security officials told Representatives Espaillat and Velázquez to contact a public affairs representative. The same security official denied them access to the 10th Floor Facility to conduct oversight.

251.    Representative Espaillat's oversight visits to ICE facilities, including the 10th Floor Facility, are critical to his legislative work, including his work on the Appropriations Committee. The information that can be obtained only through in-person oversight is also essential to his ability to serve his constituents, because many of them are detained in or impacted by these and other DHS and ICE facilities.

252.    Defendants' oversight visit policies and practices, which bar Representative Espaillat from conducting oversight visits, hinder his ability to perform his duties as a member of Congress.

253.    After this Court's stay order, Representative Espaillat visited the 10th Floor Facility on December 19, 2025, at 9:00 am.

254.    Representative Espaillat observed detainees sleeping on the floor on thin mats and blankets and with toilets in the same areas where they sat, waited, and slept. He also saw that there were no showers in the facility.

255.    Representative Espaillat also observed multiple staff members mopping and cleaning the detention space.

256.    Representative Espaillat intends to conduct both announced and unannounced visits to DHS facilities used to detain or otherwise house noncitizens for the purpose of conducting oversight and to address the concerns of his constituents.

257.    Without obtaining necessary information through this oversight, Representative Espaillat is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 5.    Representative Correa

258.    Representative Correa represents California's 46th congressional district. He is a member of the Judiciary Committee and the Homeland Security Committee. In 2023, he was named ranking member of the Homeland Security Committee's Subcommittee on Border Security and Enforcement. As part of that role, he has been actively engaged in oversight of DHS and ICE.

259.    The ICE Santa Ana Field Office at 34 Civic Center Plaza in Santa Ana, California, is located in his district. This facility is used to detain or otherwise house immigrants.

260.    Representative Correa's previous oversight activities include numerous in-person oversight visits to DHS facilities where noncitizens were detained or otherwise housed over the last several years. These on-the-ground oversight visits are integral to other activities he has undertaken

to investigate immigration detention and to craft relevant legislation, including DHS appropriations. He has sent oversight letters to DHS, ICE, and the Government Accountability Office, calling for greater transparency regarding ICE arrests, the conditions of detention facilities and processing facilities at ports of entry, and the processing of asylum claims, and expressing concern regarding the denial of entry by members of Congress into detention facilities for oversight purposes.

261.    On June 7, 2025, Representative Correa, along with Representatives Gomez, Rivas, and Torres traveled to the LA Field Office in downtown Los Angeles to conduct an oversight visit, consistent with their authority under the oversight rider. The LA Field Office is used to detain or otherwise house immigrants.

262.    After they arrived, Representative Torres contacted an ICE liaison officer and informed the officer that members of Congress were requesting a briefing on the previous day's ICE operations. After numerous attempts to communicate with ICE officials in the facility, the representatives were told they would not be granted access to the LA Field Office and would not receive the requested briefing.

263.    The representatives remained within the vicinity and were later told by ICE officials they needed to return during regular business hours and that they were being denied access because of "unsafe conditions" related to a protest that had started outside the facility. A short time later, while they were still in the vicinity, someone inside the building deployed a chemical agent that caused irritation to their throats and lungs, making them cough. They did not see who sprayed the chemical agent and remain uncertain as to what it was.

264.    Beginning on June 8, 2025, Representative Correa began visiting the Santa Ana Field Office in his district on a daily basis to ensure there was no overcrowding and to locate specific individuals based on requests from his constituents. Representative Correa often conducted these visits with one day's notice, and sometimes, with no notice at all. Over the course of his visits, he

witnessed a surge in the number of detainees at the field office, from fewer than 10 to approximately 77 individuals, housed in about eight holding cells.

265.    After conducting these visits without issue for about 12 days, Representative Correa was denied entry to the Santa Ana Field Office on June 21, 2025. When he arrived that morning, ICE officials informed him of a new rule requiring his office to provide written notice at least seven days in advance in order to visit the facility. He was therefore unable to obtain immediate, reliable information regarding the conditions of confinement.

266.    Representative Correa left the Santa Ana Field Office without being able to conduct oversight of the facility. He was also told that he could no longer use his regular contacts to schedule visits to the Santa Ana Field Office but had to submit requests to a centralized email address.

267.    After the Court's December 17 order, Representative Correa was again able to conduct an oversight visit at an immigration detention facility without issue.

268.    On December 19, Representative Correa conducted an oversight visit with a member of his staff at the ICE Santa Ana Field Office. Before the visit, Representative Correa's office called the assistant field office director to inform her that he would be stopping by to conduct oversight following this Court's ruling. She claimed she had not been given any information about the decision and would most likely deny entry. Representative Correa's office emailed her a copy of the decision and informed her that he would be carrying a copy with him during the visit. Within ten minutes, she replied, "Good morning Cynthia, There is no issue at this time. Congressman Correa may resume his visit."

269.    When Representative Correa arrived, the assistant field officer director additionally informed Representative Correa that he would be able to visit the facility at any time to conduct oversight without advance notice provided he check in at the front window before entry.

270.    During that visit, Representative Correa observed a total of eight people detained, and the assistant field officer director informed him that no one was being held overnight at that facility.

271.    Representative Correa's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. It is also directly relevant to his role as ranking member of the Subcommittee on Border Security and Enforcement, which requires close oversight to inform him on the topic of immigration detention and to ensure that funds are being adequately appropriated to immigration agencies.

272.    Representative Correa therefore intends to continue conducting in-person oversight at DHS facilities that detain or otherwise house immigrants, including both planned and unannounced visits.

273.    Defendants' refusal to permit Representative Correa to conduct oversight visits at the Santa Ana Field Office without seven days' notice hinders his ability to perform his duties as a member of Congress.

274.    Without the information that can be obtained through timely, in-person oversight, Representative Correa is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations—including limits on such appropriations—going forward.

### 6.    Representative Gomez

275.    Representative Gomez represents California's 34th congressional district. He previously served as the vice chair of the House Committee on Oversight and Government Reform.

276.    The LA Field Office is located in Representative Gomez's district.

277.    Representative Gomez has conducted in-person oversight visits to the United States–Mexico border to monitor CBP interactions with asylum seekers in 2020 and twice to CBP facilities in 2018 and 2020. In June 2025, his staff, at his direction, aided his oversight duties by visiting the LA Field Office following reports that attorneys and family members were being denied access to the individuals detained in the basement of the building. He has issued statements and written letters to DHS and ICE leadership raising a number of concerns, including claims of mistreatment by detainees in CBP custody and the illegal rejection of asylum seekers at official ports of entry.

278.    On June 7, 2025, Representative Gomez, along with Representatives Torres, Rivas, and Correa, traveled to the LA Field Office to conduct an oversight visit, consistent with their authority under section 527. As alleged above, they requested a briefing and access to the facility. Their requests were denied.

279.    Over the following several weeks, Representative Gomez and his staff attempted to conduct oversight visits at the LA Field Office and were repeatedly denied access.

280.    On June 9, Representative Gomez and his staff returned to the LA Field Office. They identified themselves and requested access for Representative Gomez for the purpose of conducting oversight consistent with the oversight rider. He was again denied entry and given the same reason that it was "unsafe."

281.    On June 17, Representative Gomez and his staff returned to the LA Field Office. Representative Gomez presented himself to officials on site and requested access. While he was waiting, an ICE official contacted by phone told his staff that she did not have authority to speak to them. A second ICE official contacted by phone told them that they needed to provide 72 hours' notice to conduct a visit and that ICE had previously emailed this information to his team. Representative Gomez's staff informed the ICE official that the representative had the legal

authority under the oversight rider to conduct a site visit for oversight purposes. The ICE official told Representative Gomez and his staff that the LA Field Office is not a "detention facility," but rather a field office, and that ICE does not detain immigrants in field offices. They denied him entry on that basis.

282.    On June 19, Representative Gomez's staff contacted an ICE official via email to follow up on a request to schedule an oversight visit to the LA Field Office. ICE denied this request and cited the new DHS oversight visit policies. ICE stated that the new policy requires seven days' notice for congressional oversight visits. ICE further stated that because the LA Field Office is not a "detention facility," there was no legal basis for Representative Gomez's oversight request. Representative Gomez's staff had observed vans transporting detainees earlier in the month, while they had been on site seeking access to the LA Field Office.

283.    On July 7, after receiving repeated reports of poor facility conditions, Representative Gomez's staff once again attempted to schedule a visit to the LA Field Office for the purposes of conducting oversight. ICE again responded that the field office was not a "detention facility" and denied their request on that basis.

284.    After the Court's December 17 order, Representative Gomez was again able to conduct oversight at an immigration detention facility.

285.    On December 19, Representative Gomez conducted an oversight visit without prior notice at the LA Field Office.[50] He was able to enter the facility and conduct oversight without incident. During that visit, Representative Gomez learned that there were 110 people in the facility, some of whom had been held for over 12 hours. Some had been held up to 72 hours even though the LA Field Office is not designed to hold people for longer than 12 hours. Additionally, he

---

[50] Jordan Rhynning, *Rep. Jimmy Gomez inspects ICE facility in LA during unannounced visit*, LAist (Dec. 19, 2025), https://laist.com/news/politics/rep-jimmy-gomez-inspects-ice-facility-in-la-during-unannounced-visit.

observed that the LA Field Office did not have a working kitchen, and was feeding people chips, cookies, and frozen burritos. Further, the LA Field Office did not have medical personnel on site, and stocked only some non-refrigerated medicines.

286.    Oversight visits by Representative Gomez and his staff provide necessary information on how to serve his constituents impacted by ICE raids and detention. His district is especially diverse; he represents temporary protected status (TPS) recipients, asylum seekers, undocumented immigrants, and their families. The reported inhumane treatment and conditions of those detained in the LA Field Office directly affect the wellbeing of his constituents. The uptick in the number of those detained has already begun to take an emotional and economic toll on the communities he represents.

287.    Defendants' refusal to permit Representative Gomez to conduct immediate oversight visits at the LA Field Office therefore significantly harms his ability to perform his duties as a member of Congress.

288.    Representative Gomez intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

289.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation that would require ICE to be transparent and accountable for resolving poor facility conditions.

### 7.    Representative Garcia

290.    Representative Garcia represents California's 42nd congressional district. He has been a member of Congress since 2023, and as of June 2025 he is the ranking member of the

Oversight and Government Reform Committee. Prior to serving in that role, he served on both the Oversight Committee and the Homeland Security Committee. As part of his roles, he has been actively engaged in oversight of DHS and ICE.

291.    The LA Field Office is located near Representative Garcia's district. This facility is being used to detain or otherwise house immigrants.

292.    In-person oversight visits to this and other facilities, both announced and unannounced, are essential to Representative Garcia's ability to conduct oversight of DHS and ICE. These visits permit him to directly observe conditions with his own eyes and speak directly with impacted individuals in these environments.

293.    On-the-ground oversight visits and activities are also interconnected with activities Representative Garcia has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent various oversight letters to DHS and ICE officials, as well as to private contractors, regarding issues related to immigration detention and enforcement operations, as well as recent obstruction of oversight by the Trump administration. He has also introduced legislation to address issues he has observed and identified through his oversight of DHS.

294.    On July 23, 2025, Representative Garcia's staff provided ICE with written notice of his intent to travel to the LA Field Office to conduct an oversight visit.

295.    He had received information that individuals were being detained in that facility and that the conditions in the facility were bleak, with many individuals crammed in a small concrete room without basic necessities. He had also seen reports that many individuals have been held overnight at the LA Field Office without beds or general medical care.

296.    An in-person oversight visit was necessary for Representative Garcia to obtain timely, reliable information regarding the conditions of confinement at the LA Field Office.

297.    The written notice specifically stated that Representative Garcia was "authorized by Sec. 527 of PL 118-47" to visit the facility and conduct oversight.

298.    The facility's assistant field office director (AFOD) responded to the written notice by email the same day, referencing Defendants' recent oversight visit policies, stating "the Department requires requests be made a minimum of seven (7) calendar days in advance to schedule visits to DHS detention facilities. . . . Only Members and congressional staff scheduled and confirmed for the visit will be allowed to participate." The AFOD did not schedule or confirm a visit for Representative Garcia.

299.    On July 24, 2025, Representative Garcia traveled to the LA Field Office. His purpose in doing so was to conduct oversight. Upon arrival, Representative Garcia presented himself at the intercom controlling access to a locked door that visitors are known to use. After identifying himself as a member of Congress, he stated his intent to conduct an oversight walk-through, consistent with the oversight rider. However, he was not permitted to enter. A voice on the intercom told Representative Garcia that they had asked their "management" and stated, "We're not considered a facility. You will have to go to the Adelanto Detention Facility," a facility located about 85 miles from downtown Los Angeles.

300.    Representative Garcia responded that he was taking that as a denial from ICE of his request to conduct oversight at a detention facility. Representative Garcia reiterated that members of Congress have the right to conduct such oversight and ended the conversation. Representative Garcia left the facility without being able to conduct the oversight he is entitled by statute to perform.

301.    Oversight visits by Representative Garcia and his staff provide necessary information on how to best craft legislation, understand how appropriated funds are being used for immigration detention, and ensure humane and legal treatment of detainees within the facilities. These visits also

61
Add.214

inform him on how to best serve his constituents when he hears about issues or concerns about immigration detention and enforcement actions. The information obtained through in-person oversight is also directly relevant to his work as ranking member of the Oversight and Government Reform Committee.

302.    Representative Garcia intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

303.    Without obtaining necessary information through this oversight, he is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 8.    Representative Ruiz

304.    Representative Ruiz represents California's 25th congressional district. He has a medical degree from Harvard Medical School and a Master of Public Heath from the Harvard School of Public Health.

305.    Representative Ruiz's previous oversight activities include in-person oversight visits to an ICE field office in 2014 and to multiple Border Patrol facilities in 2018, 2019, and 2023. As a physician trained in humanitarian aid, he has focused his oversight on ensuring that those in ICE and CBP custody have access to adequate healthcare. He has issued statements and written letters to DHS and ICE leadership raising these concerns, among others.

306.    In-person oversight visits to DHS facilities are integral to Representative Ruiz's legislative work. He has used the information obtained from those visits in drafting legislation, including the Humanitarian Standards for Individuals in Customs and Border Protection Custody

Act, which calls on CBP to conduct health assessments, provide emergency medical care and humane living conditions, and ensure access to adequate water and nutrition.

307.    On July 11, 2025, Representative Ruiz, along with Representative Torres, traveled to the ICE Adelanto Processing Center in Adelanto, California, to conduct an oversight visit. An in-person oversight visit was necessary to obtain immediate, reliable information regarding the conditions of confinement at the Adelanto Processing Center.

308.    Upon arrival, Representative Ruiz and Representative Torres identified themselves and were greeted by a guard at the fence surrounding the facility. While they explained that they were authorized to tour the facility under the oversight rider, an individual whom they believe to be an employee of the GEO Group (the private prison company that contracts with ICE to manage the Adelanto facility) met them at the gate. He told them that it was his understanding that they had been given notice that they were not approved for a visit that day.

309.    Representative Torres explained that she had made prior arrangements and provided ICE with notice of the visit the previous week. The individual then handed the representatives a piece of paper with DHS contact information and suggested they contact DHS. Representative Ruiz reiterated that it was their legal right to conduct an unannounced oversight visit, and he asked to speak to an ICE agent. The individual told them he would let the ICE officials in the facility know and then walked back to the building. No one from the facility came out to speak with the representatives.

310.    Because of Defendants' oversight visit policies and practices, Representatives Ruiz and Torres left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

311.    After the Court's December 17 order, and after Secretary Noem issued the January 8 memorandum reimposing a notice requirement, Representative Ruiz sought to conduct further oversight visits.

312.    On January 20, 2026, Representative Ruiz's office contacted ICE OCR by email for the purpose of scheduling an oversight visit to the Adelanto Processing Center. Although his office requested confirmation of receipt, as of January 23, they had received no response from ICE.

313.    Representative Ruiz's ability to observe operations and conditions in DHS facilities firsthand is essential to his ability to serve his constituents, who are directly impacted by ICE raids and detention. Defendants' refusal to permit Representative Ruiz to conduct immediate oversight visits at the Adelanto Processing Center, and other ICE facilities, therefore significantly harms his ability to perform his duties as a member of Congress.

314.    He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both scheduled and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Ruiz is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation.

**9.    Representative Torres**

315.    Representative Torres represents California's 35th congressional district. She is a member of the Appropriations Committee and Administration Committee. She also previously served on the Homeland Security Committee.

316.    The LA Field Office is located near Representatives Torres's district, as is the Adelanto ICE Processing Center. The LA Field Office is being used to detain or otherwise house noncitizens.

317.    In the course of conducting oversight of DHS, Representative Torres has performed previous in-person visits to immigration detention facilities in California, New Mexico, and Texas. Representative Torres conducted oversight visits of these facilities to assess conditions of minors and families being held at CBP and ICE facilities based on reports of inhumane treatment of minors and families.

318.    For example, while at the ICE Otay Mesa Detention Center in San Diego, California, in June 2018, Representative Torres observed toddlers huddled under aluminum blankets in freezing cold cells as they waited to be processed. In June 2019, she conducted oversight visits, along with colleagues from the Congressional Hispanic Caucus, of El Paso Border Patrol Station 1 and Clint Border Patrol Station, both located in Texas and operated by CBP, to investigate reports of inhumane conditions faced by children and families. During this visit she observed appalling conditions in which children were being held in groups of 10 to 15 in cells with no furniture and without access to basic necessities. She has conducted numerous visits to ensure that DHS and ICE adhere to the law and provide a safe environment for detained individuals.

319.    For example, on February 19, 2025, Representative Torres visited the LA Field Office following reports that unidentified federal agents had removed her constituents from their homes and detained them in the facility. During her visit, Representative Torres was able to have a conversation with ICE officials about how to safely execute their duties without endangering local communities.

320.    Representative Torres's on-the-ground visits and activities are integral to her other legislative duties. For example, these visits have informed relevant legislation she has crafted, including the Fairness to Freedom Act, introduced in April 2025, which seeks to establish a universal right to legal representation for individuals facing deportation.

321.     On June 7, 2025, Representative Torres joined Representatives Gomez, Rivas, and Correa in an unannounced oversight visit at the LA Field Office. Representative Torres had seen reports of violent ICE operations taking place in the Los Angeles area, and information from constituents suggested that individuals detained in the operations were being held in the LA Field Office. She was also aware of credible reports that individuals were being detained in the LA Field Office under inhumane conditions. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the LA Field Office.

322.     As alleged above, the representatives were denied access to the LA Field Office. While the representatives stood in the vicinity of the field office, someone from inside the building deployed a chemical agent that caused irritation to the representatives' throats and lungs. Representative Torres's exposure to the chemical agent required her to visit the hospital emergency room for respiratory treatment.

323.     Representatives Torres, Gomez, Rivas, and Correa left the LA Field Office without being able to conduct the oversight which they are entitled to perform under the oversight rider.

324.     On June 18, Representative Torres again attempted to conduct an oversight visit at the LA Field Office. She identified herself as member of Congress at an entrance to the building and requested access to tour the facility pursuant to her authority under the oversight rider. Representative Torres was denied access to the LA Field Office. In later correspondence, an ICE representative asserted that she was denied entry because the LA Field Office did not "house aliens." This information was directly contrary to the reports she had received regarding the detention of individuals at that location.

325.     Representatives Torres again left the LA Field Office without being able to conduct the oversight which she is entitled by statute to perform.

326.    On July 11, Representative Torres traveled to the Adelanto Processing Center to conduct an oversight visit with Representative Ruiz, as described above.

327.    Representatives Torres and Ruiz were denied entry and left the Adelanto Processing Center without being able to conduct the oversight visit that was necessary for them to obtain needed information and which they are entitled by statute to perform.

328.    On July 11, after Representative Torres was denied entry to the Adelanto Processing Center, her staff emailed ICE requesting an oversight visit on a future date.

329.    On July 16, Representative Torres received a communication from ICE informing her that she was "approved" for a 90-minute tour of the Adelanto Processing Center to take place on July 18 at 10:00 a.m. PT. Due to travel delays, Representative Torres was unable to arrive at the Adelanto Processing Center until approximately 11:00 a.m. PT, whereupon she was informed that the length of the tour could not be extended. She was given a tour of the Processing Center's health unit, kitchen, and processing area, but she was unable to see other parts of the facility, including where detained individuals are housed.

330.    Representative Torres's tour of the Adelanto Processing Center ended before she was able to see all parts of the facility necessary to conduct the oversight that she is entitled by statute to perform.

331.    Representative Torres's staff immediately placed another request for a full visit of the facility, which ICE scheduled for July 28, 2025—10 days after the request was made. The visit took place as scheduled at 10:00 a.m. PT on July 28. Representative Torres and her staff reviewed the East Wing and West Wing facilities, the latter of which holds female detainees. They also observed the female health clinic and an ongoing immigration court proceeding, which was taking place virtually. Representative Torres was told that she was not allowed to speak with detainees, and that neither she nor her staff could have access to detained constituents unless names were sent in

advance along with a privacy release form with the detainee's own signature. The staff located at the facility indicated that the number of detainees was well below capacity. Representative Torres observed low-risk and medium-risk detainees, but not high-risk detainees.

332.    Representative Torres's ability to observe operations and conditions in DHS facilities firsthand without delay is crucial to her ability to serve her constituents, who are directly affected by the presence of ICE facilities near her district. The information obtained through in-person oversight is also directly relevant to her work on the Appropriations Committee.

333.    Representative Torres intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities that detain or otherwise house individuals, including both planned and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Torres is less able to serve her constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

### 10.    Representative Thompson

334.    Representative Thompson represents Mississippi's 2nd congressional district and is the ranking member of the Homeland Security Committee. From 2007 to 2011 and 2019 to 2023, he served as chair of the committee; during all other times since 2005, he has served as the ranking member. As part of that role, he has been actively engaged in oversight of DHS and ICE since Congress created those agencies.

335.    An ICE detention facility, the Adams County Correctional Center, is located in his district, and an ICE field office is located just outside of his district in Mississippi. His office does regular and significant case work for constituents involving ICE activities and detention, at the Adams County Correctional Center facility in particular.

336.     In the course of conducting oversight of DHS, Representative Thompson has performed many in-person visits to immigration detention facilities, including ICE facilities and many CBP facilities.

337.     For example, in April 2025, Representative Thompson visited the Central Louisiana ICE Processing Center and South Louisiana ICE Processing Center, where he received tours of the facilities and spoke with detained individuals about their medical care and other concerns. In addition, at his direction as then-chair of the Homeland Security Committee, committee staff visited eight ICE detention facilities in Louisiana, Mississippi, California, New Mexico, and Maryland, leading to the 2020 committee staff report on the conditions of confinement and the inadequacy of DHS's internal oversight tools.[51]

338.     Those on-the-ground oversight visits and activities are integral to other activities Representative Thompson has undertaken to investigate immigration detention and to craft relevant legislation. For example, he has sent oversight letters to DHS and ICE officials and contractors raising concerns and seeking information on a range of relevant topics, and he has introduced legislation to address issues that have arisen in the course of his oversight of DHS.

339.     On July 21, 2025, Representative Thompson, along with Representatives Raskin and Neguse, traveled to the ICE Washington Field Office in Chantilly, Virginia, to conduct an unannounced oversight visit. They had received information from multiple organizations that individuals were being detained in that facility, even though it is a field office, and that the conditions in the facility were unknown. They were also aware of reports regarding poor conditions and overcrowding at ICE field offices across the country. An in-person oversight visit was necessary to obtain prompt, reliable information regarding the conditions of confinement at the Washington Field Office.

---

[51] *ICE Detention Facilities* Report, *supra* n.7.

340.     Upon arrival, Representative Thompson and the others identified themselves and were greeted at the door around 10:00 a.m. by a guard, who asked them to wait outside while he conferred with officials inside. An ICE official offered to show them only the public lobby. After the representatives explained that they intended to and were authorized under the oversight rider to tour entire facility, the ICE official returned inside to confer with management. Eventually, the deputy field office director and assistant field office director informed them that their latest guidance was that field offices are not subject to the oversight rider. On that basis, ICE denied Representatives Thompson, Neguse, and Raskin entry to conduct an oversight visit.

341.     In answer to questions from the representatives, the ICE officials confirmed that the Washington Field Office was currently holding, and routinely held, individuals who are not at liberty to leave, while a decision is made whether to "keep them in detention" and transfer them to another facility. The Washington Field Office is being used to detain or otherwise house noncitizens.

342.     Representatives Thompson, Neguse, and Raskin left the facility without being able to conduct the oversight which they are entitled by statute to perform.

343.     After the Court's December 17 order, and after Secretary Noem issued the January 8 memorandum reimposing a notice requirement, Representative Thompson sought to conduct further oversight visits.

344.     On January 19, 2026, Representative Thompson's office requested an oversight visit to the New Orleans Field Office for January 26. That request was approved.

345.     Representative Thompson's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Homeland Security Committee and to his ability to serve his constituents, who are directly affected by the presence of ICE facilities in and nearby his district. He intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities, including both planned and unannounced visits.

346.    Without the information that can be obtained only in those circumstances, Representative Thompson is less able to serve his constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

**11.    Representative Neguse**

347.    Representative Neguse represents Colorado's 2nd Congressional district. He has served as the Assistant Democratic Leader in the House since 2024 and is a member of the Judiciary Committee. He also previously served on the Immigration Subcommittee of the Judiciary Committee. As a member of the Judiciary Committee, he has been actively engaged in oversight of DHS and ICE.

348.    Representative Neguse's previous oversight activities include in-person oversight visits to ICE facilities where noncitizens were detained or otherwise housed in 2019 and 2020, and his staff has, at his direction, aided his oversight duties by visiting ICE facilities in 2019, 2023, and 2024. As a member of the Colorado delegation, he has focused his concerns in particular on the use of private contractor facilities to detain noncitizens, including at the ICE detention facility in Aurora, Colorado. He has issued statements and written letters to DHS and ICE leadership raising those concerns.

349.    On July 21, 2025, Representative Neguse joined Representatives Thompson and Raskin in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Neguse based on Defendants' oversight visit policies and practice of prohibiting oversight visits at ICE field offices.

350.    Oversight visits by Representative Neguse and his staff provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place

conditions on funding through the appropriations process, and ensure humane and legal treatment of staff and detainees within the facilities.

351.    Representative Neguse intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation and otherwise serve his constituents.

352.    Without obtaining necessary information through this oversight, Representative Neguse is less able to serve his constituents, to ensure that DHS and ICE are acting consistently with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

353.    The need for oversight into conditions at the Aurora Facility has increased since this Court entered its order staying ICE's seven-day-notice requirement. Accordingly, Representative Neguse's staff is scheduled to conduct an oversight visit of the Aurora facility on January 28.

### 12.    Representative Raskin

354.    Representative Raskin represents Maryland's 8th congressional district. He currently serves as the ranking member of the Judiciary Committee. From 2023 to 2025 he served as ranking member of the House Oversight Committee. Before 2023, he was a member of both the Judiciary and Oversight Committees; he also served as chair of the Subcommittee on Civil Rights and Civil Liberties of the Oversight Committee.

355.    Oversight of immigration matters is particularly important to Representative Raskin's service on the Judiciary Committee. The Judiciary Committee has jurisdiction over civil rights issues and civil liberties issues, as well as jurisdiction over all immigration policy and non-border enforcement, including ICE. The committee has authorized tens of billions of dollars for ICE, including for detention facilities. Because Representative Raskin is the ranking member of the

Judiciary Committee, it is very important for him to have an accurate and detailed understanding of ICE's detention operations, including the processes under which ICE detains individuals and the conditions in which they are detained. In-person oversight visits, both announced and unannounced, are critical to this understanding of ICE detention facilities.

356.    Immigration enforcement and detention are important issues to Representative Raskin's constituents, who often reach out to his office about these matters. Some of these constituents have family members in ICE detention, and they are desperate for information about their relatives. Recently, his office was contacted by a Maryland resident whose mother is in immigration detention and is facing removal despite the fact that she fled her country of origin because of persecution on the basis of her religion and political opinions. Another of his constituents was unexpectedly detained by ICE in front of his home on his way to work, despite having no criminal record or any removal order; he was transferred to a facility in Texas for no apparent reason. Constituents have also told Representative Raskin's office that ICE refuses to provide their detained relatives with a privacy waiver form, which is necessary to allow family members to learn about their case.

357.    Representative Raskin also engaged in oversight of DHS and ICE in his prior capacity as member and subcommittee chair of the House Oversight Committee. In August and September 2019, the Oversight Committee sent bipartisan staff delegations across the country to conduct oversight inspections of DHS immigration detention facilities. Committee staff inspected 22 DHS facilities in six states, including 12 detention centers run by ICE and for-profit contractors, seven Border Patrol stations, and three ports of entry operated by CBP. DHS cancelled staff inspections of 11 CBP facilities a day before they were to occur.[52]

---

[52] *ICE Detention Facilities* Report, *supra* n.7.

358.     A 2019 investigation by the Oversight Committee, in which Representative Raskin participated, led to issuance of a staff report in 2020 on the poor treatment of detainees in detention facilities operated by private contractors, focusing especially on deaths in custody and deficient medical care. That report followed staff visits to 12 detention facilities, 10 of which were operated by contractors and two by ICE. The report concluded that the detention system needs fundamental reform, including greater internal and external oversight, and that privately run facilities are particularly problematic. It also concluded that DHS and ICE had refused to release full investigative reports into detainee deaths, as required by law.

359.     Representative Raskin's oversight visits have also led to oversight actions during his service in Congress. In July 2019, he chaired a hearing on inhumane treatment of children in detention facilities. In August 2020, he requested that the Government Accountability Office (GAO) prepare a report on the care of pregnant women in DHS facilities, which it did. In March 2020, Representative Raskin requested that ICE and CBP provide documents on procedures in detention facilities to protect detainees from the virus that causes COVID-19.

360.     In September 2020, the Oversight Committee, along with the Homeland Security Committee, opened an investigation into a medical whistleblower complaint from an ICE detainee and requested that ICE produce documents. In May 2024, Representative Raskin, along with other members of the Oversight Committee, requested that GAO conduct a review of medically necessary procedures for detainees in ICE and CBP facilities.

361.     More recently, during the current Trump administration, Representative Raskin has sent several letters to DHS and ICE leadership, raising issues such as the detention of U.S. citizens, DHS plans for detention of families, and the detention of individuals whose student visas have been revoked.

362.     On July 21, 2025, Representative Raskin joined Representatives Thompson and Neguse in an unannounced oversight visit at the Washington Field Office. As alleged above, ICE officials confirmed that the facility routinely held individuals who are not at liberty to leave, but they denied entry to Representative Raskin based on Defendants' oversight visit policies and practice of prohibiting oversight visits at ICE field offices.

363.     Representative Raskin's ability to observe operations and conditions in DHS facilities firsthand is crucial to his role as ranking member of the Judiciary Committee and to his ability to serve his constituents. These visits provide necessary information on how to best craft legislation, allocate funds through the appropriations process, place conditions on funding through the appropriation process, and ensure humane and legal treatment of staff and detainees within the facilities.

364.     Representative Raskin intends to continue engaging in on-the-ground, real-time oversight of DHS facilities used to detain or otherwise house noncitizens, because timely and accurate information is critical for him to do his work to craft legislation, serve on relevant committees, and otherwise serve his constituents.

365.     Without obtaining necessary information through this oversight, Representative Raskin is less able to serve his constituents, ensure that DHS and ICE are acting consistently with the law, and craft relevant legislation and appropriations, including limits on such appropriations.

### 13.     Representative Morrison

366.     Representative Morrison represents Minnesota's 3rd congressional district, which includes the west metro area of the Twin Cities.

367.     Representative Morrison's constituents have been among those violently arrested and detained in Operation Metro Surge despite having committed no crime.

368.    The majority of individuals arrested and detained in Operation Metro Surge are being held, at least initially, at an ICE holding facility called the Bishop Henry Whipple Federal Building (Whipple) in Fort Snelling, Minnesota. That facility is located near Representative Morrison's district.

369.    Whipple is not set up to detain a large number of individuals, or to hold people for any extended period of time.

370.    Representative Morrison's office has received numerous reports about unsafe, cruel, and unlawful conditions inside of Whipple, including from constituents who have been detained there.

371.    One constituent, who is a U.S. citizen, had just dropped his parents off at the airport when he took a wrong turn. His car was swarmed by ICE agents, and he was dragged out of his car and detained at Whipple for multiple hours. He was patted down at least eight times, shackled by his ankles in a cell, and taunted, belittled, and threatened by guards. He was eventually released without charge.

372.    An Army veteran and Purple Heart recipient was tackled and aggressively arrested by ICE agents while peacefully observing ICE agents just a few blocks from where Renee Good was killed. He was detained in a cell at Whipple for more than 8 hours and not allowed to contact a lawyer. He was released without charge.

373.    Representative Morrison is a physician, and she has a particular concern about reports that ICE is not providing adequate medical care to detainees at Whipple. She has heard reports that there is *no* medical care being provided at Whipple, and that individuals do not have access to necessary medications.

374.    For example, Representative Morrison heard a report that one individual had what was described as a significant seizure while in custody. She was motionless when the seizure ended.

Instead of immediately calling 911, the guards debated whether or not she was faking a seizure before finally calling for emergency help.

375.    Representative Morrison has also heard reports that a man arrested by ICE in Minnesota had a heart attack. Instead of receiving necessary medical care, he was transported to another detention facility in Texas where he died. Representative Morrison has also received reports that a man who was detained at Whipple was injured and taken to a local hospital, where nurses reported that he had a skull fracture, and would either be permanently brain injured or not survive.

376.    Representative Morrison has also heard disturbing reports about other unacceptable conditions at Whipple. These include individuals sleeping on a concrete floor with no blanket or pillow; inadequate food; lack of access to counsel; extreme overcrowding; a communal toilet in view of all detainees; a lack of toothbrushes, soap, and other hygienic products; and no showers. She has been told that individuals have been held in these conditions for multiple days at a time. She has also received reports that ICE shackles the feet of individuals while they are in custody and that, at one point, approximately 130-140 individuals were being detained in a room that is only supposed to hold 20-30 people.

377.    Representative Morrison has also received reports that many of the new agents coming into Whipple from out of state are not adequately trained and are roughing up the detainees, swearing at them, calling them names, belittling them, and generally behaving in an unprofessional manner.

378.    However, Representative Morrison has no way to confirm any of this information because ICE has refused to allow her to access Whipple.

379.    It is in Representative Morrison's interest, in the interest of her constituents, and important to the performance of her duties as a member of Congress representing the suburbs of Minneapolis that she be able to conduct oversight of DHS facilities to ensure that any individuals

detained directly by DHS and ICE are treated humanely and in compliance with all relevant federal laws. Given the number of DHS arrests in the Twin Cities area from Operation Metro Surge, and the outpouring of reports she is receiving, including from constituents who have been detained at Whipple, it is important that she be able to conduct oversight of this facility immediately and without notice.

380.     On January 10, 2026, Representative Morrison joined Representatives Ilhan Omar and Angie Craig for an unannounced oversight visit to the Whipple federal facility.

381.     The executive associate director for ICE Enforcement and Removal Operations (ERO) and the deputy director for ICE ERO informed the representatives that they could not conduct an oversight visit because the "operation is being funded by OB3 funds." When Representative Morrison repeatedly asked for an explanation, they said she was being denied access because "it" was being funded by the reconciliation act without providing any additional explanation.

382.     During this conversation, the directors relayed that a privacy waiver release form would be required, but they did not explain why such a form would be required or what it would be required for. Also during this conversation, one employee repeatedly interrupted the representatives and aggressively demanded to know whether they had taken any pictures of the facility.

383.     Representative Morrison told the directors that ICE's presence in Minnesota was raising tensions in the community and that the Members' ability to conduct oversight of this facility would go a long way to bringing down the temperature. This request was ignored.

384.     ICE denied entry to Representative Morrison based on Defendants' unlawful oversight visit policy.

385.    Representative Morrison was not able to conduct an oversight visit of this facility or speak with ICE personnel or detainees about the conditions in the facility. Nor was she able to assess the medical care being provided to detainees.

386.    Representative Morrison's ability to observe operations and conditions in DHS facilities firsthand without delay is crucial to her ability to serve her constituents. This is especially important for Representative Morrison as a member of Congress representing the suburbs of Minneapolis: tensions within her community are very high because of ICE's surge in operations, violent arrest tactics, and detentions in Minneapolis.

387.    Representative Morrison has participated in legislation related to the conduct of ICE officers and transparency measures to improve the public's safety and trust. She is cosponsor of the No Secret Police Act, which would require agents detaining or arresting individuals in connection with a border security or immigration enforcement function to clearly identify the agency they are with and ban the use of face coverings. She is also a cosponsor of the Stop Excessive Force in Immigration Act, which would codify standards for appropriate use of force by immigration enforcement personnel. Representative Morrison has also signed letters to the Administration regarding the treatment of pregnant women in detention and ICE enforcement efforts against service members, veterans, and their families.

388.    As a member of Congress, it is Representative Morrison's duty to advance policies that meet the most pressing needs of her constituents. Her office has received a significant amount of outreach from constituents who are concerned about ICE's conduct in Minnesota, especially since the beginning of Operation Metro Surge. These inquiries have included first-hand accounts of the harmful impact of ICE's presence and behavior on schools, businesses, hospitals, and families in her district. ICE agents are violating Minnesotans' constitutional rights, unlawfully detaining and arresting United States citizens, racially profiling people, terrorizing communities, forcing schools,

restaurants, and businesses to close, preventing Minnesotans from seeking essential medical care, and using increasingly aggressive, excessive, and even lethal force against Minnesotans that has now killed two 37-year-old United States citizens.

389.     Representative Morrison has also heard from constituents who have described the overwhelming fear and stress that Operation Metro Surge has inflicted on their community. It is clear that oversight of ICE is a top priority for her constituents.

390.     Representative Morrison intends to continue engaging in on-the-ground, real-time oversight at DHS detention facilities that detain or otherwise house individuals, including both planned and unannounced visits. Without the information that can be obtained only in those circumstances, Representative Morrison is less able to serve her constituents, to ensure that DHS and ICE are acting consistent with the law, and to craft relevant legislation and appropriations, including limits on such appropriations.

391.     It is critical that this oversight happen in real time. After DHS officers shot and killed Alex Pretti, who was observing ICE along with other residents on January 24, Representative Morrison immediately began receiving reports that DHS arrested witnesses who had filmed the shooting and took them to Whipple (along with their phones). But for ICE's unlawful oversight visit policy, because Representative Morrison was in Minneapolis, she would have immediately conducted an oversight visit to investigate why ICE had kidnapped witnesses and detained them at Whipple.

392.     Additionally, requiring seven days' notice can present a significant and sometimes insurmountable scheduling barrier to conducting an oversight visit. Representative Morrison's work as a member of Congress causes her schedule to be very fluid due to unpredictable vote schedules, unexpected Committee activity, and constant travel between D.C. and her district. Minnesota also experiences extreme weather, which can impact travel ability and plans. This unpredictability often

makes it impossible to schedule and attend an oversight visit with more than a couple of days'
notice, if that.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA—Contrary to Law and in Excess of Statutory Authority

393.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1
through 272.

394.    The APA provides that a court "shall" "hold unlawful and set aside agency action"
found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of
statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

395.    Defendants' oversight visit policies, including their requirement that individual
members of Congress provide advance notice before conducting oversight visits to DHS facilities
used to house noncitizens and their prohibition against members of Congress from conducting
oversight visits at certain DHS facilities, including ICE field offices, are final agency action.

396.    Defendants' oversight visit policies are "not in accordance with law" under 5 U.S.C.
§ 706(2)(A) because they are contrary to the requirements of the oversight rider in DHS's annual
appropriations, which imposes a substantive ban on Defendants' preventing members of Congress
from entering DHS facilities used to detain or otherwise house noncitizens.

397.    Defendants' oversight visit policies, including the use of reconciliation act funds,
pursuant to the January 8 memorandum, for the development, promulgation, implementation, or
enforcement of the notice requirement violates the reconciliation act and the purpose statute, 31
U.S.C. § 1301, as well as foundational principles of appropriations law, and exceed Defendants'
authority under that statute.

398.    In any event, Defendants have used annually appropriated funds subject to the oversight rider for the development, promulgation, implementation, and enforcement of the notice requirement and the bar on oversight visits at certain DHS facilities. Defendants' policies are therefore also contrary to the oversight rider in DHS's annual appropriations and in excess of Defendants' authority under that law.

399.    Defendants' oversight visit policies are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 5 U.S.C. § 706(2)(C) because no statute or other source of law provides Defendants with the authority to prohibit unannounced oversight visits by individual members of Congress to any DHS facilities that detain or otherwise house noncitizens.

## COUNT II

### Violation of the APA—Arbitrary, Capricious, and an Abuse of Agency Discretion

400.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

401.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

402.    Defendants' oversight visit policies—which require individual members of Congress to provide advance notice and obtain approval, at DHS's and ICE's discretion, before conducting oversight visits to DHS facilities used to detain or otherwise house noncitizens and prohibit members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices—are final agency action.

403.    Defendants' oversight visit policies are arbitrary and capricious because they lack a lawful basis and because Defendants have not articulated an adequate, reasoned, or lawful basis for requiring at least seven days' notice for individual members of Congress to inspect DHS facilities or

for denying members of Congress access to ICE field offices, where noncitizens are detained or otherwise housed, for the purpose of conducting oversight.

## COUNT III

### Violation of the APA—Unlawfully Withheld or Unreasonably Delayed

404.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

405.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

406.    The oversight rider imposes a mandatory duty on Defendants to admit individual members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purpose of conducting oversight.

407.    Defendants have not complied with their nondiscretionary duties to admit individual members of Congress without advance notice to DHS facilities, including ICE field offices, used to detain or otherwise house noncitizens for the purpose of conducting oversight.

408.    This court should compel Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, for the purpose of conducting oversight.

## COUNT IV

### *Ultra Vires* / Violation of the Oversight Rider

409.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

410.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a

federal officer has acted "beyond th[e] limitations" set by federal statute, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

411.    Plaintiffs have a nonstatutory right of action to ask a court to enjoin and declare unlawful official action that is *ultra vires*. The oversight rider establishes a nondiscretionary duty on the part of Defendants to admit members of Congress to DHS facilities used to detain or house noncitizens.

412.    Each Plaintiff, in his or her official capacity as an individual member of Congress, has attempted to obtain information about conditions at a DHS facility used to detain or otherwise house noncitizens. Each Plaintiff has done so by visiting a facility in person, or by giving DHS notice of imminent plans to do so, for the purpose of conducting real-time oversight of that facility. Each of those attempted oversight visits has been blocked by Defendants, notwithstanding the oversight rider.

413.    Defendants' oversight visit policies, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, violate the oversight rider.

414.    Plaintiffs are entitled to equitable relief to remedy Defendants' ongoing violation of federal law.

## COUNT V

### Mandamus Act and All Writs Act

415.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

416.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

417.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

418.    The oversight rider imposes a mandatory duty on Defendants to admit members of Congress without advance notice to DHS facilities used to detain or otherwise house noncitizens.

419.    Defendants' oversight visit policies, requiring individual members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, are contrary to the oversight rider.

420.    Defendants have not complied with their nondiscretionary duty under the oversight rider to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

421.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 to compel Defendants' nondiscretionary legal duty to admit members of Congress, without advance notice, to DHS facilities used to detain or otherwise house noncitizens.

## COUNT VI

### Declaratory Judgment Act

422.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 272.

423.     Defendants' refusal to admit individual members of Congress to DHS facilities used to detain or otherwise house noncitizens, including ICE field offices, to conduct oversight activities without advance notice violates Plaintiffs' rights under the oversight rider.

424.     The Declaratory Judgment Act, 28 U.S.C. § § 2201 and 2202, authorizes the Court to "declare the rights . . . of any interested party seeking such a declaration," in addition to any injunctive or other available relief.

425.     Plaintiffs are entitled to a declaratory judgment awarding them declaratory and injunctive relief, attorneys' fees, costs, and any other relief the Court deems just and appropriate.

**PRAYER FOR RELIEF**

Plaintiffs request that the Court enter the following relief:

A.     Declare unlawful, vacate, and set aside Defendants' oversight visit policies, requiring members of Congress to provide advance notice before conducting oversight visits to DHS facilities used to detain or otherwise house noncitizens and prohibiting members of Congress from conducting oversight visits at certain DHS facilities, including ICE field offices, as contrary to law, in excess of statutory authority, arbitrary and capricious, and *ultra vires*.

B.     Declare unlawful, vacate, and set aside Defendants' withholding and unreasonable delays of performing their mandatory duties to admit individual members of Congress to conduct oversight activities without advance notice at DHS facilities used to detain or otherwise house noncitizens, including ICE field offices.

C.     Grant preliminary and permanent injunctive relief to enjoin Defendants from enforcing, implementing, maintaining, or giving effect to any policy that would deny individual members of Congress entry to conduct oversight visits, without prior notice, at any DHS facilities that detain or otherwise house noncitizens.

D.      Exercise the Court's authority under 5 U.S.C. § 705 to issue all necessary and appropriate relief pending review, barring Defendants from enforcing or otherwise giving effect to the oversight visit policy.

E.      Enter an order in exercise of the Court's equitable powers that directs Defendants to immediately take all steps necessary to ensure that individual members of Congress may conduct oversight visits, without advance notice, at all DHS facilities that detain or otherwise house noncitizens.

F.      Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate.

G.      Grant such other relief as the Court deems just, equitable, and proper.

January 26, 2026

Respectfully submitted,

*/s/ Lisa Newman*
Lisa Newman (TX Bar No. 24107878)
Christine L. Coogle (D.C. Bar No. 1738913)
Anna L. Deffebach (D.C. Bar No. 241346)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
Brian D. Netter (D.C. Bar No. 979362)
Josephine T. Morse (D.C. Bar No. 1531317)
Skye L. Perryman (D.C. Bar No. 984573)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
lnewman@democracyforward.org

Daniel Martinez
D.C. Bar No. 90025922
Ronald A. Fein
D.C. Bar No. 90026641
Katherine M. Anthony
D.C. Bar No. 1630524
Jessica Jensen
D.C. Bar No. 1048305

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

*Counsel for Plaintiffs*

# Exhibit 1

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



February 2, 2026

MEMORANDUM FOR:    Todd. M. Lyons
Acting Director for U.S. Immigration and Customs Enforcement

Rodney Scott
Commissioner, U.S. Customs and Border Protection

James H. Percival II
General Counsel

Holly C. Mehringer
Senior Official Performing the Duties of the Chief Financial Officer

FROM:                          Kristi Noem
Secretary of Homeland Security

SUBJECT:                     Congressional Access to Alien Detention Facilities – Ratification of Access Policy and Use of Appropriations for Enforcement

On January 8, 2026, I issued a new policy directing that requests by Members of Congress to visit an ICE facility be submitted at least seven days in advance of the visit.[1]  On February 2, 2026, in *Neguse v. ICE*, a judge in the U.S. District Court for the District of Columbia temporarily enjoined DHS from enforcing that policy or otherwise requiring any plaintiff to provide advance notice before conducting oversight visits for a period of 14 days.[2]

The court concluded that DHS's policy remains inconsistent with Section 527(b) of the Department's appropriation. It is odd that the court issued this decision given the appropriation containing Section 527(b) lapsed on January 31, 2026.  As a result of the lapse, Section 527 is not currently in effect.  Therefore, as of this date, I am issuing this new policy that is identical in substance to the January 8 access policy.  The General Counsel will provide further guidance regarding the effective date of this policy in light of the court's order.

---

[1] This updated policy—issued as a result of the case against ICE—was directed to ICE.  Neither CBP nor its policy has been involved in the case to date.  In light of today's decision, however, I am also issuing that policy as to CBP.
[2] *Neguse v. ICE*, No. 25-2463, Memorandum Op. at 9 (D.D.C. Feb. 2, 2026).

Add.243

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

JOE NEGUSE, in his capacity as a Member
of the U.S. House of Representatives, *et al.*,

              Plaintiffs,

     v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

              Defendants.

Case No. 25-cv-2463 (JMC)

---

## MEMORANDUM OPINION

Plaintiffs are thirteen Members of the House of Representatives who bring suit to challenge policies instituted by the Department of Homeland Security (DHS) and U.S. Customs and Immigration Enforcement (ICE) regarding congresspersons' access to DHS immigration detention facilities.[1] Since June 2025, DHS has imposed various requirements that Plaintiffs argue unlawfully limit Members' ability to perform oversight of these facilities, including a requirement that Members provide seven days of advance notice before being allowed into a facility. At the heart of this dispute is an appropriations rider attached to DHS's annually appropriated funds which prohibits DHS from "us[ing]" appropriated funds "to prevent" Members of Congress from "entering, for the purpose of conducting oversight," specific DHS facilities. Further Consolidated Appropriations Act, 2024 (FY2024 Appropriations Act), Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619. The Court previously held that a prior version of the notice

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

requirement was likely contrary to the terms of the rider and stayed the policy, but on January 8, 2026, Defendant Secretary of Homeland Security Kristi Noem issued a memorandum purporting to reinstitute the requirement, albeit claiming to do so with funds not subject to the rider. Plaintiffs, filed an amended complaint and moved for a stay of the January 8 policy under 5 U.S.C. § 705, arguing that the notice requirement is contrary to the rider and federal appropriations law and arbitrary and capricious. For the reasons discussed below, the Court will **GRANT** Plaintiffs' motion and stay the January 8 policy, which necessarily includes Secretary Noem's purported February 2 ratification of the policy.

## I.    BACKGROUND[2]

### A.  Statutory Background

This case centers on the statutes funding Defendant DHS and its various sub-agencies, including ICE. The Constitution's Appropriations Clause commands that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "For most federal agencies, Congress provides funding on an annual basis," *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024), and annually passed appropriations bills provide funding for agencies like DHS "and most of the programs, projects, and activities [they] carr[y] out." Cong. Rsch. Serv., R48731, *Full-Year Continuing Resolutions: Frequently Asked Questions* 1 (2025). Congress will also frequently fund agencies through continuing resolutions, which function as stopgap measures that provide "funding for ongoing programs pending enactment of a formal" appropriations act, often by incorporating the prior appropriations act's provisions by reference. *Com. of Pa. v. Weinberger*, 367 F. Supp. 1378, 1380 (D.D.C. 1973);

---

[2] The Court assumes familiarity with the background of this dispute as discussed in the Court's prior opinion, which the Court incorporates by reference and refers to only as is relevant to explaining its decision on the present motion. *See Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-cv-2463, 2025 WL 3653597, at *1–7 (D.D.C. Dec. 17, 2025).

*see, e.g.*, Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026 (2026 Continuing Appropriations Act), Pub. L. No. 119-37, div. A, §§ 101, 103, 139 Stat. 495, 496–97 (2025) (providing for a short-term extension of funding to DHS and other agencies until January 30, 2026).

"Congress's control over federal expenditures is absolute," and one way that Congress exercises that power is through the Purpose Statute, which commands that "'[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 31 U.S.C. § 1301(a)). Recent DHS appropriations bills have provided fixed amounts to be used by the Department for specific purposes, such as funds provided to the "Office of the [DHS] Secretary and for executive management for operations and support," as well as funds for "necessary expenses of [ICE] for operations and support." FY2024 Appropriations Act, div. C, tit. I, 138 Stat. at 593; *id.* div. C, tit. II, 138 Stat. at 598.

In addition to being limited to finite amounts and for specific purposes, appropriated funds are also often time-limited, meaning that they can lapse if Congress has not provided additional funds beyond the deadline set by statute. *See, e.g.*, 2026 Continuing Appropriations Act, § 106, 139 Stat. at 497 (providing appropriations until January 30, 2026).

Because the Anti-Deficiency Act "expressly prohibits agencies from incurring obligations in excess of appropriations," *Navajo Nation v. U.S. Dep't of Interior*, 852 F.3d 1124, 1128 (D.C. Cir. 2017); *see* 31 U.S.C. §§ 1341(a), 1342, when the agency lacks available funds to continue functioning, the agency will enter a "lapse in appropriations—more commonly known as a government shutdown." *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Educ.*, No. 25-cv-3553, 2025 WL 3123707, at *1 (D.D.C. Nov. 7, 2025).

Add.246

Congress frequently provides appropriated funds subject to conditions limiting how those funds may be used by the agency. *See Neguse*, 2025 WL 3653597, at *3 (discussing statutory provisions imposing such conditions, often known as "[l]imitations riders" or "appropriations riders"). As readers of the prior opinion and orders in this case are aware, the present dispute centers on an appropriations rider commonly known as Section 527, which has been attached to every one of DHS's annual appropriations bills since 2020, either through direct incorporation or incorporation by reference. *See id.* at *4 & n.4. The text of the rider reads as follows:

> SEC. 527. (a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
>
> > (1) A Member of Congress.
> >
> > (2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
>
> (b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.
>
> (c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

§ 527, 138 Stat. at 619.

Not all of DHS's funding comes from the annual appropriations process. In July 2025, Congress passed a bill through the reconciliation process that provided additional funds to DHS and its components. *See* One Big Beautiful Bill Act (OBBBA), Pub. L. No. 119-21, 139 Stat. 72 (2025). For example, the bill, commonly known as the OBBBA, provided to ICE, "[i]n addition

to any amounts otherwise appropriated," $45 billion dollars to be used for "single adult alien detention capacity," to be available through September 30, 2029. *Id.* § 90003(a), 139 Stat. at 358. The OBBBA also provided funds to ICE to hire and train "additional [ICE] personnel, . . . to carry out immigration enforcement activities," to cover "transportation costs and related costs associated with alien departure or removal operations," and to provide "[f]unding for facility upgrades to support enforcement and removal operations." *Id.* § 100052(1), (4), (6), 139 Stat. at 387–89. The OBBBA does not itself contain the text of Section 527 or expressly incorporate it by reference.

### B. Factual and Procedural Background

This case began in June 2025, when ICE began enforcing two policies regarding congresspersons' access to ICE facilities. First, ICE began requiring Members of Congress to provide a minimum of seven days' notice before being allowed to enter ICE detention facilities for the purpose of conducting oversight, even those facilities which squarely fell within the scope of Section 527 as "facilit[ies] operated by or for the Department of Homeland Security used to detain or otherwise house" noncitizens. § 527, 138 Stat. at 619; *see Neguse*, 2025 WL 3653597, at *5. Second, ICE also took the position that certain ICE facilities, namely ICE Field Offices, were categorically exempt from Section 527's requirements because they did not "detain or otherwise house" noncitizens as was contemplated by the rider. *Id.* at *7, *27–29. Shortly after these policies were first implemented, twelve Members of the House of Representatives sued to challenge the policies. As discussed at length in the prior opinion, each Plaintiff Member demonstrated an interest in the present Administration's immigration enforcement and detention practices, and each had requested and been denied access to DHS facilities based on Defendants' oversight visit policies. *Id.* at *6–7.

On December 17, 2025, the Court granted Plaintiffs' request for a stay of the June 2025 policies under Section 705 of the APA. ECF 37. First, the Court found that Plaintiffs had shown a substantial likelihood of standing to bring their suit. *Id.* at *9–20. The Court found that Section 527 entitled Members of Congress to enter ICE facilities without being subject to a notice requirement, and to view the facilities in their condition at the time of the request. *Id.* at *10–13. The Court noted that this entitlement of access was tied to whether the agency's actions in attempting to bar Plaintiffs utilized "appropriated funds." *Id.* at *10 ("Given that ICE cannot act other than through appropriated funds, the result of Section 527's provisions is that, upon request by a visiting Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member."). The Court then found that Plaintiffs' injuries—whether characterized as the denial of physical access to facilities or to the information they would glean upon entry—were sufficiently concrete, personal, and particularized to each Member, such that the caselaw regarding legislative standing did not bar their lawsuit. *Id.* at *10–20 (discussing, among other cases, *Raines v. Byrd*, 521 U.S. 811 (1997)). As for other threshold issues, the Court also found that the doctrine of equitable discretion did not counsel in favor of declining jurisdiction, and that Plaintiffs had a substantial likelihood of a cause of action for, at minimum, their APA claims. *Id.* at *20–24.

As for the merits of those APA claims, the Court found that Plaintiffs were likely to succeed on their arguments that the challenged oversight policies were contrary to the terms of Section 527 and in excess of Defendants' statutory authority. As for the seven-day notice requirement, the Court found that requiring a seven-day delay before entry to a covered facility clearly qualified as "prevent[ing]" a "Member of Congress . . . from entering" a covered facility as was prohibited by the rider. *Id.* at *25 (quoting § 527(a), 138 Stat. at 619). Additionally, a separate subdivision of the

rider indicated that "prevent[ing]" entry included instituting notice requirements. *See id.* (citing § 527(b), 138 Stat. at 619). As for the categorical exclusion of some ICE facilities from the scope of Section 527, the Court found that the policy was contrary to Section 527 because the record indicated that ICE field offices with holding facilities were being "used to detain or otherwise house" noncitizens as was contemplated by the statute. *Id.* at *27–29.

Finally, and as is critical to this iteration of the litigation, the Court's December 17 opinion found that the factual record demonstrated that the challenged policies were "promulgated with" appropriated funds subject to Section 527, "and they continue[d] to be implemented and enforced through the use of" those funds. *Id.* at *31. The Court noted that the likely unlawfulness of the policy arose from the "limitation on the use of funding contained in Section 527." *Id.* In so ruling, the Court acknowledged Defendants' claims that they had access to the OBBBA funds which did not contain Section 527's limitations. *Id.* at *26. The Court indicated that its views as to the lawfulness of the policies might well be different if the government could "demonstrate different facts regarding the sources of funding DHS has used to promulgate and implement the challenged policies." *Id.* at *31. However, the Court had no occasion to determine whether Defendants could lawfully promulgate and implement similar policies by relying solely on funds from the OBBBA— or if Defendants had the ability to do so as a factual matter—given that all parties agreed that Defendants were using Section 527-restricted appropriated funds for the "adoption and implementation" of the June 2025 policies. *Id.* at *26; ECF 34 ¶ 3. The Court accordingly issued an order temporarily staying the effective dates of implementation and enforcement of the policies. ECF 37. Defendants did not appeal that order.

But heeding the old adage that if you don't succeed, try, try again, on January 8, 2026, Defendant Secretary of Homeland Security Kristi Noem issued a memorandum purporting to

reinstitute the seven-day notice requirement. ECF 39-1 at 1–2. The "new" policy was almost identical to the prior notice requirement, in that Members of Congress were required to make facility visit requests seven days in advance, and with exceptions to be approved only by the Secretary. *Id.* However, the notice policy contained some significant differences from the prior one. The Secretary claimed in her memorandum that the January 8 policy was to be "implemented and enforced exclusively with money appropriated" for DHS and ICE by the OBBBA. *Id.* at 2. The Secretary instructed that "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding," and that she "anticipate[d] that there [was] more than sufficient funding available for the limited expenses associated with implementing and enforcing these policies." *Id.* Unlike the prior policies, the memorandum also included a rationale for the notice requirement: "to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike." *Id.* In the memorandum, Secretary Noem also condemned what she called "circus-like publicity stunts . . . which create[] a chaotic environment" at facilities. *Id.*

The timing of the January 8 memorandum was perhaps not a coincidence. Between December 17, 2025 and January 8, various Plaintiffs had been making oversight visits to DHS facilities without providing seven days' advance notice without incident. *See, e.g.*, ECF 49-4 ¶¶ 29–32; ECF 49-8 ¶¶ 12–14; ECF 49-9 ¶¶ 22–26; ECF 49-10 ¶¶ 20–22; ECF 49-11 ¶¶ 32–36. But during the period between the Court's order and Secretary Noem's memorandum, DHS had also continued to expand its detention and removal operations around the country, including a massive increase in enforcement in Minnesota, which DHS called the "largest DHS operation ever." ECF 49-13 ¶ 4. The day before the January 8 memorandum was issued, a DHS officer in Minnesota shot and killed Renee Good, an event which inflamed "[t]ensions . . . between

immigration authorities and protesters" and focused national attention on DHS's enforcement and detention practices. *Tincher v. Noem*, No. 25-cv-4669, 2026 WL 125375, at *13 n.18 (D. Minn. Jan. 16, 2026) (noting this event as "an incident of wide notoriety"); *see also* ECF 49-13 ¶ 13; ECF 53 ¶ 94. Two days after the memorandum was issued (but before it was made public or filed with this Court), a group of Members of Congress, including Representative Kelly Morrison, sought to conduct an unannounced oversight visit of the Whipple Federal Building in the greater Minneapolis area. ECF 49-13 ¶¶ 9, 19–20. Upon arriving at the facility, they were met by two ICE officials who denied their request to tour the facility, on the ground that the "operation [was] being funded by [OBBBA] funds." *Id.* ¶ 26–27. Subsequently various Plaintiffs were also denied entry to ICE facilities based on the policy as stated in the January 8 memorandum. ECF 49-9 ¶ 28; ECF 49-10 ¶ 23; ECF 49-11 ¶ 38.

During this time period, ICE has also been taking actions that affect Members' ability to speak with detainees once the Member is inside a facility. According to an email sent by ICE's Office of Congressional Relations to Plaintiff Representative Escobar's office regarding the "ICE facility visitation policy," ICE currently prohibits Members of Congress from "[h]av[ing] any physical or verbal contact with any person in ICE detention facilities unless previously requested and specifically approved by ICE Headquarters," and that a Member may only meet with detainees if the detainee has a "valid, signed privacy release[]." ECF 57-2 at 8–10. If Members "would like to meet with a specific detainee or set of detainees," they must provide a "valid, signed privacy release[]" along with their visit request, meaning, in advance of the visit. *Id.* at 10. According to Representative Escobar, ICE had previously allowed Members and their staffs to provide these releases in person to detainees during the visit to allow them to speak with the Member at the time.

ECF 57-2 at 2 ¶ 15. Representative Escobar also maintains that Members of Congress had previously been allowed to speak to detainees during oversight visits. *Id.* at 2 ¶ 7.

Predictably, these new developments brought the Parties back to Court. On January 12, Plaintiffs moved for an order requiring Defendants to show why the January 8 memorandum purporting to reinstitute the seven-day notice requirement was not in violation of the Court's December 17 order, and asked the Court to enjoin enforcement of the requirement. ECF 40; ECF 43-1. After briefing and a hearing on the request, the Court denied the motion on procedural grounds, agreeing with Defendants that the January 8 policy was a new policy that must be challenged through an amended or supplemental complaint. ECF 46; *see* Jan. 14, 2026 Min. Entry; *see also* ECF 42; ECF 44; ECF 45. Plaintiffs shortly afterwards moved for leave to amend and supplement their complaint, which the Court granted. Jan. 26, 2026 Min. Order.

The Amended Complaint has expanded the list of Plaintiffs to include Representative Morrison, and again challenges as unlawful ICE's oversight visit policies, which again include the seven-day notice requirement as imposed by the January 8 memorandum, and ICE's exclusion of certain facilities, including field offices, from the scope of congressional visits. *See* ECF 53 ¶¶ 33, 393–425. The same day they filed their Amended Complaint, Plaintiffs also filed their motion for a temporary restraining order (TRO), and in the alternative, requested that the Court issue a stay under Section 705 of the APA. ECF 49. Plaintiffs sought to block enforcement of the January 8 notice policy, as well as DHS's policy regarding privacy releases. As to the notice policy, Plaintiffs again contended that it was contrary to law, in violation of not only Section 527, but also the terms of the OBBBA itself and the Purpose Statute, 31 U.S.C. § 1301(a). *See* ECF 49-1 at 25; ECF 53 ¶¶ 396–98. Defendants opposed the motion, and Plaintiffs submitted a reply. ECF 50; ECF 51.

On February 2, the Court issued a two-week TRO in order to preserve the status quo pending consideration of Plaintiffs' request for a Section 705 stay. ECF 52. On the limited record before it at the time, the Court found that Plaintiffs were likely to prevail on their arguments that the January 8 notice requirement violated the APA, because it seemed highly likely that Section 527-restricted annually appropriated funds had been used to promulgate and initially enforce that version of the policy. *Id.*at 5–6. The Court found that issuance of a TRO was appropriate even though the appropriations to which Section 527 had applied lapsed on January 30, 2026. *Id.* at 7 n.6. The Court found the fact that Section 527-restricted funds were likely used in the promulgation of the policy prior to the lapse in funding would provide a basis for setting that specific policy decision aside even if the Section 527 limitation did not exist going forward. *Id.*

That same day, and in response to the Court's TRO order, Secretary Noem issued another memorandum. ECF 55-1 at 2. This February 2 memorandum noted that annually appropriated funds had lapsed and purported to "issue [a] new policy that [was] identical in substance to the January 8 access policy." *Id.* However, the memorandum did not state an effective date for the policy, and instead instructed the DHS general counsel to "provide further guidance regarding the effective date of this policy in light of the Court's order." *Id.* The next day, Congress ended the lapse in DHS appropriations by passing another continuing resolution, subsequently signed into law by President Trump, which extended DHS's annual appropriations through February 13, 2026 and incorporated the Section 527 rider by reference. Consolidated Appropriations Act, 2026, div. H, § 101, Pub. L. No. 119-75, 140 Stat. 173, 628. The Court sought additional briefing and held a hearing on Plaintiffs' request for a Section 705 stay. ECF 55; ECF 57; *see* Feb. 12, 2026 Min. Entry. The Court also extended the TRO until March 2, 2026 to provide time to rule on the significant legal issues raised by the motion. ECF 58.

Add.254

Two days later, on February 14, 2026, Defendants notified the Court that DHS's annual appropriated funds once again lapsed after Congress failed to pass an updated DHS appropriations bill by the statutory deadline. ECF 59. They remain lapsed as of the date of this opinion.

The Court now proceeds to resolve Plaintiffs' motion.

## II.    LEGAL STANDARD

Section 705 of the APA authorizes a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.*

The factors governing the issuance of relief under Section 705 are the same as those for the issuance of a preliminary injunction. *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citing, *inter alia*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985)). To prevail on such a motion, the movant "must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [stay] were not granted, (3) that a[ ] [stay] would not substantially injure other interested parties, and (4) that the public interest would be furthered by the [stay]." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In a case like this one, where the Government is the non-movant, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    ANALYSIS

The Court finds that each of these four factors favors granting a stay of the January 8 memorandum and its purported February 2 ratification under Section 705. This section addresses each of those factors in turn, as well as the scope of the relief granted.

**A.  Plaintiffs are Substantially Likely to Succeed on the Merits.**

Plaintiffs have demonstrated a substantial likelihood of success on their claim that the January 8 notice policy is contrary to law and in excess of Defendants' statutory authority.[3] In the Court's view, various threshold issues such as the Court's likely jurisdiction and the availability of a cause of action have been largely resolved by the Court's prior opinion, *see Neguse*, 2025 WL 3653597, at *9–24, but this section will address them in brief to address any issues that are not covered by the Court's prior reasoning. The Court will then proceed to address the merits of Plaintiffs' contrary to law claim.

**1.  No Jurisdictional or Other Threshold Issues Block Plaintiffs' Requested Stay.**

**a.  Plaintiffs Continue to Have Article III Standing to Bring this Suit.**

The Court's prior opinion exhaustively addressed the issue of whether Plaintiffs, individual members of Congress suing to challenge an action of the Executive Branch, have standing to bring this lawsuit, and the Court fully reincorporates the analysis here. *Neguse*, 2025 WL 3653597, at *9–20. Defendants did not appeal that decision, but in their opposition to Plaintiffs' motion, they reiterate their objections to Plaintiffs' standing. Most of Defendants' objections, including that Plaintiffs' injuries are insufficiently concrete, personal, and particularized to each Member, such that they cannot overcome the precedents regarding legislator standing, ECF 50 at 14–15, are squarely covered by the analysis in the prior opinion.

---

[3] In addition to Plaintiffs' challenge to the January 8 notice policy, Plaintiffs also argue in a single page of their stay motion that Defendants' policy regarding privacy releases violates the APA as arbitrary and capricious action. *See* ECF 49-1 at 47. While Plaintiffs discuss the privacy release policy in their complaint, ECF 53 ¶¶ 140–42, it was not obvious to the Court that they were bringing an independent arbitrary and capricious challenge to this policy. This privacy release policy appears to be a discrete policy separate from the January 8 notice requirement and is not encompassed in Plaintiffs' challenge to that policy, despite Plaintiffs framing the privacy release requirement in their stay motion as part of "Defendants' January 8 oversight visit policy." ECF 49-1 at 47. Plaintiffs have also not attempted to satisfy threshold questions regarding this policy, such as whether they have standing to challenge the requirement or whether it qualifies as final agency action. For that reason, the Court does not fault Defendants in their failure to separately raise their objections to Plaintiffs' challenge to the release policy, and declines to address the issue at this time.

Defendants do have one new argument: They argue that the analysis in the Court's prior opinion should not govern the current state of the case because the prior opinion focused on Plaintiffs' alleged entitlements pursuant to Section 527, and in their view, the Plaintiffs' current complaint "relies upon the theory that Defendants have violated other legal provisions, including the OBBBA and the APA, none of which confer upon these Plaintiffs any such particularized cognizable interest." ECF 50 at 15–16.

The Court finds that Defendants are not properly characterizing Plaintiffs' theory of injury and current legal challenge, which remains premised on the interests secured by Section 527 and Defendants' alleged violation of that statute. The Court's prior opinion found that Plaintiffs had standing because Section 527 had the effect of providing Plaintiffs with a legally protected interest regarding access to DHS facilities—whether considered as an entitlement to physical access to the facilities or to the information about conditions therein. This interest arose from the fact that, under the terms of the rider, DHS was prohibited from taking any actions using annually appropriated funds to prevent Plaintiffs' access to these facilities. *Neguse*, 2025 WL 3653597, at *10; § 527(a), 138 Stat. at 619. At the time of the Court's prior opinion, there was no factual dispute that all of Defendants' actions taken to prevent Plaintiffs from entering ICE facilities were being funded by annually appropriated funds subject to Section 527, and Defendants lacked the ability to use any other funds for the policy, functionally entitling Plaintiffs to enter without notice. *Id.* at *10. However, this was not the only basis for the Court's holding: The Court also found that other provisions in the rider specifically addressed, and rejected, the permissibility of Defendants using Section 527 funds to implement a notice requirement as a mechanism of preventing Members' entry. § 527(b), (c), 138 Stat. at 619; *see Neguse*, 2025 WL 3653597, at *10. Thus, under the rider, Plaintiffs are entitled to seek entry to the facilities covered by Section 527 without DHS taking

actions to stop them that were funded by annually appropriated funds (including by imposing a notice requirement).

Defendants are right that things are slightly different this time around. Defendants now argue that they are legally and logistically capable of using solely OBBBA funds to promulgate and implement the January 8 notice policy. ECF 50 at 8–9. Were it the case that Defendants had established that every expenditure used to prevent Plaintiffs' entry into a given facility was funded by the OBBBA and not by appropriated funds, the Court thinks it unlikely that Plaintiffs would have standing to sue on a theory that Defendants had exceeded their authority to spend funds under the OBBBA. This is because it is only Section 527, rather than anything in the OBBBA, which limits DHS's ability to hinder Plaintiffs' entry to DHS facilities.[4] But as the Court will discuss in more detail below, *infra* Section III.A.2.b.ii.(a), Plaintiffs are likely to succeed in showing that, as a factual matter, Section 527-restricted annual appropriated funds were indeed used by DHS to promulgate the January 8 policy and have been used by Defendants to enforce it, and that as a result, the notice requirement is again contrary to law. To the extent that Plaintiffs raise legal issues regarding Defendants' ability to spend funds under the OBBBA and Defendants' potential violation of the Purpose Statute, the Court considers these arguments not as independent challenges for which Plaintiffs are required to show standing, but as additional legal bases to conclude that Defendants have acted in violation of Section 527 and could not cure those violations through the retroactive shifting of funds or other proposed mechanisms.

The Court sees no basis to revise its conclusion that Plaintiffs have standing to bring this suit. *Neguse*, 2025 WL 3653597, at *9–20. As a result, and based on the facts as stated in Plaintiffs'

---

[4] As discussed below, *infra* Section III.A.2.b.i., the Court rejects Plaintiffs' claim that Section 527 applies beyond the funds in the annual appropriations act and serves as a freestanding substantive ban on using any appropriated funds to prevent congressmembers' entry to DHS facilities that also applies to the OBBBA appropriations.

first, second, and third round of declarations, the Court finds that Plaintiffs have shown a likelihood of Article III jurisdiction.[5] Plaintiffs are all members of Congress who have demonstrated an interest in the present Administration's immigration enforcement and detention practices, and each has requested and been denied access to DHS facilities based on the challenged oversight visit policies in the suit. And, although it is again not in dispute in this case, the Court finds that Plaintiffs' injuries meet the Article III requirements of causation and redressability. *See Neguse*, 2025 WL 3653597, at *11, *13. Secretary Noem's January 8 memorandum lays out the details of the notice requirement and directs various DHS and ICE officials to implement and enforce it. ECF 39-1. A vacatur of the notice requirement would deprive that policy of legal effect and is thus likely to redress Plaintiffs' harms.

### b.  Plaintiffs Have a Cause of Action Under the APA.

Defendants again contest whether Plaintiffs lack a cause of action under the APA but raise nearly identical arguments to ones the Court has already addressed and rejected. ECF 50 at 16–17. The Court again rejects them for the same reasons. *See Neguse*, 2025 WL 3653597, at *21–24.

### 2.  Plaintiffs are Likely to Succeed on the Merits of their APA Contrary-to-Law and Statutory Authority Claim Against the January 8 Notice Policy.

The Court proceeds to the merits of Plaintiffs' claim that the January 8 notice policy is contrary to law and in excess of statutory authority. Section 706 of the APA requires the Court to "hold unlawful and set aside agency action" that is "not in accordance with law," or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In Plaintiffs' view, the January 8 policy prevents Members of Congress from entering covered

---

[5] These declarations include the declaration of Representative Morrison, who was not party to the suit at the time of the Court's December 17 decision, but whose declaration sufficiently supports her Article III standing to bring the suit under the principles discussed in that opinion. *See* ECF 49-13 (discussing Representative Morrison's interest in conducting oversight of ICE facilities, her denial of access to an ICE facility on January 10, 2026, and her intent to continue pursuing oversight visits to such facilities).

facilities just as did the June 2025 notice policy. ECF 49-1 at 7–8. Plaintiffs claim that this policy is still contrary to Section 527 because, despite Secretary Noem's instructions that the new policy be promulgated and implemented with solely OBBBA funds, DHS could not legally use OBBBA funds for that purpose and has in fact used Section 527-restricted annually appropriated funds to promulgate and enforce the policy. The Court agrees and finds that Section 527-restricted funds have likely been used in a manner contrary to law in reimposing the seven days' notice requirement.

### a. The January 8 Policy Prevents Members of Congress from Entering Covered Facilities.

Section 527 commands that "[n]one of the funds appropriated" by the DHS annual appropriations bill "may be used to prevent" Members of Congress "from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house" noncitizens. § 527(a), 138 Stat. at 619. The Court previously found that the seven-day notice requirement clearly functioned to "prevent" a member from entering a facility, as the term was used in Section 527. *Neguse*, 2025 WL 3653597, at *25. Here, the Court is faced with a new policy that, at least with respect to the notice requirements imposed on Members of Congress, is nearly identical to the one the Court considered in June 2025. *Compare Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV, *with*, ECF 39-1 at 1–2. The Court has no difficulty finding that the enforcement of this policy again continues to "prevent" Members of Congress from accessing facilities. The Court also reiterates that this finding applies not only to funds used in the enforcement of this policy, but also funds used in the creation and promulgation of the policy, which also counts as DHS "prevent[ing]" Members' entry as is contemplated by Section 527. Defendants argue that the process of promulgating the policy, separate from its enforcement, cannot be considered "prevent[ing]" Members of Congress from

entering covered facilities as contemplated by the rider. § 527(a), 138 Stat. at 619; *see* ECF 50 at 19. The Court disagrees. It is hard to fathom that promulgation of the very policy which is employed to deny Members' access to facilities would not be included in the scope of Section 527's prohibition. So, on that score, the new policy shares the same defect as the June 2025 policy that the Court previously stayed.

### b. Defendants Have Used Section 527-Restricted Funds to Promulgate and Enforce the January 8 Policy.

Of course, whether the policy "prevent[s]" Members of Congress from entering covered facilities is only part of the statutory inquiry under Section 527. The rider does not function by simply prohibiting DHS from "prevent[ing]" congresspersons' entry: It acts by prohibiting DHS from "us[ing]" "funds" appropriated by the annual appropriations acts and continuing resolutions to do so. § 527(a), 138 Stat. at 619. The question of what it means to have "used" funds to promulgate and enforce the seven-day notice requirement is not a question that the Court has previously addressed. In the case of the June 2025 notice policy previously stayed by the Court, it was undisputed as a factual matter that Section 527-restricted funds had indeed been "used" to promulgate the policy and were continuing to be "used" to implement it. Thus, the only question facing the Court was whether those uses of funds were preventing Members' entry under the statute. *Neguse*, 2025 WL 3653597 at *26, *31. That is not the case here. The Parties dispute several issues relating to the use of funds in connection with the notice policy, such as the types of expenses that are properly considered as having been "used" to promulgate and enforce the policy and whether Section 527-restricted funds supported those expenses. The Court addresses each of those issues in turn.

i.    **The Types of Expenditures Necessary to Promulgate and Enforce the January 8 Policy**

Unsurprisingly, the Parties have widely divergent views on what funds are necessary to promulgate and implement the January 8 policy. Plaintiffs argue that the "number and variety" of DHS resources that must be used to promulgate and implement the January 8 oversight visit policy "are almost too vast to contemplate." ECF 49-1 at 38. In their view, the process of promulgating and enforcing the policy "begins with the [S]ecretary, continues down through ICE leadership and middle management, and affects all ICE detention facilities." *Id.* Plaintiffs also claim that "use[s]" of funds prohibited by Section 527 include more incidental costs incurred by DHS, such as "paper, pens, information technology systems and contracts, security contracts, facility utilities, and physical infrastructure." *Id.* at 39. Finally, Plaintiffs argue that there is "no de minimis exception to appropriation limitations," and that to the extent that any Section 527-restricted funds are implicated in putting the notice requirement into effect, no matter the amount, the requirement is contrary to Section 527. *Id.* at 41 (citing Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1362 (1988)). Defendants dispute that Section 527 extends to "various and sundry overhead costs [DHS] would incur regardless" of the notice requirement, and instead argues that it "applies only to activities that directly prevent the entry to covered facilities." ECF 55 at 14.

The Court finds Plaintiffs' view more persuasive. As for why, look first to the principle which animates limitation riders and gives them their force as a mechanism for Congress's control of substantive government policy: "[t]he government cannot make expenditures, and therefore cannot act, other than by appropriation." *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 872 (9th Cir. 1995) (citing 31 U.S.C. §§ 1341–42); *see also* Gillian E. Metzger, *Taking Appropriations Seriously*, 121 Colum. L. Rev. 1075, 1077 (2021) ("Without appropriations, the executive branch cannot act, and thus choices about agency funding have a fundamental impact on how the

government operates."). Consistent with this understanding that appropriated funds are used when an agency "act[s]," *Babbitt*, 73 F.3d at 872, courts interpreting similar riders to Section 527 have interpreted them to prohibit a wide range of agency activities related to facilitating the prohibited purpose. To do otherwise would be to deprive the riders of their effect in restraining government action. For example, in *Environmental Defense Center v. Babbitt*, the Ninth Circuit evaluated whether a rider which stated that no appropriated funds "may be made available for making a final determination that a species is threatened or endangered," prohibited the Secretary of the Interior from making a final decision that the California red-legged frog was endangered. 73 F.3d at 870–71. The Ninth Circuit found that although "the only action that . . . remain[ed] to be taken [was] in-house review and decisionmaking," the action was prohibited by the rider. *Id.* at 871. This was because any further action on the listing would "necessarily require the use of appropriated funds," given that "the use of any government resources—whether salaries, employees, paper, or buildings—to accomplish a final listing would entail government expenditures." *Id.* at 871–72. The Ninth Circuit emphasized that action on the listing would violate the rider, and the Secretary could not act, even though "completion of the process may require only a slight expenditure of funds." *Id.* at 871. Further, the Ninth Circuit found this to be the case even though the Secretary's action in question was a "nondiscretionary duty" under federal law. *Id.* at 872.

The Ninth Circuit's approach—which implicated the use of incidental resources that facilitated the government's actions—was cited favorably by the D.C. Circuit in *Kimberlin v. U.S. Department of Justice*, where the Circuit found that a rider prohibiting the "use[]" of appropriated funds "for the use or possession" of electric instruments in federal prisons was "reasonably . . . construed to prohibit paying for costs incidental to such use or possession," including "those incurred for storage, supervision, and electricity." 318 F.3d 228, 230, 232

(D.C. Cir. 2003). One of the judges of that panel described the holding—accurately in this Court's view—as "recogniz[ing] the proposition that an appropriations law denying funding for certain activities generally amounts to a substantive ban on those activities, regardless of the amount of funding involved." *Id.* at 237 (Tatel, J., concurring in part and dissenting in part). The Court therefore agrees with Plaintiffs that *Kimberlin* and *Babbitt* support the proposition that for the purposes of analyzing a limitation rider such as this one, the types of resources considered necessary to accomplish a given government action are of a wide-ranging scope.

Before addressing whether any of those many types of resources were "used" in promulgating or enforcing the policy, however, the Court notes one argument Plaintiffs have made about *Kimberlin* that it rejects. Seizing on Judge Tatel's discussion of "substantive ban[s]", Plaintiffs ask the Court to find that the prohibition in Section 527 should be read as a freestanding prohibition that impliedly extends to act as a legal restriction on the funds appropriated by the OBBBA. ECF 49-1 at 27 (arguing that Section 527 serves as an "existing[,] substantive ban on ICE preventing members of Congress from conducting oversight at detention facilities"). The Court declines the invitation to apply *Kimberlin* in this way. First, Plaintiffs ignore that Section 527 applies only to the funds in "this Act"—as in, the annual appropriations bill and subsequent continuing resolutions—rather than applying, as some other limitation riders do, to "funds appropriated or otherwise made available in this *or any other Act*." *Compare* § 527(a), 138 Stat. at 619, *with* § 537, 138 Stat. at 622 (emphasis added). Second, it ignores that *Kimberlin* and *Babbitt*, while instructive, did not deal with the exact scenario faced here. In those cases, there was no dispute about whether an alternative source of funds existed or was being used to effectuate the challenged actions. There, the denial of funding for a specific activity amounted to a substantive

ban on that activity because the government lacked any non-restricted funds which it could (arguably) use to perform that activity.

The Court therefore understands Section 527's rider to bar the use of every expenditure under the appropriations act necessary to "prevent" Members of Congress from entering DHS facilities, but not to expenditures of OBBBA funds. But while Section 527's limitation is cabined to funds appropriated under its "Act," the limitation is no doubt far-reaching: It extends to the more incidental but nevertheless necessary expenditures that make creation and enforcement of the notice policy possible. Such an understanding is consistent with the statutory text. The relevant term, "used," is the past participle form of the verb "use," which in this context means "[t]o employ for the accomplishment of a purpose; to avail oneself of." *Use*, Black's Law Dictionary (12th ed. 2024). That the inquiry focuses on funds expended to facilitate the prohibited activity, even incidental expenditures, is consistent with that definition. *See United States v. Jackson*, 388 F. Supp. 3d 505, 514 (E.D. Pa. 2019) (finding that rider which provided that none of the Department of Justice's appropriated funds "may be used to prevent" various states from implementing their own medical marijuana laws had the impact of prohibiting Department employees from participating in a supervised release hearing, because "the fact that these employees would be devoting time to this case over another case . . . constitute[d] use of funds," "however minor the expense").[6]

---

[6] Defendants cite several cases for the proposition that appropriations riders are meant to be read narrowly. But Defendants' cases are inapposite to the specific question at hand. Several concern how courts are to construe appropriations riders in cases where it is alleged that the rider is in conflict with other substantive laws, *see Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000), has repealed prior substantive law by implication, *see Me. Cmty. Health Options v. United States*, 590 U.S. 296, 317 (2020), or where it was alleged that the rider was itself imposing substantive law, *Bldg. & Const. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 273 (D.C. Cir. 1992). These cases do not speak to the issue here, which is what Congress means when it prohibits funds from being "used" to achieve a specific purpose.

As for identifying the types of expenditures under review in this case, the Court first considers the expenditures likely involved in the promulgation of the policy. Defendants provide next to no detail as to what agency activities took place or what funds were involved in the process of formulating the policy, despite being those in the best position to know, and being fully aware of the Court's view that promulgation of the policy likely falls within the scope of Section 527. *See* ECF 52 at 5. However, the Ninth Circuit in *Babbitt* was faced with determining the kinds of funds involved in similar management-level "review and decisionmaking," and suggested that the funds involved would include "salaries, employees, paper, or buildings." *Babbitt*, 73 F.3d at 871–72. All of those categories of expenditures were likely implicated here. The memorandum itself reflects that various DHS officials, including the Secretary and DHS budgeting and legal officials such as the DHS General Counsel and the Chief Financial Officer, were involved in the promulgation of the policy. ECF 39-1 at 1–2. As Plaintiffs persuasively argue, the employees involved likely included not only the decisionmakers themselves, but other staff in the Secretary's office and other legal and budgeting offices that supported them. ECF 49-1 at 38–39. Plaintiffs, citing to the declaration of a former high-level ICE and DHS budgeting and legal official, identify a variety of other offices whose involvement was substantially likely to be involved in promulgating the notice policy. *See* ECF 49-2 ¶ 20 (citing personnel from the "ICE Office of Congressional Relations, DHS Office of Legislative Affairs, ICE Office of Regulatory Affairs and Policy, DHS Office of Policy, ICE [Enforcement and Removal Operations], the DHS Office of General Counsel and ICE [Office of the Principal Legal Advisor]"). While Defendants dispute that as a legal matter, Section 527 would serve to restrict actions taken in the promulgation of this policy, they do not offer any factual evidence to dispute Plaintiffs' claims about who was actually involved in promulgating the policy. The fact that officials and employees spent time on the

promulgation of the policy constitutes a use of funds, one which is prohibited by the rider if Section 527 funds supported the time spent, "however minor the expense." *See Jackson*, 388 F. Supp. 3d at 514. As for the other associated costs for promulgating the policy, the Court agrees that to the extent that DHS officials' actions were facilitated by other resources, such as the "paper[] or buildings" in *Babbitt*, those costs are properly considered within the scope of "use[]" as contemplated by Section 527. *Babbitt*, 73 F.3d at 872. Plaintiffs identify a wide variety of these kinds of expenditures, such as "information technology systems and contracts, office supplies, utilities, and building infrastructure." ECF 49-2 ¶ 20. And again, while Defendants contest that as a legal matter, "use[]" of funds in Section 527 extends to these types of uses of government resources—an argument the Court has rejected—they do not present any evidence to dispute as a factual matter Plaintiffs' claims that such resources were likely employed by Defendants in promulgating the January 8 notice policy. *See* ECF 50 at 22–23; ECF 55 at 13–14.

Looking beyond the promulgation of the policy to the types of expenditures used in enforcing it, Defendants do acknowledge certain costs that can be attributable to the policy, including "time spent by ICE employees responding to requests by Members of Congress to visit ICE facilities, including time spent planning such visits," although Defendants do not provide any more details as to who those employees might be, what offices or units of DHS they may be part of, or what resources they might be using to facilitate enforcement of the policy. ECF 42-1 ¶ 8. While Defendants have claimed that "it is possible to track the costs incurred to issue and enforce the January 8 policy," Defendants have not presented any evidence that they have in fact done so. *Id.* ¶ 6. Plaintiffs again seek to fill in the gap. One obvious example in the record that they point to is ICE's Office of Congressional Relations (OCR), which is the ICE office that posted the notice policies, and by the terms of the January 8 policy, is in charge of approving and coordinating visits

to facilities. *See, e.g.*, ECF 39-1 at 2; ECF 57-2 at 8–10 (example of ICE OCR email to Plaintiff Escobar in response to oversight visit request); ECF 49-10 ¶ 23 (OCR denying a request to visit a facility on January 12, based on the policy as stated in the January 8 memorandum). The employees' time, their salaries, and the various resources they employ to review and deny visit requests are thus implicated by the notice policy. The January 8 memorandum also contemplates that at minimum the DHS Secretary's office is implicated in enforcing the policy, given that any exceptions to the notice requirement "must be approved by [the Secretary]." ECF 39-1 at 2. For that reason, the Court finds persuasive Plaintiffs' declaration which states that various "different management functions would also necessarily be involved in scheduling visits under the oversight visit policy and enforcing the policy against unannounced visits at facilities." ECF 49-2 ¶ 21.

###### ii.    What Appropriations Provided for these Expenditures?

Having determined the scope of the relevant expenditures prohibited by Section 527, the Court must now address the question at the crux of this case: Were any of these agency expenditures funded by Section 527-restricted annual appropriation funds? The Court finds that it is highly likely that Section 527-restricted annual appropriations funds were used in promulgating and enforcing the January 8 notice policy, and that Defendants' legal theories for curing these violations are unpersuasive, given that the Purpose Statute would prohibit Defendants from using OBBBA appropriations to fund at least some of the expenditures in question.

###### (a) The Record Demonstrates that Section 527-restricted Funds were Likely Used to Promulgate and Enforce the January 8 Notice Policy.

As discussed, the record demonstrates that a wide variety of agency activities at DHS and ICE were necessary to promulgate this policy and are necessary to enforce it. The present record also reflects that Section 527-restricted annual appropriated funds were likely employed to support those activities.

Take for instance certain expenditures required to promulgate the January 8 policy. The Court has determined that officials and offices at DHS, such as the Secretary's office, DHS legal counsel, and various others, were substantially likely to have been involved in the promulgation of the January 8 policy. *See* ECF 39-1 at 1–2 (indicating the involvement of the Secretary in the issuance of the policy); ECF 49-2 ¶ 20 (stating that the "DHS Office of Legislative Affairs," the "DHS Office of Policy," and "DHS Office of General Counsel" were also likely involved in the promulgation of the policy). Further, those officials and employees undoubtedly used resources, such as "buildings," "paper," *Babbitt*, 73 F.3d at 872, and similar materials to accomplish this. At DHS, many of the relevant offices are housed under the Office of the Secretary. *See Office of the Secretary*, DHS, https://perma.cc/H9UX-XNUG. The record and other materials of which the Court takes judicial notice indicate that at the time the policy was issued, those offices were funded through DHS's annual appropriated funds. DHS's annual appropriations contain a specific appropriation for "necessary expenses of the Office of the Secretary and for executive management for operations and support," *see* FY2024 Appropriations Act, 138 Stat at 593, and DHS's own congressional budget justifications regarding this appropriation notes that it "funds the Office of the Secretary and Executive Management's (OSEM) operating salaries and expenses." DHS, *Office of the Secretary and Executive Management, Budget Overview, Fiscal Year 2026 Congressional Justification* 12 (2025), https://perma.cc/J5W5-KHCN [hereinafter OSEM Congressional Budget Justification]. The budget justification indicates offices that were likely part of promulgating the January 8 notice policy, such as the Office of the Secretary, the Office of the General Counsel, the Office of Legislative Affairs, and the Office of Strategy, Policy, and Plans, are all funded by this appropriation. *Id.* The OSEM appropriation also provides a specific appropriation for "necessary expenses of the Office of the Secretary and for executive management

for procurement, construction, and improvements." FY2024 Appropriations Act, 138 Stat. at 593. This is all consistent with the testimony of Plaintiffs' declarant that various relevant DHS offices' "salaries are funded from the 'operations and support' annual appropriation," and their "information technology systems and contracts, office supplies, utilities, and building infrastructure . . . are funded by the 'procurement, construction, and improvements' annual appropriation." ECF 49-2 ¶ 20.

The January 8 policy was also directed to and contemplated the assistance of the Chief Financial Officer of DHS. ECF 39-1 at 1–2. The Office of the Chief Financial Officer is part of DHS's Management Directorate, which is "responsible for Department-wide mission support services and oversight functions, including information technology, budget and financial management, procurement and acquisition, . . . security, [and] logistics and facilities." DHS, Management Directorate Budget Overview Fiscal Year 2026 Congressional Justification 6 (2025), https://perma.cc/44S5-4AHH [hereinafter MD Congressional Budget Justification].[7] DHS's Management Directorate is also funded through a specific appropriation in the annual appropriations process, which provides for "necessary expenses of the Management Directorate for operations and support." FY2024 Appropriations Act, 138 Stat at 594; *see also* ECF 49-2 ¶ 13

---

[7] The Court takes judicial notice of DHS's fiscal year 2026 budget justifications. "Executive agencies submit written justifications of their budget requests to the appropriations committees and subcommittees of jurisdiction in each chamber. An agency's budget justification generally consists of a detailed description of each program activity and its purpose." Cong. Rsch. Serv., R47090, *Executive Agency Justification of the President's Budget: In Brief* 3 (2025). While these congressional budget justifications date to shortly before the OBBBA was passed in July 2025, the Court views these documents as strong evidence regarding the state of funding at DHS at the present time. *See* DHS, *Congressional Budget Justification Fiscal Year (FY) 2026*, https://perma.cc/48LT-LGEJ (noting that these documents date to June 2025). First, they are entirely consistent with the testimony of Plaintiffs' declarant, the relevant appropriations acts, and DHS's other documentation regarding the organization of these offices. Further, the budget justifications appear to have been prepared with anticipation of the funding that was to come from the reconciliation process. The budget justification for ICE, for example, states that the annually appropriated funding "complements the Administration funding requested in the reconciliation bill currently under consideration in the Congress," DHS, *U.S. Immigration and Customs Enforcement Budget Overview Fiscal Year 2026 Congressional Justification* 7 (2025), https://perma.cc/432S-UAEZ, whereas the justification documents for OSEM and the Management Directorate make no mention of the reconciliation bill. *See generally* OSEM Congressional Budget Justification; MD Congressional Budget Justification.

(noting that the Office of the Chief Financial Officer is funded as part of DHS's Management Directorate, and that this funding is also provided through annually appropriated funds).

The record thus reflects that various offices and employees involved in promulgating the notice policy are funded through DHS's annual appropriations, to which Section 527 attaches. There is also evidence that funds used to enforce the policy were paid for by annual appropriations rather than any other funds. For example, the Court finds it likely that DHS officials in the Office of the Secretary and its subdivisions are also involved in enforcing the policy, given that the January 8 notice requirement assigns to the Secretary the sole authority to approve exceptions from the notice requirement. ECF 39-1 at 2. While the Court views the uses of Section 527-restricted appropriated funds by DHS sufficient to render the policy problematic, the Court notes that these issues appear to extend to ICE's use of funds as well. Take the ICE Office of Congressional Relations, which is heavily involved in enforcing the policy, including by approving, scheduling, and denying visit requests. *Id.* Plaintiffs have presented evidence that shows that OCR was operating with annually appropriated funds as late as February 2, 2026, about a month after the January 8 policy was implemented. On February 2, while appropriated funds were lapsed, Plaintiff Representative Torres' staff sent an email to OCR following up on a request to visit an ICE facility. ECF 57-1 at 5–10. ICE's response stated that OCR was "unable to return emails or telephone calls" "[d]ue to the current federal funding hiatus," and would "return to duty once appropriations are restored." *Id.* at 10. When questioned about this issue at the February 12 hearing on Plaintiffs' stay request, Defendants did not contest Plaintiffs' factual contention that OCR was, even to that date, operating with annually appropriated funds. The annual appropriation for ICE contains an appropriation for "necessary expenses of [ICE] for operations and support." FY2024 Appropriations Act, 138 Stat. at 598. While it is not clear from ICE's FY 2026 congressional

budget justification whether this funding was going to be used for ICE OCR, Plaintiffs' declarant claims that ICE OCR is "funded through annual appropriations," ECF 49-2 ¶ 21, a conclusion which is supported by the fact that OCR was claiming it had ceased functioning during the lapse of appropriated funds.

Finally, the language of the January 8 memorandum supports Plaintiffs' contention that at the time the new policy was issued and first implemented, DHS and ICE had not attempted to ensure that only OBBBA-funded resources were employed. Indeed, the language of the January 8 memorandum anticipates that the steps taken to ensure DHS and ICE's compliance with Section 527 are largely prospective. The memorandum states that DHS and ICE officials "shall ensure"— not *have* ensured—"appropriate funding for the promulgation" and "implement[ation] and "enforce[ment]" of the policy." ECF 39-1 at 2. The Court finds on this record that it is substantially likely that Section 527-restricted annual appropriated funds were used for promulgating and enforcing the January 8 notice policy.

### (b) The Purpose Statute Undermines Defendants' Proposed Methods to Cure Their Uses of Section 527 Funds.

Perhaps acknowledging these factual difficulties, Defendants have not seriously attempted to argue that DHS and ICE ensured that only OBBBA-funded resources were employed when promulgating and first implementing the January 8 policy. Instead, they proffer legal arguments for why even if the facts were as Plaintiffs claim, Defendants' actions would not represent a violation of Section 527. In Defendants' view, any such violations could be fixed through back-end accounting, through which DHS tracks the relevant expenditures and cures the use of Section 527 funds, either by reassigning incurred (but as of yet unpaid) financial obligations to the OBBBA appropriations, or, assuming that the annual appropriation account had been charged, otherwise adjusting accounts by the end of the fiscal year. ECF 50 at 22–27. Plaintiffs dispute Defendants'

ability to take such steps under principles of appropriations law. *See* ECF 49-1 at 33–38. They also contest that Defendants could feasibly accomplish this task as a practical matter, given the wide range of expenditures involved in promulgating and enforcing the policy. *Id.* at 38–41.

The Parties' arguments on this point raise complex questions regarding the technical details of DHS budgeting and the application of appropriations law that the Court finds difficult to resolve on this preliminary factual record. Luckily, the Court does not need to fully address those disputes to resolve the present motion, because Defendants' proposed solution suffers from a fatal flaw: It assumes that OBBBA funds are available for all of the costs necessary to promulgate and enforce the policy. But the Purpose Statute, 31 U.S.C. § 1301(a), does not allow Defendants to use OBBBA funds for at least some of the relevant expenditures here.

The Purpose Statute commands that all "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). As a result, "all uses of appropriated funds must be affirmatively approved by Congress; the mere absence of a prohibition is not sufficient." *U.S. Dep't of Navy*, 665 F.3d at 1348. Thus, for OBBBA funds to permissibly be used in service of promulgating and enforcing the notice requirement, the types of expenditures discussed previously in this opinion, *see supra* Section III.A.2.b.i, need to have been affirmatively authorized in the OBBBA. *See id.* Authorization may be express or implied. *Id.* at 1349. Implied authorization for a given expenditure may exist when the "general statutory text leaves open whether a specific proposed expenditure is a legally authorized purpose for which appropriated funds may be expended." *Id.* In such cases, a reviewing Court applies the Comptroller General's "necessary expense" doctrine.[8] *Id.* To apply that doctrine

---

[8] The Comptroller General is a legislative official who heads the Government Accountability Office. *See* 31 U.S.C. § 702(b). Among other publications and opinions issued by the Office regarding appropriations-related questions and disputes, GAO publishes "its 'Red Book,' an influential guide to appropriations law and rulings cited numerous times

in this case, the Court must review the appropriations made in the OBBBA and ask whether the proposed expenditures—in this case, the various expenditures necessary to promulgate and implement the January 8 notice policy—are "necessarily incident to accomplishing" the object of the OBBBA appropriations. *Id.* However, even if the expenditure is "necessarily incident" to accomplishing the object of the OBBBA appropriation, the expenditure may still be unauthorized under the Purpose statute if it is "prohibited by law" or "otherwise provided for," *id.*, meaning that the expenditure "must not be an item that falls within the scope of some other appropriation or statutory funding scheme," GAO, *Principles of Federal Appropriations Law* (Red Book), GAO-17-797SP, at 3-17 (4th ed. 2017).[9]

To catalogue the relevant appropriations that Defendants have suggested authorize the disputed expenditures, ECF 50 at 19–20, the OBBBA appropriates hefty sums directly to ICE for the following purposes:

- "Hiring and training additional [ICE] personnel, including officers, agents, investigators, and support staff, to carry out immigration enforcement activities and prioritizing and streamlining the hiring of retired [ICE] personnel." *Id.* § 100052(1).

- "[T]ransportation costs and related costs associated with alien departure or removal operations." *Id.* § 100052(4).

- "[F]acility upgrades to support enforcement and removal operations." *Id.* § 100052(6).

The bill also appropriates funds to DHS, separately from ICE, for the following purposes:

---

by the federal courts, including . . . by the Supreme Court." Jesse M. Cross & Abbe R. Gluck, *The Congressional Bureaucracy*, 168 U. Pa. L. Rev. 1541, 1593 (2020); *Me. Cmty. Health Options*, 590 U.S. at 308–316 (extensively citing and discussing the Red Book).

[9] The GAO has framed the test's requirements as follows: (1) "[t]he expenditure must bear a logical relationship to the appropriation sought to be charged," (2) "[t]he expenditure must not be prohibited by law," and (3) "[t]he expenditure must not be otherwise provided for, that is, it must not be an item that falls within the scope of some other appropriation or statutory funding scheme." GAO, Red Book, GAO-17-797SP, at 3-16–17. In conducting the Purpose Statute analyses in this opinion, the Court focuses on the first and third prongs of the test. The second test is not relevant here, given that the Court has found that Section 527 does not represent a freestanding substantive ban on "prevent[ing]" congressional access to ICE facilities that would prohibit OBBBA funds from being used for those purposes if they otherwise satisfied the requirements of the Purpose Act.

- "Hiring and training of additional U.S. Customs and Border Protection agents, and the necessary support staff, to carry out immigration enforcement activities." *Id.* § 100051(1).

- "[T]ransportation costs and related costs associated with the departure or removal of" noncitizens. *Id.* § 100051(2).

- "[A]ssignment of [DHS] employees and State officers to carry out immigration enforcement activities pursuant to sections 103(a) and 287(g) of the Immigration and Nationality Act." *Id.* § 100051(3).

The Court finds that at minimum, expenses undertaken by DHS's Office of the Secretary and Management Directorate in promulgating and enforcing the notice requirement, *see supra* III.A.2.b.ii.(a), are not authorized by the OBBBA appropriations. The Court has determined that various officials in the Secretary's office, DHS legal counsel, and various others, were substantially likely to have been involved in the promulgation of the January 8 policy and used various resources for those offices assigned to and paid out of annually appropriated funds. While the OBBBA makes appropriations specifically to the Secretary of Homeland Security in Section 100051, none of those appropriations can be construed to include the activities undertaken by these DHS officials. Section 100051(1) focuses on the hiring of CBP agents and their support staffs, and does not extend to the salaries, costs, and expenses of the relevant DHS offices. The same goes for Section 100051(2), which focuses on a specific purpose—transportation costs for the removal of noncitizens. Nor does the Court find that the expenditures that DHS undertook to promulgate and enforce the policy are categorized as "necessary expenses" for those appropriations under the GAO's test.

As for Section 100051(3), this is a closer issue. To begin, the Court does not view the relevant expenditures as expressly included in the appropriation providing for the assignment of DHS employees to carry out "immigration enforcement activities pursuant to sections 103(a) and

287(g)" of the Immigration and Nationality Act (INA). Given that Section 103(a), codified at 8 U.S.C. § 1103(a), provides the source of authority to the Secretary of DHS to "administ[er] and enforce[]" the immigration laws, the reference to "section[] 103(a)" in a vacuum could be construed to extend to the authorization of funding of some of the management-level actions taken by the Office of the Secretary and the Management Directorate in this case. However, the simultaneous reference in the same appropriation to section 287(g) of the INA, codified at 8 U.S.C. § 1357(g), which allows for DHS to enter into agreements that allow state or local employees to serve as "immigration officer[s]," demonstrates that the purpose of the appropriation is to provide funding for DHS employees engaging in the kinds of on-the-ground enforcement of the immigration laws contemplated by section 287(g), meaning "the investigation, apprehension, or detention of aliens in the United States," 8 U.S.C. § 1357(g), rather than the kind of management-level policymaking in question here.

Nor can the relevant expenditures qualify as "necessary expense[s]" to the 100051(3) appropriation because even if they were implicitly authorized under the appropriation, they were at the time of the issuance of the January 8 policy "otherwise provided for in another" more specific appropriation. GAO, Red Book, GAO-17-797SP, at 3-407 (noting this inquiry as the "final step of [the] . . . purpose analysis," and that this step applies even when an expense is found to be "plainly . . . available"). That "other appropriation" is DHS's annually appropriated funds. Again, DHS's annual appropriations bill provides funding for the "necessary expenses of the Office of the Secretary and for executive management for operations and support," along with a separate specific appropriation for "procurement, construction, and improvements." FY2024 Appropriations Act, 138 Stat. at 593. This appropriation plainly covers many of the offices previously discussed in this opinion. DHS's Management Directorate, similarly implicated by the

notice policy, is also funded by a specific appropriation. *Id.* at 594. "It is a well-settled rule that even where an expenditure may be reasonably related to a general appropriation, it may not be paid out of that appropriation where the expenditure falls specifically within the scope of another appropriation." GAO, Red Book, GAO-17-797SP, at 3-407.

Finally, the Court also does not find that the appropriations to ICE in the OBBBA Section 100052 can support the various expenditures associated with the above-discussed DHS officials' involvement with the promulgation and enforcement of the notice requirement. Given that Section 100052 of the OBBBA appropriates funds to ICE alone, the appropriation cannot be construed as expressly or implicitly appropriating funds to the DHS offices and officials discussed above. And again, attempts to fund the DHS offices and officials in question would fail under appropriations principles given that they are provided for in their more specific appropriation.[10]

As a result, the Court agrees with Plaintiffs that, even assuming that Defendants had the logistical ability to transfer the costs of promulgating and enforcing the notice requirement between annually appropriated funds and the OBBBA appropriations, the Purpose Statute would prohibit Defendants from doing so because not all of those costs are authorized for payment under the OBBBA appropriations.

---

[10] The OBBBA also appropriates funds to DHS for "reimbursement of costs incurred in undertaking activities in support of the Department of Homeland Security's mission to safeguard the borders of the United States." § 90007, 139 Stat. at 361. Defendants do not argue that this provision is a source of funding for the various expenditures involved with the notice requirement, *see* ECF 50 at 19–20 (citing various other provisions, but not § 90007), and the Court also does not view this section as authorizing funding for the expenditures in dispute here. According to Plaintiffs' declarant, the term "'reimbursement of costs' in this context refers to funds that may 'reimburse' existing DHS annual appropriations, which are available for other specified purposes." ECF 49-2 ¶ 16(b). The Court thus agrees with Plaintiffs' interpretation of Section 90007 that the reimbursement of costs contemplated by the provision extends only to reimbursement of costs that could be permissibly incurred under DHS's annual appropriations. DHS's annual appropriations were, of course, restricted by Section 527 which prohibited funding for the activities in question.

c. **The January 8 Notice Policy is Contrary to Law and the February 2 Memorandum Does not Change that Conclusion.**

To sum up the Court's determinations regarding the January 8 notice policy: The Court has found that expenditures necessary to promulgate and enforce the notice policy—including actions taken by and resources used by DHS leadership and management staff—were highly likely to have been funded by Section 527-restricted appropriations. Further, it is substantially likely under the Purpose Statute that the OBBBA does not provide funding for these categories of expenditures, meaning that DHS could not use OBBBA funds to either remedy the use of Section 527-restricted funds after the fact, or, although it appears Defendants did not do so, use OBBBA funds to take the steps it did in the first instance. Because the record reflects that at least some Section 527-restricted funds were used in promulgating and enforcing the policy, and that Defendants' only other available source of funds may not be used to remedy that violation, the January 8 notice policy is contrary to law.

Secretary Noem's February 2 memorandum does not affect that conclusion. Recall that this memorandum was issued while DHS appropriated funds had lapsed between January 31 and February 3. The memorandum stated that Secretary Noem was "issu[ing] [a] new policy that is identical in substance to the January 8 access policy," and noted the Secretary's view that "Section 527 is not currently in effect." ECF 55-1 at 2. At the February 12 hearing on Plaintiffs' stay motion, Defendants' counsel represented that the February 2 memorandum was not a "new" policy, but merely a "ratification" of the January 8 policy. Hr'g Tr. 40:17–20, 41:7–19. Because the funds to which the Section 527 rider were lapsed at that time, Defendants appear to view the issuance of the February 2 memo as curing any concerns the Court has about whether the promulgation of the January 8 policy was contrary to law. ECF 55 at 10; Hr'g Tr. 38:11–15. This seems to be both because of their view that the Section 527 rider did not restrict the DHS Secretary's actions during

the lapse and because, while the annual appropriation was lapsed, OBBBA funds were necessarily used for the issuance of the memorandum.

First, the Court has doubts regarding the legal effect, if any, of the February 2 memorandum given the obvious tension between Defendants' claims that the memorandum is both a fresh repromulgation of the notice requirement and simultaneously not a new policy that must be addressed through an amended or supplemental pleading. Second, assuming that the February 2 memorandum counts as a repromulgation of the policy, the Court does not view the repromulgation to change the outcome here. As a result of the Purpose Statute analysis, the Court has found that the kind of activities that the Secretary purported to engage in on February 2 related to the notice requirement are not the kinds of activities that may be funded by the OBBBA.[11] And, as a factual matter, the record indicates that the Office of the Secretary is presently funded through annual appropriations. Defendants argue that nevertheless, because appropriated funds had lapsed, the "legally logical[] necessary conclusion" is that OBBBA funds were being used for DHS activities during the lapse because DHS "only had access to one" set of funds. Hr'g Tr. 39:5–8. But it is not accurate to say that, because appropriated funds had lapsed, Reconciliation Act funds must have

---

[11] The Court also finds that its Purpose Act holding that OBBBA funds could not pay for the DHS activities in question is also not altered by the existence of a lapse in appropriations on February 2. In the Court's view, the only way that a lapse could conceivably affect the analysis is by altering the third step of the "necessary expense" analysis of whether the putative expenditures "fall within the scope of another appropriation or funding source." *Bd. of Directors*, B-330693, 2019 WL 4942499 at *3 (Comp. Gen. Oct. 8, 2019). The GAO has rejected this proposition, on the principle that "where general and specific appropriations are both available for a given expenditure, the agency must use the specific appropriation for that expenditure to the exclusion of the more general appropriation." *Id.* at *4. GAO has previously applied this specifically in the case of a lapse of funds at the Federal Deposit Insurance Corporation (FDIC). *See generally id.* In that case, a government shutdown had led to the lapse of funds at the FDIC's Office of Inspector General (OIG), which was funded through a specific appropriation, while other components of the FDIC were funded through the deposit insurance fund (DIF). *Id.* at *4. Even though providing money to the OIG through the DIF satisfied the first two steps of the "necessary expense[]" test, GAO found that doing so nevertheless was impermissible because Congress had long funded OIG through its own, more specific appropriation. *Id.* GAO found that this was the case even though OIG's specific appropriation had lapsed and no funds were at the time available for OIG to operate. *Id.* at *5 ("[D]uring a lapse in appropriations, FDIC's general authority to incur obligations against the DIF remains unavailable to FDIC OIG, just as such authority has been unavailable to FDIC OIG in every fiscal year since FY 1998.").

been used during that period. As DHS's own guidance recognizes, during a government shutdown, functions and activities may continue if they are either "exempt" or "excepted." DHS, *Procedures Relating to a Lapse in Appropriations* 4 (2025), https://perma.cc/66L7-65HM. "Exempt" functions and activities are funded by appropriations that "have neither lapsed nor been exhausted"—for example, the OBBBA. *Id.* In contrast, "excepted" functions and activities are funded by "lapsed . . . appropriations" (e.g. annual appropriations) "which may nonetheless continue because the function or activity by law[] may continue to be performed during a lapse in appropriations." *Id.*

Given the restrictions on OBBBA funding and the fact that the Office of the Secretary is funded through the annual appropriations process, the Court finds on this record that the logical conclusion is not that the Office of the Secretary was using OBBBA funds, but that it was acting in an excepted status while the February 2 memorandum was issued and working pursuant to the lapsed appropriation.[12] But as Defendants previously acknowledged in this litigation, an agency that continues work on excepted functions during a lapse in appropriations is not simply working with a blank check, legally or financially: The agency is funding its activity by "incur[ring] obligations in advance of [future] appropriations." ECF 32-1 ¶ 6. Those obligations must eventually be retroactively funded and approved by Congress, which is what happened here: On February 3, 2026, Congress passed a continuing resolution that "ratified and approved" "[a]ll obligations incurred and in anticipation of the appropriations made and authority granted by" the continuing resolution. Consolidated Appropriations Act, 2026, div. H, § 104, 140 Stat. at 629.

---

[12] Further supporting the notion that the Office of the Secretary and related offices continued to be funded through the annual appropriations process, even after the passage of the OBBBA, is DHS's own guidance issued in September 2025 regarding procedures to be followed in the case of a lapse of appropriations. That guidance indicates that the Office of the Secretary and Executive Management had approximately 1,060 employees prior to a lapse in appropriations and estimated that only 158 employees would be working during a lapse of appropriations. DHS, *Procedures Relating to a Lapse in Appropriations* 35.

However, the continuing resolution only approved expenditures "if otherwise in accord with the provisions of" the continuing resolution, which contains the Section 527 rider. *Id.* Because the Secretary's actions in allegedly repromulgating the policy were eventually funded by appropriations which ultimately included the Section 527 restriction (through incorporation by reference to the prior appropriations bill), the Court does not view the memorandum as curing the Court's concerns regarding the policy's promulgation.

Defendants also raise the fact that DHS's annual appropriated funds again lapsed on February 14, 2026. The Court does not view this as an obstacle to Plaintiffs' likely success on the merits of their challenge to the January 8 notice policy, which is not only premised on how it has and will be enforced, but also includes a backwards-looking challenge addressing how it was promulgated—i.e., challenging actions that took place while Section 527 was fully in force (both on January 8 and again on February 2 in light of the continuing resolution passed on February 3). Plaintiffs' challenge asks whether the agency, at the time it made its decision, acted impermissibly under governing law. The fact that appropriated funds have now lapsed does not mean that Section 527 has been repealed or wiped off the books, or otherwise did not impose a limitation on the agency in January and early February 2026. The present record shows that it is likely that Section 527-restricted funds were used to promulgate the policy, a finding which, if confirmed at the end of merits litigation, would provide a sufficient basis to vacate and set aside the agency's actions. *See* 5 U.S.C. § 706(2)(C) (requiring a reviewing court to "hold unlawful and set aside agency action" found to be "in excess of statutory . . . authority[] or limitations"). That same finding would justify granting preliminary relief in the form of a Section 705 stay, as the Court does here.

*       *       *

Throughout this litigation, Defendants have emphasized the vast amount of money appropriated to DHS and ICE under the OBBBA. The Court agrees that these funds are indeed staggering. But the power of the purse rests with Congress, and even a deep-pocketed agency must comply with Congress's restrictions on the permissible uses of appropriated funds. *See Reeside v. Walker*, 52 U.S. 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion."); *U.S. Dep't of Navy*, 665 F.3d at 1348. When Section 527 says that "[n]one" of DHS's annually appropriated funds may be used for a prohibited purpose, it means none. § 527, 138 Stat. at 619; *see* Stith, *supra*, at 1362 ("[T]here is no de minimis exception to appropriation limitations, just as there is no de minimis exception to the constitutional appropriations requirement."). Defendants' likely inability to promulgate and enforce a notice policy in the manner they currently desire is not a question of, as Defendants portray it, having "Section 527 . . . negate and override Congress's later decision to make millions of dollars available to DHS." ECF 50 at 23. And Defendants continue to act as if the OBBBA appropriations expressly authorized them to impose notice requirements on Members of Congress, when the statute is in fact altogether silent on this question. The legal infirmities with the notice policy are a function of how DHS is structured and how Congress has decided to provide for its operations, including by funding significant decisionmaking portions of the agency through annual appropriations. *See Babbitt*, 73 F.3d at 872 (finding that an appropriations rider prevented the Secretary of the Interior himself from taking action otherwise required by law). Defendants may disagree with those choices, but they are obliged to respect those decisions.

The Court thus finds that Plaintiffs are likely to succeed on the merits of their claim that the January 8 version of the notice policy is contrary to law and in excess of DHS's statutory authority.[13]

### B. Plaintiffs Have Demonstrated Irreparable Harm.

Success on the merits of Plaintiffs' claim will not alone justify preliminary relief. Plaintiffs must also establish that they face irreparable injury absent relief. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy*, 454 F.3d at 297. To constitute irreparable injury, the injury "must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

The Court previously found that the policy imposes irreparable harm upon the Plaintiffs in denying them the ability to carry out timely oversight of covered facilities. *Neguse*, 2025 WL 3653597, at *30. As the Court found in the first opinion, Plaintiffs continue to demonstrate a significant need for real-time, on-the-ground information about conditions in facilities, the status of detainees, and Defendants' practices. *Id.* The record continues to reflect that the information to be gained from such visits is inherently time-sensitive, and that it is not speculative that the relevant conditions in the facilities could change over the course of the seven-day notice period. *Id.* The Court sees no reason to revise its prior conclusion, which also extends to Representative Morrison, who was not a Plaintiff at the time of the original opinion, but whose declarations reflect that the harm she suffers is also irreparable like those of her co-Plaintiffs. *See* ECF 49-13 ¶¶ 35–46. If anything, the strength of the Court's irreparable harm finding has become even greater over the

---

[13] Having found that the January 8 policy is likely contrary to law under the APA, and (as discussed below) found that this likely violation justifies a stay of the policy, the Court finds it unnecessary to address Plaintiffs' separate claim that the January 8 policy violates the APA as arbitrary and capricious agency action.

intervening months, given that ICE's enforcement and detention practices have become the focus of intense national and congressional interest. Accordingly, Plaintiffs have shown that they suffer irreparable harm due to the January 8 notice policy and this factor weighs in their favor.

### C.  The Equitable Factors Support Preliminary Relief.

As before, the public interest and the balance of equitable considerations weigh strongly in favor of granting Plaintiffs limited preliminary relief. The Court's prior reasoning on this issue fully applies here and addresses the majority of Defendants' objections on this point. *See Neguse*, 2025 WL 3653597, at *30–31. To address Defendants' new contentions, the Court acknowledges that the federal government has an interest in providing for adequate safety measures on federal property. *See* ECF 55 at 16 (citing *District of Columbia v. Trump*, No. 25-5418, 2025 WL 3673674, at *11 (D.C. Cir. Dec. 17, 2025)). However, Defendants have presented no record evidence, aside from Secretary Noem's suggestion in her memorandum that congressional visits create a "chaotic environment with heightened emotions," ECF 39-1 at 2, demonstrating that congressional visits without the notice policy are causing Defendants harm, let alone harm sufficient to outweigh the public interests in ending the perpetuation of unlawful agency action and ensuring that the statutes enacted by Congress are "not imperiled by executive fiat," *see Neguse*, 2025 WL 3653597, at *30 (citing *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *5 (D.D.C. Jan. 25, 2019)). As for Defendants' argument that the Court should decline to rule given the pendency of ongoing negotiations in Congress regarding the status of DHS appropriations funding, ECF 50 at 33, the Court disagrees. This case—which regards statutes previously passed by Congress and how they apply to DHS and ICE—is not the type of dispute that must be "resolved through the process of negotiation and accommodation between the political branches rather than through the judicial system." *Neguse*, 2025 WL 3653597, at *31.

41

**D.  The Court Stays the January 8 Notice Policy Under Section 705 of the APA.**

All the factors support a grant of preliminary relief. Plaintiffs ask the Court not only to exercise its power under 5 U.S.C. § 705 to "postpone the effective date" of the January 8 policy, but to issue additional relief necessary to "preserve status or rights pending conclusion of the review proceedings, " including that the Court order that "Defendants may not enforce, implement, extend, or give effect to any policy, under any name, that alters the status quo that existed prior to June 2025 by requiring [M]embers of Congress to provide advance notice before conducting oversight visits." ECF 57 at 12–13. Plaintiffs also ask that the Court order that Defendants be required to provide any new or modified policy to the Court before doing so. *Id.* at 13.

The Court will stay the January 8 policy under Section 705, which necessarily includes a stay of the February 2 purported "ratification" of the January 8 memo, ECF 55-1, but will decline at this time to order the additional relief that Plaintiffs request. The Court acknowledges that Section 705's language regarding the Court's ability to "issue all necessary and appropriate process . . . to preserve status or rights" could be interpreted to allow the Court to fashion a stay beyond simply "postpon[ing] the effective date" of the January 8 memorandum. 5 U.S.C. § 705. But the Court finds that staying the policy alone provides Plaintiffs relief sufficient to return the Parties to the status quo which existed before the notice requirement was instituted. Plaintiffs' lawsuit challenges a specific agency decision: the January 8 memorandum. Issuance of a Section 705 stay will function as a "temporary form of vacatur," in that it "suspends the legal source of authority to act," *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett, J. and Childs, J.), and thus deprives the memorandum "of enforceability," *Nken*, 556 U.S. at 428. Plaintiffs will be back in the same place they were before the notice policy was enacted, and Defendants will be prohibited from enforcing that policy.

42

Plaintiffs are undoubtedly frustrated with Defendants' repeated attempts to impose a notice requirement. But in taking further action, Defendants are required to abide by the terms of the Court's order and act consistently with the legal principles announced in this opinion. The Court has found that OBBBA funds cannot be used to fund various DHS activities that were undertaken to implement this policy. The Court has also found that, on this record, in any lapse of appropriations, the DHS executive management offices discussed in this opinion are likely to be operating by incurring obligations in advance of Congress's next appropriations bill. Their expenditures of funds must necessarily be consistent with that bill and any limitation riders contained within it, lest they violate those riders, the Purpose Statute, and the Anti-Deficiency Act.

Finally, the Court denies Defendants' request that the Court issue a stay of its order pending appeal. ECF 55 at 17. None of the factors weigh in favor of a stay. *See Nken*, 556 U.S. at 426 (listing the relevant factors). As for a likelihood of success on the merits, while the Court acknowledges that this iteration of the litigation raises complex legal and factual issues regarding appropriations law—issues that will likely benefit from a more developed record in the case— Defendants' failure to prevail on their arguments regarding the merits at this stage indicates that they will also be unlikely to prevail on the merits of their appeal. Defendants have also not shown that they are irreparably harmed by the failure to grant a stay. Defendants point to the need to protect federal facilities and property, but during the pendency of this litigation, Defendants have not cited any concrete examples of safety issues posed by congressional visits without advanced notice, let alone the significant harm necessary to justify a stay of the Court's order. The Court's order is targeted to one specific measure that Defendants have taken with regard to these facilities—the notice policy. It does not affect any other measures that Defendants have provided for the safety and security of visitors, ICE employees, or detainees. ECF 57-2 at 8–10 (listing

various other visitor requirements). If DHS is concerned about "circus-like publicity stunts," ECF 39-1 at 2, a notice requirement does not prevent those—a publicity stunt can still happen after a seven-day delay. Defendants' claim of irreparable harm from the Court's decision in this case is also undermined by Defendants' decision not to appeal the Court's prior opinion, which resulted in a similar outcome with respect to allowing Members' visits to DHS facilities. As to the equitable factors, the Court has already held that they clearly favor the *Plaintiffs'* stay of the challenged agency action, rather than Defendants' stay of the Court's order. Each factor weighs against granting Defendants a stay pending appeal.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a stay of agency action, ECF 49, is **GRANTED**. The challenged January 8 notice policy, including the purported ratification on February 2, is **STAYED** pending conclusion of these review proceedings, and the temporary restraining order entered by the Court on February 2, 2026, ECF 52, is hereby dissolved.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: March 2, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

JOE NEGUSE, in his capacity as a Member
of the U.S. House of Representatives, *et al.*,

                Plaintiffs,

      v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *et al.*,

              Defendants.

Case No. 25-cv-2463 (JMC)

---

**ORDER**

    For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED**
that Plaintiffs' motion for a stay of agency action under 5 U.S.C. § 705, ECF 49, is **GRANTED**.

    It is further **ORDERED** that, to "preserve status or rights pending conclusion of the review
proceedings," 5 U.S.C. § 705, the effective dates of implementation and enforcement of the seven-
day notice policy laid out in Secretary Noem's January 8 memorandum, ECF 39-1, including as
ratified by Secretary Noem's February 2 memorandum, ECF 55-1, are immediately postponed and
stayed.

    It is further **ORDERED** that the temporary restraining order entered by the Court on
February 2, 2026, ECF 52, is hereby dissolved.

    **SO ORDERED.**

                            _____
                            JIA M. COBB
                            United States District Judge

Date: March 2, 2026

Add.288