# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Joe Neguse, in his capacity as a Member of the
U.S. House of Representatives, *et al.*,

        *Plaintiffs-Appellees*,

v.

U.S. Immigration and Customs Enforcement *et al.*,

        *Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Columbia
Case No. 25-cv-2463, Hon. Jia M. Cobb

## Plaintiffs-Appellees' Opposition to Emergency Motion for an Immediate Administrative Stay

Daniel Martinez*
Ronald A. Fein
Katherine M. Anthony
Jessica Jensen*

American Oversight
1030 15th Street NW, B255
Washington, D.C. 20005
(202) 897-2465
danny.martinez@americanoversight.org

* Application for admission forthcoming

Christine L. Coogle
Lisa Newman
Paul R.Q. Wolfson
Brian D. Netter
Josephine T. Morse
Skye L. Perryman

Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 445-4939
ccoogle@democracyforward.org

*Counsel for Plaintiffs-Appellees*

# INTRODUCTION

Nearly three months ago, the district court stayed a Department of Homeland Security policy that imposed waiting periods before members of Congress could conduct oversight visits at immigration detention facilities, notwithstanding an appropriations rider prohibiting precisely such a policy. Rather than heed the court's order or seek appellate review, DHS waited three weeks and then secretly reissued a substantively identical policy, which has now also been stayed pursuant to 5 U.S.C. § 705.

Defendants-appellants the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and their respective heads (collectively DHS) now seek emergency relief from this Court, but there is quite transparently no emergency for DHS.

This filing responds to DHS's request for an immediate administrative stay pending adjudication of their motion for a stay pending appeal.[1] The request for an administrative stay should be denied. Entering the requested immediate relief would exceed the proper bounds of an administrative stay and would also be inequitable, disrupting a status quo that has been in place

---

[1] Plaintiffs will respond to the motion for a stay pending appeal within the time allotted by Federal Rule of Appellate Procedure 27(a)(3)(A), unless otherwise ordered by this Court.

for more than six years at a time when the importance of oversight at U.S. immigration detention facilities cannot be overstated.

DHS has made no showing that it will experience irreparable injury warranting this Court's emergency intervention while the appeal is pending. The entirety of DHS's irreparable-harm argument is contained in a single sentence and includes only a speculative fear of unexplained "safety" concerns. Mot. 26. As the district court found, "during the pendency of this litigation, Defendants have not cited any concrete examples of safety issues posed by congressional visits without advanced notice, let alone the significant harm necessary to justify a stay of the [district c]ourt's order." Add.286. DHS cannot overcome the high bar to obtain the stay it seeks, "a rare form of emergency relief reserved for true emergencies," *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *3 (D.C. Cir. Sep. 25, 2025), and this Court should not credit DHS's attempt to do so by issuing an immediate administrative stay.

## STATEMENT

Since fiscal year 2020, the law has guaranteed that members of Congress can conduct oversight of immigration detention facilities, with or without notice, and that congressional staff members can do so with up to 24 hours' notice. The relevant provision of law, contained in section 527 of the most recent DHS appropriations act, provides the following:

> **(a)** None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting member of Congress or such designated employee, compared to what would be observed in the absence of such modification:
>
>> **(1)** A Member of Congress.
>>
>> **(2)** An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.
>
> **(b)** Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.
>
> **(c)** With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, title V, § 527, 138 Stat. 460, 619 (Mar. 23, 2024).

This rider remains good law, even as the annual DHS funding to which it applies has at times expired and been renewed. *See generally, e.g.*, 43 Op. Att'y Gen. 224, 229 (1980) ("[O]n a lapse in appropriations, federal agencies may incur no obligations that cannot lawfully be funded from prior

appropriations unless such obligations are otherwise authorized by law."); *accord* GAO, *Principles of Federal Appropriations Law* 6-148–49 (4th ed. 2017), https://www.gao.gov/legal/appropriations-law/red-book; *Operation in the Absence of Appropriations*, GSA Order ADM 4220.1S, at 1 (Sept. 30, 2025), https://perma.cc/JWT7-N6VW. DHS has therefore had to comply with the restrictions of section 527 at all times since fiscal year 2019.

Despite Congress's repeated reenactment of this provision guaranteeing members' entitlement to engage in unannounced, on-the-ground oversight at DHS detention facilities, DHS for the first time began obstructing this oversight in June 2025. It imposed a policy that, in relevant part, required members to provide at least seven days' notice, and receive agency approval, before conducting oversight visits to ICE detention facilities. Plaintiffs, individual members of Congress, brought this lawsuit in response, leading to the district court's order of December 17 staying the notice requirement under section 705. Add.72–145. DHS did not appeal that order. Instead, weeks later, it secretly promulgated a new policy imposing the same seven-day-notice requirement. Add.147. DHS stated that it intended to implement and enforce the new policy using only funds provided in the reconciliation act of July 4, 2025, to which section 527 does not apply. *Id.* It proposed to accomplish this by using funds subject to section 527 to carry out the policy and later, by the end of the fiscal year, manipulate the

accounting by shifting money on the back end. Add.272. After emergency briefing and a temporary restraining order issued on February 2, the district court again stayed DHS's policy, concluding that it was likely unlawful for the same reasons as the June policy because it had likely been promulgated, and was likely continuing to be enforced, using annually appropriated funds subject to section 527 and that DHS could not lawfully carry out its proposed accounting fix. Add.268–77.

## ARGUMENT

**I.** To obtain a stay pending appeal, the movant must, among other requirements, "demonstrate that it will be 'irreparably injured' before the appeal concludes." *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). A failure to satisfy this requirement "is fatal to [a] stay request because a showing of irreparable harm is a necessary prerequisite for a stay." *Id.* at 64; *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Rather, "[t]he movant must provide proof that the harm has occurred in the

past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* DHS has offered nothing more than speculative allegations of harm, which do not satisfy its burden.

DHS's assertion of irreparable harm comprises a single sentence in its motion, stating vaguely that "'any unannounced visit is highly disruptive' and that advance notice is 'critical to ensure the safety of ICE facilities for staff, detainees, and visitors.'" Mot. 26 (quoting Add.70). DHS has not proffered a single piece of evidence to support its claim that the members' oversight visits in any way jeopardize "the safety of ICE facilities," despite numerous opportunities during multiple rounds of substantive briefing and three in-person hearings before the district court. *See* Add.286–87 ("Defendants have not cited any concrete examples of safety issues posed by congressional visits without advanced notice, let alone the significant harm necessary to justify a stay of the Court's order."). DHS offers only "[b]are allegations" of what it purportedly fears may occur, without any "proof that the harm has occurred in the past" or "is certain to occur in the near future." *Wisconsin Gas*, 758 F.2d at 674. DHS, "like other litigants, may not simply assume that [a] court will leap to intervene on its behalf based on generalized assertions of injury." *Fed. Educ. Ass'n*, 2025 WL 2738626, at *3.

In addition to being baseless, DHS's allegations are contrary to the evidence proffered by the members, who each submitted multiple

declarations describing in-person oversight visits, conducted with little or no advance notice, involving no risk to the safety of ICE facilities or personnel. *See, e.g.*, Add.251 (citing plaintiffs' declarations).

DHS's unsupported assertions are further undercut by its decision not to appeal the district court's December 17 order staying its first seven-day-notice policy. If there were truly an emergency, DHS would have sought relief from this Court at that time (or would have more expeditiously implemented the substantially identical January policy that it issued weeks later). The members engaged in multiple unannounced oversight visits during the ensuing weeks, again without incident. Add.251. And after the district court issued the TRO against the January policy on February 2, the members again recommenced their oversight visits, again without incident.

DHS has utterly failed to show irreparable harm absent a stay by this Court. The Court need go no further and should deny their request for an administrative stay on that basis. *See D.C. Circuit Handbook of Practice and Internal Procedures* 32–33 (2025).[2]

---

[2] DHS also did not include "a specific statement of the time exigencies involved" necessitating this Court's emergency intervention as is required by this Court's rules. *See D.C. Circuit Handbook of Practice and Internal Procedures* 33 (2025). Nor did DHS request expedited briefing on its motion, underscoring that an administrative stay is not appropriate here. *See id.* (explaining that a "very short" administrative stay is typically entered only in conjunction with an expedited briefing schedule); *see also Fed. Educ. Ass'n*, 2025 WL 2738626, at *3 ("[I]t is not enough that the government

7

**II.** In any event, DHS also cannot satisfy the remaining requirements for an emergency stay, including that it "make a strong showing that it is likely to succeed on the merits; . . . show that issuing a stay will not substantially injure the other parties interested in the proceeding; and . . . establish that the public interest favors a stay." *KalshiEX LLC*, 119 F.4th at 63 (cleaned up). As the district court correctly concluded "none of the factors weigh in favor of a stay." Add.286.

As to the latter two requirements, the district court rightly determined that "they clearly favor the *Plaintiffs'* stay of the challenged agency action, rather than Defendants' stay of the Court's order." Add.287. In stark contrast to DHS's lack of harm, the plaintiff members and the public will be substantially injured if the Court were to issue a stay allowing DHS to reinstate its unlawful policy of obstructing the members' oversight at immigration detention facilities. The members' need to obtain prompt information about the conditions in immigration detention facilities is paramount, especially for those members whose constituents are affected by the conditions of detention and for those members actively engaged in appropriations negotiations. This is particularly true where the facts on the ground in those facilities change rapidly. Add.138–40, 283. The importance

---

stamps the word 'EMERGENCY' on the front cover of its stay application." (cleaned up)).

8

of this oversight—to the members who have a personal interest in conducting such oversight and to the American public—has only grown as DHS's immigration enforcement and detention operations have expanded across the country and "have become the focus of intense national and congressional interest." Add.284.

As to the likelihood of success, DHS's motion barely addresses the merits of the members' claims that the seven-day-notice requirement is contrary to section 527 and exceeds DHS's authority. Instead, DHS contends first that the members do not have Article III standing, but that contention depends on a mischaracterization of *Raines v. Byrd*, 521 U.S. 811 (1997), and its progeny, and of the harms that the plaintiff members assert. *Compare* Mot. 9–18 *with* Add.90–116, Add.265–259. "The key point" in assessing legislator standing "is that there should be no 'mismatch' between the party 'seeking to litigate' and the party . . . that has been harmed." Add.105 (quoting *Comm. on the Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 767 (D.C. Cir. 2020) (en banc)). There is no mismatch here, where, as the district court recognized, the members' "injuries are personal rather than institutional." Add.105.

Next, DHS argues that the Antideficiency Act indicates that Congress intended to preclude review of appropriations-related claims under the APA. Not so. "Congress rarely intends to prevent courts from enforcing its

directives to federal agencies," and thus courts apply a "'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986)). DHS cannot overcome the presumption here, where the text of section 527 "says nothing about the preclusion of judicial review," Add.122, and does not suggest that "Congress wanted [the] agency to police its own conduct," *Mach Mining*, 575 U.S. at 486. Moreover, the members do not seek to enforce the Antideficiency Act itself through an APA claim, and the Act is only "'one of *several means* by which Congress has sought to enforce' its appropriations instructions," Add.124 (quoting 25 Op. O.L.C. 33, 33 (2001) (emphasis added)).

As to the merits, DHS breezily states that the stayed seven-day-notice policy "does not implicate Section 527" because the secretary instructed ICE to "ensure" that the policy is "implemented and enforced" using only reconciliation act funds not subject to the limitations of section 527. Mot. 23 (quoting Add.147). But a secretary's bald instructions alone do not make it so. The district court carefully considered multiple declarations submitted by the members and made several factual findings contrary to DHS's assertions, including that "expenditures necessary to promulgate and enforce the notice policy—including actions taken by and resources used by DHS leadership and management staff—were highly likely to have been

funded by Section 527-restricted appropriations." Add.278; *see also* Add.271 ("The record thus reflects that various offices and employees involved in promulgating the notice policy are funded through DHS's annual appropriations, to which Section 527 attaches."). Indeed, DHS has not even attempted to assert—and it cannot—that the policy was promulgated *without* using those funds. *See* Add.266 ("Defendants provide next to no detail as to what agency activities took place or what funds were involved in the process of formulating the policy, despite being those in the best position to know, and being fully aware of the Court's view that promulgation of the policy likely falls within the scope of Section 527.").

Finally, DHS's suggestion (at 24) that "formulating [a] policy" to violate the law is not itself contrary to law is specious and was rightly rejected by the district court. Add.260–61. DHS asked the district court, and now invites this Court, to rely on its mere suggestion that DHS is complying with section 527 without requiring any proof, despite significant evidence to the contrary submitted by the members and credited by the district court. The Court should decline that extraordinary invitation.

## CONCLUSION

The Court should deny DHS's request for an immediate administrative stay pending a ruling on the emergency motion for a stay pending appeal.

11

March 5, 2026                                    Respectfully submitted,

<u>/s/ Christine L. Coogle</u>
Christine L. Coogle
Lisa Newman
Paul R.Q. Wolfson
Brian D. Netter
Josephine T. Morse
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 445-4939
ccoogle@democracyforward.org

Daniel Martinez*
Ronald A. Fein
Katherine M. Anthony
Jessica Jensen*
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 897-2465
danny.martinez@americanoversight.org

\* *Application for admission forthcoming*

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2586 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Cir. Rule 32(e)(1). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

*/s/ Christine L. Coogle*
Christine L. Coogle

# CERTIFICATE OF SERVICE

I certify that on March 5, 2026, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Christine L. Coogle*
Christine L. Coogle
