**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-5072**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

JOE NEGUSE, in his capacity as a Member of the U.S. House of Representatives, *et al.*,

Plaintiffs-Appellees,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## REPLY IN SUPPORT OF EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
MICHAEL S. RAAB
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.   The Government Is Likely To Succeed On The Merits. ......................2

   A.   The Members May Not Base Standing On Impediments To
   Official Duties. ...............................................................................2

   B.   The Members' APA Claims Are Precluded. ...................................7

   C.   The Advance-Notice Requirement Is Lawful. ................................9

II.  The Remaining Factors Support A Stay. ...........................................12

CONCLUSION ...................................................................................................14

## INTRODUCTION

The merits question in this case is whether the Executive Branch may use a particular appropriation for a particular purpose:  the government believes that it may use funds appropriated in the One Big Beautiful Bill Act (OBBBA) to enforce a commonsense advance-notice policy for Members of Congress wishing to enter secure detention facilities, whereas the Members believe that it is neither logistically feasible nor legally permissible to do so.  That obscure accounting dispute should never have found its way into court, and it was certainly not a basis to prohibit the government from enforcing a policy it has determined is critical to the safe management of detention facilities while litigation continues.

Most obviously, this case is brought by individual members of Congress, who cannot assert injuries "to official authority or power" and arising "solely because they are Members of Congress."  *Raines v. Byrd*, 521 U.S. 811, 821, 826 (1997).  Nor do the Members have a cause of action, since the Anti-Deficiency Act exclusively governs claims that the Executive Branch has expended funds without authorization.

Even if the Court could reach the merits, the district court erred. The Members sued to enforce an appropriations rider that applies to only *some* of the funds available to Immigration and Customs Enforcement (ICE), but the challenged policy is explicit that the agency will enforce it with funds *not* subject to that rider—which is not even currently in effect.

Finally, the district court required ICE to abandon a policy it has determined is "critical to ensure the safety of ICE facilities for staff, detainees, and visitors," Add.70, thereby causing extraordinary harm to the government and public interest. Although the government initially sought to address the district court's concerns by revising its policy, the district court rejected that approach. This Court's prompt intervention is thus necessary to prevent mounting and irreparable harm to the government.

## ARGUMENT

### I.    The Government Is Likely To Succeed On The Merits.

#### A.    The Members May Not Base Standing On Impediments To Official Duties.

The controlling Article III principles are straightforward: legislators lack standing to assert injuries "to official authority or

power" and arising "solely because they are Members of Congress." *Raines v. Byrd*, 521 U.S. 811, 821, 826 (1997). That is why legislators could not challenge the Line Item Veto Act, *id.*; an executive order concerning the protection of rivers, *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999); military action in Yugoslavia, *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000); or the receipt of purported emoluments, *Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020) (per curiam). Instead, political disputes are "hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Trump v. Mazars USA*, 591 U.S. 848, 859 (2020).

The Members suggest that they are seeking information to which they are personally entitled, Opp'n 13, but any rights they possess arise because they are "Member[s] of Congress" seeking to enter ICE facilities "for the purpose of conducting oversight," Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619 (2024). Any rights thus attach to the Members in their capacities as members of Congress, which is why they sued in that capacity. Add.157-58; *see* Congressman Joe Neguse, *Court Again Orders Trump-Vance Administration to Restore Congressional Oversight of ICE Detention Facilities* (Mar. 2, 2026),

3

https://perma.cc/Z89R-62TP (stating that the Members sought relief "to restore oversight authority to all Members of Congress" and that the district court's ruling "reaffirms Congress's authority to investigate detention conditions").

The Members suggest that "injury need not be private to be personalized," Opp'n 13, but *Raines* also involved rights—to vote on legislation—"that a member of Congress enjoys by virtue of her office but which are conferred on and may be exercised by that member individually." *Id.*; *see* Brief for Appellees, *Raines*, 1997 WL 251423, at *28 (U.S. May 9, 1997) (suggesting that "Members have an *individual* interest in the integrity of their votes" akin to "his right to his seat in the legislature" or "congressional salary"). The Supreme Court nevertheless rejected standing because the plaintiffs had "not been singled out for specially unfavorable treatment"; did not seek something to which they "*personally*" are entitled, like a paycheck; and "would no longer have a claim" if they were "to retire tomorrow." 521 U.S. at 821. Those factors point the same way here: the Members are being treated like any other legislators who do not provide advance notice, do not seek something (like a paycheck) to which they are personally entitled, and

4

would have no claim if they retired.  That is why there is a "mismatch," Opp'n 13:  the Members are individual legislators asserting injuries to Congress.  Indeed, the Members do not even attempt to dispute the government's observation that this case is easier than *Raines* because, instead of conferring rights on the Members, Section 527 merely limits the purposes for which certain funds may be spent.  *See* Mot. 20-21. The Members' claim that the Executive Branch is improperly spending money is a classic generalized grievance.

The Members suggest that "history and tradition" support review because they are asserting claims involving "denial of access and information," Opp'n 14, but that framing is too abstract.  Under *Raines*, the question is whether there is "historical practice" of "analogous" inter-branch suits "brought on the basis of claimed injury to official authority or power."  521 U.S. at 826.  That is why *Raines* rejected legislators' vote dilution claims even though such claims *by private parties* are commonplace.  *Id.* at 837 (Stevens, J., dissenting).  The same reasoning controls here.[1]

---

[1] The only time after *Raines* that this Court countenanced a suit like this one, the Supreme Court granted certiorari and the plaintiffs

*Continued on next page.*

5

The Members also wrongly downplay the absence of congressional authorization to sue. They contend that Congress already "passed a law that applied to members individually," Opp'n 14-15, but the same was true in *Raines*, where the statute permitted members objecting to the Line Item Veto Act to bring suit, 521 U.S. at 815-16. The Supreme Court nevertheless rejected standing because—as in this case—the plaintiffs "have not been authorized to represent their respective Houses of Congress in this action." *Id.* at 829.

Nor would holding that plaintiffs lack standing deprive the Members of a remedy. Article I grants Congress potent political tools, and the Supreme Court has made clear that Congress must use them to resolve its disputes with the Executive Branch. *See Mazars*, 591 U.S. at 863. To the extent the Members complain that they cannot protect Congress's interests without convincing a majority of their colleagues to deploy those tools, that simply underscores the standing problem.

---

abandoned their claims. Mot. 13-14 (discussing *Maloney v. Carnahan*, 45 F.4th 215 (D.C. Cir. 2022)). The Members dispute that the *Maloney* plaintiffs dismissed their lawsuit to avoid Supreme Court review, Opp'n 14 n.5, but only after certiorari was granted did the plaintiffs take "unilateral action" to "abandon their claim," Response to Suggestion of Mootness 1, *Carnahan v. Maloney*, No. 22-425 (U.S. June 20, 2023).

Finally, the Members have no good answer to the government's observation that whatever interests they possess under Section 527, that is no longer what this case is about given the policy's requirement that it be implemented and enforced with funds appropriated by the OBBBA. Instead, the Members are expressly relying on the district court's determination "the notice policy could not be lawfully implemented using only [OBBBA] funds because at least some actions needed to promulgate and implement that policy … fall outside the limited, enumerated" purposes for which OBBBA funds can be used. Opp'n 21. That theory alleges a violation of the OBBBA, *not* Section 527. And the Members do not have *any* interest—personalized or otherwise—in policing the boundaries of the OBBBA, for even a member of Congress has no "direct interest in having monies appropriated by the Congress used for no other purpose than those authorized by law." *Hansen v. National Comm'n on Observance of Int'l Women's Year*, 628 F.2d 533, 534 (9th Cir. 1980).

## B.    The Members' APA Claims Are Precluded.

Even if the Members had standing, the Anti-Deficiency Act precludes their APA claims. The Members observe that neither Section

7

527 nor the Anti-Deficiency Act expressly precludes review, Opp'n 16, but it is well established that preclusion may be implied as well as express.  It would have made little sense for Congress to enact a comprehensive scheme for addressing unlawful expenditures through a "complex scheme of interbranch dialogue," *Global Health Council v. Trump*, 153 F.4th 1, 19 (D.C. Cir. 2025), if any plaintiff who objected to an expenditure could seek APA relief.

The Members suggest that *Global Health Council* is distinguishable because the Impoundment Control Act "created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations."  Opp'n 18 (quoting *Global Health Council*, 153 F.4th at 18).  But the Anti-Deficiency Act likewise requires notification to Congress and the Comptroller General.  31 U.S.C. § 1351.  And while the Anti-Deficiency Act does not purport to permit suits by the Comptroller General, Article III would not permit such suits in any event.  *See Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002).

The Members further suggest that their claim is based on Section 527 rather than the Anti-Deficiency Act.  Opp'n 18.  As discussed above, that is no longer true given the government's reliance on OBBBA funds.  Moreover, absent the Anti-Deficiency Act, there would be nothing improper in the government using resources it had already purchased, or even incurring new obligations, so long as dollars did not leave the treasury: as several of the plaintiff Members have explained, "until the Anti-Deficiency Act of 1870, there was no general prohibition on the government obligating funds—meaning committing to making a payment—in the absence of an appropriation."  Brief of Current and Former Members of Congress 11, *CFPB v. Community Fin. Servs. Ass'n*, No. 22-448 (U.S. May 15, 2023).  This case is an attempt to enforce the Anti-Deficiency Act, and the Members may not do so under the APA.

### C.    The Advance-Notice Requirement Is Lawful.

**1.**    In any event, the policy is lawful.  As to promulgation, Section 527 does not apply to developing policy; it concerns funds used to "prevent" a member of Congress from entering an ICE facility.  Pub. L. No. 118-47, § 527(a), 138 Stat. at 619.  The government does not "prevent" anyone from doing anything by developing a policy and

9

disseminating it within the Executive Branch, *contra* Opp'n 19-20.

Beyond that, (1) the January 8 policy directed the Chief Financial

Officer to "ensure appropriate funding for the promulgation of this

policy, including use of OBBBA funding where appropriate," Add.147,

and (2) the government repromulgated the policy on February 2, when

it had no funds subject to Section 527, Add.243.

Plaintiffs suggest that so long as any resources initially purchased

with funds subject to Section 527 were used to promulgate the policy—

paper, office space, etc.—the policy would be unlawful.  Opp'n 20.  But

that position reflects a basic misunderstanding of appropriations law,

which permits retroactive adjustments between accounts.  *See* U.S.

Gov't Accountability Off., *Principles of Federal Appropriations Law* 7-9

(2006) (explaining that an "agency may initially charge common-use

items to a single appropriation as long as it makes the appropriate

adjustments from other benefiting appropriations before or as of the end

of the fiscal year" and that "[t]here is no rule or formula for this

allocation apart from the general prescription that the agency must use

a supportable methodology").  The district court's contrary holding was

incorrect—and unsurprising because federal courts have no expertise in

the minutiae of appropriations issues, which are not the stuff of justiciable controversies.[2]

That leaves only the district court's theory that the government could not lawfully use OBBBA funding. That theory is incorrect, Mot. 24-25, and the Members lack standing to assert it because the OBBBA has nothing to do with the purported rights that they assert under Section 527.

**2.**     The Members are also wrong about implementation. Even if the law extending Section 527 had not lapsed, the challenged policy requires that "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding." Add.147; *see also* Add.150 (noting Department's intention to "reconcile its accounts" so that costs are "charged to and recorded against the appropriate [OBBBA]

---

[2] The Members' theory seems to be that the government cannot deliberately charge the wrong account, Opp'n 22, but that is not what is happening here. The government acted lawfully in using funds subject to Section 527 to purchase items like computers and office supplies. To the extent "common-use items" are later used for a purpose falling within Section 527, it is permissible to make adjustments later with OBBBA funds. And even if that were wrong, it would at worst suggest a violation of the OBBBA, not Section 527, which cannot plausibly be construed as prohibiting reimbursements from non-covered funds.

11

accounts"). That is an acceptable way of complying with appropriations law, and neither the district court nor the Members identified authority for the proposition that a court could stay a facially lawful policy based on a belief that it would be "logistically difficult," Opp'n 20 (quotation marks omitted), for the government to implement it.

## II.   The Remaining Factors Support A Stay.

The remaining factors support a stay. As we have explained, the Members assert only official-capacity harms that do not even suffice for standing. Mot. 26. But on the other side of the ledger, Secretary Noem determined, "following significant and sometimes violent incidents at ICE facilities," that "advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike" because "[u]nannounced visits require pulling ICE officers away from their normal duties." Add.146-47. An ICE declarant similarly explained that the policy is "critical to ensure the safety of ICE facilities for staff, detainees, and visitors." Add.70; *see* Add.71 (noting that some members of Congress have "refused to comply with facility visitation requirements, including limitations on recording devices," thereby "requir[ing] additional staff attention and resources");

United States Attorney's Office for the District of New Jersey, *Congresswoman Charged for Forcibly Impeding and Interfering With Federal Officers* (June 10, 2025), https://perma.cc/W6GG-8MHF.  Those are interests of the highest order, and they are no less important because the government made a good-faith effort to revise its policy to address the district court's concerns before seeking this Court's intervention, *contra* Opp'n 11.  Similarly, while certain members engaged in a limited number of oversight visits without serious incident while the temporary restraining order was in effect (at a time when they had every incentive not to seek conflict, given pending litigation), *see id.*, that is no more proof that the policy is unnecessary to prevent serious security incidents than a successful road trip without a seatbelt is a reason to stop wearing one.

Finally, the Members give short shrift to the public interest in allowing political disputes to be resolved through the political process—an interest explaining why this Court has repeatedly entered stays when district courts have interfered in disputes like this one.  *See Committee on the Judiciary v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (per curiam) (granting stay pending appeal); Order, *Committee on the*

13

*Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. Nov. 27, 2019) (entering

lengthy administrative stay).  The same result is warranted here.

## CONCLUSION

The Court should enter an immediate stay.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney
  General*

MARK R. FREEMAN
MICHAEL S. RAAB
 */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648
  Steven.A.Myers@usdoj.gov*

MARCH 2026

14

## CERTIFICATE OF COMPLIANCE

I hereby certify that this reply satisfies the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,597 words. This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Century Schoolbook, 14-point font, a proportionally-spaced typeface.

/s/ *Steven A. Myers*
Steven A. Myers