**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-5072**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

JOE NEGUSE, in his capacity as a Member of the U.S. House of
Representatives, *et al.*,

Plaintiffs-Appellees,

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Plaintiffs-appellees are Joe Neguse, in his capacity as a Member of the U.S. House of Representatives; Adriano Espaillat, in his capacity as a Member of the U.S. House of Representatives; Bennie G. Thompson, in his capacity as a Member of the U.S. House of Representatives; Jamie Raskin, in his capacity as a Member of the U.S. House of Representatives; Robert Garcia, in his capacity as a Member of the U.S. House of Representatives; J. Luis Correa, in his capacity as a Member of the U.S. House of Representatives; Jason Crow, in his capacity as a Member of the U.S. House of Representatives; Veronica Escobar, in her capacity as a Member of the U.S. House of Representatives; Daniel S. Goldman, in his capacity as a Member of the U.S. House of Representatives; Jimmy Gomez, in his capacity as a Member of the U.S. House of Representatives; Raul Ruiz, in his capacity as a Member of the U.S. House of Representatives; Norma Torres, in her capacity as a Member of the U.S. House of Representatives; and Kelly Morrison, in her capacity as a Member of the U.S. House of Representatives. Defendants-appellants are U.S. Immigration and Customs

Enforcement; David Venturella, in his official capacity as Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement; the U.S. Department of Homeland Security; and Markwayne Mullin, in his official capacity as Secretary of the U.S. Department of Homeland Security. Lawyers Defending American Democracy participated as amicus curiae in district court and have indicated that they also intend to participate in this Court.

**B. Rulings Under Review**

The ruling under review (issued by Judge Jia M. Cobb) is an order filed March 2, 2026, granting the Members' motion for a stay of agency action. JA497-541. The accompanying memorandum opinion is available on Westlaw at 2026 WL 575509.

**C. Related Cases**

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Steven A. Myers*
STEVEN A. MYERS

**TABLE OF CONTENTS**

**Page**

GLOSSARY

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF THE ISSUE.............................................................4

STATEMENT OF THE CASE .............................................................4

    A.    ICE's Operation Of Detention Facilities And
        Congressional Appropriations For That Purpose...................4

    B.    The June 2025 Policy And The District Court's First
        Stay Order. .................................................................................8

    C.    The January 2026 Policy And The District Court's
        Second Stay Order. .................................................................13

SUMMARY OF ARGUMENT...............................................................18

STANDARD OF REVIEW.....................................................................21

ARGUMENT ...........................................................................................21

I.    The Members Are Unlikely To Succeed On The Merits................22

    A.    The Members Lack Article III Standing To Assert
        Injuries To Official Power And Arising Solely Because
        They Are Members Of Congress.............................................23

        1.    Supreme Court And Circuit Precedent Foreclose
            Standing For Individual Legislators Asserting
            Harms To Their Official Functions.............................23

2. Under Supreme Court And Circuit Precedent, The Members Lack Standing. ...................................... 32

3. The District Court's Contrary Holding Is Irreconcilable With *Raines*. ........................................... 43

B. The Members' APA Claims Are Precluded By The Anti-Deficiency Act, Which Comprehensively Governs The Remedies For Unlawful Executive Branch Expenditures. ................................................................. 53

C. The Advance Notice Policy Is Lawful Because It Complies With All Applicable Funding Restrictions............ 60

II. The Remaining Equitable Factors Favor The Government. .......... 65

CONCLUSION ................................................................................. 68

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ............................................................... 41

*Bender v. Williamsport Area Sch. Dist.,*
475 U.S. 534 (1986) ............................................................... 27

*Block v. Community Nutrition Inst.,*
467 U.S. 340 (1984) .................................................... 20, 53, 57

*Blumenthal v. Trump,*
949 F.3d 14 (D.C. Cir. 2020) (per curiam) ................... 24, 30, 35, 43, 49

*Campbell v. Clinton,*
203 F.3d 19 (D.C. Cir. 2000) ........................................ 29, 40, 41, 49

*Carnahan v. Maloney,*
143 S. Ct. 2456 (2023) ........................................................... 31

*Carnahan v. Maloney,*
143 S. Ct. 2653 (2023) ........................................................... 32

*Cheney v. U.S. Dist. Ct. for D.C.,*
542 U.S. 367 (2004) ............................................................... 39

*Chenoweth v. Clinton,*
181 F.3d 112 (D.C. Cir. 1999) ...................................... 28, 29, 49

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................... 44

*Committee on the Judiciary of the U.S. House of Representatives v. McGahn,*
968 F.3d 755 (D.C. Cir. 2020) (en banc) ............................... 39

*Cuomo v. U.S. Nuclear Regul. Comm'n,*
772 F.2d 972 (D.C. Cir. 1985) (per curiam) ......................... 22

*Department of State v. AIDS Vaccine Advoc. Coal.,*
  146 S. Ct. 19 (2025) .......................................................................54

*Feldman v. Bowser,*
  315 F. Supp. 3d 299 (D.D.C. 2018) .....................................................55

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) .......................................................................21

*Global Health Council v. Trump,*
  153 F.4th 1 (D.C. Cir. 2025) ..................................................... 12, 20, 54

*Goldwater v. Carter,*
  444 U.S. 996 (1979) .......................................................................39

*Hansen v. National Comm'n on Observance of Int'l Women's Year,*
  628 F.2d 533 (9th Cir. 1980) ...............................................................36

*Kerr v. Hickenlooper,*
  824 F.3d 1207 (10th Cir. 2016) ..........................................................47

*Lamie v. U.S. Tr.,*
  540 U.S. 526 (2004) .......................................................................64

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) .......................................................................34

*Maine Cmty. Health Options v. United States,*
  590 U.S. 296 (2020) .......................................................................56

*Make the Rd. N.Y. v. Noem,*
  No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)
  (per curiam) .......................................................................21

*Maloney v. Carnahan,*
  45 F.4th 215 (D.C. Cir. 2022) ............................................................51

*Maloney v. Murphy,*
  984 F.3d 50 (D.C. Cir. 2020) ...............................................2, 30, 31, 32

*Mills v. District of Columbia,*
571 F.3d 1304 (D.C. Cir. 2009) ...........................................................21

*Natural Res. Def. Council, Inc. v. Hodel,*
865 F.2d 288 (D.C. Cir. 1988) ...........................................................40

*Nken v. Holder,*
556 U.S. 418 (2009) ...........................................................65

*Powell v. McCormack,*
395 U.S. 486 (1969) ........................................... 11, 19, 46, 48

*Raines v. Byrd,*
521 U.S. 811 (1997) ...................................2, 10, 18, 19, 22, 23, 24, 25, 26, 31, 33, 34, 35, 37, 38, 40, 42, 43, 44, 46, 47, 49, 66

*Robertson v. Seattle Audubon Soc'y,*
503 U.S. 429 (1992) ...........................................................56

*Simon v. Eastern Ky. Welfare Rts. Org.,*
426 U.S. 26 (1976) ...........................................................34

*Texas v. United* States,
599 U.S. 670 (2023) ...........................................28, 31, 44

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ...........................................................37

*Trump v. CASA, Inc.*
606 U.S. 831 (2025) ...........................................................66

*Trump v. Mazars USA, LLP,*
591 U.S. 848 (2020) ...........................................27, 37, 38, 67

*United States v. Ballin,*
144 U.S. 1 (1892) ...........................................................26

*United States v. Vulte,*
233 U.S. 509 (1914) ...........................................................55

vii

*United States v. Will,*
  449 U.S. 200 (1980) ......................................................................56

*United States v. Windsor,*
  570 U.S. 744 (2013) ................................................................40, 67

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
  529 U.S. 765 (2000) ................................................................23, 44

*Virginia House of Delegates v. Bethune-Hill,*
  587 U.S. 658 (2019) ................................................................27, 38

*Walker v. Cheney,*
  230 F. Supp. 2d 51 (D.D.C. 2002). ...............................................59

**Statutes**

2 U.S.C. § 192 ..............................................................................57

2 U.S.C. § 194 ..............................................................................57

2 U.S.C. § 288d ............................................................................57

2 U.S.C. § 692(a)(1) (1996) ..........................................................24

5 U.S.C. § 2954 ......................................................................30, 31

5 U.S.C. § 705 ......................................................1, 3, 9, 13, 15, 21

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................4

8 U.S.C. § 1225(b)(2)(A) .................................................................4

8 U.S.C. § 1226(c) ...........................................................................4

8 U.S.C. § 1231(a)(2) .......................................................................4

8 U.S.C. § 1231(g)(1) .......................................................................4

8 U.S.C. § 1231(g)(2) .......................................................................5

28 U.S.C. § 1292(a)(1) .....................................................................4

28 U.S.C. § 1331 .......................................................................3

28 U.S.C. § 1361 .......................................................................3

28 U.S.C. § 1365(b) .................................................................57

31 U.S.C. § 1341(a)(1)(A) .......................................................55

31 U.S.C. § 1349 .....................................................................55

31 U.S.C. § 1350 .....................................................................55

31 U.S.C. § 1351 .....................................................................55

Consolidated Appropriations Act, 2026,
Pub. L. No. 119-75, 140 Stat. 173 ......................................6

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118-47, 138 Stat. 460 .......................5, 6, 19, 33, 47, 62, 64

Homeland Security and Further Additional Continuing Appropriations Act, 2026,
Pub. L. No. 119-86, 140 Stat. 773 .......................................6

Pub. L. No. 119-21, 139 Stat. 72 (2025) .............................7, 62

Secure America Act,
Pub. L. No. 119-98, 140 Stat. 837 (2026) ...........................7, 8

**Legislative Materials**

H.R. 9070, 119th Cong. (2026) ..............................................40

H.R. Doc. No. 103-324 (1994) ...............................................38

**Rules**

Fed. R. App. P. 4(a)(1)(B) .......................................................4

**Other Authorities**

Brief for Appellees,
*Raines v. Byrd*, 1997 WL 251423 (U.S. May 9, 1997) ......................... 45

Brief of Current and Former Members of Congress,
*CFPB v. Community Fin. Servs. Ass'n*,
No. 22-448 (U.S. May 15, 2023) ......................................................... 58

Congressman Joe Neguse, *Court Again Orders Trump-Vance
Administration to Restore Congressional Oversight of ICE Detention
Facilities* (Mar. 2, 2026), https://perma.cc/Z89R-62TP ...................... 36

Congressman Joe Neguse, *Rep. Neguse Leads Colorado House
Democrats in Introducing Immigration and Customs Enforcement
Reforms* (June 2, 2026), https://perma.cc/FZ3B-GPR2 ...................... 40

Response to Suggestion of Mootness, *Carnahan v. Maloney*,
No. 22-425 (June 20, 2023) ............................................................... 32

U.S. Gov't Accountability Off.,
*Department of the Treasury Office of Inspector General—Availability
of Appropriations for Pandemic Emergency Rental Assistance
Program Oversight and Recoupment* (2026) ....................................... 63

U.S. Gov't Accountability Off., *Principles of Federal
AppropriationsLaw* (2006) ......................................................... 54, 61

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| DHS | Department of Homeland Security |
| ICE | Immigration and Customs Enforcement |
| JA | Joint Appendix |
| OBBBA | One Big Beautiful Bill Act |

# INTRODUCTION

To ensure the safety of government personnel, detainees, and visitors, the government carefully controls access to detention facilities operated by Immigration and Customs Enforcement (ICE). Consistent with those critical security needs, the Secretary of Homeland Security determined that members of Congress must provide seven days' notice before visiting such a detention facility so that the government can arrange adequate staffing for these resource-intensive visits. At the behest of thirteen individual members of Congress, the district court nevertheless stayed that advance-notice policy pursuant to 5 U.S.C. § 705 because it believed the policy was inconsistent with an appropriations rider, known as Section 527, that had previously limited ICE's ability to use certain funds to "prevent" members of Congress from entering such facilities. That order rests upon a misconception of Article III that the Supreme Court and this Court have rejected, flouts the comprehensive remedial scheme for unlawful expenditures created by the Anti-Deficiency Act, and wrongly requires ICE to comply with an inapplicable (and expired) appropriations rider. This Court should vacate the district court's order and remand with instructions to

dismiss.

First, under unambiguous Supreme Court precedent, legislators lack standing to assert injuries "to official authority or power" that arise "solely because they are Members of Congress." *Raines v. Byrd*, 521 U.S. 811, 821, 826 (1997). This Court has repeatedly applied that principle, and the only time it departed from it after *Raines*, *see Maloney v. Murphy*, 984 F.3d 50 (D.C. Cir. 2020), the Supreme Court granted certiorari and the plaintiffs abandoned their claims rather than face reversal in the Supreme Court. In any case, *Maloney* is distinguishable because the statute upon which the Members rely here is an appropriations rider governing the purposes for which the Executive Branch may expend certain funds, not a statute purporting to vest the Members with substantive rights. For related reasons, even if the district court had jurisdiction, it still erred in reaching the merits because the Anti-Deficiency Act, not the Administrative Procedure Act (APA), governs claims that the Executive Branch has unlawfully expended funds.

The district court erred on the merits as well. The policy it stayed was clear on its face that ICE must implement and enforce it without

2

funds subject to Section 527—the only funds that were subject to the appropriations rider upon which the Members rest their claims. And ICE's last funds subject to Section 527 expired in February 2026, which means that (as of this filing) the district court's stay order has required ICE to comply with an appropriations rider governing the use of funds it has not had in over four months, simply because the policy was initially promulgated at a time when the Department of Homeland Security (DHS) and ICE both had funds subject to Section 527.

Finally, the remaining equitable factors weighed heavily against preliminary relief. The Members suffer no cognizable harms from purported injuries to their ability to conduct congressional oversight, whereas the district court's order disregards the agency's determination that the policy is necessary to ensure the safety of members of Congress, ICE personnel, and detainees, thereby seriously harming the government and the public interest.

## STATEMENT OF JURISDICTION

The jurisdiction of the district court was contested, but the Members invoked 28 U.S.C. §§ 1331 and 1361. JA409. The district court stayed the challenged policy pursuant to 5 U.S.C. § 705 on March

3

2, 2026, JA497-541, and the government filed a timely notice of appeal on that date, *see* JA542-43; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Acting at the behest of thirteen individual members of Congress, the district court stayed a policy that DHS adopted to ensure the safety of government personnel, detainees, and visitors because it believed that the policy was inconsistent with an appropriations rider. The question presented is whether the district court's order was unlawful.

## STATEMENT OF THE CASE

### A. ICE's Operation Of Detention Facilities And Congressional Appropriations For That Purpose.

1. ICE, a component of DHS, administers Congress's mandate that certain aliens be detained during removal proceedings or pending removal. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(c), 1231(a)(2). As relevant here, Congress has provided that "[t]he [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." *Id.* § 1231(g)(1). Congress has further authorized DHS to build and operate detention facilities when "United States Government facilities"

or "facilities adapted or suitably located for detention are unavailable for rental."  *Id.*; *see also id.* § 1231(g)(2) (requiring DHS to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility" prior to constructing a new facility).

2.     When Congress funded DHS and ICE for fiscal year 2024, Section 527(a) of the relevant appropriations bill provided that "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent [a member of Congress or staff] from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619.  Subsection (b) provided that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight."  *Id.* § 527(b), 138 Stat. at 619.  And subsection (c) provided that, as to congressional staff, "the Department of Homeland Security may require that a request be

5

made at least 24 hours in advance." *Id.* § 527(c), 138 Stat. at 619. Although that legislation applied only to the appropriations made by that statute for fiscal year 2024, certain later continuing resolutions incorporated it by reference—including most recently the continuing resolution that funded DHS and ICE through February 13, 2026. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. H, § 101, 140 Stat. 173, 628.

On February 14, 2026, annual appropriations to DHS lapsed, including to ICE. The lapse of annual appropriations mostly ended on April 30, 2026, when the President signed the Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, 140 Stat. 773, which appropriated funds to most components of DHS through September 30, 2026. But although that legislation includes (as Section 546) the restrictions previously imposed by Section 527, it appropriates no funds to ICE. Since February 14, 2026, therefore, ICE has had no appropriated funds subject to Section 527.

**3.** In addition to these annual appropriations, Congress has provided DHS and ICE substantial funding outside the normal appropriations process. First, on July 4, 2025, legislation commonly

known as the One Big Beautiful Bill Act (OBBBA), appropriated more than $2 billion to the Secretary of Homeland Security, to remain available through September 30, 2029.  Pub. L. No. 119-21, tit. X, subtitle A, pt. II, § 100051, 139 Stat. 72, 385 (2025).  That funding was appropriated for "immigration and enforcement activities," including "transportation costs and related costs associated with the departure or removal of aliens" and "the assignment of Department of Homeland Security employees … to carry out immigration enforcement activities." *Id.* § 100051(1)-(3), 139 Stat. at 386.  It also appropriated nearly $30 billion for ICE, to remain available through September 30, 2029.  *Id.* § 100052, 139 Stat. at 387.  That funding was appropriated for "[h]iring and training additional [ICE] personnel … to carry out immigration enforcement activities"; "transportation costs and related costs associated with alien departure or removal operations"; and "facility upgrades to support enforcement and removal operations."  *Id.* § 100052(1), (4), (6), 139 Stat. at 387-89.  Congress did not subject any of the appropriations in the OBBBA to Section 527.

Second, on June 10, 2026, Congress enacted the Secure America Act, Pub. L. No. 119-98, 140 Stat. 837 (2026), which fully funded ICE

through September 30, 2029.  In addition to providing ICE billions of dollars for enforcement and removal operations, *id.* § 202, 140 Stat. at 839-41, the legislation appropriated an additional $2.5 billion to the Secretary of Homeland Security to be used for those purposes (among others), *see id.* § 203, 140 Stat. at 841.  None of the funding appropriated by this legislation is subject to Section 527.

**B.    The June 2025 Policy And The District Court's First Stay Order.**

1.    To "protect staff, detainees, and the surrounding community, and to maintain order, ICE enforces strict security measures, including advance scheduling of facility tours, maintaining a secure perimeter, and screening all visitors prior to entry."  JA91.  In June 2025, amidst rising tensions concerning immigration enforcement, ICE imposed a policy requiring that members of Congress and staff provide seven days' notice before visiting a detention facility.  JA94.  In district court, ICE provided sworn testimony from its congressional relations office explaining that such notice "is necessary to ensure that ICE can allocate the staff and resources necessary to ensure these visits can take place safely."  JA91.  "Visits from Members of Congress and their staff are resource intensive because ICE must ensure the safety of these

high-profile visitors and any unannounced visit is highly disruptive to ICE's immigration enforcement operations." JA91. In particular, "Members of Congress and their staff require screening at entry to facilities, access to locked units in facilities, and escorts between locked units in facilities." JA91.

2.  The Members commenced this suit on July 30, 2025. JA22-88. With each Member purporting to sue in his or her "official capacity as an individual member of Congress," JA27-29, the Members contended that the June 2025 notice requirement violated Section 527 and impeded "their individual duties as members of Congress by denying them information that is integral to completing constituent casework, to working effectively on congressional committees of jurisdiction, to crafting legislation, to determining appropriations, and to protecting the American public by verifying that the U.S. government is complying with federal law and respecting the civil rights and civil liberties of individuals in its custody." JA44-45.

On December 17, 2025, the district court stayed the June 2025 policy under 5 U.S.C. § 705. JA93-166. In concluding that the Members had Article III standing, the court first extensively addressed

why they would have standing to assert harms concerning "denial of physical access" and "inability to gather in-person information" if they were private individuals asserting private rights—a point that the government had not contested. *See* JA111-20.

Only then did the district court turn to the principles governing legislator standing set out in *Raines v. Byrd*, 521 U.S. 811 (1997). The Court recognized that *Raines* set out a dichotomy between "personal" and "institutional" injuries, JA126, but it found that the Members' injuries were personal because the statute "provides access to ICE facilities for individual congresspeople," JA126, and the Members are "individual Members of Congress who have been denied access to Section 527-funded facilities," JA127; *see also, e.g.*, JA129 ("Section 527 is specifically focused on granting access to ICE facilities to individual Members of Congress and their designated staff members."). It further suggested that the injury was personal because the plaintiff Members, unlike other members, "sought … to exercise the right of access granted under Section 527 and were denied." JA129. While the court recognized that the power of oversight belongs to Congress, it believed that "Congress can, and often does, delegate its oversight

responsibilities." JA130. And in any event, it reasoned, the Members were asserting rights under a federal statute instead of rights dependent upon Congress's inherent oversight power. JA130.

The district court further rejected the government's contention that "to be a personal and particularized injury under *Raines*, the injury must be one that only occurs in Plaintiffs' personal capacities." JA130 (quotation marks omitted). In reaching that conclusion, it relied on the Supreme Court's decision in *Powell v. McCormack*, 395 U.S. 486 (1969), in which Congressman Adam Clayton Powell challenged his expulsion from the House. In the district court's view, Congressman Powell also sued over "rights he was entitled to as a congressperson," JA131, thereby demonstrating that official injuries can be actionable.

The district court found that no other separation-of-powers concerns would preclude standing. JA132-37. Rejecting the government's contention that there is no history of interbranch litigation over access to information, the court reasoned that this lawsuit was "analogous to disputes over an individual's entitlement to information based on a congressionally passed and presidentially-signed statute." JA133. It further held that the absence of

11

authorization by the full House did not matter because the Members were not asserting institutional injuries. JA133. Finally, it held that denying the Members a judicial forum would deny them a remedy because they had already exhausted their political tools by enacting a statute guaranteeing access to ICE detention facilities. JA133-37.

The district court rejected the government's argument that the Anti-Deficiency Act precluded APA review. JA142-47. It recognized that this Court had already held that the Impoundment Control Act precludes reliance on the APA, JA144 (citing *Global Health Council v. Trump*, 153 F.4th 1, 18 (D.C. Cir. 2025)), but it found that holding distinguishable because, in its view, the Members were not expressly seeking to enforce the Anti-Deficiency Act itself, JA145. It also believed that, in contrast to the Impoundment Control Act, the Anti-Deficiency Act does not create a "complex scheme of interbranch dialogue." JA146 (quoting *Global Health Council*, 153 F.4th at 19). And it rejected the government's argument that other statutes addressing congressional access to Executive Branch information precluded review, reasoning that those provisions were "irrelevant to this analysis as they concern requests for documents and testimony by committees." JA146.

On the merits, the district court concluded that the June 2025 policy violated Section 527(a) because it uses funds subject to that restriction to "stop[] visiting Members of Congress from entering a facility unless they have provided seven days of advance notice," JA149. It observed, however, that its conclusion "might well be different" if "the Government demonstrate[d] different facts regarding the sources of funding DHS has used to promulgate and implement the challenged policies." JA163. After finding that the remaining factors supported a stay, JA162-65, it stayed the policy under 5 U.S.C. § 705.

## C. The January 2026 Policy And The District Court's Second Stay Order.

**1.** The government did not appeal from the district court's first stay order. Instead, on January 8, 2026, DHS issued a new policy. JA167-68. While the January 2026 policy also requires that access requests by members of Congress be made seven calendar days in advance, the January 2026 policy requires that ICE "implement[] and enforce[]" it "exclusively with money appropriated by the OBBBA." JA168. Thus, "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding." JA168. The policy further

directs the Chief Financial Officer to "ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." JA168. In a declaration, ICE reiterated that it would track relevant costs to ensure that they were "properly recorded against" OBBBA appropriations. JA171-72.

The January 2026 policy explained that "advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike." JA168. It explained that "[u]nannounced visits require pulling ICE officers away from their normal duties." JA168. And it noted the "increasing trend of replacing legitimate oversight activities with circus-like publicity stunts, all of which creates a chaotic environment with heightened emotions." JA168.[1]

**2.** Shortly after DHS adopted the January 2026 policy, the Members filed a motion for an order to show cause, contending that the January 2026 policy represented a violation of the district court's order

---

[1] On February 2, 2026, at a time when its funding subject to Section 527 had temporarily lapsed, DHS issued a "new policy that is identical in substance to the January 8 access policy." JA496.

14

staying the June 2025 policy.  Dkt. No. 40.  The court denied that motion, explaining that the January 2026 policy was a "new agency action not subject to the Court's prior stay order."  JA174.  The Members then amended their complaint, JA405-94, and filed a motion seeking a temporary restraining order or stay pursuant to 5 U.S.C. § 705, Dkt. No. 49.  The court initially granted a temporary restraining order, JA396-404, which it later extended through early March 2026, Dkt. No. 58.

**3.**      Shortly before the temporary restraining order was set to expire, the district court stayed the new policy pursuant to 5 U.S.C. § 705.  JA497-541.  On the threshold issues, it largely reincorporated its earlier analysis, JA509-12, reasoning that its prior opinion had "exhaustively addressed" the Members' standing, JA509, and rejecting the government's preclusion arguments for the "same reasons" it provided previously, JA512.

The district court did acknowledge one pertinent difference from its earlier opinion, which was that the agency had committed to "using solely OBBBA funds to promulgate and implement the January 8 notice policy."  JA511.  "Were it the case that Defendants had established that

15

every expenditure used to prevent Plaintiffs' entry into a given facility was funded by the OBBBA and not by appropriated funds," the court explained, it would be "unlikely that Plaintiffs would have standing to sue on a theory that Defendants had exceeded their authority to spend funds under the OBBBA." JA511. Nevertheless, it reasoned, the Members were "likely to succeed in showing that, as a factual matter, Section 527-restricted annual appropriated funds were indeed used by DHS to promulgate the January 8 policy and have been used by Defendants to enforce it." JA511.

On the merits, the district court found that the January 2026 policy was unlawful because "Section 527-restricted funds have likely been used in a manner contrary to law in reimposing the seven days' notice requirement," JA513, and because "promulgation of the very policy which is employed to deny Members' access to facilities" falls within the prohibition of Section 527, JA514. In the court's view, Section 527 would be violated even if "incidental … expenditures" subject to Section 527 were incurred in promulgating the policy, JA518, including using items like "'paper,'" JA519. And while the court noted the government's intentions to use exclusively OBBBA funds to enforce

16

the policy, it found that ICE was not permitted "to use OBBBA funds for at least some of the relevant expenditures." JA526. Finally, the court rejected arguments that it should deny a stay because (1) DHS had reissued the policy on February 2, 2026, while it lacked funds subject to Section 527, JA531-34, or (2) that at the time of the court's order, the appropriations bill extending Section 527 had lapsed, JA534. After determining that the remaining factors favored plaintiffs, JA536-37, the court again stayed the policy.

4. The government appealed to this Court and sought a stay pending appeal, which a motions panel denied without an opinion. *See* Order (May 8, 2026) (per curiam). Judge Rao concurred, agreeing with the government that "the text and structure of the Constitution, historical practice, and Supreme Court precedent foreclose standing for members of Congress to vindicate injuries to institutional legislative power." Order 3 (Rao, J., concurring). In concluding otherwise, Judge Rao explained, "the district court's decision contravenes *Raines* and subsequent Supreme Court decisions rejecting assertions of congressional standing." Order 4 (Rao, J., concurring). While "the Members visit detention facilities as individual lawmakers,"

17

"conducting such investigations for oversight purposes is not a personal prerogative or right; rather, it is an exercise of the institutional power of Congress." Order 5 (Rao, J., concurring). Judge Rao nevertheless concurred in the denial of the stay because, in her view, the government had not established sufficient harm to justify a stay pending appeal. Order 7-10 (Rao, J., concurring).

## SUMMARY OF ARGUMENT

The district court's holding is irreconcilable with Supreme Court and Circuit precedent rejecting Article III standing in analogous cases, improperly seeks to police Executive Branch expenditures through the APA notwithstanding the comprehensive scheme created by the Anti-Deficiency Act, and wrongly requires ICE to comply with an appropriations rider governing the use of funds it no longer has. This Court should vacate the district court's order and remand with instructions to dismiss.

**I.A.** The Members are unlikely to succeed on the merits because they have alleged no personal injuries redressable in an Article III court. Under *Raines v. Byrd*, individual members of Congress cannot assert injuries "to official authority or power" and arising "solely

18

because they are Members of Congress." 521 U.S. 811, 821, 826 (1997). Yet that is precisely what the Members are doing here: they are suing to enforce a purported right that attaches only to members of Congress who seek entry to ICE detention facilities "for the purpose of conducting oversight." Pub. L. No. 118-47, § 527(a), 138 Stat. at 619. While the district court relied on *Powell v. McCormack*, 395 U.S. 486 (1969), for the proposition that a loss of political power can sometimes be cognizable, that case was brought by a member who claimed to have been "singled out for specially unfavorable treatment as opposed to other Members." *Raines*, 521 U.S. at 821. *Powell* is irrelevant here, where the Members challenge an Executive Branch policy that applies to all 535 members of Congress in their capacities as members of Congress. Their essential claim is that the Executive Branch is mistreating the institution of Congress itself—a claim that is not cognizable under binding precedent and that is utterly foreign to our Constitutional tradition.

**B.** Even if the Members could surmount the Article III hurdle, their APA claims are precluded by statute. Although the district court read Section 527 as creating an affirmative right to enter ICE facilities,

19

that is not what the statute says: it is a restriction on the Executive

Branch using certain funds for certain purposes. Claims that the

Executive Branch has used funds for improper purposes, however, are

governed by the Anti-Deficiency Act. The Members cannot expand the

remedies provided by that statute by bringing a claim under the APA.

*See Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984); *Global*

*Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025).

**C.** The Members' claims fail on the merits as well. Even while

ICE had funds subject to Section 527, the policy was explicit that ICE

would implement it using funds not subject to that restriction. While

ICE might initially use certain resources purchased with funds subject

to Section 527, an agency may ensure appropriate funding through

retroactive adjustments, as ICE indicated it would do here. The

Members' belief that such adjustments would be logistically difficult is

insufficient to warrant a § 705 stay. In any event, the challenged policy

does not prohibit members of Congress from entering ICE facilities—it

simply regulates the terms on which they may do so.

**II.** The remaining equitable factors weighed heavily against

preliminary relief. The challenged policy causes the Members no

20

cognizable injury at all, and harms that do not suffice for standing cannot support irreparable harm either. On the other side of the ledger, the district court's order disregards the agency's determination that the challenged policy is necessary to the safe and efficient management of detention facilities and harms the public interest by interfering in a political dispute over which the court lacked jurisdiction.

## STANDARD OF REVIEW

A stay of agency action pursuant to 5 U.S.C. § 705 is appealable as a preliminary injunction. *See Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *9-11 (D.C. Cir. Nov. 22, 2025) (per curiam) (statement of Millett & Childs, JJ.); *see also Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 377 (2024). This Court reviews the grant of a preliminary injunction for abuse of discretion, but the district court's legal conclusions are reviewed de novo. *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009).

## ARGUMENT

To obtain a stay of agency action under 5 U.S.C. § 705, the Members needed to demonstrate that they were likely to succeed on the merits, that they would suffer irreparable injury without judicial

intervention, and that the public interest and the balance of the equities weighed in their favor.  *E.g.*, *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam).  The Members failed to make any of these showings, let alone all of them.

## I.     The Members Are Unlikely To Succeed On The Merits.

To succeed on the merits, the Members would have to demonstrate that the district court had jurisdiction, even though *Raines v. Byrd* precludes standing for individual members of Congress asserting injuries "to official authority or power" and arising "solely because they are Members of Congress," 521 U.S. 811, 821, 826 (1997); that they could invoke the APA, even though the Anti-Deficiency Act comprehensively governs claims that the Executive Branch has made unlawful expenditures; *and* that they were entitled to base their claims on Section 527, even though the policy directed that it be enforced without funds subject to that provision.  The Members cannot make any of these showings.

**A. The Members Lack Article III Standing To Assert Injuries To Official Power And Arising Solely Because They Are Members Of Congress.**

At the outset, the Members lack Article III standing because they are suing in their capacity as members of Congress to assert injuries to their ability to do their jobs as members of Congress. As Judge Rao recognized, "the text and structure of the Constitution, historical practice, and Supreme Court precedent foreclose standing for members of Congress to vindicate injuries to institutional legislative power." Order 3 (May 8, 2026) (Rao, J., concurring).

**1. Supreme Court And Circuit Precedent Foreclose Standing For Individual Legislators Asserting Harms To Their Official Functions.**

"[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Raines*, 521 U.S. at 820 (quotation marks omitted). Article III constrains the types of controversies justiciable in federal courts to those "that were the traditional concern of the courts at Westminster," *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000) (quotation marks omitted), and suits brought by individual legislators pose special standing problems, *Raines*, 521 U.S. at 820-21. As a result, "*Raines* is our starting point

23

when individual members of the Congress seek judicial remedies."
*Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) (per curiam).

**a.** In *Raines*, six representatives challenged the Line Item Veto Act, which permitted the President to cancel specific appropriations. 521 U.S. at 813-14. The Act authorized "[a]ny Member of Congress or any individual adversely affected by [the Act]" to "bring an action … for declaratory judgment and injunctive relief on the ground that any provision of [the Act] violates the Constitution." *Id.* at 815-16 (first alteration in original) (quoting 2 U.S.C. § 692(a)(1) (1996)). Invoking that cause of action, the *Raines* plaintiffs contended that the Act had injured them by "alter[ing] the legal and practical effect of [their] votes" and "divest[ing them] of their constitutional role in the repeal of legislation." *Id.* at 816 (quotation marks omitted).

The Supreme Court held that the legislators lacked a cognizable injury. *Raines*, 521 U.S. at 818, 829-30. It explained that members of Congress, like other litigants, must demonstrate standing by "claim[ing] that they have been deprived of something to which they *personally* are entitled"—that is, by asserting harm in a "private capacity." *Id.* at 821. The legislators failed to satisfy that requirement

because their asserted injuries were "based on a loss of political power, not loss of any private right." *Id.* The Court noted that each plaintiff's claimed injury "runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power." *Id.* The Court emphasized that "[i]f one of the Members were to retire tomorrow, he would no longer have a claim." *Id.* The plaintiffs' suit thus involved purely "a type of institutional injury (the diminution of legislative power)." *Id.*

The Supreme Court found that that asserted injury was not cognizable. Among other things, the Court emphasized the absence of any "historical practice" supporting such a suit. *Raines*, 521 U.S. at 826. "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." *Id.* For example, despite their strong objections, "[s]ucceeding Presidents" never sued to challenge the Tenure of Office Act of 1867, which ultimately was repealed through legislative action, or to challenge similar successor

25

legislation, the validity of which has been adjudicated in private-party litigation. *Id.* at 827. Nor did Congress or any legislator "challenge[] the validity of President Coolidge's pocket veto" of an enacted bill, the legality of which was addressed in private litigation implicating the purported law. *Id.* at 828. The fact that past Presidents and Congresses never resorted to the courts to resolve such disputes underscored that the *Raines* plaintiffs' suit was not one "traditionally thought to be capable of resolution through the judicial process." *Id.* at 819 (quotation marks omitted).

*Raines* noted two other factors militating against the plaintiffs' standing. First, the Court "attach[ed] some importance to the fact that [the plaintiffs] have not been authorized to represent their respective Houses of Congress in this action." 521 U.S. at 829. The Court observed that Congress's powers are "not vested in any one individual, but in the aggregate of the members who compose the body," *id.* at 829 n.10 (quoting *United States v. Ballin*, 144 U.S. 1, 7 (1892)), and reaffirmed that "[g]enerally speaking, members of collegial bodies do not have standing to [take litigative actions] the body itself has declined

26

to take," *id.* (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986)).  Second, the Court highlighted that the plaintiffs had "adequate remed[ies]" through the legislative process that would entirely address their injuries, provided that they could persuade a majority of their colleagues to agree.  *Id.* at 829.

*    *    *

The Supreme Court has never retreated from *Raines*'s holding that suits by individual legislators asserting institutional injuries are not cognizable.  To the contrary, in *Virginia House of Delegates v. Bethune-Hill*, it reiterated that "individual members lack standing to assert the institutional interests of a legislature."  587 U.S. 658, 667 (2019).  In *Trump v. Mazars USA, LLP*, it cast substantial doubt on the justiciability of suits between the political branches more broadly, recognizing that "disputes over congressional demands" for information from the Executive Branch have traditionally "been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive."  591 U.S. 848, 859 (2020) (quotation marks omitted).  Finally, in *Texas v. United States*, it reiterated the importance of standing in enforcing the separation of powers,

underscoring that certain injuries (like "[m]onetary costs," which are "of course an injury" in most contexts) still might not be "legally and judicially cognizable" in the context of a "dispute" that "history and tradition" revealed was not "thought to be capable of resolution through the judicial process." 599 U.S. 670, 676 (2023) (quotation marks omitted).

**b.** Since *Raines,* this Court has repeatedly rejected lawsuits by legislators asserting injuries to official, institutional authority. In *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), four members of Congress claimed that, by issuing an allegedly unlawful executive order, "the President denied them their proper role in the legislative process and, consequently, diminished their power as Members of the Congress." *Id.* at 113. This Court recognized that *Raines* had abrogated much of its case law on legislative standing, which (before *Raines*) had sometimes allowed legislators "seek[ing] judicial relief from allegedly illegal executive actions" to establish standing based upon a claimed "impair[ment]" to "the exercise of their power as legislators." *Id.* at 114. Following *Raines*, the Court observed, the "separation of powers" concerns raised by legislator suits are properly considered

under Article III, *see id.* at 116, and those concerns generally foreclose legislator standing to litigate harms to the "legislative process," *id.* at 115. The Court further noted that the dispute was "fully susceptible to political resolution," given that Congress could "terminate" the executive order "were a sufficient number in each House so inclined." *Id.* at 116.

The following year, in *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), thirty-one members of Congress sought a declaratory judgment that air strikes in Yugoslavia were unlawful. *Id.* at 20. Those same members had previously defeated congressional "authorization" of the air strikes, and they contended that the President's decision to proceed absent authorization had effectively "nullified" their vote. *Id.* at 20, 22 (quotation marks omitted). Noting "the separation-of-powers problems inherent in legislative standing," the Court explained that under *Raines*, legislators did not "have standing whenever the government does something Congress voted against" or "anytime a President allegedly acts in excess of statutory authority." *Id.* at 21-22. It further noted that the legislators still had legislative remedies available to them if they could persuade their colleagues to act. *See id.* at 23 (noting

that Congress "could have passed a law forbidding the use of U.S. forces" or could have "cut off funds" via its appropriations authority).

Finally, in *Blumenthal*, 949 F.3d 14, this Court held that members of Congress could not challenge the President's receipt of purported emoluments. The district court had found that by receiving emoluments, the President denied the Members the "opportunity to give or withhold their consent … , thereby injuring them in their roles as members of Congress." *Id.* at 19 (quotation marks omitted). Rejecting that reasoning, this Court held that the members lacked standing because they "were not singled out" insofar as "their alleged injury is shared by the 320 members of the Congress who did not join the lawsuit," and because "their claim is based entirely on the loss of political power." *Id.*

**c.** There is only one time since *Raines* that this Court has permitted a claim by individual members of Congress asserting official capacity harms to proceed:  in *Maloney v. Murphy*, 984 F.3d 50 (D.C. Cir. 2020), a panel of this Court permitted a claim by individual members who did not receive documents they had requested pursuant to 5 U.S.C. § 2954, which directed the Executive Branch to provide

members of Congress certain information on request. Like the district court here, the panel reasoned that "informational injuries satisfy the injury-in-fact requirement," *Maloney*, 984 F.3d at 59, and that the asserted injury was personal because it is "inflicted only on those who asked for the information," *id.* at 65.

*Maloney* is neither binding nor persuasive. First, the statute at issue in *Maloney* was not an appropriations rider; it provides that the Executive Branch "shall submit" certain information upon request. 5 U.S.C. § 2954. Second, *Maloney* has been undermined by subsequent Supreme Court precedent, including *Texas*, 599 U.S. at 676, which as set out above underscores that injuries that are cognizable in some contexts may still not be cognizable where history and tradition counsel against judicial intervention. *See supra* pp. 27-28.

Third, and most importantly, the Supreme Court has vacated *Maloney*. In particular, after the government filed a certiorari petition explaining that the panel's decision was irreconcilable with *Raines*, *see* Petition for a Writ of Certiorari, *Carnahan v. Maloney*, No. 22-425 (U.S. Nov. 4, 2022), the Supreme Court granted certiorari, *Carnahan v. Maloney*, 143 S. Ct. 2456 (2023). Barely three weeks later, the plaintiff

members took what they acknowledged was "unilateral action" to "abandon their claim" by filing a notice of dismissal in district court pursuant to Rule 41(a)(1)(a)(i).  Response to Suggestion of Mootness 1, *Maloney*, No. 22-425 (June 20, 2023).  As a result, the Supreme Court vacated this Court's decision.  *See Maloney*, 143 S. Ct. 2653 (2023).  Under those circumstances, *Maloney* is not just exceedingly unpersuasive; it is a cautionary tale for what happens when a lower court so dramatically departs from Supreme Court precedent.[2]

### 2. Under Supreme Court And Circuit Precedent, The Members Lack Standing.

Under *Raines*, *Bethune-Hill*, *Chenoweth*, *Campbell*, and *Blumenthal,* the analysis is straightforward:  the Members cannot rest their standing on the deprivation of access to which they assert they are

---

[2] *Maloney* is illustrative of another pertinent point, which is that the government's position on legislative standing is the consistent position of the Executive Branch that has persisted across numerous administrations.  The *Maloney* litigation sought documents from the first Trump administration pertaining to the Trump International Hotel, *see Maloney*, 984 F.3d at 56-57, but although the first Trump administration litigated the case in district court and this Court, the Biden administration successfully sought certiorari from the Supreme Court.

entitled solely because they are members of Congress and that they claim to need solely because they are members of Congress.

a. As in *Raines*, each Member sues in his "capacity as an individual member of Congress," JA410-11,[3] alleging injury to a purely official right—here, the right "to conduct oversight," JA409. The Members assert no private-capacity right to inspect ICE facilities, and none exists. Indeed, Section 527 only applies where members seek access "for the purpose of conducting oversight," Pub. L. No. 118-47, § 527(a), 138 Stat. at 619. As the district court noted, the Members "stress the importance of unannounced visits to their duties as Members of Congress, including their duties in drafting and passing legislation, timely serving constituents impacted by the Administration's enforcement policies, and conducting oversight of

---

[3] Prior to amending the complaint, each Member expressly sued in his or her "official capacity as an individual member of Congress," JA27-29, which is precisely how the *Raines* plaintiffs purported to sue, *see* 521 U.S. at 821. Perhaps belatedly recognizing their unintentional admission that this case is governed by *Raines*, the Members omitted the word "official" in the amended complaint but still each purported to sue in his or her "capacity as an individual member of Congress." JA410-11. If there is a meaningful difference between suing in one's "official capacity as an individual member of Congress" and one's "capacity as an individual member of Congress," the Members have never explained it.

government operations."  JA106.  Any rights thus attach to the Members in their capacities as members of Congress, which is why they sued in that capacity.  JA410-11.

As *Raines* emphasized, the "key" element of Article III standing in a suit brought by legislators is that the "plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct." 521 U.S. at 818-19 (quotation marks omitted).  "[A] plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him," meaning that the injury "'affect[s] the plaintiff in a personal and individual way.'"  *Id.* at 819 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)); *see Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 39 (1976) (plaintiff must "stand to profit in some personal interest" in the suit).  But as in *Raines*, a lawsuit suggesting that all members of Congress are being treated in a way that will make it more difficult for them to do their jobs does not state a personal injury:  legislators cannot assert injuries "to official authority or power" and arising "solely because they are Members of Congress."  521 U.S. at 821, 826.

The Members' alleged injuries—the deprivation of information they consider relevant to legislative oversight—do not involve their private interests. As in *Raines*, the asserted injury arises "solely because they are Members of Congress." *Raines*, 521 U.S. at 821. As in *Raines*, moreover, the injury attaches to the Member's seat: "[i]f one of the Members were to retire tomorrow, he would no longer have a claim." *Id.* As in *Raines*, therefore, "injury to official authority or power" of an individual member of Congress cannot create standing. *Id.* at 826.

Nor have the Members been "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies." *Raines*, 521 U.S. at 821. To the contrary, the challenged policy applies to *any* member of Congress who seeks to visit an ICE facility. Thus, as in *Blumenthal*, the Members' alleged injury cannot be personal because it is shared by the entirety of Congress, including the many "members of the Congress who did not join the lawsuit." 949 F.3d at 19. Indeed, the Members have been clear about that point, stating that they sued "to restore oversight authority to all Members of Congress" and that the district court's ruling "reaffirms Congress's authority to investigate detention conditions." Congressman Joe Neguse, *Court Again Orders*

35

*Trump-Vance Administration to Restore Congressional Oversight of ICE Detention Facilities* (Mar. 2, 2026), https://perma.cc/Z89R-62TP.

Finally, it bears emphasis that the statute upon which the Members rely does not purport to vest them with personal rights, as by providing that ICE must immediately admit every member of Congress who seeks entrance to a detention facility. It is instead simply a restriction on the Executive Branch expending certain funds for certain purposes. Claims that the government has unlawfully expended funds, however, represent a pure form of generalized grievance: even a member of Congress has no "direct interest in having monies appropriated by the Congress used for no other purpose than those authorized by law." *Hansen v. National Comm'n on Observance of Int'l Women's Year*, 628 F.2d 533, 534 (9th Cir. 1980). This case is thus significantly easier than both *Raines* and *Maloney*: even if it were assumed that the Members could judicially enforce a statute purporting to grant them oversight rights, that *still* would not mean that they could sue over a statute regulating which funds can be used for which purposes.

36

**b.** The lack of standing is reinforced by "history and tradition," which "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quotation marks omitted). In *Raines*, the Court observed "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." 521 U.S. at 826. Similarly here, disputes about congressional demands for Executive Branch information traditionally have not ended up in court. "Instead, they have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 591 U.S. at 859.

Plaintiffs have identified no historical practice of judicial resolution of demands by legislators for information held by the Executive Branch. Indeed, whether before or after *Raines*, neither the Supreme Court nor this Court has ever compelled the Executive Branch to provide information to Congress or allow members of Congress to enter Executive Branch facilities.

That historical lacuna is not for lack of any such disputes between the Executive and Legislative Branches. Since the beginning of the Republic, the Branches have clashed about access to information. *See Mazars*, 591 U.S. at 859-62; H.R. Doc. No. 103-324, at 234 (1994) (explaining that "the executive has resisted House and Senate attempts to obtain information on numerous occasions"). But they traditionally have not resorted to litigation to resolve their disputes and have instead used the tools of political pressure, negotiation, and compromise. *See Mazars*, 591 U.S. at 861. There is no valid reason to depart from that tradition here.

**c.** Just as in *Raines*, Congress has not purported to authorize this lawsuit. *See* 521 U.S. at 829 (rejecting standing in part because the plaintiff members "ha[d] not been authorized to represent their respective Houses of Congress"); *Bethune-Hill*, 587 U.S. at 664 (noting that Virginia could have, but did not, "authorize[] the House to litigate on the State's behalf"). If interbranch litigation is ever cognizable—and the consistent position of the Executive Branch following *Raines* is that it is not—it requires at a minimum that Congress authorize the suit. Indeed, in finding litigation brought by the House Committee on the

Judiciary to be cognizable—a holding with which the Executive Branch respectfully maintains its disagreement—this Court took pains to observe that, "unlike the unauthorized individual legislators in *Raines*," the plaintiff committee there "was authorized by House Resolution 430 to bring the present lawsuit." *Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 776 (D.C. Cir. 2020) (en banc). Just like the members in *Raines*, however, the Members here have *not* obtained authorization to sue on the House's behalf. "[O]ccasions for constitutional confrontation between … two branches [of the federal government] should be avoided whenever possible," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389-90 (2004) (alteration and quotation marks omitted), and if interbranch lawsuits are ever cognizable, courts should at an absolute minimum insist upon congressional authorization. *See also, e.g.*, *Goldwater v. Carter*, 444 U.S. 996, 997 (1979) (Powell, J., concurring) (declining to "encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict").

**d.**     Finally, as in *Raines*, concluding that the Members lack standing does not "deprive[] Members of Congress of an adequate remedy."  521 U.S. at 829.  Members of Congress, unlike members of the public, have access to various "self-help" remedies uniquely available to legislators.  *Campbell*, 203 F.3d at 24; *see United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting) (noting that Congress has "available innumerable ways to compel executive action without a lawsuit"); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988) ("[T]he most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives.").  Among its many other powers, Congress could enact substantive legislation actually requiring on-demand admission to ICE facilities,[4] override vetoes, decline to enact legislation that the

---

[4] Indeed, Congressman Neguse is leading a push for legislation that, unlike the appropriations rider at issue here, would substantively require the Secretary of Homeland Security to "ensure that all Members of Congress are given unrestricted access, without advance notice, to all immigration detention facilities used or operated by the Department of Homeland Security."  H.R. 9070, 119th Cong., § 3(a)(1) (2026); *see also* Congressman Joe Neguse, *Rep. Neguse Leads Colorado House Democrats in Introducing Immigration and Customs Enforcement Reforms* (June 2, 2026), https://perma.cc/FZ3B-GPR2.

Executive Branch favors, or refuse to confirm the President's nominees. The availability of such political remedies reinforces the wisdom of Article III's "barrier against congressional legal challenges to executive action." *Campbell*, 203 F.3d at 21; *see id.* at 24 ("*Raines* explicitly rejected [the] argument that legislators should not be required to turn to politics instead of the courts for their remedy.").

To be sure, before these political tools may be employed, individual legislators may have to persuade a majority of their colleagues to act. But that is inherent in the constitutional design: if members of Congress "fail[] to prevail in their own Houses," they "c[an] not repair to the Judiciary to complain." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015).

e.   Even if plaintiffs had standing to enforce Section 527, that is not what this case is about now that the government has made clear its intentions to enforce and implement the policy exclusively with funds not subject to Section 527. Even if it were assumed that Section 527 somehow grants plaintiffs personal rights, the OBBBA and the Secure America Act unquestionably do not. The Members do not have *any*

41

interest—personalized or otherwise—in policing the boundaries of those statutes.

The sole remaining merits questions do not concern Section 527; they are instead whether *other* statutes provide funds that the government may lawfully use for the policy. Indeed, that is presumably why the district court acknowledged that plaintiffs would likely lack standing if "Defendants had established that every expenditure used to prevent Plaintiffs' entry into a given facility was funded by the OBBBA and not by appropriated funds." JA511. While the court believed that the government could not lawfully use OBBBA funds for at least some of the expenses it would incur to enforce the policy, JA526, that is a question about the legality of expenditures made under the OBBBA, not the use of funds subject to Section 527—a topic that the Members lack standing to litigate.

*     *     *

At bottom, although "[t]here would be nothing irrational about a system that granted standing" to individual legislators over interbranch disputes, "it is obviously not the regime that has obtained under our Constitution to date." *Raines*, 521 U.S. at 828.

### 3. The District Court's Contrary Holding Is Irreconcilable With *Raines.*

The district court's attempts to distinguish *Raines* and this Court's decisions applying it fundamentally misunderstand the doctrine.

**a.** The district court first held that the principal theories of injury advanced by the Members—"denial of physical access" to a building and "inability to gather in-person information"—would be cognizable if the Members were ordinary individuals. JA111-20. But the Members are not ordinary individuals: they have sued in their capacity as members of Congress, assert purported rights that they hold because they are members of Congress, and contend that they have been limited in their ability to do their jobs as members of Congress. *Raines* should therefore have been the "starting point" in assessing the Members' standing, *Blumenthal*, 949 F.3d at 19—not an afterthought.

In fact, *Raines* itself makes clear that if a legislator asserts an injury to a right that he holds in his capacity as a member of Congress, the claim might not be cognizable even if an analogous claim would be cognizable in the hands of a private party. *Raines* held that the "diminution of legislative power" would not support a claim by an

43

individual Member of Congress, 521 U.S. at 821, even though, as the *Raines* dissent observed, private parties do suffer an Article III injury when their right to vote is allegedly diluted, *id.* at 837 (Stevens, J., dissenting). Likewise, the legal question on which *Raines* refused to opine at the behest of members of Congress—the constitutionality of the Line Item Veto Act—was resolved the following year in a proper suit by private parties and a local government. *See Clinton v. City of New York*, 524 U.S. 417 (1998). Because Article III and the separation of powers constrain courts to those forms of controversy "that were the traditional concern of the courts at Westminster," *Vermont Agency*, 529 U.S. at 774 (quotation marks omitted), it is hardly surprising that a claim for relief in the hands of one plaintiff may not be justiciable even if a similar claim in the hands of another would be. *See also, e.g.*, *Texas*, 599 U.S. at 676 (even "[m]onetary costs" may not be cognizable where "history and tradition" counsel against judicial intervention (quotation marks omitted)). The district court's extended discussion of why private parties asserting vaguely analogous claims would have standing is irreconcilable with the analytical framework compelled by *Raines* and has nothing to do with the question that was actually before it.

44

**b.** When the district court eventually got around to applying *Raines*, it further erred. It first suggested that the Members' asserted injury was personal rather than institutional because Section 527 authorizes oversight by "individual Members of Congress and their designated staff members," such that the purported right to enter ICE facilities was "something they are entitled to 'as individuals,' rather than a right assigned to a committee or to Congress as a whole." JA129. The fact that an official power can be exercised individually, however, is obviously not sufficient to make it personal under *Raines*. After all, the canonical right that legislators exercise individually is the right to vote—the same right that was unsuccessfully asserted in *Raines*, *Chenoweth*, *Campbell*, and *Blumenthal*. Indeed, the *Raines* plaintiffs specifically told the Supreme Court that "[t]he vote is an individual right of the legislator, like his right to his seat in the legislature, or his congressional salary." *See* Brief for Appellees, *Raines*, 1997 WL 251423, at *28 (U.S. May 9, 1997) (citation omitted); *see also id.* at *24 ("Appellees' constitutional claim on the merits is that the Act deprives them of their right, as individual Members, to vote on every bill in the exact final form in which it becomes operative as law.").

45

That argument did not work in *Raines*, and it does not work here. Whether a member of Congress is voting or seeking entrance to an ICE facility, he does so "as trustee for his constituents, not as a prerogative of personal power." *Raines*, 521 U.S. at 821.

In concluding otherwise, the district court wrongly analogized this case to *Powell v. McCormack*, 395 U.S. 486 (1969), in which Congressman Adam Clayton Powell challenged his exclusion from the House. JA122-23, 131. In explaining why Congressman Powell had suffered the loss of a "private right," *Raines* underscored that he had been denied both his "salary" and his "seat[] as [a] Member[] of Congress." 521 U.S. at 821. In other words, (1) Congressman Powell had lost something unquestionably private (money in his pocket), and (2) to the extent his claim concerned his ability to be in Congress in the first place, he alleged that he had been "singled out for specially unfavorable treatment as opposed to other Members." *Id.*

Neither consideration applies here. The Members have not been denied a private entitlement akin to their salary: they are challenging an Executive Branch policy on the grounds that it impedes them from performing their congressional duties. Any rights they possess arise

46

because they are "Member[s] of Congress" seeking to enter ICE facilities "for the purpose of conducting oversight." Pub. L. No. 118-47, § 527(a), 138 Stat. at 619. Nor, unlike Congressman Powell, do the Members allege that they have they been "singled out" for uniquely unfavorable treatment. They are instead challenging a policy that applies to every member of Congress—which is another way of saying that they are complaining about the Executive Branch's treatment of Congress itself. That is the very definition of an institutional injury.

To conclude that the Members lack standing, this Court therefore need not hold that injuries bearing some relationship to a legislator's official status can *never* be personal and cognizable: *Powell* recognizes that a specific member's expulsion from the House may be cognizable, and *Raines* similarly acknowledged that if a member of a legislature were "singled out for specially unfavorable treatment as opposed to other Members," the injury might be cognizable. *Raines*, 521 U.S. at 821; *see also id.* at 824 n.7 (reserving hypothetical in which "first-term Members were not allowed to vote on appropriations bills" (quotation marks omitted)); *Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016) (similar). In a "singling out" case, the allegation is not that the

47

Executive Branch is mistreating all members of Congress, which is functionally identical to a claim that the Executive Branch has mistreated Congress. The claim is instead that specific members have been denied rights or privileges that all other members enjoy. Thus, whatever the precise limits of a theory premised on "singling out," that theory is irrelevant to this case because it is a challenge to an Executive Branch policy that applies to all 535 members of Congress.

*Powell* is distinguishable for yet another reason, which is that it was brought by a legislative branch plaintiff (Congressman Powell) against legislative branch officials (other members, the Speaker, the Clerk, the Sergeant at Arms, and the Doorkeeper). 395 U.S. at 493. It thus does not present the same separation-of-powers concerns as a lawsuit brought by a legislator against the Executive Branch.

Nor does it affect the analysis that only some members of Congress have sought to enter ICE facilities in a manner inconsistent with the ICE policy. *See* JA129 (suggesting that the Members had suffered individual injuries because only they "sought … to exercise the right of access granted under Section 527 and were denied"). Indeed, analogous arguments could have been made each time courts rejected

48

standing for legislators. In *Raines,* for example, only some members of Congress objected to the Line Item Veto Act; the bill had passed by large majorities in both houses, and only six members sufficiently objected to the statute to go to court. 521 U.S. at 814. In *Chenoweth,* only four members sued, and presumably many others supported the relevant executive order. 181 F.3d at 112, 116. In *Campbell,* only thirty-one members sued; half the House had voted in favor of the air strikes. 203 F.3d at 20. And in *Blumenthal*, even though only 215 members challenged the President's receipt of purported emoluments, this Court explained that the injury was "shared by the 320 members of the Congress who did not join the lawsuit." 949 F.3d at 16, 19. Precedent thus makes abundantly clear that the question is not whether only some legislators care about an issue, but whether those members have been "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies." *Raines*, 521 U.S. at 821. The Members here have not been.

**c.** The district court further suggested that "Congress can, and often does, delegate its oversight responsibilities to individual committees, which then may be the proper plaintiff in an Article III

lawsuit seeking to vindicate harms to that oversight power." JA130.

But even accepting that Congress can and did delegate oversight power

to individual members, an official power would remain official even

after being delegated. The members to whom Congress's official

oversight power was purportedly delegated would therefore remain

obligated to obtain authorization to sue under *Raines*, *Bethune-Hill*,

and *McGahn*, all of which make clear that legislators may not assert

institutional injuries absent, at a minimum, authorization from the

affected institution. *See supra* pp. 38-39. The court suggested that

authorization was not required because the injuries "are not

institutional but personal to Plaintiffs," JA133, but that circular

reasoning simply depends on the injury not having been institutional in

the first place—a proposition that is incorrect for all the reasons

discussed above.

The district court further questioned whether the limitations

imposed by Section 527 had anything to do with Congress's inherent

oversight power, noting that the Members were invoking rights under a

federal statute. *See* JA130. But as Judge Rao has explained, "Congress

cannot reallocate the Constitution's carefully separated powers by

enacting statutes that purport to give members an individual right to vindicate legislative power through the Article III courts." Order (May 8, 2026) at 4 (Rao, J., concurring). As she observed, an equivalent argument was rejected in *Raines*, which "concluded that members of Congress lacked standing to challenge the Line Item Veto Act, even though the Act specifically authorized lawsuits by members of Congress." Order 5 (Rao, J., concurring); *see also Maloney v. Carnahan,* 45 F.4th 215, 226 (D.C. Cir. 2022) (Rao, J., dissenting from denial of rehearing en banc) (rejecting the proposition that "a statute can constitutionally grant members of Congress a *personal* right, enforceable in federal court, to information from the Executive Branch").

**d.** The district court suggested that unlike in *Raines*, the asserted injury does not "'run[] … with the Member's seat'" because "the injury arises from the particular Member's request for access and subsequent denial by the Executive Branch." JA132 (alterations in original. Any possible rights that a Member has, however, only arise because of his seat in Congress. *See supra* pp. 33-34. Beyond that, the Members bring a facial challenge to the visitation policy, and on their

theory, a legislator need not actually be denied access to have standing, so long as he anticipated wanting to violate the policy. While it is certainly possible that a hypothetical successor member might not be interested in visiting ICE facilities, it was equally possible that a successor member might have supported every possible exercise of the Line Item Veto Act (*Raines*), supported the President's executive orders (*Chenoweth*), and had no objection to the President's business dealings (*Blumenthal*). The fundamental point is that the injury is based on the Members' status, exclusively concerns their official functions, and does not involve any suggestion that they have been treated differently from other members of Congress.

e. Finally, the district court reasoned that Congress had already "passed legislation guaranteeing … access to individual Members," JA135, such that there was now no possibility of political resolution. But Congress has obviously not exhausted its legislative options: the only thing it has done is restrict the way in which ICE could spend some (but not all) of the funds appropriated to it. Nor has Congress extended those restrictions to ICE since its last funds subject to the restriction lapsed in February. *See supra* p. 6. Congress retains

potent political tools, provided that a majority of Congress elects to wield them.

### B. The Members' APA Claims Are Precluded By The Anti-Deficiency Act, Which Comprehensively Governs The Remedies For Unlawful Executive Branch Expenditures.

Even if the Members had standing, their APA claims—which fundamentally reduce to an argument that the Executive Branch is using money for an unauthorized purpose—are precluded by statute. *See* 5 U.S.C. § 701(a)(1).

1. Congress may impliedly preclude some parties from seeking APA review by enacting a detailed scheme that provides for review only by other parties. For example, in *Block v. Community Nutrition Institute*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain orders. 467 U.S. 340, 346 (1984). In holding that the statute precluded consumers from challenging those orders under the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that

Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. As this Court has explained with respect to the Impoundment Control Act, "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" under the APA. *Global Health Council v. Trump*, 153 F.4th 1, 19 (D.C. Cir. 2025); *see also Department of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19, 19 (2025) (noting government's "showing that the Impoundment Control Act precludes [the] respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce [certain] appropriations").

In this case, the Anti-Deficiency Act precludes recourse to the APA. The Members' theory is that the Executive Branch is spending funds without authorization, but the Anti-Deficiency Act is the statute that addresses purportedly unauthorized expenditures by Executive Branch officials—including claims that an expenditure violated an appropriations rider. *See* U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law* 6-82 to 6-84 (2006).

The Anti-Deficiency Act provides that the Executive Branch may not "make or authorize an expenditure or obligation exceeding an

amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A). Where it is violated, the head of the agency must report the violation to the President, to Congress, and to the Comptroller General. *Id.* § 1351. Congress further authorized the Executive Branch to pursue administrative and criminal penalties against responsible officials. *Id.* §§ 1349-1350. Yet Congress never suggested that actions taken in violation of the Anti-Deficiency Act are void, nor has it authorized judicial orders barring the expenditure of funds or providing other prospective equitable relief. *See Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018) (Jackson, K.B., J.). Congress's view that the Anti-Deficiency Act is an adequate safeguard of its spending power forecloses the Members' reliance on the APA.

In this regard, it bears emphasis that Section 527 is simply a limitation on the Executive Branch spending certain funds in certain ways—precisely the subject comprehensively regulated by the Anti-Deficiency Act. Contrary to the district court's understanding, Section 527 does not grant members of Congress an affirmative right to enter ICE facilities. *See United States v. Vulte*, 233 U.S. 509, 514-15 (1914) (presumption that appropriations bills do not amend substantive law

"follows naturally from the nature of appropriation bills"); Order (May 8, 2026) at 4 n.2 (Rao, J., concurring) (explaining that Section 527 "provides that DHS may not spend appropriated funds to prevent members of Congress from entering detention facilities for oversight purposes" but "provides no affirmative authority for members to visit facilities"). And the OBBBA, of course, does not address access by the Members at all.

As the district court observed, JA99, a provision of an appropriations act may amend substantive law if "it does so clearly." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992); *see, e.g.*, *United States v. Will*, 449 U.S. 200, 222 (1980) (appropriations bill indicated that raises "shall not take effect" (quotation marks omitted)). But that principle does *not* mean that every funding provision automatically amends substantive law—which is why, for example, the government remained obligated to make payments under the Risk Corridor program even after Congress provided that "none of the funds made available" by the relevant act could be used to make them. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315-17 (2020) (alteration and quotation marks omitted).

Even if Section 527 were understood as creating oversight rights, and even if the OBBBA were not understood to limit them, Congress has considered the circumstances under which disputes about congressional demands for information may be resolved in court. If a party fails to comply with a subpoena, Congress may refer the matter to the Executive Branch for prosecution. *See* 2 U.S.C. §§ 192, 194. Congress has also purported to authorize the Senate to bring civil actions to enforce some subpoenas, though it has carved out most interbranch suits. *See id.* § 288d; 28 U.S.C. § 1365(b). These provisions would be superfluous if a member of Congress could file an APA action whenever he was dissatisfied with the Executive Branch's response to an oversight request. Given the provisions for enforcement of certain subpoenas and the mechanisms for enforcing appropriations, "the omission of [similar] provision[s]" for judicial enforcement of Section 527 is "sufficient reason to believe that Congress intended to foreclose" such actions. *Block*, 467 U.S. at 346-47.

**2.** The district court rejected this analysis, suggesting that *Block* "involved plaintiffs bringing claims under the very statute that precluded other avenues of judicial review." JA145. Put differently, the

theory seems to be that even if the Anti-Deficiency Act precludes APA review of claims alleging violations of the Anti-Deficiency Act, it cannot bar claims naming the appropriations acts themselves.  But the fundamental point is that the Anti-Deficiency Act is the statute that provides the consequences for unlawful expenditures by Executive Branch officials.  The Members cannot avoid the preclusive force of that statute by failing to name it as a basis for their APA claims.

That is particularly true because the Members' claim depends upon the existence of the Anti-Deficiency Act.  Absent that statute, there would be nothing improper in the Executive Branch using resources it had already purchased, or even incurring new obligations, so long as dollars did not actually leave the treasury:  as several of the plaintiff Members have explained, "until the Anti-Deficiency Act of 1870, there was no general prohibition on the government obligating funds—meaning committing to making a payment—in the absence of an appropriation."  Brief of Current and Former Members of Congress 11, *CFPB v. Community Fin. Servs. Ass'n*, No. 22-448 (U.S. May 15, 2023).  This case is an attempt to enforce the Anti-Deficiency Act, and the Members may not do so under the APA.

The district court also suggested that *Global Health Council* was distinguishable because the Impoundment Control Act permitted suits by a legislative branch official (the Comptroller General), whereas remedies are only available under the Anti-Deficiency Act where "enforcing officials in the Executive Branch have decided that a violation of the ADA exists." JA146. In other words, the court's reasoning was that because Congress did not authorize suits by members of the legislative branch, the court would authorize suits by members of the legislative branch. To state that logic is to refute it— Congress decided what mechanisms are necessary to protect its spending power, and it was not the court's job to revisit that judgment. In any event, to the extent that the court thought that the Impoundment Control Act's authorization of lawsuits by the Comptroller General is a meaningful distinction between that statute and the Anti-Deficiency Act, it erred because lawsuits by the Comptroller General against the Executive Branch are impermissible under Article III. *See Walker v. Cheney*, 230 F. Supp. 2d 51 (D.D.C. 2002).

## C. The Advance Notice Policy Is Lawful Because It Complies With All Applicable Funding Restrictions.

In all events, the advance-notice policy does not violate Section 527. That is true both because (1) the policy does not rely on funds subject to Section 527, which ICE no longer has, and (2) even if it did, Section 527 permits an advance notice requirement.

**1.** The January 2026 notice policy did not implicate Section 527. It was instead explicit: "ICE must ensure that this policy is implemented and enforced exclusively with money appropriated by the OBBBA." JA168. "To that end, any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding." JA168. The policy further directs the Department's Chief Financial Officer and General Counsel to "ensure appropriate funding for the promulgation of this policy, including use of OBBBA funding where appropriate." JA168. In district court, at a time when ICE still had funds subject to Section 527, the government specifically explained the process it would use to ensure that the policy would be enforced only with funds not subject to Section 527. JA169-72. And to further address any possible

60

issue concerning promulgation, Secretary Noem promulgated it anew on February 2, 2026, when the agency lacked funding under Section 527. JA496. But despite these steps—and even though the appropriations act extending Section 527 had lapsed at the time of its ruling—the court still stayed the policy.

The district court suggested that the Executive Branch would violate Section 527 if the notice policy were initially developed or enforced using any resources initially funded with Section 527 money, including items like "paper" and "office supplies." JA520. But Section 527 applies to preventing members of Congress from entering ICE facilities, not formulating policy. The government does not "prevent" anyone from doing anything by developing a policy and disseminating it within the Executive Branch. In any event, even assuming that the advance notice policy was initially promulgated using office supplies purchased with funds subject to Section 527, the policy contemplates— and federal appropriations law permits—retroactive adjustments between accounts. *See* U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law*, *supra,* at 7-9 (explaining that an "agency may initially charge common-use items to a single appropriation as long

61

as it makes the appropriate adjustments from other benefiting appropriations before or as of the end of the fiscal year" and that "[t]here is no rule or formula for this allocation apart from the general prescription that the agency must use a supportable methodology").  For the same reasons, there would be nothing improper in an ICE employee paid from funds subject to Section 527 enforcing an advance notice policy, provided that any applicable costs were later charged to the OBBBA.

The district court did not dispute that, as a general matter, the Executive Branch can make these sorts of retroactive adjustments.  *See* JA526 (declining to address "complex questions regarding the technical details of DHS budgeting and the application of appropriations law that the Court finds difficult").  Instead, the court reasoned that the agency was not permitted "to use OBBBA funds for at least some of the relevant expenditures here."  JA526.  In particular, the court believed that defendants could not use OBBBA funds for these purposes because relevant expenditures are also provided for elsewhere.  JA529.  But the purpose of the OBBBA was to provide funding "[i]n addition to amounts otherwise available."  Pub. L. No. 119-21, §§ 100051-100052, 139 Stat.

at 385-87.  And when Congress "makes an appropriation available in addition to other appropriations available for the same object," then "an agency may elect to use both appropriations for the particular expense." U.S. Gov't Accountability Off., *Department of the Treasury Office of Inspector General—Availability of Appropriations for Pandemic Emergency Rental Assistance Program Oversight and Recoupment* 7 (2026).  The court's narrow understanding of which expenses may be charged to the OBBBA was not correct.  In any case, the Members do not have standing to challenge the government's expenditure of funds under the OBBBA, which unquestionably does not create any personal rights for the plaintiff Members; even if the court were correct that the government could not lawfully use OBBBA funds, that would not mean that it *actually* used funds subject to Section 527.  It would at most just mean that the government violated the OBBBA.

**2.**     Even if Section 527 were relevant, the policy would be lawful.  The policy does not "prevent" members of Congress from entering ICE facilities; members who provide advance notice may be admitted.  JA153.  The policy instead regulates the terms on which

members may enter, just as ICE might require persons to pass through a magnetometer or surrender dangerous weapons.

Nor does the policy violate Section 527(b), which provides that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight," Pub. L. No. 118-47, § 527(b), 138 Stat. at 619, since the government is not suggesting that Section 527(b) is the statutory authority for the notice requirement. The Members evidently think that Congress meant Section 527(b) to prohibit an advance-notice requirement derived from any statute, but "[i]f Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent." *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004).

Finally, Section 527(c) provides that for congressional staff, ICE "may require that a request be made at least 24 hours in advance." Pub. L. No. 118-47, § 527(c), 138 Stat. at 619. That language is permissive rather than restrictive, so it is best understood as limiting subsection (b), which otherwise restricts the agency's ability to derive an advance-notice requirement from Section 527.

## II. The Remaining Equitable Factors Favor The Government.

Even if the Members were likely to succeed on the merits, a § 705 stay would still have been improper because the notice requirement does not cause the Members any cognizable harm, whereas the district court's order impedes the government's safe and effective management of detention facilities.

At the outset, any injury that the Members suffer in their capacity as members of Congress is not cognizable at all—either under Article III or as irreparable harm. Whatever practical interest in congressional oversight the Members may have, it is not an interest that supports judicial relief.

In contrast, the district court's order imposes serious harm on the Executive Branch, thereby harming the government and the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). Most concretely, the Secretary of Homeland Security determined, "following significant and sometimes violent incidents at ICE facilities," that "advance notice is necessary to ensure adequate protection for Members of Congress, congressional staff, detainees, and ICE employees alike" because

65

"[u]nannounced visits require pulling ICE officers away from their normal duties." JA167-68. An ICE declarant similarly explained that the policy is "critical to ensure the safety of ICE facilities for staff, detainees, and visitors." JA91; *see* JA92 (noting that some members of Congress have "refused to comply with facility visitation requirements, including limitations on recording devices," thereby "requir[ing] additional staff attention and resources"). When ICE has adequate warning in advance of these visits, it can ensure the staffing necessary to keep everyone safe.

The district court's order further harms the government and the public interest by interfering in a political dispute over which the court lacked jurisdiction. *See Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025) (government is irreparably injured by an "injunction[] that likely exceed[s] the authority conferred by the Judiciary Act"). Indeed, involving the federal courts in an interbranch political dispute would "risk damaging the public confidence that is vital to the functioning of the Judicial Branch" by "embroiling the federal courts in a power contest nearly at the height of its political tension." *Raines*, 521 U.S. at 833 (Souter, J., concurring in the judgment). "Congress and the

President—the two political branches established by the Constitution—have an ongoing relationship that the Framers intended to feature both rivalry and reciprocity," *Mazars*, 591 U.S. at 854, and "[p]lacing the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership does not do the system a favor," *Windsor*, 570 U.S. at 791 (Scalia, J., dissenting).  The Supreme Court granted certiorari the last time that this Court sought to intervene in a political dispute of this nature, *see supra* pp. 31-32, and this Court ought not repeat the error.

**CONCLUSION**

For the foregoing reasons, this Court should vacate the district court's order and remand with instructions to dismiss.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
 /s/ Steven A. Myers
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7232*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8648*
*Steven.A.Myers@usdoj.gov*

June 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,913 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers

**ADDENDUM**

# TABLE OF CONTENTS

Further Consolidated Continuing Appropriations Act, 2024,
Pub. L. No. 118-47 ........................................................................ A1

**Further Consolidated Continuing Appropriations Act, 2024, Pub. L. No. 118-47**

...

SEC. 527.

(a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:

(1) A Member of Congress.

(2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.

(b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

(c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

...