**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 26-5072**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Joe Neguse, in his capacity as a Member of the U.S. House of Representatives, *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. Immigration and Customs Enforcement *et al.*,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the District of Columbia
Case No. 25-cv-2463, Hon. Jia M. Cobb

# Response Brief of Plaintiffs-Appellees


Katherine M. Anthony
Elizabeth Haddix*

American Oversight
1030 15th Street NW, B255
Washington, D.C. 20005
(202) 897-3918
katherine.anthony@americanoversight.org

* *Application for admission pending*

Christine L. Coogle
Lisa Newman
Joshua M. Salzman
Paul R.Q. Wolfson
Brian D. Netter
Josephine T. Morse
Skye L. Perryman

Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 445-4939
ccoogle@democracyforward.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

### B. Rulings under Review

References to the rulings at issue appear in the Brief for Appellants. *See Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86 (D.D.C. 2026); JA497–541.

### C. Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Christine L. Coogle*
Christine L. Coogle

## TABLE OF CONTENTS


Introduction .......... 1

Statement of the Issues .......... 3

Pertinent Statutes and Regulations .......... 4

Statement of the Case .......... 4

A. Congressional Appropriations and Oversight .......... 4

1. The duty and authority of members of Congress to appropriate funds and conduct oversight .......... 4

2. The oversight rider at section 527 .......... 6

3. Plaintiffs' individual interests and engagement in DHS oversight .......... 10

B. DHS's Unlawful Policies and the District Court's Stay Decisions .......... 12

1. DHS's June 2025 notice policy .......... 12

2. The district court's stay of the June 2025 policy .......... 14

3. DHS's January 2026 notice policy .......... 15

4. The district court's stay of the January 2026 policy .......... 18

Summary of Argument .......... 20

Standard of Review .......... 23

Argument .......... 23

I. Plaintiffs Are Likely to Succeed on the Merits .......... 23

A. Plaintiffs have standing to assert their claims in their capacities as members of Congress .......... 23

1. Plaintiffs satisfy the requirements for Article III standing .......... 25

2. As this Court's cases confirm, DHS is wrong in asserting that *Raines* precludes virtually all suits by legislators .......... 31

3. Plaintiffs have standing under *Raines* and *McGahn* .......... 36

B. Plaintiffs' suit is proper under the APA ....................................48

C. DHS's oversight visit policy is contrary to law..........................53

1. A policy requiring notice is contrary to section 527 ...........54

2. DHS used funds subject to section 527 in promulgating and enforcing the policy ................................57

II. Plaintiffs Demonstrated Irreparable Harm, and the Remaining Factors Strongly Favor Affirmance ................................65

Conclusion ..........................................................................................66

Certificate of Compliance

Addendum

## TABLE OF AUTHORITIES

### Cases

*Animal Legal Def. Fund, Inc. v. Vilsack*,
111 F.4th 1219 (D.C. Cir. 2024) .......... 27, 28

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015) .......... 40

*Barenblatt v. United States*, 360 U.S. 109 (1959) .......... 5

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984). .......... 49, 50

*Blumenthal v. Trump*, 949 F.3d 14 (D.C. Cir. 2020) .......... 39, 40

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000) .......... 40

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) .......... 40

*Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc) .......... 20, 25, 27, 30, 32, 34, 35, 37, 38, 40, 41, 46, 47

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025). .......... 65

*Doe v. Blanche*, 172 F.4th 901 (D.C. Cir. 2026) .......... 23

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) .......... 6

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) .......... 26

*Env't Def. Ctr. v. Babbitt*, 73 F.3d 867 (9th Cir. 1995) .......... 29

*FEC v. Akins*, 524 U.S. 11, 21 (1998) .......... 26, 28

*Fertilizer Inst. v. EPA*, 935 F.2d 1303 (D.C. Cir. 1991) .......... 56

*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir 2025) .......... 52

*Greer v. Spock*, 424 U.S. 828 (1976) .......... 25

*Kerr v. Hickenlooper*, 824 F.3d 1207 (10th Cir. 2016) .......... 41

*Kimberlin v. DOJ*, 318 F.3d 228 (D.C. Cir. 2003) .......... 29, 50, 57

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)....................................49

*Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ....................................23

*Maloney v. Murphy*, 984 F.3d 50 (D.C. Cir. 2020).................35, 36, 41, 43

*McGrain v. Daugherty*, 273 U.S. 135 (1927)............................................6

*Moreno Gonzalez v. Noem*, 1:25-cv-13323, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025) ....................................................................11

*Powell v. McCormack*, 395 U.S. 486 (1969) ...........................................33

*Pulsifer v. United States*, 601 U.S. 124 (2024)......................................56

*Raines v. Byrd*, 521 U.S. 811 (1997).....20 32, 33, 34, 37, 39 41, 42, 43–47

*Rust v. Sullivan*, 500 U.S. 173 (1991) .......................................................5

*Spokeo, Inc., v. Robbins*, 578 U.S. 330 (2016).........................................31

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ............25, 44, 46

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ..................................45

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016)......................28

*United States v. Texas*, 599 U.S. 670 (2023) ......................................45, 46

*United States v. Will*, 449 U.S. 200 (1980)..............................................30

*Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019) ...........34, 39

**U.S. Constituion and Statutes**

31 U.S.C. § 1301(a)......................................................................................63

31 U.S.C. § 1341 .........................................................................................49

5 U.S.C. § 705 ..............................................................................................23

Pub. L. No. 116-6, div. A, tit. V, § 532, 133 Stat. 13 (Feb. 15, 2019) ....................................................................................7

Pub. L. No. 118-47, div. C, tit. V, § 527, 138 Stat. 460 (Mar. 23, 2024)..........................................................9, 10, 22, 27, 58

Pub. L. No. 119-21, tit. IX–X, 139 Stat. 72 (July 4, 2025) ......................16

Pub. L. No. 119-86, div. A, tit. V, § 546, 140 Stat. 773, 808 (Apr. 30, 2026) .......... 9

Pub. L. No. 119-98, 140 Stat. 837 ( June 10, 2026) .......... 19

U.S. Const. art. I, § 9 .......... 4

**Legislative Authorities**

14 Comp. Gen. 103, 103–04 (Aug. 8, 1934) .......... 64

Government Accountability Off. (GAO), B-336626 (Jan. 15, 2026) .......... 64

H. Comm. on Appropriations, Oversight Hearing—U.S. Immigration and Customs Enforcement (May 14, 2025), https://www.youtube.com/watch?v=TPY8dC4TpWI .......... 12

H. Comm. on Homeland Sec., Majority Staff Report, *ICE Detention Facilities: Failing to Meet Basic Standards of Care* (2020), https://perma.cc/W9TG-URSC .......... 8

H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties, *The Trump Administration's Mistreatment of Detained Immigrants* (2020), https://perma.cc/37NF-SFBS .......... 9

H.R. Rep. No. 116-163 (2019) .......... 7

**Other Authorities**

25 Op. O.L.C. 33 (2001) .......... 49, 50

33 Op. O.L.C. 221 (2009), https://perma.cc/GR5E-J5P3 .......... 58

41 Op. Att'y Gen. 230 (1955) .......... 5

45 Op. O.L.C. — (July 30, 2021) (slip op.), https://perma.cc/2EBU-5XPZ .......... 5

Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343 (1988) .......... 57

## GLOSSARY

| | |
|---|---|
| ADA | Antideficiency Act |
| APA | Administrative Procedure Act |
| DHS | Department of Homeland Security |
| ICA | Impoundment Control Act |
| ICE | Immigration and Customs Enforcement |
| OBBBA | One Big Beautiful Bill Act |

## INTRODUCTION

Since 2020, Congress has forbidden the Department of Homeland Security (DHS) from using its annually appropriated funds to deny members of Congress access to immigration detention facilities. Members, including plaintiffs, have availed themselves of this important oversight prerogative for years without incident. Yet in June 2025, DHS abruptly instituted an unlawful policy precluding members from exercising this right without at least seven days' notice and approval. This new policy was announced as immigration detention facilities across the country were overflowing and grave concerns emerged about the conditions at those facilities. Each plaintiff attempted to conduct oversight at an Immigration and Customs Enforcement (ICE) facility, and each was turned away based on DHS's new policy.

The district court stayed the June 2025 policy in December 2025. DHS did not seek appellate review; instead, in January 2026, DHS reinstituted the notice policy, reasoning that it could circumvent the limitation on its authority—which was enacted through an appropriations rider known as section 527—through an accounting

fiction. The district court rejected this attempted evasion and issued a stay of the reinstituted policy, from which defendants (collectively DHS) have appealed. This Court should affirm.

DHS devotes most of its brief to contesting plaintiffs' standing, but its argument relies on an overreading of *Raines v. Byrd* and a disregard for this Court's en banc decision in *Committee on the Judiciary of the U.S. House of Representatives v. McGahn*. Together, those cases stand for the proposition that members of Congress can bring suit if, but only if, they are asserting rights that they exercise individually, rather than seeking to vindicate prerogatives that belong to Congress as a whole. The necessary alignment is present here: section 527 secures for each plaintiff a right of access to immigration facilities for oversight purposes upon request, and each plaintiff sought and was denied the access and information to which they are entitled under law.

DHS is equally misguided in arguing that the Antideficiency Act (ADA) is the exclusive means for enforcing prohibitions on the use of appropriated funds and that plaintiffs therefore cannot seek enforcement of section 527 under the Administrative Procedure Act (APA). Congress did not give the executive branch exclusive control over

the decision whether a statutory restriction on executive authority should be judicially enforced.

On the merits, the January 2026 notice policy is contrary to law. A seven-day notice-and-approval requirement plainly "prevent[s]" members from entering facilities within the meaning of section 527. And the district court correctly found that DHS could not and did not promulgate or enforce the notice policy without using funds Congress prohibited from being used for that purpose. DHS did not dispute that factual conclusion as to promulgation and failed to rebut the factual evidence requiring that conclusion as to enforcement.

Finally, the district court did not abuse its discretion in weighing the equities. The plaintiff members have an urgent, ongoing need for firsthand information about rapidly deteriorating conditions in immigration detention, and the public interest lies in enforcing duly enacted law.

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have Article III standing to challenge DHS's policy requiring plaintiffs to provide seven days' notice of and obtain approval for any oversight visits to immigration detention facilities.

2. Whether Congress, through the ADA, intended to displace the APA and preclude anyone except the executive branch itself from enforcing section 527 and other substantive limitations on executive branch use of appropriated funds.

3. Whether the district court clearly erred in finding that the notice policy was promulgated and enforced using annually appropriated funds, and whether the court erred in concluding that the notice policy is contrary to section 527.

4. Whether the district court abused its discretion in concluding that the equities favored preliminary relief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Congressional Appropriations and Oversight

#### *1. The duty and authority of members of Congress to appropriate funds and conduct oversight*

"In our constitutional scheme, 'Congress's control over federal expenditures is absolute.'" JA98 (quoting *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012)); *see* U.S. Const. art. I, § 9, cl. 7.

"Congress'[s] power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use." *Rust v. Sullivan*, 500 U.S. 173, 195 n.4 (1991). Accordingly, "Congress frequently provides appropriated funds subject to conditions limiting how those funds may be used by the agency," which often serve as a direct constraint on agency action. JA500; *see also* 41 Op. Att'y Gen. 230, 233 (1955) ("Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted[.]").

Congress also has a power to investigate that is "as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). Members of Congress have the authority and duty to "conduct investigations in order to obtain facts pertinent to possible legislation and in order to evaluate the effectiveness of current laws." 45 Op. O.L.C. — (July 30, 2021) (slip op. 20), https://perma.cc/2EBU-5XPZ (quoting 9 Op. O.L.C. 60, 60 (1985)). "[B]ecause a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or

change," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up), the "power to secure needed information" is firmly grounded in Congress's duty and authority to exercise "all legislative powers" under Article I, *McGrain v. Daugherty*, 273 U.S. 135, 160–61 (1927).

Congress exercises its investigative duty and authority in various ways. Congressional committees request and, when necessary, compel documents and testimony, including from executive branch officials. *See, e.g.*, *id.* at 174. Individual members of Congress play distinct oversight roles, and the information necessary to a given member's oversight duties varies based on the concerns of their constituents, their committee memberships, and their issue areas of focus. *See, e.g.*, JA241 (Representative Garcia attributing his active engagement in DHS oversight to the facts that he is ranking member of the Oversight and Government Reform Committee and represents a district with a large immigrant population).

#### *2. The oversight rider at section 527*

In 2018, a humanitarian crisis unfolded at the southern border, in which "children and families [were] subjected to inhumane conditions,"

and "thousands of children [were] separated from family members." H.R. Rep. No. 116-163, at 17 (2019). Congress became concerned about "DHS'[s] poor management of this humanitarian crisis," *id.*, and individual members traveled to DHS facilities to witness that management firsthand. But members who attempted to conduct this oversight were often frustrated by agency obstruction of their attempts to timely assess on-the-ground conditions, and they were frequently denied entry to detention facilities. *E.g.*, JA202. Congress therefore acted to strengthen members' ability to conduct oversight of conditions at immigration detention facilities.

To ensure that members could assess true conditions without obstruction, Congress added a provision in the fiscal year 2019 appropriations act for DHS that codified individual members' right to exercise their oversight duties through in-person visits to DHS facilities where minors were detained. Pub. L. No. 116-6, div. A, tit. V, § 532, 133 Stat. 13, 42 (Feb. 15, 2019). That provision prohibited the use of appropriated funds to "prevent a Member of Congress from entering, for the purpose of conducting oversight," any DHS facility "used to detain or otherwise house" noncitizen minors. *Id.* Many members, including

several plaintiffs, subsequently conducted in-person oversight at DHS detention facilities. Congress soon recognized that the need for in-person oversight was not limited to facilities housing minors.

For example, in 2019, House staff visited eight ICE facilities and used the information obtained to prepare a report highlighting the failures of internal ICE oversight of immigration detention facilities. H. Comm. on Homeland Sec., Majority Staff Report, *ICE Detention Facilities: Failing to Meet Basic Standards of Care* 2–3 (2020), https://perma.cc/W9TG-URSC. The report emphasized concerns regarding detention conditions and observed that when staff provided advance notice of visits, ICE "used the advanced warning to improve the conditions within the facility," such as applying "fresh paint," conducting "major clean-up[s]," and "relocat[ing]" detainees "from solitary cells to the general population." *Id.* at 5, 8; JA216.

In the following months, bipartisan House Oversight Committee staff visited 22 DHS detention facilities and examined more than 60,000 documents, culminating in a report that identified "serious risks" in ICE detention "due to deficient sanitation practices and poor handling of infectious diseases"; "systemic health and safety issues at

immigration detention facilities operated by for-profit contractors"; and failures by ICE "to publicly release investigative reports on detainee deaths in custody." Staff of H. Comm. on Oversight & Reform and Subcomm. on Civil Rights & Civil Liberties, *The Trump Administration's Mistreatment of Detained Immigrants* 1–4 (2020), https://perma.cc/37NF-SFBS.

As a result, in fiscal year 2020 appropriations, Congress broadened the oversight provision. The expanded provision—referred to as section 527—has been carried forward with identical language in DHS appropriations every year since, including in the current fiscal year 2026 appropriations. *See* Pub. L. No. 119-86, div. A, tit. V, § 546, 140 Stat. 773, 808 (Apr. 30, 2026).

Thus, since fiscal year 2020, section 527 has provided that "[n]one of the funds appropriated or otherwise made available to [DHS]" in the annual appropriations act "may be used to prevent" "[a] Member of Congress" or her "designated" staff "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens." Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat. 460, 619 (Mar. 23, 2024) ("§ 527"). Emphasizing the

importance of obtaining accurate information, section 527(a) further prohibits the use of appropriated funds "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress . . . compared to what would be observed in the absence of such modification." And emphasizing the importance of obtaining timely information, section 527(b) states that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a [DHS] facility . . . for the purpose of conducting oversight." Finally, section 527(c) provides a limited prior-notice carveout regarding members' designated staff, as to whom DHS "may require that a request be made at least 24 hours in advance of an intent to enter a [DHS] facility."

#### *3. Plaintiffs' individual interests and engagement in DHS oversight*

As part of the Trump administration's campaign of mass deportation, DHS has stretched the immigration detention system far beyond its capacity and again created a humanitarian crisis in detention facilities. In 2025, the number of individuals detained by ICE exploded to an all-time high—and continued growing to even higher

numbers in 2026.[1] As the number of detained individuals has grown beyond the capacity of existing facilities, DHS has resorted to detaining individuals in buildings not designed to hold large numbers of individuals for extended periods of time, resulting in horrific conditions and abusive treatment. *See, e.g.*, *Moreno Gonzalez v. Noem*, No. 1:25-cv-13323, 2025 WL 3204602, at *1 (N.D. Ill. Nov. 17, 2025).

Plaintiffs here are members of the House of Representatives, each of whom has a particular interest in conducting oversight visits at DHS facilities. Some plaintiffs are leaders or members of committees with jurisdiction over DHS and ICE and over appropriations for those agencies. JA104. Several have significant interest in oversight over immigration detention conditions due to the presence of DHS detention facilities in or affecting the districts that they represent. *Id.*

The information that can be obtained only through in-person and immediate access is essential to plaintiffs' work in serving on committees of relevant jurisdiction; in serving constituents, many of whom are individually affected by DHS activities; and in drafting and

[1] "Detention FY26," *ICE Detention Data, FY2026* (last updated July 12, 2026), https://www.ice.gov/detain/detention-management, *archived at* https://perma.cc/99N8-2B9M.

proposing legislation on related topics, including DHS appropriations. This is particularly true where the facts on the ground in those facilities change rapidly. JA159–61, JA536. The importance of this oversight has only grown as DHS's immigration enforcement and detention operations have expanded nationwide. *See, e.g.*, JA536–37.

### B. DHS's Unlawful Policies and the District Court's Stay Decisions

#### *1. DHS's June 2025 notice policy*

During a May 2025 oversight hearing, then–Acting ICE Director Todd Lyons testified that DHS was "fully supportive" of congressional oversight visits and committed "to ensur[ing] that the oversight that is granted by law by this committee is abided by." *Oversight Hearing—U.S. Immigration and Customs Enforcement*, H. Comm. on Appropriations, at 15:23 (May 14, 2025), https://www.youtube.com/watch?v=TPY8dC4TpWI. A month later, however, ICE adopted a contrary stance on in-person congressional oversight.

In mid-June 2025, ICE indicated for the first time that it would restrict members' ability to conduct oversight visits at ICE field offices. ICE, *U.S. Immigration and Customs Enforcement Facility Visits and*

*Engagement Protocol for Members of Congress and Staff* (June 2025), *archived at* https://perma.cc/UL23-J4ZM. Shortly thereafter, DHS finalized a new policy that, in relevant part, imposed a new requirement that members provide at least seven days' advance notice, and receive approval for, any congressional oversight visit to an ICE detention facility. *See, e.g.*, *Office of Congressional Relations*, ICE, https://perma.cc/P6XD-4HNV (archived July 8, 2025).

This policy change "occurred during a period of heightened immigration enforcement," as DHS "turbocharged the arrest and deportation of" noncitizens. JA103 (cleaned up). In June and July 2025, each plaintiff traveled to an immigration detention facility for the purpose of conducting oversight, and DHS prevented each plaintiff from entering, citing the new policy. JA105; *see* JA185–86, JA208–09, JA218–19, JA236–37, JA244–45, JA252–54, JA273–75, JA282–86, JA301–04, JA312–15, JA332–34, JA343–45, JA358–60. Each plaintiff affirmed "their intent to continue to visit ICE facilities without prior notice," to obtain information critical to "their duties in drafting and passing legislation, timely serving constituents impacted by the Administration's enforcement policies, and conducting oversight of

government operations." JA106. And plaintiffs' declarations "emphasize[d] their concerns that the notice requirement provides ICE time to obscure the true conditions at a given facility, thereby diminishing the value of visits as a mechanism to determine how ICE is conducting detention operations." JA107.

#### *2. The district court's stay of the June 2025 policy*

Plaintiffs sued to challenge DHS's June 2025 notice policy and enforce their rights to conduct unannounced visits. Plaintiffs challenged the policy as contrary to law and in excess of DHS's authority under the APA. JA22–88.

In December 2025, the district court stayed the notice policy pursuant to 5 U.S.C. § 705. The court "satisfied itself of likely jurisdiction and rejected Defendants' threshold objections" to plaintiffs' claims, including that plaintiffs lacked both Article III standing and a cause of action under the APA. JA148. The court then concluded that "Plaintiffs are likely to succeed on their claim" that the "seven-day advance notice policy is [not] permissible under" section 527 and is not otherwise authorized by law. JA149–51. As the court explained, "the result of Section 527's provisions is that, upon request by a visiting

Member of Congress to conduct an oversight visit, a facility operated with or staffed using Section 527 funds must admit that Member." JA114. The court further found that plaintiffs had demonstrated irreparable harm and that the "public interest and the balance of equitable considerations weigh[ed] strongly in favor of granting Plaintiffs their requested relief." JA162.

DHS did not appeal the stay. In the ensuing weeks, plaintiffs conducted numerous in-person oversight visits to detention facilities, including visits without advance notice, and obtained valuable and time-sensitive information. JA504; *e.g.*, JA210–11, JA253–54, JA274–75, JA285–86, JA302–04. No safety or security concerns were raised during those visits.

### *3. DHS's January 2026 notice policy*

When section 527 was first enacted in 2020, annual appropriations were the only source of funding available to DHS and its components. That remained true until July 2025, when Congress passed the OBBBA, a reconciliation act providing lump-sum appropriations "[i]n addition" to the annual appropriations that serve as the principal source of funds for operating DHS and its components.

Pub. L. No. 119-21, §§ 90001–07, §§100051–52, 139 Stat. 72, 358–61, 385–89 (July 4, 2025). The OBBBA did not include a rider like that contained in section 527. But the funds it authorized are available only for specific, enumerated purposes, such as ICE "detention capacity," *id.* § 90003, hiring and training certain types of employees, *id.* § 100052, and "reimbursement" for certain "costs incurred" to "safeguard the borders," *id.* § 90007. The OBBBA did not provide funds for the general operations of DHS, including existing employee salaries and resources and the expenses of most offices, such as the DHS Office of the Secretary and Management Directorate and ICE Office of Congressional Relations, which are funded by DHS's annual appropriations and thus subject to section 527's restrictions.

On January 8, 2026, then–Secretary of Homeland Security Kristi Noem issued a memorandum to the director of ICE and chief financial officer of DHS, setting out a purported "new policy," "effective immediately," which imposed the same seven-day notice requirement stayed by the court weeks earlier. JA167. Secretary Noem's memorandum purported to sidestep section 527 by instructing ICE to "ensure that this policy is implemented and enforced exclusively with

money appropriated by the OBBBA." JA168. She directed that, going forward, "any time or resources spent conducting activities otherwise subject to Section 527's limitations must be appropriately logged and funded from OBBBA funding." *Id.* Although she stated that she "anticipate[d] that there is more than sufficient funding available" for the policy and directed the "Chief Financial Officer, in consultation with the General Counsel" to "ensure appropriate funding," the memorandum did not address whether OBBBA funding was available for those purposes or how DHS and ICE would carry out these directives. *Id.* Nor did the memorandum address the fact that the notice policy had already been promulgated and implemented using funds subject to section 527's restrictions.

The acting chief financial officer later submitted a declaration in the district court stating that "[f]rom an accounting perspective, [DHS] has determined that it is possible to track the costs incurred to issue and enforce the January 8 policy," but providing no details as to how that was feasible or how DHS would carry that out. JA171. She stated that DHS would "track the costs incurred enforcing the policy" "[g]oing forward" but made no mention of the costs incurred for the policy's

promulgation, dissemination, or enforcement up to January 13, 2026 (the date of her declaration). *Id.* She also did not address whether OBBBA funds were available for the relevant purposes—i.e., for all the "costs incurred" that DHS would purportedly "track." *Id.*

#### *4. The district court's stay of the January 2026 policy*

Plaintiffs promptly filed a supplemental complaint and moved for a temporary restraining order and section 705 stay of the January 2026 notice policy. The district court issued a temporary restraining order as to plaintiffs.[2] Following supplemental briefing and a hearing, the court again granted a section 705 stay. Relying in part on a declaration plaintiffs submitted by a former DHS and ICE budget and operations official, JA177–83—which DHS did not rebut—the court determined that "a wide variety of agency activities at DHS and ICE were necessary to promulgate this policy and are necessary to enforce it," and "that Section 527-restricted annual appropriated funds were likely employed to support those activities." JA521; *see* JA531 ("[E]xpenditures necessary to promulgate and enforce the notice

---

[2] That same day, February 2, Secretary Noem issued a memorandum purporting to be a "[r]atification" of the January notice policy. JA496.

policy—including actions taken by and resources used by DHS leadership and management staff—were highly likely to have been funded by Section 527-restricted appropriations."). The court thus concluded that the record established that DHS had used funds subject to section 527 to promulgate and implement the new policy and that DHS could not implement the policy without using such funds. JA531.

This appeal followed. DHS sought a stay pending appeal, which this Court denied. Order (May 8, 2026) (per curiam).

While the appeal was pending, Congress provided further reconciliation funding to DHS and its components in the Secure America Act on June 10, 2026. Pub. L. No. 119-98, 140 Stat. 837 (2026). The Secure American Act does not provide "OBBBA funding" that can be used to implement the January 2026 notice policy. JA168. And like the OBBBA, it provides funding for specific, enumerated purposes. DHS's baseline operations—including, for example, the Office of the Secretary and the Management Directorate—remain funded through the fiscal year 2026 annual appropriations act, which incorporates the section 527 restrictions. *See* Pub. L. No. 119-86, 140 Stat. 773.

## SUMMARY OF ARGUMENT

DHS unlawfully adopted a notice policy that prevents plaintiffs from exercising their individual rights to conduct timely oversight in immigration detention facilities. The district court correctly held that plaintiffs have standing and are likely to succeed on the merits of their claims challenging the notice policy.

**I.A.** Plaintiffs have Article III standing to challenge the notice policy in their capacities as individual members of Congress. DHS does not seriously dispute that plaintiffs' injuries—denial of physical access to detention facilities and of the information such access yields—are the kind of injuries federal courts routinely redress. But DHS overreads *Raines v. Byrd*, 521 U.S. 811 (1997), to suggest that individual members cannot assert injuries related to their official duties and privileges. As this Court explained in *Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc), *Raines* holds that individual members lack standing to assert the institutional interests of the legislature as a whole. But here there is no mismatch between plaintiffs and their injuries: section 527 entitles individual members to access detention facilities free of DHS

interference using appropriated funds, and each plaintiff sues to vindicate an individual, particularized injury—the denial of access to an immigration detention facility. Each of the considerations that drove the result in *Raines* points the opposite way here. Plaintiffs' injuries are concrete and particularized rather than wholly abstract and widely dispersed; history and tradition support suits by legislators to vindicate statutory rights to information; the absence of authorization from the full chamber is irrelevant because plaintiffs seek redress for their own injuries, not the institution's; and dismissal would leave plaintiffs with no adequate remedy, because a civil suit is the only practicable means of enforcing a provision of law that Congress has already enacted and repeatedly re-enacted.

**B.** Plaintiffs' suit is proper under the APA. The APA carries a strong presumption in favor of judicial review of agency action. The text and history of section 527, which Congress enacted and expanded precisely to stop DHS from obstructing oversight, refute any suggestion that Congress, through the Antideficiency Act, entrusted the executive branch with the exclusive authority to police its own violations. The ADA is only one of several means of enforcing appropriations

conditions, not an exclusive remedy. In practice, foreclosing APA review of violations of limitations on the use of appropriated funds would leave plaintiffs—and the public—without any means of enforcing these restrictions.

**C.** The notice policy is contrary to law. A seven-day notice-and-approval requirement plainly "prevent[s]" members from entering facilities within the meaning of section 527, as plaintiffs' declarations describing more than a dozen actual denials of entry confirm. The district court also correctly determined that the record demonstrated that "a wide variety of agency activities at DHS and ICE were necessary to promulgate this policy and are necessary to enforce it," and "that Section 527-restricted annual appropriated funds were likely employed to support those activities." JA521. DHS offered no evidence to counter the district court's factual determinations. And the agency's proposed back-end accounting fix—even if it were feasible—cannot remedy this ongoing violation: the violation occurred when restricted funds were "used," § 527(a), and many of the relevant costs of both promulgating and enforcing the policy were and are funded only by annual appropriations subject to section 527.

**II.** The district court did not abuse its discretion in holding that the equities favor relief. Plaintiffs have an urgent, ongoing need for firsthand information about rapidly changing conditions in immigration detention facilities, and the public interest lies in enforcing validly enacted law.

## STANDARD OF REVIEW

This Court reviews a district court's grant of a stay under 5 U.S.C. § 705 for abuse of discretion, its legal conclusions de novo, and its factual findings for clear error. *Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir. 2026); *see Make the Rd. New York v. Noem*, No. 25-5320, 2025 WL 3563313, at *9–11 (D.C. Cir. Nov. 22, 2025).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

#### A. Plaintiffs have standing to assert their claims in their capacities as members of Congress

Congress, in duly enacted federal law, authorized individual members to investigate conditions in immigration detention facilities. This assignment of oversight power to individual members was based on a determination by Congress that members need, and had previously been denied, timely and sufficient information to perform their DHS

oversight responsibilities. Congress therefore prohibited DHS from using appropriated funds to prevent members from gaining access to detention facilities for the purpose of conducting oversight. Under any reasonable reading of section 527, Congress gave members a right of access to detention facilities, without advance notice, and to real-time, in-person information about conditions in those facilities, without interference by DHS using appropriated funds. Plaintiffs seek to vindicate those rights and, in doing so, seek redress for injuries that federal courts routinely entertain: unlawful restrictions on physical access and denial of information to which plaintiffs are entitled.

DHS does not seriously contest that these injuries are of the type that have long been entertained and redressed by federal courts. DHS instead contends that members of Congress are uniquely disabled from asserting informational and other routine forms of injury if those injuries relate to the performance of official duties. This erroneous contention depends on an overreading of the Supreme Court's decision in *Raines* and is inconsistent with this Court's en banc ruling in *McGahn*, which DHS all but ignores. "[I]n exercising jurisdiction over the present lawsuit," the court "plays its appropriate constitutional

role." *See, e.g.*, *Committee on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 769 (D.C. Cir. 2020) (en banc).

### *1. Plaintiffs satisfy the requirements for Article III standing*

Plaintiffs readily satisfy the injury, traceability, and redressability elements of the traditional standing analysis. *See, e.g.*, *McGahn*, 968 F.3d at 763.

Plaintiffs suffer concrete and particularized injuries in the form of both physical access restrictions and denial of information. DHS's notice policy is a direct restriction on plaintiffs' physical access to covered facilities, pursuant to which agency personnel have literally barred plaintiffs from entering such facilities. That sort of restriction on physical access is a classic "tangible harm[]" that can constitute an injury in fact. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); JA115 (concluding "[w]ith little trouble" that "denial of access to a location to which Plaintiffs claim a right of entry upon request [is] a 'cognizable injury'"). Federal courts have traditionally exercised jurisdiction over suits by plaintiffs seeking to challenge restrictions on

access to federal land or facilities. *See, e.g.*, *Greer v. Spock*, 424 U.S. 828, 833–34 (1976).

In addition to the denial of physical access, plaintiffs are injured by the denial of information. A "plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). To demonstrate an "informational injury, the plaintiff must show that (1) it has been deprived of information that, on [the plaintiff's] interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (quotation marks omitted).

Plaintiffs easily meet this standard. First, the information that plaintiffs seek in immigration detention facilities is information to which they are entitled. The oversight rider ensures that each "Member of Congress" may "enter[], for the purpose of conducting oversight," any such DHS facility, without "provid[ing] prior notice of the intent to enter [such] facility," and to observe facility conditions without

"modification." § 527(a). As a result, DHS is "required to disclose" that information—the actual conditions of confinement at immigration detention facilities—upon request because they are prohibited from interfering with each plaintiff's access to the facilities where that information is learned. *McGahn*, 968 F.3d at 766.

Second, plaintiffs have suffered the consequences of DHS's denial of information pursuant to the notice policy. *See generally McGahn*, 968 F.3d at 766 ("[W]hen a person seeks to obtain information the government is required to disclose, the denial of the information is a concrete injury for standing purposes."). Namely, plaintiffs seek on-the-ground information regarding the conditions at immigration detention facilities. *See, e.g.*, JA282–85 (Representative Escobar sought to conduct oversight at El Paso ICE facility following reports of crowded and abusive conditions); JA330–34 (Representative Morrison sought to conduct oversight at Minneapolis-area ICE facility after receiving "numerous reports about unsafe, cruel, and unlawful conditions inside [the facility], including from constituents who have been detained there"). Plaintiffs "desire[] information with which [they] can make an informed [legislative] decision, and the 'information deficit' created by

[DHS's] policy 'hinder[s] [their] ability' to do so." *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1229 (D.C. Cir. 2024) (quoting *TransUnion*, 594 U.S. at 442). "That is the sort of 'downstream consequence[]'" of a denial of information "that can establish Article III standing." *Id.* (quoting *TransUnion*, 594 U.S. at 442); *see also, e.g.*, *Akins*, 524 U.S. at 21 (standing where voters alleged the information "would help them (and others to whom they would communicate it) to evaluate candidates for public office").

DHS briefly protests that plaintiffs have no legal entitlement to access or information because section 527 is a provision of appropriations law. DHS Br. 36. Even setting aside that this protestation conflates standing with the merits, *see* JA113, JA118, DHS "read[s] too much into Congress's use of an appropriations bar to implement its chosen policy and ignore[s] the practical implications of Section 527." JA113; *see* JA119. Congress routinely uses appropriation limitations to codify its chosen policies in federal law, and those limitations are enforceable by individuals whose interests they protect. *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1172–73 (9th Cir. 2016) ("When Congress has enacted a legislative restriction . . . that

expressly prohibits DOJ from spending funds on certain [prosecutorial] actions, federal criminal defendants may seek to enjoin the expenditure of those funds."). An "appropriations law denying funding for certain activities generally amounts to a substantive ban on those activities, regardless of the amount of funding involved." *Kimberlin v. DOJ*, 318 F.3d 228, 237 (D.C. Cir. 2003) (Tatel, J., concurring in part and dissenting in part). The "use of *any* government resources—whether salaries, employees, paper, or buildings"—to accomplish any task "entail[s] government expenditure," and "therefore would run afoul of [a] statutory moratorium on spending for" that activity. *Id.* at 232 (per curiam) (quoting *Env't Def. Ctr. v. Babbitt*, 73 F.3d 867, 871–72 (9th Cir. 1995)).

This conclusion follows from the bedrock principle that agencies "cannot make expenditures, and therefore cannot act, other than by appropriation." *Babbitt*, 73 F.3d at 872. When section 527 prohibits DHS and its components from using appropriated funds for "prevent[ing] any . . . Member of Congress" "from entering" an immigration detention facility, it restricts the ability of DHS to impede such entry and creates a corresponding right on the part of the

members not to face unlawful interference. Thus, assuming DHS uses resources funded by section 527 to facilitate the violation—as the Court must assume when considering standing—the rider's provisions impose enforceable obligations on the government as surely as any other statutory provision. JA118–19; *see generally, e.g.*, *United States v. Will*, 449 U.S. 200, 222 (1980) ("[T]here can be no doubt that [Congress] could accomplish its [legislative] purpose by an amendment to an appropriation bill, or otherwise." (quotation marks omitted)).

Plaintiffs are not seeking to vindicate a generalized "interest in having monies appropriated by the Congress used" lawfully, DHS Br. 36 (quotation marks omitted), any more than a FOIA plaintiff is seeking to vindicate a generalized interest in having an agency follow the law. They are seeking to vindicate their individual entitlements to physical access to and information within specific kinds of facilities under specific provisions of appropriations law. Accordingly, both the denial of physical access and denial of information are concrete injuries.

These injuries are also particularized because they are "specific to the plaintiff[s]" in this case. *McGahn*, 968 F.3d at 767. The right of access and to information that section 527 protects extends to

individual legislators directly, not to a congressional committee or chamber of Congress or Congress as a whole. And DHS's "actions in implementing the policies have . . . 'affect[ed]' each of 'the [p]laintiff[s] in a personal and individual way.'" JA115–16 (quoting *Spokeo, Inc.*, 578 U.S. at 339). Each plaintiff has previously individually requested, and has been denied, access to a DHS detention facility and on-the-ground information regarding the true conditions at that facility.

Finally, the denial of access and deprivation of the real-time, on-the-ground information to which plaintiffs are entitled is directly traceable to DHS's unlawful notice policies. Each such denial creates harm to the denied member redressable by Article III courts. JA116.

#### *2. As this Court's cases confirm, DHS is wrong in asserting that* **Raines** *precludes virtually all suits by legislators*

DHS pins its challenge to plaintiffs' standing almost exclusively on "the special considerations" set forth in the Supreme Court's *Raines* decision. On DHS's telling, *Raines* sounded the death knell of virtually all suits by individual legislators seeking to protect official prerogatives. But, as this Court has since confirmed, *Raines* said no such thing. While individual legislators cannot assert interests that belong to Congress as

a whole, when individual legislators or committees are entitled to and denied particular information, that “deprivation . . . is a concrete injury and because the plaintiff is the distinctly injured party, the injury is particularized” and thus cognizable. *McGahn*, 968 F.3d at 767–68.

In *Raines*, six individual members of Congress sued the director of the U.S. Office of Management and Budget to challenge the constitutionality of the Line Item Veto Act, which authorized the president to cancel spending provisions in enacted appropriations laws. *See* 521 U.S. 811, 814–15 (1997). The members claimed that the act “unconstitutionally expand[ed] the President’s power” by conferring the authority “to cancel and thus repeal provisions of federal law.” *Id.* at 816 (quotation marks omitted). They alleged that the act therefore injured them by “alter[ing] the legal and practical effect” of their legislative votes, by “divest[ing] [them] of their constitutional role in the repeal of legislation,” and by “alter[ing] the constitutional balance of powers between the Legislative and Executive Branches.” *Id.* (quotation marks omitted).

The Supreme Court held that the members lacked standing to bring the suit, principally because they alleged “no injury to themselves

as individuals" but rather asserted an "institutional injury" that was "wholly abstract and widely dispersed." *Id.* at 829. It explained that the "type of institutional injury" that the plaintiffs alleged—i.e., "the diminution of legislative power"—"necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821. The Court indicated that the outcome might have been different if the House or the Senate—to which the alleged institutional injuries belonged—had authorized the individual members to represent their respective chambers in the suit, but neither chamber had done so. *Id.* at 829.

The *Raines* Court contrasted those plaintiffs' widely dispersed institutional harm to the personal harm to the plaintiff in *Powell v. McCormack*, 395 U.S. 486 (1969). Representative Powell was "duly elected" to and yet excluded from a seat in the House and consequently denied his salary. *Id.* at 493. The Court distinguished that case in that the *Raines* plaintiffs, unlike Powell, claimed an injury that "necessarily damage[d] all Members . . . equally," and that they did not claim to "have been deprived of something to which they *personally* are entitled," such as their individual seats in Congress. *Raines*, 521 U.S. at 821.

Finally, the Court observed that its holding did not "deprive[] Members of Congress of an adequate remedy" for the asserted institutional injuries, as they could "repeal the [Line Item Veto] Act or exempt appropriations bills from its reach." *Id.* at 829. In other words, the plaintiffs, who had "simply lost [a] vote," *id.* at 824, improperly sought litigation as an alternative means of achieving their policy goals.

The Supreme Court has clarified in subsequent legislative-standing cases that *Raines* stands for the proposition that "individual members lack standing to assert the institutional interests of a legislature." *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019). In other words, *Raines* involved a "mismatch," *id.*, between the plaintiffs (individual members) and the asserted "institutional injury," *Raines*, 521 U.S. at 829.

This Court has reaffirmed that *Raines* stands only for this "narrow proposition." *McGahn*, 968 F.3d at 775. In *McGahn*, the en banc Court held that the House Committee on the Judiciary—pursuant to the House's delegation of subpoena authority and subsequent authorization to sue—had standing to seek judicial enforcement of a subpoena issued to the former White House counsel. *Id.* at 778. The

Court explained that the committee was "an institutional plaintiff asserting an institutional injury," and there was therefore no "mismatch" between the body seeking to litigate and the body assigned the relevant authority. *Id.* at 767 (quotation marks omitted). This critical alignment distinguished cases like *Raines* and *Bethune-Hill*, on which McGhan had relied.

More recently, in *Maloney v. Murphy*, a panel of this Court concluded that a group of individual legislators had standing based on a denial of information to which those legislators were entitled. 984 F.3d 50, 54 (D.C. Cir. 2020), *vacated and remanded sub nom. Carnahan v. Maloney*, 143 S. Ct. 2653 (2023). Eight members of the House Committee on Oversight and Reform had sued to enforce a federal law that "expressly authorizes seven or more members" of that committee "to request and to receive information from government agencies as relevant to the performance of their Committee duties." *Id.* at 54 (citing 5 U.S.C. § 2954). The Court explained that a "personal injury to a legislator, for Article III purposes, is not limited to injuries suffered in a purely private capacity, wholly divorced from their occupation." *Id.* at 62. Rather, a legislator's injury "is also 'personal' if it harms the legal

rights of the individual legislator, as distinct from injuries to the institution in which they work or to legislators as a body." *Id.* Concluding that "nothing in Article III erects a categorical bar against legislators suing to enforce statutorily created informational rights against federal agencies" and that the plaintiffs were the proper legislators to bring that suit, the Court determined that they had standing. *Id.* at 54. *Maloney* was later vacated as moot, but its careful analysis under *Raines* and *McGahn* is persuasive.[3]

#### 3. *Plaintiffs have standing under* **Raines** *and* **McGahn**

This suit falls within the category of cases in which legislators can judicially enforce their prerogatives. In *McGahn*, this Court explained

[3] DHS implies (at 31–32) that the *Maloney* plaintiffs dropped their suit merely to avoid Supreme Court review. In fact, the suit was dropped after the number of plaintiff members remaining in office dropped below seven—the threshold for maintaining a claim under section 2954. *See* Reply in Support of Cert. 2, *Carnahan v. Maloney*, No. 22-425 (U.S. filed Feb. 22, 2023) (describing this development as a fatal merits defect and as arguably mooting the case). This development, if anything, underscored that the denial of information challenged in *Maloney* was concrete and particularized because it injured the specific members who sought the information, and not their seats in Congress (or Congress as a whole). *See Maloney*, 984 F.3d at 66 ("[w]hile the *legal right* to request information under Section 2954 runs with Committee membership, the injury arises from the asking and its rebuff, not from the seat itself," and thus if one of the plaintiffs "were to leave the Committee, the injury sued upon would end with her service").

that *Raines* had turned on "four considerations": "(1) the individual plaintiffs alleged an institutional injury that was 'wholly abstract and widely dispersed'; (2) plaintiffs' 'attempt to litigate their dispute at this time was contrary to historical experience'; (3) the plaintiffs 'had not been authorized to represent their respective Houses of Congress, and indeed both Houses actively opposed their suit'; and (4) dismissing the lawsuit 'neither deprived Members of Congress of an adequate remedy, nor foreclosed the Act from constitutional challenge.'" *McGahn*, 968 F.3d at 775–76 (cleaned up) (quoting *Raines*, 521 U.S. at 829). *Raines* had been careful to cabin its holding, emphasizing that it "need not now decide" "[w]hether the case would be different if *any* of these circumstances were different." *Raines*, 521 U.S. at 829–30 (emphasis added). Here, *every one* of those circumstances is different; none counsels against plaintiffs' standing.

**a.** First, plaintiffs' informational and physical-access injuries are not "wholly abstract and widely dispersed," *Raines*, 521 U.S. at 829, but affect each plaintiff in a particularized way. Although plaintiffs' injuries are tied to their official responsibilities, the injuries impact each plaintiff individually, not the House or the Congress as a whole.

The harm is therefore "personal rather than institutional," and there is "no 'mismatch' between the party 'seeking to litigate' and the party . . . that has been harmed." JA126 (quoting *McGahn*, 968 F.3d at 767).

Start with the language of section 527: "[i]t provides access to ICE facilities for individual congresspeople or their designated staff members." JA126–27. Plaintiffs seek to exercise that individual prerogative in individualized ways. They seek physical access to different immigration detention facilities, and the information they seek within those facilities necessarily differs as well. *See, e.g.*, JA273 (Representative Crow describing denial of entry to ICE facility in Aurora, Colorado); JA282–84 (Representative Escobar describing denial of entry to ICE facility in El Paso, Texas); JA332–34 (Representative Morrison describing denial of entry to ICE facility in Fort Snelling, Minnesota).

An individual member's oversight activities and responsibilities are determined by particularized factors such as the member's committee membership and the location and constituent makeup of the member's district. Accordingly, some plaintiffs have conducted oversight at ICE detention facilities that are located in the districts they

represent; some have conducted oversight in response to constituent requests or reports; and others have conducted oversight to inform their legislative proposals and decisions on committees with jurisdiction over DHS and its components and their appropriations. JA104. Many other members do not share those responsibilities and oversight activities, and thus have not attempted to exercise their oversight prerogative under section 527 and likely would not have standing to bring this suit. *Cf. Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) (noting mismatch between plaintiffs and claimed injury because asserted injury to plaintiff members' voting power was "shared by the 320 members of the Congress who did not join the lawsuit"). Accordingly, plaintiffs' injuries are not "widely dispersed" and do not "belong[] to a committee or to the legislature as a whole." JA116, JA126.

"This is different from cases involving institutional injuries," where there existed a "clear mismatch between the plaintiff and the institution injured." JA127; *compare, e.g.*, *Raines*, 521 U.S. at 816 (rejecting standing for individual members asserting injury to Congress's "constitutional role" and "balance of powers"); *Bethune-Hill*, 587 U.S. at 671 (rejecting standing for one chamber of bicameral state

legislature asserting injury to interests in redistricting power that belonged to both chambers jointly); *Chenoweth v. Clinton*, 181 F.3d 112, 115 (D.C. Cir. 1999) (rejecting standing for individual members asserting dilution of their authority as legislators based on allegedly unlawful presidential initiative); *Campbell v. Clinton*, 203 F.3d 19, 22–23 (D.C. Cir. 2000) (rejecting standing for individual members similarly asserting diminishment of legislative authority based on president's alleged violation of War Powers Clause and War Powers Resolution); *and Blumenthal*, 949 F.3d at 17, 19 (rejecting standing for individual members asserting harm based on "loss of political power" resulting from president's "failure to seek and obtain congressional consent" to receipt of foreign emoluments), *with Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 799–800 (2015) (finding standing for state legislature alleging harm to its legislative "prerogative to initiate redistricting," which was thus "an institutional plaintiff asserting an institutional injury"); *and McGahn*, 968 F.3d at 767 (finding standing for House committee, on behalf of and authorized by the House, to seek judicial enforcement of a subpoena, asserting harm to both its own and the House's "informational and investigative

prerogatives”). Like the plaintiffs in *Arizona Independent Redistricting Commission* and *McGahn*, plaintiffs here are “the appropriate parties to bring suit and there is no ‘mismatch.’” JA126 (quoting *McGahn*, 968 F.3d at 767).

In disputing this conclusion, DHS confuses the reference in *Raines* to “personal” injury with a private injury. What matters under *Raines* is whether the injury affects plaintiffs’ *individual* entitlements (whether in a private or official capacity), rather than affecting a right that belongs only to the collective institution of which they are members. *E.g.*, 521 U.S. at 821, 830. A personal injury, as distinct from an institutional injury, “is not limited to [harm] suffered in a purely private capacity”; rather, in the context of legislator standing, a personal injury is one that “harms the legal rights of the individual legislator.” *Maloney*, 984 F.3d at 62; *see also Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016) (stating that, if individual legislators were barred from voting, those members “could claim a personal injury”).

The *Raines* Court acknowledged that, in *Powell*, the plaintiff had a sufficiently personal and particularized injury, arising “from rights he

was entitled to as a congressperson—in his case, entitlement to sit in Congress and exercise the authority that attached to that seat, as well as a salary." JA131. The Court stated that the "loss of a[] private right" by legislative plaintiffs "would make the injury more concrete," but it did not suggest that members of Congress cannot satisfy Article III based on other, more concrete injuries to rights that a member enjoys by virtue of her office, but which may be exercised by that member individually. 521 U.S. at 821.

DHS nonetheless insists that plaintiffs' individual injuries are institutional because, as in *Raines*, "[i]f one of the Members were to retire tomorrow, he would no longer have a claim." DHS Br. 35 (quoting 521 U.S. at 821). But DHS cuts the *Raines* quotation short, obscuring the critical point: the problem in *Raines* was not that "the injury attaches to the Member's seat," *id.*, but that the injury "*runs* . . . with the Member's seat," such that "[i]f one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his *successor* instead," *Raines*, 521 U.S. at 821 (emphases added). That is not the circumstance here: if one of the plaintiffs were to retire tomorrow, her successor would not possess her claim in this case.

Rather, her successor would have to establish their own individual oversight interest that was frustrated in order to have a cognizable claim. *Cf. Maloney*, 984 F.3d at 66 ("While the *legal right* to request information under Section 2954 runs with Committee membership, the injury arises from the asking and its rebuff, not from the seat itself.").

DHS objects that plaintiffs have not been "singled out for specially unfavorable treatment" relative to the other members. DHS Br. 35, 47–48 (quoting *Raines*, 521 U.S. at 821). But *Raines* in no way suggested that only a *targeted* legislator would have standing to vindicate a personal injury. Rather, the Court distinguished the plaintiffs before it, who claimed "a type of institutional injury . . . which necessarily damages all Members of Congress . . . equally," from Representative Powell, who was "singled out." 521 U.S. at 821. Here, plaintiffs' injuries are indeed particularized, for each has a right of access and information under section 527, and each individually sought to exercise and was denied that right. And although "any Member of Congress may have the ability to seek access under Section 527," they suffer an injury in fact only "when those rights have been stymied." *Id.* In that sense, plaintiffs' injuries are more analogous to being "singled out" from other members,

*Raines*, 521 U.S. at 821, than to holding a particular view of institutional power that is frustrated in the abstract.

DHS also insists that *Raines* cannot be distinguished because the Line Item Veto Act purported to authorize suits by members wishing to challenge that law. DHS Br. 51 (citing Order at 4 (May 8, 2026) (Rao, J., concurring)). But there is no broader lesson to be drawn from the fact that this authorizing provision failed to overcome the deficiency in the *Raines* plaintiff's standing. After all, a statutorily created right cannot confer standing in the absence of a traditional injury in fact. *See TransUnion*, 594 U.S. at 425–26. But as explained, *supra* at 25–31, plaintiffs here assert traditional cognizable injuries that they each experienced individually.

Under *Raines* and *McGahn*, plaintiffs are therefore the proper parties to seek redress for their informational and access injuries, which are not "wholly abstract and widely dispersed," *Raines*, 521 U.S. at 829, but personal and particularized to them individually.

**b.** Second, history and tradition support judicial review of plaintiffs' claims. "*Raines* itself acknowledged historical precedent for individual legislator suits that were premised on 'injur[ies] to

themselves as individuals.'" JA133 (quoting 521 U.S. at 829). And, as explained, this case involves the kinds of injuries—denials of access to facilities and to information—that federal courts have long redressed. This case "is not the kind of 'confrontation[] between'" the political branches "'brought on the basis of claimed injury to official authority or power' that *Raines* viewed as unsuitable for judicial intervention." *Id.* (quoting 521 U.S. at 826).

DHS claims support in *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020), and *United States v. Texas*, 599 U.S. 670 (2023), but neither alters the outcome. *Mazars* involved the unique and extreme separation-of-powers concerns presented by congressional demands for documents regarding the finances of the president and his family and businesses, and it did not speak to standing at all.

*Texas* is even further afield. There, the Court held that two states did not have standing to challenge DHS law-enforcement guidelines, where the states were not the direct object of DHS's exercise of authority; they were "neither prosecuted nor threatened with prosecution" under those guidelines." 599 U.S. at 673–74 (quotation marks omitted). The case did not involve legislative standing at all; it

merely relied on *Raines* for the axiom that a plaintiff's "injury must be legally and judicially cognizable." *Id.* at 676 (quoting *Raines*, 521 U.S. at 819).

Furthermore, *McGahn* rejected an argument that the plaintiffs would lack standing based solely on the executive's assertion that "federal courts have not historically entertained" similar suits, explaining that "the Court's discussion of history in *Raines* informed its conclusion that individual legislator plaintiffs lacked standing, but did not append to the three-pronged standing analysis an entirely distinct historical prong." 968 F.3d at 776. Instead, historical practice can inform a court's determination of whether an alleged injury is sufficiently concrete to constitute an injury in fact. *See TransUnion*, 594 U.S. at 424–25. As explained, this case involves the types of harms—denial of access and information—that courts have long held satisfy Article III.

**c.** Third, the lack of authorization to sue by the full chambers of Congress that was a consideration in *Raines* and *Bethune-Hill* is "not relevant" here. JA133. In *Raines*, members—and in *Bethune-Hill*, one chamber—sought to vindicate injuries to the entire legislature. And in

*McGahn*, the committee sued pursuant to the authorization of the full House to which the subpoena power belonged. 968 F.3d at 767. But here, where individual members seek judicial redress of harms to their individual interests, the broader institution has no direct role to play in the litigation. *Contra* DHS Br. 38–39.

**d.** Finally, dismissing this lawsuit would "deprive[]" plaintiffs "of an adequate remedy" and "foreclose[]" judicial challenges to the notice policy. JA133 (quoting *Raines*, 521 U.S. at 829). In *Raines*, this was not the case: Congress—which on the plaintiffs' theory was suffering institutional harm from the Line Item Veto Act—could "repeal the Act or exempt appropriations bills from its reach," and "someone who suffers judicially cognizable injury as a result of the Act" could bring a constitutional challenge. 521 U.S. at 829. But here, members desiring the oversight access that section 527 guarantees have already done what *Raines* said that those members *should* have done: secured passage of legislation—and they have done so repeatedly, in every DHS annual appropriations law since fiscal year 2020, including the current fiscal year. "[A] civil enforcement suit" by injured members "is the only

practicable way" to obtain relief from the challenged policy. *McGahn*, 968 F.3d at 776.

**e.** DHS makes a last-ditch effort (at 41) to oppose standing by mischaracterizing this suit as an attempt to enforce "the OBBBA and the Secure America Act," which do not include section 527 language and which, DHS argues, do not confer rights on plaintiffs. But DHS misstates plaintiffs' claims, which assert violations of section 527, not either of those other laws. And the district court decisively found that DHS *in fact* used funds subject to section 527 in both promulgating and implementing the notice policy—a finding that DHS failed to rebut. JA513; *see also* JA511; *infra* at 57–61. Section 527 is therefore the basis for both plaintiffs' standing and their merits arguments.

### B. Plaintiffs' suit is proper under the APA

DHS next argues that Congress has entrusted the executive branch with the exclusive mechanism for enforcing restrictions on the use of appropriated funds. On their telling, the ADA sweepingly precludes APA challenges to executive branch actions that violate appropriations statutes. The suggestion that Congress intended to

entrust the executive branch with exclusive authority to police its own misuse of funds does not withstand scrutiny.

"Congress rarely intends to prevent courts from enforcing its directives to federal agencies," and thus courts apply a "'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quotation marks omitted). That presumption in favor of APA review is overcome only "by specific language or specific legislative history that is a reliable indicator of congressional intent." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). This includes "when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct." *Mach Mining*, 575 U.S. at 486.

DHS cannot meet that burden here. Nothing in the ADA provides the requisite evidence that the APA is unavailable to challenge unlawful government action that contravenes appropriations laws. The ADA prevents the government from making or authorizing expenditures or obligations in excess of congressionally appropriated funds or for unauthorized purposes. *See* 31 U.S.C. § 1341; 25 Op. O.L.C. 33, 35 (2001). The ADA prescribes certain consequences for the

unauthorized expenditure of federal funds. But plaintiffs are not seeking to enforce the ADA or to require the imposition of the penalties that the ADA authorizes; they are seeking to set aside agency action (the notice policy) that is contrary to law (section 527), which is standard fare for an APA suit. And it is hardly unusual for unlawful conduct to violate, and be redressable by, multiple statutes. DHS does not meaningfully explain why the ADA's remedy should be considered exclusive.

Indeed, the executive branch has long recognized that the ADA is only "one of *several means* by which Congress has sought to enforce" its appropriations instructions. 25 Op. O.L.C. at 33 (emphasis added). Accordingly, the ADA posed no obstacle to other suits involving APA claims that agency actions were invalid because they were taken without a valid appropriation. *See, e.g.*, *Kimberlin*, 318 F.3d at 237 (APA claim that agency's action violated appropriations rider). Holding otherwise would "threaten [the] realization of the fundamental objectives" of appropriations provision and thwart enforcement of those objectives. *Block*, 467 U.S. at 352.

The consequence of DHS's position would be startling. The ADA is enforced exclusively by the executive branch itself. Accepting DHS's arguments would foreclose enforcement of any appropriations restriction by anyone outside of the executive branch—including private parties that Congress intended to protect. Congress routinely enacts its desired policy through appropriations riders, but if the enforceability of those riders depends on the willingness of the executive branch to abide by and enforce them, they would be rendered effectively precatory. Unsurprisingly, no court has adopted this contention.

This case is illustrative of the implausibility of DHS's position. DHS's obstruction of oversight of immigration detention facilities beginning in 2018 led Congress to pass, expand, and repeatedly re-enact section 527. It strains credulity to suggest that Congress would pass a law to prevent executive obstruction of congressional oversight and yet place the sole remedy for a violation of that law in the hands of the same executive.

DHS wrongly contends (at 58) that plaintiffs' claims "depend[] upon the existence of" the ADA. In fact, section 527 itself prohibits the "use[]" of appropriated "funds" for prohibited purposes and does not

refer to the ADA. Plaintiffs' claims depend only on the terms of section 527; the ADA bears no relevance to the merits at all. *See infra* at 54–65 (arguing that the notice policy is contrary to section 527).

DHS also reprises (at 55–56) its assertion that a law constraining DHS from blocking members' entry to detention facilities does not provide members with the obvious affirmative benefit of that prohibition. As explained above, a right to inspect is inherent in the prohibition on expending resources to prevent plaintiffs from conducting unannounced oversight. *See supra* at 38–30.

*Global Health Council v. Trump* is not to the contrary. There, this Court held that foreign aid grantees could not bring suit under the APA to enforce the Impoundment Control Act (ICA) because the ICA itself "preclude[d] such review." 153 F.4th 1, 7 (D.C. Cir. 2025). The Court expressly reserved the question of whether the ICA also precluded "contrary-to-law claims . . . based on" other "substantive provisions." *Id.* at 20 n.17. That situation is more analogous to the case here, because plaintiffs have not sued under the APA to enforce the ADA; they seek to enforce section 527. Finally, unlike the ADA, "the ICA created a complex scheme of notification of the Congress, congressional action on

a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations." *Id.* at 18.

Finally, DHS "venture[s] even further afield," JA146, in arguing (at 57) that this suit is precluded because other statutes authorize congressional committees to sue to enforce congressional subpoenas. (citing 2 U.S.C. § 288d; 28 U.S.C. § 1365(b)). Those statutes concern enforcement of requests for documents and testimony by committees, a method of congressional oversight that is distinct from on-the-ground visits by individual members to DHS facilities. They have nothing with "enforcing appropriations" limitations as DHS asserts (at 56). As the district court recognized, the "existence of statutory causes of action to vindicate Congress's general powers of inquiry are not sufficient to overcome the presumption that APA review is available in this case" "about the access to ICE facilities by individual Members of Congress under the terms of Section 527." JA146–47.

### C. DHS's oversight visit policy is contrary to law

The district court also correctly concluded that plaintiffs are likely to prevail on their claim that the notice policy violates section 527.

DHS's "seven-day notice requirement clearly functioned to 'prevent' a member from entering a facility" within the meaning of section 527. JA513. The oversight policy is thus unlawful insofar as DHS "used" any funds subject to section 527 in its promulgation or enforcement. The district court then determined that "a wide variety of agency activities at DHS and ICE were necessary to promulgate this policy and are necessary to enforce it," and "that Section 527-restricted annual appropriated funds were likely employed to support those activities." JA521. DHS offers no persuasive reason to disturb the district court's legal and factual determinations.

#### ***1. A policy requiring notice is contrary to section 527***

To start, a "seven-day notice requirement clearly function[s] to 'prevent' a member from entering a facility" within the meaning of section 527. JA513; JA148–51; *contra* DHS Br. 63. The notice requirement prevents entry because it "stops visiting Members of Congress from entering a facility unless they have provided [at least] seven days of advance notice." JA148–49. Plaintiffs' declarations described more than a dozen instances in which DHS, citing the policy, in fact prevented plaintiffs from entering DHS facilities. JA185–86,

JA208–09, JA218–19, JA236–37, JA244–45, JA252–54, JA273–75, JA282–86, JA301–04, JA312–15, JA332–34, JA343–45, JA358–60.

Any lingering doubt regarding the permissibility of a notice requirement is dispelled by section 527(b), which expressly provides that "[n]othing in this section may be construed to require a Member of Congress to provide prior notice of the intent" to conduct an oversight visit. This provision would serve no purpose if, as DHS contends, it merely invites DHS to search for statutory authority elsewhere to avoid the limitations in section 527. In any event, DHS identifies no such authority. Section 527(a) further prohibits the agency from "mak[ing] any temporary modification at any such facility that in any way alters what is observed by a visiting member of Congress," underscoring the importance Congress placed on members' timely access to ensure accurate observations at detention facilities.

Even further, section 527(c) provides that, with respect to congressional employees, DHS "may require that a request be made at least 24 hours in advance of an intent to enter a [DHS] facility." "To adopt Defendants' interpretation of Section 527 to allow a seven-day notice requirement would also render subsection (c)'s grant of license to

issue a one-day notice requirement to congressional employees superfluous, which counsels against the interpretation." JA149. "When a statutory construction" thus "render[s] an entire subparagraph meaningless, . . . the canon against surplusage applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 125 (2024).

Section 527's prohibition against an advance-notice requirement applies broadly—"not only to funds used in the enforcement of this policy, but also funds used in the creation and promulgation of the policy, which also counts as DHS 'prevent[ing]' Members' entry as is contemplated by Section 527." JA513. DHS submits (at 61) that an agency "does not 'prevent' anyone from doing anything by developing a policy and disseminating it within the [agency]." That contention is risible. "It is hard to fathom that promulgation of the very policy which is employed to deny Members' access to facilities would not be included in the scope of Section 527's prohibition." JA514; *see, e.g.*, *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("Ordinarily, when a regulation is not promulgated in compliance with the APA, the regulation cannot be afforded the force and effect of law." (quotation marks omitted)).

### *2. DHS used funds subject to section 527 in promulgating and enforcing the policy*

**a.** "[T]he principle which animates limitation riders and gives them their force" is that "'[t]he government cannot make expenditures, and therefore cannot act, other than by appropriation.'" JA515 (quoting *Babbitt*, 73 F.3d 867, 872) (citing 31 U.S.C. §§ 1341–42)). "[T]here is no de minimis exception to appropriation limitations." Kate Stith, *Congress's Power of the Purse*, 97 Yale L.J. 1343, 1362 (1988). Courts thus interpret appropriations riders to prohibit the "wide range of agency activities related to facilitating the prohibited purpose," as "[t]o do otherwise would be to deprive the riders of their effect in restraining government action." JA516; *see, e.g.*, *Kimberlin*, 318 F.3d at 230–32 (per curiam) (finding rider prohibiting "use[]" of funds for "use or possession" of electronic instruments in prisons prohibited "paying for costs incidental to such use or possession," including "those incurred for storage, supervision, and electricity").

Rigorous application is consistent with the language of section 527 itself, which is "no doubt far-reaching." JA518. The law's prohibition—"None of the funds appropriated or otherwise made available [DHS] by this Act may be used"—"is unambiguously phrased in mandatory

terms": "[n]one" means "none," § 527(a), and there is "no evidence that Congress intended the word 'may' to mean 'should.'" 33 Op. O.L.C. 221, 225 (2009), https://perma.cc/GR5E-J5P3. Focusing "on funds expended to facilitate the prohibited activity, even incidental expenditures," is likewise consistent with the term "use[]" in section 527, which "means '[t]o employ for the accomplishment of a purpose; to avail oneself of.'" JA518 (quoting *Use*, Black's Law Dictionary (12th ed. 2024)).

**b.** The district court concluded that the record demonstrated that DHS had contravened that prohibition both in promulgating and then in implementing that policy. First, the district court observed that "salaries, employees, paper, or buildings" were all "likely implicated" in "management-level 'review and decisionmaking'" for the policy. JA519 (quoting *Babbitt*, 73 F.3d at 871–72). Indeed, the secretary's "memorandum itself reflects that various DHS officials, including the Secretary and DHS budgeting and legal officials such as the DHS General Counsel and the Chief Financial Officer, were involved in the promulgation." *Id.* And the court credited plaintiffs' "persuasive[]" evidence, including "the declaration of a former high-level ICE and DHS budgeting and legal official, identify[ing] a variety of other offices whose

involvement was substantially likely to be involved," as well as "other associated costs," "such as 'information technology systems and contracts, office supplies, utilities, and building infrastructure.'" JA520 (quoting JA182). "[D]espite being those in the best position to know," DHS offered no evidence to dispute the court's findings "that such resources were likely employed by Defendants in promulgating the January 8 notice policy." JA519–20.

Second, as to enforcement, DHS "acknowledge[d] certain costs that can be attributable to the policy, including "time spent by ICE employees responding to requests" for oversight visits. JA520. DHS claimed that "it is possible to track the costs incurred to issue and enforce the January 8 policy," but it did not explain how, nor present "any evidence that they have in fact done so." *Id.* The district court observed one "obvious example in the record": the time, salaries, and "various resources" employed by employees in the ICE Office of Congressional Relations, which "is in charge of approving and coordinating visits to facilities." *Id.* The DHS secretary's office, "at a minimum," is also involved in enforcement, as the memorandum

requires that any exceptions "must be approved by [the secretary]." *Id.* (quoting JA168).

Finally, the record reflects that section 527–restricted funds (and not just OBBBA funds) were "used" in the promulgation and implementation of the policy. JA521. For example, "at the time the policy was issued," and still today, the salaries and expenses of the DHS Office of the Secretary and other likely involved DHS offices are "funded through DHS's annual appropriated funds" and therefore subject to section 527.[4] JA522. And the January memorandum was "directed to and contemplated the assistance of the [DHS] Chief Financial Officer," whose office is under the Management Directorate, which is "funded through a specific appropriation in the annual appropriations process," to which section 527 attaches. JA523 (citing 138 Stat. at 594). The court noted that these "uses of Section 527-restricted appropriated funds by DHS [are] sufficient to render the policy problematic" but observed

[4] For this reason, even if DHS were to issue a substantially similar policy purporting to rely on Secure America Act funds—which are not available for use under the terms of the January notice policy at issue—DHS could not avoid the use of section 527 funds in its promulgation and implementation, and that policy would therefore also be unlawful.

"that these issues appear to extend to ICE's use of funds as well." JA524.

Ignoring those DHS-specific factual findings, DHS notes that ICE is currently experiencing a lapse in annual appropriations. Even assuming this lapse exempts ICE from the restrictions of section 527, the lapse does not render the policy lawful. DHS's operations funded by annual appropriations are indisputably subject to section 527, including the Office of the Secretary and the Management Directorate, both of which (among others) were involved in the promulgation and implementation of the January notice policy—which DHS has not contested as a matter of fact.

**c.** Unable to counter these legal and factual determinations, DHS suggests (at 62) that, although it has used section 527 funds to promulgate and enforce the January notice policy, it can fix this legal violation on the back end, "no later than the end of the fiscal year." JA172. The district court rightly concluded based on the record evidence that this proposed after-the-fact fix is "unpersuasive" and legally "prohibit[ed]." JA521.

To start, section 527 was already violated when resources funded by annual appropriations were "used" in an impermissible way; DHS's *post hoc* accounting maneuvers do not change that conclusion. Section 527 is not an accounting exercise: the rider's language is intentionally broad to make unlawful specified actions—i.e., preventing members from conducting oversight visits—in the moment that those actions are taken. Further, DHS "ma[d]e no attempt to disprove the specific factual claims made by Plaintiffs' declarant" that it would be logistically difficult, if not impossible, for DHS to identify and segregate the relevant expenditures to ensure that only funds from the OBBBA were used to first promulgate and enforce the January 8 policy or will be used to enforce it going forward." JA401; *see* JA180–83 (declaration of former DHS budgeting official explaining how annually appropriated funds were unavoidably used in promulgating and implementing the January policy—evidence that DHS did not rebut).

"[E]ven assuming that [DHS] had the logistical ability to transfer the costs of promulgating and enforcing the notice requirement between annually appropriated funds and the OBBA appropriations," the notice policy could not be lawfully implemented using only OBBBA funds for

the additional reason that at least some the relevant costs are specifically funded by annual appropriations and fall outside the limited, enumerated functions "authorized for payment under the OBBBA appropriations." JA530; *see* 31 U.S.C. § 1301(a) (providing that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law"); JA527–30 (closely examining relevant purposes for which the reconciliation act and the annual appropriations law, respectively, provided DHS and ICE funds). Where the annual appropriations act provides specific funding for certain purposes—such as the DHS Management Directorate—that funding must be used only for those purposes.

DHS ignores these legal obstacles and states simply that "the purpose of the OBBBA was to provide funding '[i]n addition to amounts otherwise available.'" DHS Br. 62 (quoting Pub. L. No. 119-21, §§ 100051–52)). The OBBBA indeed provided funds for certain specific purposes "in addition" to the annual appropriations that fund DHS's general operations, which remain subject to section 527; it did not, however, provide funds as an *alternative* to the annual appropriations.

Rather, it provided supplemental funding that could be used for certain enumerated purposes that cover only a subset of DHS and ICE operations.

It follows that DHS's proposed back-end accounting maneuvers are unavailing. DHS relies (at 63) on a Government Accountability Office report stating that when Congress "makes an appropriation available in addition to other appropriations available for the same object," the agency may use both appropriations for the expense. GAO, B-336626, at 7 (Jan. 15, 2026), https://perma.cc/LN7S-364Z. But that report makes clear that such an agency choice is contingent on there being two different appropriations equally available for that expenditure. *Id.* Here, there are *no* appropriations available for many of the expenditures used to promulgate or enforce the notice policy. As explained, the OBBBA does not make funds available for all of the expenses necessary to the promulgation and implementation of the policy.[5]

[5] Even setting aside the unavailability of funds for these purposes, DHS's proposed solution would require it to "deliberately charge the wrong appropriation with the expectation of" a future "adjustment"—but that deliberate mischarge would "result[] in the rendition of false accounts." 14 Comp. Gen. 103, 103–04 (Aug. 8, 1934).

At bottom, in promulgating and implementing the notice policy, DHS acted contrary to section 527 and in excess of their authority. Under the APA, once a court makes that determination, the court must "vacate the unlawful agency action." *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 182 (D.C. Cir. 2025).

**d.** Finally, the February 2 memorandum does not alter this conclusion for several reasons, including that it was at most an express "[r]atification" of the January policy at issue, JA496, that "the Secretary's actions in allegedly repromulgating the policy were eventually funded by appropriations which ultimately included the Section 527 restriction," JA534, and that the memorandum never went into effect in any event, *see* JA496 (promising "further guidance regarding the effective date").

## II. Plaintiffs Demonstrated Irreparable Harm, and the Remaining Factors Strongly Favor Affirmance

The district court also correctly determined that "the public interest and the balance of equitable considerations weigh strongly in favor of granting plaintiffs limited preliminary relief." JA537. That holding properly reflects plaintiffs' urgent and ongoing need for

firsthand information about conditions in immigration detention facilities, which are subject to rapid changes. JA159–61.

DHS's cursory challenge to that holding is largely redundant with their other arguments. They reprise their assertions that plaintiffs lack a cognizable interest in this suit and that this case presents a political dispute outside the jurisdiction of the courts. DHS Br. 65–67. As explained above, these attacks on standing and justiciability are incorrect, *see supra* at 23–48, and should be no more availing when repackaged as appeals to the equities.

DHS also argues that the challenged policy is a necessary safety measure. But the appropriations rider has existed since 2020, and the district court correctly determined that DHS never submitted any record evidence substantiating a legitimate safety concern that would outweigh plaintiffs' need for and entitlement to access to immigration detention facilities. JA537. The equities weigh decisively in favor of upholding and enforcing validly enacted law.

## CONCLUSION

The Court should affirm the district court's order staying the January notice policy under 5 U.S.C. § 705.

July 24, 2026

Respectfully submitted,


/s/*Christine L. Coogle*
Christine L. Coogle
Lisa Newman
Joshua M. Salzman
Paul R.Q. Wolfson
Brian D. Netter
Josephine T. Morse
Skye L. Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 445-4939
ccoogle@democracyforward.org

Katherine M. Anthony
Elizabeth Haddix*
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, D.C. 20005
(202) 897-3918
katherine.anthony@americanoversight.org


*Counsel for plaintiffs-appellees*

* *Application for admission pending*

## CERTIFICATE OF COMPLIANCE

This response complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,550 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Cir. Rule 32(e)(1). This response complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

*/s/ Christine L. Coogle*
Christine L. Coogle

# ADDENDUM

## TABLE OF CONTENTS

Further Consolidated Continuing Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527, 138 Stat. 460, 619 (March 23, 2024) .......... A1

Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, tit. V, § 546, 140 Stat. 773, 808 (Apr. 30, 2026) .......... A2

**Further Consolidated Continuing Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 527, 138 Stat. 460, 619**

SEC. 527.

(a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:

(1) A Member of Congress.

(2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.

(b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

(c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).

**Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, div. A, tit. V, § 546, 140 Stat. 773, 808**

SEC. 546.

(a) None of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any of the following persons from entering, for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens, or to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress or such designated employee, compared to what would be observed in the absence of such modification:

(1) A Member of Congress.

(2) An employee of the United States House of Representatives or the United States Senate designated by such a Member for the purposes of this section.

(b) Nothing in this section may be construed to require a Member of Congress to provide prior notice of the intent to enter a facility described in subsection (a) for the purpose of conducting oversight.

(c) With respect to individuals described in subsection (a)(2), the Department of Homeland Security may require that a request be made at least 24 hours in advance of an intent to enter a facility described in subsection (a).